**No. 11-3853**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **) Appeal from the United States** |
| | **) District Court for the** |
| **Plaintiff-Appellee,** | **)  Northern District of Illinois,** |
| | **)** |
| **vs.** | **)** |
| | **)      No. 08 CR 888** |
| **ROD BLAGOJEVICH,** | **)** |
| | **) Honorable James B. Zagel** |
| **Defendant-Appellant.** | **) Judge Presiding.** |

---

### BRIEF AND SHORT APPENDIX FOR DEFENDANT-APPELLANT
### ROD BLAGOJEVICH

---

Leonard C. Goodman
Len Goodman Law Office LLC
53 West Jackson Blvd.
Suite 1650
Chicago, IL 60604
(312) 986-1984

Lauren Kaeseberg
158 W. Erie
Chicago, IL 60654
(773) 517-0622

*Attorneys for Defendant-Appellant Rod Blagojevich*

## DISCLOSURE STATEMENT

The undersigned, counsel of record for Defendant-Appellant, Rod Blagojevich, furnishes the following in compliance with Circuit Rule 26.1:

1.     Full name of every party represented: Rod Blagojevich.

2.     Names of all law firms whose partners or associates have appeared or are expected to appear for the party:

Sheldon Sorosky
Aaron Goldstein
Lauren Kaeseberg
Elliot Riebman
158 W. Erie
Chicago, IL 60654

Samuel Forbes Adam
Law Office of Samuel E. Adam
6133 South Ellis Avenue
Suite 200
Chicago, IL 60637

Allan A. Ackerman
Allan A. Ackerman, P.C.
2000 North Clifton Avenue
Chicago, IL 60614

Carolyn Pelling Gurland
Carolyn & Gurland Attorney at Law
2 North LaSalle St
17th Floor
Chicago, IL 60602

Giel Stein
Stein Law Group LLC
P. O. Box 11462
Chicago, IL 60611

Marc William Martin
Marc W. Martin, Ltd.
53 West Jackson Blvd.
Suite 1420
Chicago, IL 60604

Ed Genson
Genson and Gillespie
53 West Jackson Blvd.
Suite 1420
Chicago, IL 60604

Michael P. Gillespie
Genson and Gillespie
53 West Jackson Blvd.
Suite 1420
Chicago, IL 60604

Samuel E. Adam
Law Offices of Samuel E. Adam
6133 S. Ellis
Garden Suite
Chicago, IL 60637

Leonard C. Goodman
53 West Jackson Blvd.
Suite 1650
Chicago, IL 60604

     3.     The party is an individual not a corporation.

/s/ Leonard C. Goodman
Leonard C. Goodman
53 W. Jackson Blvd.
Suite 1650
Chicago, Illinois 60604
(312) 986-1984

Date: July 15, 2013

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.    THE EVIDENCE WAS INSUFFICIENT UNDER PROPER PRINCIPLES OF
      LAW TO PROVE ANY OF THE COUNTS OF CONVICTION. . . . . . . . . . . . 32

          Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

          A. The alleged scheme to trade the senate seat for a political appointment.32

          B. The alleged scheme to trade the senate seat to Jesse Jackson, Jr., in
          exchange for campaign contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

          C. The alleged attempt to extort campaign contributions from the President of
          Children's Memorial Hospital, Patrick Magoon. . . . . . . . . . . . . . . . . . . . . 39

          D. The alleged attempt to extort campaign contributions from horse racing
          executive John Johnston. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

II.   THE JURY WAS MISLED AS TO THE LAW FOR FRAUD, EXTORTION
      AND BRIBERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

          Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

          A. The court's instructions to the jury misstated the law. . . . . . . . . . . . . 46

                  1. There was no legal basis to instruct the jury that an arms' length
                  exchange of an official act for a public service job is a federal
                  crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

i

2. The jury instructions omitted the quid pro quo requirement that the government prove that Blagojevich's requests for campaign contributions were made in return for an "explicit promise or undertaking" to perform or not perform an official act. . . . . . . . . . 50

B. The government exploited the deficient instructions to mislead the jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

III.   THE LOWER COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING EVIDENCE OF THE DEFENDANT'S GOOD FAITH AND THEN MISSTATING THE GOOD FAITH DEFENSE IN ITS INSTRUCTIONS TO THE JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. Good faith is a defense to fraud, extortion and bribery. . . . . . . . . . . . 59

B. The lower court committed constitutional error in taking away Blagojevich's good faith defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

C. The court's revised "good faith" instruction to the jury misstated the law and sealed Blagojevich's fate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

D. The exclusion of the defendant's good faith defense and the erroneous instructions to the jury was not harmless error. . . . . . . . . . . . . . . . . . . . . 65

IV.   BLAGOJEVICH'S CONFRONTATION RIGHTS WERE INFRINGED WHEN THE LOWER COURT PREVENTED CROSS-EXAMINATION OF GOVERNMENT WITNESSES AS TO THEIR BIAS. . . . . . . . . . . . . . . . . . . . . 68

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

V.   THE LOWER COURT'S ONE-SIDED AND ERRONEOUS EVIDENTIARY RULINGS PREJUDICED THE DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . 74

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

A. The court erred in excluding nearly of all of the tape recordings offered by the defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

B. Erroneous exclusion of evidence which would have refuted the charge that Blagojevich intended to accept the illegal offer to appoint Jesse Jackson, Jr., to the Senate in exchange for campaign contributions. . . . . . . . . . . . . . . 80

C. Erroneous rulings relating to advice of counsel. . . . . . . . . . . . . . . . . . 80

D. The government was allowed to introduce irrelevant evidence to smear the defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

VI.    THE DEFENDANT'S FALSE STATEMENTS CONVICTION FROM HIS FIRST TRIAL MUST BE OVERTURNED. . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        A. The court erred in denying defendant's motion to dismiss where the alleged false statement was ambiguous; alternatively, Blagojevich's answer to the ambiguous question about whether he "tracked" campaign contributors was insufficient as a matter of law to support the conviction.. . . . . . . . . . . . . 84

        B. The Court abused its discretion in excluding evidence to provide the jury with necessary context to evaluate whether Blagojevich's statement was willfully and materially false. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

VII.   THE TRIAL COURT ERRED IN REFUSING TO STRIKE BIASED JUROR.. 87

VIII.  THE DEFENDANT'S 168-MONTH SENTENCE MUST BE VACATED WHERE THE LOWER COURT ERRONEOUSLY APPLIED THE GUIDELINES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

        Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

        A. The Court erred in including as loss the speculative evidence of an offer to raise $1,500,000 in exchange for the appointment of Jackson, Jr., to the Senate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

        B. The lower court erred in applying a four-level enhancement for leader/organizer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

# TABLE OF AUTHORITIES

## CASES

*Bronston v. United States*, 409 U.S. 352 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*California v. Green*, 399 U.S. 149 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 65

*California v. Trombetta*, 467 U.S. 479 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 65

*Cheek v. United States*, 498 U.S. 192 (1991). . . . . . . . . . . . . . . . . . . . . . . 60, 62-3, 67

*Citizens United v. FEC*, 558 U.S. 310 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Cooper v. United States*, 199 F.3d 898 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 36

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Evans v. United States*, 504 U.S. 255 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Gray v. Mississippi*, 481 U.S. 648 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Griffin v. Bell*, 694 F.3d 817 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Hamling v. United States*, 418 U.S. 87 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Hennon v. Cooper*, 109 F.3d 330 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Holmes v. South Carolina*, 547 U.S. 319 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*In re Davenport,* 147 F.3d 605 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Irvin v. Dowd*, 366 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Janky v. Batistatos*, 559 F. Supp. 2d 923 (N.D. Ind. 2008). . . . . . . . . . . . . . . . . . . . 39

*Mays v. Trump Indiana Inc.*, 255 F.3d 351 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . 38

iv

*McCormick v. United States*, 500 U.S. 257 (1991). . . . . . . . . . . . . . . . . . 37, 40, 50-1, 64

*Neder v. United States*, 527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Reynolds v. United States*, 98 U.S. 145 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Romanelli v. Suliene*, 615 F.3d 847 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . 59, 73, 84

*Sekhar v. United States*, No. 12–357, Slip op. (U.S. June 26, 2013). . . . . . . . . . . . . . . 47

*Skilling v. United States*, 130 S. Ct. 2896 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-6

*United States v. Alayeto,* 628 F.3d 917 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Allen*, 10 F.3d 405 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 41, 58, 87-8

*United States v. Aloi,* 511 F.2d 585 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Bailey*, 859 F.2d 1265 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Brantley*, 789 F.2d 1322 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Brodnicki*, 516 F.3d 570 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Ellis*, 622 F.3d 784 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Farinella,* 558 F.3d 695 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 32, 79

*United States v. Giles,* 246 F.3d 966 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Gladdish*, 536 F.3d 646 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Jacobs*, 431 F.2d 754 (2d Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Kelley*, 864 F.2d 569 (7th Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. LeDonne*, 21 F.3d 1418 (7th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . 60, 63

*United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Manske*, 186 F.3d 770 (7th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Martellano*, 675 F.2d 940 (7th Cir.1982). . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Martin*, 195 F.3d 961 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 49, 58

*United States v. Martin,* 618 F.3d 705 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Martin-Trigona*, 684 F.2d 485 (7th Cir. 1982). . . . . . . . . . . . . . . . . . 60

*United States v. Matthews*, 505 F.3d 698 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 46, 59

*United States v. McGregor*, 879 F. Supp. 2d 1308 (M.D. Ala. 2012) . . . . 36, 42, 51-3, 62

*United States v. Noel*, 581 F.3d 490 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Otto*, 850 F.2d 323 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Pree*, 408 F.3d 855 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Richards,* 2013 WL 2991897, *1 (7th Cir. 2013). . . . . . . . . . . . . . . . . 82

*United States v. Santos,* 201 F.3d 953 (7th Cir. 2000) . . . . . . . . . . . . . . . . 41, 71, 75, 77

*United States v. Sapoznik,* 161 F.3d 1117 (7th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Sheneman*, 682 F.3d 623 (7th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008).. . . . . . . . . . . . . . . . . . 34, 49, 62

*United States v. Stevenson*, 680 F.3d 854 (7th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Taylor*, 993 F.2d 382 (4th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007).. . . . . . . . . . . . . . . . 33, 34, 48

vi

*United States v. Toushin*, 899 F.2d 617 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Van Allen,* 524 F.3d 814 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Vitek Supply Corp.*, 144 F.3d 476 (7th Cir. 1998). . . . . . . . . . . . . . . . 89

*United States v. Walker*, 673 F.3d 649 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Warner,* 498 F.3d 666 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Womack*, 496 F.3d 791 (7th Cir. 2007. . . . . . . . . . . . . . . . . . . . . . . . . 88

## STATUTES AND OTHER AUTHORITY

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 86

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1866. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 33

18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1951. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 2B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.S.S.G. § 2C1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

U.S.S.G. § 3B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Fed. R. Evid. 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Fed. R. Evid. 803. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 77

Seventh Circuit Pattern Criminal Jury Instruction 6.10. . . . . . . . . . . . . . . . . . . . . 59, 63

## JURISDICTIONAL STATEMENT

This is a direct appeal from a criminal conviction in federal district court. The criminal prosecution was brought pursuant to Title 18 U.S.C. §§ 371, 666(a)(1), 1001(a)(2), 1341, 1343, 1346, 1951(a). The jurisdiction of the District Court was authorized pursuant to Title 18 U.S.C. §3231. The Court of Appeals for the Seventh Circuit has jurisdiction pursuant to Title 28 U.S.C. §1291. The Defendant was sentenced on December 7, 2011, in the United States District Court for the Northern District of Illinois Eastern Division. Notice of Appeal was timely filed by Defendant on December 20, 2011.

## ISSUES PRESENTED FOR REVIEW

(1) Whether the government's evidence was insufficient under proper principles of law to support any of the counts of conviction.

(2) Whether the jury was misinstructed as to the law fraud, extortion and bribery as they relate to political deal-making and solicitation of campaign contributions.

(3) Whether the lower court erred in excluding Blagojevich's defense that he had a good faith belief that his conduct comported with the law.

(4) Whether the lower court erred in impeachment of cooperating witnesses as to their bias to testify favorably for the government.

(5) Whether the lower court's one-sided evidentiary rulings deprived Blagojevich of a fair trial.

(6) Whether the defendant's false statements conviction should be overturned where it is based on an answer to an ambiguous question and taken out of context.

(7) Whether the lower court erred in failing to strike a biased juror.

(8) Whether the sentencing court abused its discretion by enhancing Blagojevich's guideline offense level based on vague and speculative evidence of an illegal offer to raise campaign funds which was never accepted or even entertained.

-1-

## STATEMENT OF THE CASE

Rod Blagojevich was convicted by a jury of fourteen counts of wire fraud, six counts of conspiracy and attempted extortion, one count of attempted bribery, and one count of making false statements. The district court sentenced Blagojevich to 168 months incarceration and ordered him to pay a $20,000 fine. Blagojevich now appeals his conviction and sentence.

## STATEMENT OF FACTS

### A.     Introduction.

Rod Blagojevich was elected governor of Illinois in 2002 and reelected in 2006 to a second four-year term. Tr. 1252.[1] He had previously served six years in the U.S. House representing Illinois' 5th Congressional District, and before that four years in Springfield as a State Representative. Tr. 3636-39.

FBI Agent Dan Cain testified that the government began investigating Blagojevich in December, 2003, during his first term as governor. Tr. 1257. The government's investigation of Blagojevich got a boost in October, 2008, when it entered into a cooperation agreement with John Wyma, a high-paid lobbyist and former chief of staff and campaign manager for Blagojevich. Tr. 1228, 2142, 2835. The government had previously initiated a grand jury investigation into Wyma's lobbying activities and served Wyma with "a general subpoena into clients in [his] business, healthcare companies, hospitals." Tr. 2374. In

---

[1] In this brief, "Tr-I" refers to the transcript of the first trial, "Tr." refers to the transcript of the retrial; "[date] Tr." refers to other transcripts; "R." refers to the record on appeal.

particular, the grand jury investigation was focused on Wyma's lobbying for a client named Provena, which operated a group of hospitals, and his association with Tony Rezko and Stuart Levine. Tr. 2448-60. Although the Wyma investigation was unrelated to Blagojevich, once Wyma agreed to cooperate against the Governor, the other investigation was dropped and Wyma was given immunity from prosecution. Tr. 2335, 2454.

Agent Cain testified, over objection, that Wyma told the FBI "that Mr. Blagojevich was involved in corrupt activities involving campaign fundraising." Tr. 1228. Based on this information, the government obtained court-ordered wiretaps on at least eight phone lines, including the Governor's home phone, his campaign office, and the phones of his close advisors including his brother Robert, his Chief of Staff John Harris, and his former Chief of Staff turned lobbyist Lon Monk. The government also installed a microphone in the Governor's campaign office in Chicago. Tr. 1238-43. Most of these wiretaps were in place for more than 40 days, ending on the day of Blagojevich's arrest. Tr. 1243-57.

On the morning of December 9, 2008, Blagojevich was arrested and subsequently charged by multi-count indictment with solicitation of a bribe, attempted extortion, wire fraud and conspiracy. R. 37; Tr. 1243. All charges, as the government explained at trial, involved his alleged attempts "to get a benefit for himself in exchange for an official act." Tr. 5266. All of these alleged "benefits" were either campaign contributions or political appointments to jobs where he could, as ex-governor, promote the expansion of health care. There was no evidence or allegation that Blagojevich ever took a penny out of his campaign fund for personal use or ever sought or accepted cash or gifts from any person who had

business with the State.[2]  Blagojevich's jury was repeatedly told, by both the court and government, that campaign contributions and any job that earns a salary are legally indistinguishable from cash bribes.  Tr. 5264, 5266, 5278, 5286, 5340, 5347, 5537-51.  The fact that Blagojevich honestly believed that his conduct comported with the laws relating to political corruption was deemed irrelevant and excluded from the jury's consideration.  Tr. 4181-84.

The case against Blagojevich was built primarily on his recorded conversations with his close advisors between late October and early December 2008, bolstered by the testimony of those advisors and associates who cooperated with the government.  During the relevant time period, fall-winter 2008, Blagojevich was struggling through his second term as governor.  His legislative initiatives were being blocked in the Illinois General Assembly which had begun to publicly discuss impeachment of the Governor.  The media was reporting a "federal investigation into his campaign and into his administration." Tr. 1290, 1656.  Two of the Governor's chief fundraisers, Chris Kelly and Tony Rezko, were under federal indictment.  Tr. 1291, 2725.  As his former Chief of Staff and cooperating witness John Harris explained, these circumstances caused "a noticeable decline in the amount of monies that he was raising" for his campaign.  Tr. 1290.

Also, in the fall of 2008, Illinois lawmakers passed an ethics bill which, beginning January 1, 2009, would prohibit contractors or others doing business with the State from

---

[2] In fact, Blagojevich overpaid his federal taxes for all six years he was governor.  Tr-I 3680-84.  This evidence was excluded from the retrial.  Tr. 2009.

contributing to the Governor.  Tr. 1292, 2575.  Prior to January 1, 2009, it was lawful and common practice in Illinois for governors to ask for contributions from contractors or firms doing business with the State.  Tr. 3716.  Harris explained that Blagojevich opposed the ethics bill which would harm him politically.  Tr. 1294.  However, the court excluded Blagojevich's reason for opposing the ethics bill, which was that its fundraising restrictions applied *only* to the executive branch and not to legislators or party leaders.  Blagojevich in fact supported a broader ethics bill.  Tr. 1658-63, 3706-07.

## B.    The Indictment and First Trial.

Blagojevich was charged in a twenty-four count second superseding indictment which included allegations of conspiracy, bribery, false statements, wire fraud, extortion, and RICO.  R. 231.  He was tried by jury and convicted of Count 24, making a false statement -- that he "does not track, or know, or want to know, who contributes to him or how much they contribute" -- during a March 16, 2005 interview with the FBI.  R. 231.  The government's evidence rested primarily on the testimony of FBI Agent Patrick Murphy who testified that Blagojevich made the statement and that it was material to the FBI.  Tr-I 3908, 3911.  Other witnesses testified that Blagojevich participated in fundraising meetings and appeared to have knowledge about contributors.  Tr-I 735, 858-60, 1166-68, 3949, 3952-53, 3955-56, 3966-69, 3993, 3998-99, 4001, 4003, 1041-42, 4045.

The jury failed to reach a verdict on the remaining counts (1-23) and a mistrial was declared.  Prior to retrial, the government dismissed the RICO counts.  R. 625.

-5-

**C.    The Retrial.**

In April 2011, the government retried Blagojevich on a streamlined 20-count indictment charging six separate crimes, plus the false statements charge.  R. 892.  The evidence supporting each of these alleged crimes will be discussed in separate sections.

### 1.    The alleged attempt to extort campaign fundraising from Rahm Emanuel.

Count 11 of the indictment alleged that during 2005-06, Blagojevich held up the funding of a State grant benefitting the Chicago Academy School in order to pressure then-Congressman Rahm Emanuel to hold a fundraiser for the Governor at the Hollywood home of Emanuel's brother.  Because the jury failed to reach a verdict on this count which was subsequently dismissed, it will be discussed only briefly.

In the fall of 2005, the Governor approved a $2 million grant to build an athletic field for the Chicago Academy School on the north side of Chicago in the Congressional district of Rahm Emanuel.  Tr. 3068.  Witnesses testified that the funding for the grant was unusually slow in coming and that Blagojevich made comments suggesting that he was delaying the funding to pressure Emanuel to raise funds for his campaign.  Tr. 2702, 3120.  In the end, the school received its funding and the field was completed on schedule even though Emanuel never agreed to help Blagojevich fundraise.  Tr. 2350, 3084, 3091-3104.

### 2.    The alleged scheme to trade the Senate seat for a political appointment.

Counts 2-8 and 18-20 allege that Blagojevich conspired to commit fraud and extortion by attempting to trade the appointment of a U.S. Senator for either an appointed position in the Obama Administration or a leadership position with a foundation.

The evidence established that after Barack Obama was elected president on November 4, 2008, Blagojevich had the responsibility to appoint Obama's successor in the Senate. Tr. 1305. Initially, in the summer of 2008, Blagojevich's leading candidates for the seat were himself and Illinois Senate President Emil Jones, "a long-time ally of the governor's, a friend, and a stalwart supporting the governor's agenda ...." Tr. 1307, 1691. Senator Jones fell out of favor in September, 2008, when he broke his promise to support the Governor's position on the ethics bill. Tr. 1307, 1476, 1732.

Beginning in October, 2008, the Governor and his associates were approached by intermediaries advocating for the appointment of Valerie Jarrett as Obama's choice for his old seat. Tr. 1326-27, 1695-97. Blagojevich then began discussions with his close advisors about "seeking to be appointed to the secretary of Health and Human Services in exchange for appointing Valerie Jarrett." Tr. 1334, 1348-54, 2073. Blagojevich touted his successful initiatives expanding healthcare in Illinois such as the All Kids insurance program, enacted during his first term as governor, which he believed made him an ideal candidate for the job. "Okay, who's done more for healthcare in any state than me, right? Heck of a lot more than Tommy Thompson[3] did. Is that fair to say or no?" Tr. 1358. During a November 7 call with Harris and advisor Fred Yang, Blagojevich said, "I don't see why it's so hard for him to make a governor who gave 700,000 people healthcare a head of Health and Human Services." Tr. 1466. In other calls, Blagojevich discussed the possibility of appointing

---

[3] Tommy Thompson is the former governor of Wisconsin who was appointed by President Bush as U.S. Secretary of Health and Human Services.

himself to the Senate seat and expressed anger at his advisors who were unsupportive of this option. Tr. 2224.

A meeting was arranged on November 3 between Blagojevich and two officials from the Service Employees' Union (SEIU) who were advocating for the selection of Jarrett. Tr. 1772. Tom Balanoff, president of the SEIU local, testified that at the meeting, Blagojevich said, "I love being governor, but my real passion is healthcare," and he said, "if I could be the Secretary of Health and Human Services, then I could really live out my passion." Tr. 1787. Blagojevich also discussed the possibility of appointing Lisa Madigan to the seat. Lisa Madigan was the Illinois Attorney General and the daughter of Illinois Speaker of the House and Chairman of the State Democratic Party, Mike Madigan. Blagojevich said that appointing Ms. Madigan "would be a smart political decision," as it could help "move some of his legislative priorities, the Capital bill, healthcare reform." Tr. 1776, 1785.

Balanoff set up a second meeting with Blagojevich on November 6 to push Jarrett for the seat. Tr. 1874. Prior to the meeting, Blagojevich discussed strategy with his advisors. Tr. 1370. "Do I say," Blagojevich asked his chief of staff John Harris, "look, I'd be happy to send the senator over, I'd be happy to, but I tell you what would be great, Tom, if the senator and I go to Washington and do All Kids all across America, sure could do a lot more, do I say that? Do I bring up Health and Human Services?" Tr. 1373. "Is there a role for me out there? Do I say that?" Tr. 1378.

On a November 5 call, Harris offered his opinion that it was unlikely that Obama would appoint Blagojevich to be his HHS Secretary. Blagojevich suggested they look "down

-8-

the pecking order" such as "ambassador to the U.N." Harris responded: "Yeah, I think he'd (Obama) do ambassadorships." Tr. 1385. Later Harris said: "I mean he can probably get you on a board, or boards.... Like when Elizabeth Dole was head of the Red Cross." Tr. 1386. Blagojevich asked his advisors to research ambassadorships and other possibilities and to see "what they pay." Tr. 1387-89, 2082-85, 2217. Blagojevich often expressed concerns about "his family's financial situation." Tr. 1433. At one point, Harris suggested that Blagojevich seek a position as "national coordinator of the Change To Win campaign," a union advocacy group. Blagojevich responded favorably and suggested they could "publicly announce it." Tr. 1721. Harris explained that Blagojevich wanted "to remain politically active or at least have an opportunity to return to politics after serving in this type of position." Tr. 1423.

On November 10, a message was relayed to Blagojevich that "the president-elect would be thankful and appreciative if the governor would appoint Valerie Jarrett to the senate seat." Tr. 1496. The Governor and his advisors interpreted this message to mean that a Cabinet appointment was out of the question. Tr. 1500. Blagojevich then discussed the possibility of asking the President to use his influence to set up a not-for-profit organization or "501(c)(4)" that would "advocate children's healthcare" and employ Blagojevich at the conclusion of his tenure as governor. Tr. 1909. On a November 11 call, Blagojevich asked his former deputy governor, Doug Scofield, "How do you make a deal like that? I mean, it's got to be legal, obviously, but it's very commonplace, is it not, doing things like this." Scofield replied: "That kind of 501(c)(4) is not unusual." Tr. 1911.

On November 12, Blagojevich said to Harris, "A 501(c)(4), you know, get the

contributors and others to put 10 to 15 million in it so I could advocate healthcare and other issues I care about and help them all while I stay as governor and she's a senator, that's a pretty good request, isn't it?" Tr. 1514. Then he said, "I wouldn't even be adverse to being upfront about it and saying that we established this organization, they're all going to watch and to push these things that we done in Illinois and that we can help, help you push in Illinois." Harris replied: "I like it." Tr. 1739-42. In another call, Blagojevich told Harris: "You know, I wanna play some sort of role, Howard Dean is Health and Human Services, Hillary Clinton's Secretary of State, and Arnold Schwarzenegger, EPA." Tr. 1749.

In another call on November 12, Blagojevich discussed the 501(c)(4) idea with Tom Balanoff who said: "I think it's a great idea." Tr. 1836.

On November 13, Blagojevich discussed with Scofield the idea of asking the lobbyist John Wyma to deliver the message to Rahm Emanuel, the President's Chief of Staff, to help "put together a 501(c)(4) for healthcare." Scofield asked if Wyma "should say it's unrelated" to the appointment of Jarrett. Blagojevich replied: "If he feels like he needs to even say that." Tr. 1932.

In mid-November, Blagojevich received notice that Jarrett would be taking a job in the White House and was no longer interested in the Senate seat. Tr. 1540. After Jarrett dropped out, Blagojevich stopped talking about exchanging the seat for a job.

The government also introduced evidence suggesting that Blagojevich knew it was a crime to exchange the senate seat for a job – a requirement for fraud. First, the case agent testified that in 2006, Blagojevich made a public statement reacting to the conviction of

former Governor George Ryan in which he condemned using government for "personal enrichment." Tr. 1253. Second, the director of ethics training at the State Inspector General Office testified that all state employees, including Blagojevich, take an annual training course which teaches that a state official commits "bribery" or "official misconduct" under Illinois law when he accepts or "simply ask[s] for" "anything of value" such as "unlimited free bar drinks." Tr. 1979-82.

### 3.    The alleged scheme to trade the senate seat to Jesse Jackson, Jr., in exchange for campaign contributions.

Counts 2, 3, 10, 18, 19 and 20 allege that Blagojevich schemed, conspired and attempted to commit fraud, bribery and extortion by attempting to obtain $1.5 million in campaign contributions in exchange for the appointment of Jesse Jackson, Jr., to the Senate.

On October 28, 2008, Rajinder Bedi, a representative of the Indian American community and a supporter of the Governor, told Robert Blagojevich (the Governor's fundraising chairman) that Bedi's associate, Raghu Nayak, would raise a "lot of money" to get Nayak's friend Jesse Jackson, Jr., appointed to the Senate. Tr. 2039. Robert told Bedi that he did not think the Governor would appoint Jackson who "had never supported us in the first campaign [and] has never endorsed us." Robert said that if "Raghu [Nayak] is interested, he should talk to the Governor himself." Tr. 2041.

On October 31, Blagojevich told Deputy Governor Greenlee, on an intercepted call, about the Jackson offer: "Unbelievable, isn't it, ... we were approached pay to play, you know, he'd raise me 500 grand. An emissary came. The other guy would raise a million if

I made him a senator." Tr. 2110.

After October 31, there were no discussions about the Jackson offer until early December. On December 4th, 2008, Blagojevich's pollster Fred Yang advised the Governor about a recent poll that shows Jackson in the lead among prospective candidates for the Senate seat. Tr. 2113. Later that day, Blagojevich told Harris on a recorded call that he was "honestly going to objectively look at the value of putting Jesse, Jr. there ...." Tr. 1604. Blagojevich said, "he's come to me with -- through third parties, you know, with offers of campaign contributions and help... 1.5 million they -- they're throwing numbers around." Tr. 1608. In another recorded call on December 4, Blagojevich told Yang, "There's tangible -- concrete, tangible stuff from supporters.... you know what I'm talking about...You know, specific amounts and everything." Tr. 2117.

Harris testified that Blagojevich wanted to use the threat of appointing Jackson to his advantage. Tr. 1604. In a recorded call on the afternoon of December 4, Blagojevich told Greenlee, "Yeah, want these national Democrats and Obama, ... I want them to f'ing see, holy F, it's going to be Jesse, Jr. if we don't f'ing get this Lisa thing done." Greenlee responded: "I like your play." Tr. 2127.

In another recorded call on December 4, Blagojevich told his brother: "You gotta talk to Raghu. You gotta call him and say hey look, you know Jesse Jr., ... Rod's meeting with him at some point... [Jackson is] very much real realistic .... And the other point you know all these promises of help. That's all well and good but he's had an experience with Jesse and Jesse promised to endorse him for governor and lied to him okay ... then some of this

-12-

stuff's got to start happening now." Tr. 2135, 4538. Robert Blagojevich then called Raghu Nayak and arranged to meet for coffee "to follow up on those brief conversations we had earlier in the month or late last month middle of last month." Tr. 2136.

On December 5, the Chicago Tribune reported that John Wyma was cooperating with federal agents who may have taped Blagojevich. Tr. 2139. At 9:30 a.m. on December 5, Robert Blagojevich called Raghu Nayak and asked to reschedule their meeting suggesting that they could touch base at the Indian Community fundraiser scheduled for the following evening. Tr. 2141. Five minutes later, Blagojevich called his brother and directed him to call off his meeting with Nayak. Robert replied: "Ah done." Tr. 2141.

In closing argument, the government told the jury that when Blagojevich called his brother and directed him to tell Raghu Nayak that Jesse, Jr., was "very much realistic" and that these promises of help "gotta start happening now, right now," he was guilty of soliciting a bribe. Tr. 5301.

### 4.     The alleged attempt to extort campaign contributions from the President of Children's Memorial Hospital, Patrick Magoon.

Counts 1, 12 and 13 of the indictment allege, as the government explained at trial, that Blagojevich demanded a $25,000 campaign contribution from Patrick Magoon "in exchange for providing more state money to treat sick kids." Tr. 1159.

In June, 2008, Patrick Magoon, the president of Children's Memorial Hospital ("CMH"), sent the Governor a letter requesting an increase in the rate of reimbursement under medicaid for pediatric specialists. Tr. 2506. In August or September, Magoon and the

hospital's lobbyist, John Wyma, met with State officials to discuss the rate increase plus another request for capital funding for an expansion of the hospital. Tr. 2145.

In September, Dusty Baker, the former manager of the Chicago Cubs, called Blagojevich on Magoon's behalf to advocate for the rate increase. Magoon followed up the Baker call with a September 23 email to the Governor's assistant requesting an increase in "reimbursement rates for pediatric specialty physicians." That same day, Blagojevich called Magoon and said he "was supportive of our issue, that I didn't need to go through Dusty or anyone else from this point forward, that I could contact him directly and ask[ed] that I send a background document to him that describes the issue." Magoon then sent a "briefing paper" to Blagojevich's assistant. Tr. 2508-10.

In late September or early October, Deputy Governor Greenlee advised the Governor that the rate increase would cost the State $8-10 million. Greenlee said, "he had to consider the budget constraints," but that the proposal "would fit with our overall policy." Blagojevich told Greenlee to "look into it." Tr. 2152, 2239.

On October 8, Blagojevich attended a fundraising meeting at his campaign headquarters. John Wyma, the hospital's lobbyist, also attended this meeting. Wyma testified that Blagojevich stated that "he was going to give the hospital $8 million, and he wanted me (Wyma) to get Pat Magoon for 50," meaning he wanted Wyma to ask Magoon for a $50,000 campaign contribution. Tr. 2364-65, 2415. Wyma objected that the amount was too large and Blagojevich said, "ok ask for $25K" ($25,000). Tr. 2371, 2418. Wyma explained that it was Blagojevich's belief that the hospital "was in line to get some funding

-14-

and, therefore, Children's Memorial Hospital might want to give a fundraiser for Rod because they were getting that funding." Tr. 2370, 2422.

Around this time, Wyma was served with a federal grand jury subpoena relating to a criminal investigation into his lobbying work for his client Provena which operates a group of hospitals. Tr. 2448. A short while later, Wyma agreed to cooperate with the government against Blagojevich after which the Provena investigation was dropped and Wyma was granted immunity from prosecution. Most of the circumstances which led to Wyma's decision to cooperate were ruled irrelevant and kept from the jury. 2374-75, 2452.

Magoon testified that on October 17, Blagojevich called "to let me know that he had approved a 10 million-dollar increase for Children's Memorial Hospital, and he asked that we not bring any attention to this matter until after January 1." Tr. 2513.

On October 22, after a fundraising meeting, Robert Blagojevich called Magoon, introduced himself, and then "asked that we raise $25,000 for the Governor from our, you know, my professional colleagues, friends, and members of our board, and that that be done by January 1st of the coming year." Magoon said that he would "have to give some thought to this and talk to a few folks about it" and he gave Robert his cell phone number. Tr. 2515-19.

The next day, on October 23, an article appeared in the Chicago Tribune[4] reporting that Wyma was under federal investigation for his lobbying activities for Provena Health, a

---

[4] This article can be found at: http://articles.chicagotribune.com/2008-10-23/news/0810220905_1_blagojevich-administration-john-wyma-blagojevich-insiders.

hospital company that had won a favorable state ruling.  Tr. 2379, 4014.

Magoon decided not to raise the funds for Blagojevich, although he never told Robert Blagojevich about his decision.  Instead, he just told his staff not to put through Robert's calls.  Tr. 2522-23.  Robert left messages for Magoon on October 28 and November 10 but received no response.  Tr. 2524.

Magoon conceded that Robert never said that there was any connection between the rate hike and the request for a fundraiser.  Nor did Robert ever even mention the rate increase to Magoon or make any threat whatsoever.  Tr. 2148.  But according to Magoon, Robert "asked me to raise the money in a very strong suggestion."  Tr. 2547.  Wyma, the lobbyist for the hospital and cooperating witness, also conceded that Blagojevich never indicated that the rate increase depended on Magoon's raising funds for the Governor.  Tr. 2417.

Nevertheless, Magoon testified that he believed the rate increase and the fundraising request were linked because Robert mentioned a January 1 deadline for fundraising, and Rod had previously asked Magoon to "keep it quiet 'till Jan 1."  These facts purportedly led Magoon to believe that the rate increase "was contingent upon a contribution of $25,000."  Tr. 2521-22.  However, the record is clear that Magoon was given the January 1 deadline for fundraising, not for any sinister purpose, but because that was the effective date of the new ethics bill, after which Magoon and his fellow CMH board members would likely be prohibited from contributing to the Governor.[5]

_____

[5] Blagojevich clearly explained the reason for the January 1 fundraising deadline to Mr. Krozell, another potential campaign contributor and alleged extortion target.  Tr. 2576, 2875.

On November 12th, Robert told the Governor that he had left three messages for Magoon but never got a call back. "So I'm gonna quit calling," Robert said. "I feel stupid now." The Governor said he would call Magoon. Tr. 2158. In a recorded call later that day, Blagojevich asked his deputy Greenlee whether "we have total discretion over" the rate increase and "could pull it back if we needed to budgetary concerns, right?" Greenlee said, "Yep" and Blagojevich responded, "Okay that's good to know." Tr. 2159-61.

Following this call with Greenlee, Blagojevich changed his mind and decided not to call Magoon. Tr. 4062-65, 4821. There was no further contact between Blagojevich or his staff and Magoon. Tr. 2551.

Greenlee, who cooperated with the government, testified that when Blagojevich said, "good to know" he interpreted that as an "order" to put a hold on the rate increase. He then called the State official in charge of Medicaid, Barry Maram, and told him to hold off on the rate increase. Tr. 2161-65, 2247. Greenlee claimed that he had a second conversation with Blagojevich "a few weeks later ... and I recollect in that conversation that he told me not to go forward with the rate increase." Tr. 2165. However, there is no record of this second conversation and Greenlee was impeached by his prior statement to the FBI that he was "not sure" if Blagojevich said to hold up the rate increase. Tr. 2250. The rate increase did go into effect in late January, 2009, although this information was kept from the jury. Tr. 2558, 2596.

-17-

**5.    The alleged attempt to extort campaign contributions from horse racing executive John Johnston.**

Counts 9, 14 and 15 allege that Blagojevich attempted to extort a campaign contribution from a  horse racing executive in exchange for the timely signing of a bill that benefitted the horse racing industry.

John Johnston was the president of the Maywood Park and Balmoral racetracks.  Tr. 2980.  He was also a long-time supporter of the Governor and the Governor was a supporter of the Illinois horse racing industry.  Tr. 2744, 2989, 3723, 3790.

Lon Monk was the Governor's former chief of staff and campaign manager who, in 2008, was a high-paid lobbyist for Johnston and other clients.  Tr. 2741, 3027.  Monk testified against Blagojevich pursuant to a cooperation agreement which offered him a reduced sentence for his own crimes, which included accepting cash bribes from businessman and fundraiser Tony Rezko during 2004-05, while Monk was Blagojevich's chief of staff.  Tr. 1225-26, 2704.  The Governor was not aware that Monk, his trusted law school friend, was taking bribes from Rezko.  Tr. 2721-23, 2823-24, 2849.

Monk testified that in early September, 2008, Blagojevich asked him to assist in obtaining a campaign contribution from Johnston.  Tr. 2899, 2916.  Johnston had an interest at that time in a revenue sharing "recapture bill" pending in the Illinois legislature which would require Illinois casinos to pay a percentage of their revenue to the horse racing industry.  This bill was similar to a law that had passed in 2006 but had run its term.  Tr. 2742-48.

-18-

In early November 2008, Monk asked Johnston how he was doing "on getting the hundred thousand dollars that he and Rod had talked about." Johnston told Monk he was "working on it." Tr. 2748. On November 13, Monk told the Governor that Johnston was good for the contribution and was "trying to figure out where to get the money." Tr. 2859. Robert Blagojevich also told the governor that "Johnny Johnston's good for it.... [He just has to] decide what accounts to get it out of." Tr. 2748. On November 20, Monk told Robert: "I'm hoping to get checks today from Johnston." Tr. 2856. On November 22, Monk told Blagojevich that "he's [Johnston] kind of getting pissed off at me 'cause he says, look, I've told you I'm good for it. I'm -- I'm figuring out where to get the money and you can get it in the next couple weeks." Blagojevich responded: "Good, okay.... He knows by the end of the year." Tr. 2751-52. On November 24, Monk told Blagojevich that Johnston said he would deliver the contribution on Monday. Blagojevich responded: "Okay, good, beautiful." Tr. 2754.

The recapture bill passed both houses of the Illinois legislature in November 2008 and was sent to the Governor on November 24, 2008. Tr. 1569, 2742-49. Over objection, both Monk and Johnston testified that the Governor signed the previous (2006) recapture bill one day after it arrived on his desk. Tr. 1092, 2745, 2983.

On November 26, William Quinlin, the Governor's general counsel, sent an email to Harris stating that the recapture bill was "Okay to sign." Tr. 1572. Quinlin did not testify. But according to chief of staff John Harris, Quinlin had reviewed the bill for "poison pill" language which Speaker of the House Madigan sometimes inserted in bills favored by

-19-

Blagojevich.  Tr. 1572-77.

Also on November 26, the day before Thanksgiving, Blagojevich told Harris: "I told him (Monk) I'm not doing anything ... for a while.... But I think he's got nothing to fear, okay.... I want to sit on it till I sort things through on all kinds of bills, you know, and see how it all fits in."  Tr. 1579-80.

Harris testified that around this time, he received calls from Monk, Chris Kelly, the Governor's former campaign finance chairman who was then under indictment for tax fraud, and from a downstate representative, all lobbying for a quick signing of the recapture bill. Tr. 1569.

Both Monk and Johnston testified that the racetracks wanted the bill signed right away "because every day that the bill didn't get signed and wasn't law, his two tracks were losing $9,000 a day."  Tr. 2756, 2769, 2986.  This testimony was highly misleading but the court did not allow the defense to rebut it.  In fact, the casinos had sued to block enforcement and the racetracks had seen no revenue from the 2006 recapture bill which was instead paid into a protest fund.  Tr. 3006, Tr-I 2195-2203.  However, all of this information was ruled irrelevant and kept from the jury at the retrial.  Tr. 2954-55, 3017.  The court explained that there was "no evidence on the tapes" that Blagojevich "didn't believe" Johnston was losing $9,000 a day.  Tr. 2969-77.

At a recorded conversation on December 3 in the campaign office, Monk said: "I want to go to him [Johnston] without crossing the line ... give us the money and one has nothing to do with the other, but give us the f'ing money."  Blagojevich reminded Monk: "This is a,

you know, a key month, you know, to get. It's been a year now, a year last December."

Blagojevich then called Greenlee and learned that there were 30 bills ready to be signed.

Blagojevich told Greenlee: "don't do any of 'em. I want to do 'em all together. Okay, in toto.

Okay, all 30." Then Blagojevich told Monk: "I think you just say, look, it's been a year.

Let's just get this done, just get it done. Christ." Blagojevich offered to have Greenlee call

Johnston and "say 'I'm going to have a bill signing event and schedule something during

January or late December [in] Southern Illinois.'" Monk said he was leaving the next day

on a trip but would try to see Johnston right away. The following colloquy ensued:

> BLAGOJEVICH: What are you going to say to him? Be careful.
>
> MONK: I'm gonna say to him stop screwin' around get me the money.... but what's affecting him is that he feels like you're gonna get skittish if he signs the bill, get me? I'm going to use the word skittish.
>
> BLAGOJEVICH: Yeah.... And he'd like some separation between that and signing the bill.
>
> MONK: Define separation.
>
> BLAGOJEVICH: A week.

Tr. 2769-76.

Monk testified to his "understand[ing]" that Blagojevich wanted him to deliver the

message to Johnston that "they were in exchange for one another." Tr. 2776.

The lower court excluded nearly all significant impeachment of Monk, including his

prior inconsistent testimony from the first trial that, in his recorded conversations with the

Governor, he and Blagojevich were "figuring out a way to make Johnston *not* feel extorted

...." Tr-I 1429A (emphasis added), Tr. 2924; see also Tr. 2936, 2958-68 (exploration of Monk's bias excluded).

Monk then met with Johnston at his office at the Maywood Racetrack.  Tr. 2780. Johnston, testifying under a grant of immunity, said that Monk told him that the Governor is "concerned that if he signs the racing legislation you might not be forthcoming with a contribution." Tr. 2989.  Monk told Johnston that the contribution was a "different subject matter" from the bill signing, but Johnston said he "didn't believe him." Tr. 2781, 2989-91, 3032.

After his meeting with Johnston, Monk reported to Blagojevich in a recorded call that he told Johnston: "two separate conversations, what about your commitment? ... And I said, look, there's a concern that there's going to be some skittishness if your bill gets signed because of the timeliness of the commitment." Tr. 2781-83.

On December 4, Blagojevich told Monk, in a recorded call, that he would sign the recapture bill "next week." Over objection, Monk testified that "based on the inflexion in Rod's voice, I wasn't convinced that he was going to be signing it next week." Tr. 2787-88. On December 9, Blagojevich was arrested.  He had not signed the recapture bill by the time of his arrest.  Tr. 2993.  Johnston never made the contribution.

The court excluded from the jury that Blagojevich did sign the recapture bill on December 15.  Tr. 2205, 2807.

**6.    The alleged attempt to extort campaign contributions from road builder executive Gerald Krozell.**

Counts 16 and 17 allege that Blagojevich attempted to extort a campaign contribution from a road builder executive in exchange for funding an expansion of the Illinois tollway. Because the jury acquitted Blagojevich on Count 17 and failed to reach a verdict on Count 16 which was subsequently dismissed, the evidence relating to these counts will be discussed only briefly.

In mid-2008, Blagojevich met with Gerald Krozell, a representative of the road building industry and long-time financial supporter of the Governor's campaigns. Blagojevich told Krozell he would soon be announcing a $1.8 billion program to expand the Illinois tollway and that he was hoping to do a larger program after that.  Tr. 2571. Blagojevich also asked Krozell to help raise campaign funds from the road building industry before the new ethics law took effect of January 1, 2009.  Tr. 2576.  Krozell testified that he "felt that there was a connection between the amount I was going to raise and the project itself....  I felt that if I can't raise any money, there wouldn't be a tollway bill."  Tr. 2580.

**D.    The Defense Case.**

The defense called six witnesses including the defendant himself.  Jesse Jackson, Jr., testified that he had been a member of the U.S. House of Representatives for sixteen years. He wanted Blagojevich to appoint him to the Senate seat vacated by Barack Obama.  His strategy was to launch a public campaign and to obtain endorsements.  On December 8, 2008, he met with Blagojevich at his Chicago office, discussed his qualifications for the seat, and

gave the Governor a notebook containing his history, legislative accomplishments, and polling data. Jackson testified that he never offered to raise money for the Governor's campaign and never directed anyone else to do so on his behalf. Tr. 3346-54.

Former Congressman Lipinski testified that he supported Blagojevich for governor in 2002 but never asked Jackson, Jr., for a $25,000 contribution. Tr. 5077-80. On cross-examination, over objection, the government was permitted to bring out that Lipinski himself contributed $25,000 to the Governor's campaign and that later, Lipinski's wife was appointed by the Governor to a seat on the Illinois Court of Claims. Tr. 5089-90.

Rahm Emanuel testified that as a member of Congress he had advocated for a grant benefitting the Chicago Academy School in his district. No one ever communicated to him that funding of the grant depended on raising campaign funds for Blagojevich. Tr. 3377.

Sameer Talcherkar testified that he was a state official asked to research funding options for the Chicago Academy School grant, and that the process was somewhat challenging. Tr. 5096-99.

FBI Agent Jonathon Rouske testified that on the morning of December 9, 2008, Krozell said "he never felt that the tollway bill depended upon his fundraising efforts." Tr. 5113.

### **The Governor's Testimony**

Testifying in his own defense, Blagojevich denied that he ever made any demands or threats in exchange for an official act. Tr. 3721, 3936, 3984, 3992, 4016, 4060, 4185. Blagojevich's testimony was severely restricted by a surprising ruling of the court. After

initially telling Blagojevich that he would be permitted to testify that he "honestly believed that what [he] was doing was legal" (Tr. 4/14/11 at 19, Tr. 3216), once Blagojevich began his testimony, the court changed its mind and prohibited this testimony, leaving him without a defense and looking foolish.  Tr. 4181-84.

In defense of the criminal charges, Blagojevich said the only thing he was permitted to say – that at the time of his arrest on December 9, he hadn't made up his mind who to appoint to the Senate seat, and that he never made any threats, demands or promises in connection with the Senate seat.  Tr. 4185, 4376, 4457, 4654.  Blagojevich did not want to be rushed into making his appointment.  Tr. 4307.  He believed that after his former fundraiser Tony Rezko was sentenced on January 6, 2009, that "the cloud would be removed" from himself and he considered waiting until after that date to make his final decision.  Tr. 5030.

Blagojevich testified that his first choice during much of the relevant time (November and early December) was Lisa Madigan.  He had been told she was interested in the Senate seat and he believed he could work a deal with her father, Speaker of the Illinois House Mike Madigan, to push through some of Blagojevich's legislative priorities in exchange for her appointment.  In early December, Blagojevich attempted to recruit a national politician like Rahm Emanuel to broker a deal with Speaker Madigan with whom Blagojevich had a strained relationship and did not trust to keep his word.  Blagojevich regularly discussed his plans with national politicians, business leaders and with his advisors.  Tr. 4253, 4272, 4279, 4393, 4460, 4469-91, 4551-63.  Blagojevich also frequently discussed the option of

appointing himself to the Senate seat.  Tr. 4305, 4458, 5030.

As to the allegation that he attempted to trade the Senate seat to Jesse Jackson Jr., for campaign contributions, Blagojevich testified he was aware of Nayak's offer, understood it to be illegal, and had no intention to accept it.  Tr. 4119, 4895.  Rather, in early December, when Blagojevich began his discussions with national leaders about a Madigan deal, he asked his close advisors to "elevate" Jackson as a possible candidate for the seat. Blagojevich believed that national Democratic leaders did not want him to appoint Jackson because they didn't believe Jackson could get reelected without a lot of financial help from the national party.  Tr. 4473, 4479, 4491, 4509, 4530-33.

Blagojevich denied that he ever held up the grant for the Chicago Academy in order to pressure Rahm Emanuel to raise campaign funds for him.  Tr. 3700.

Blagojevich also denied that he ever held up the signing of the recapture bill to pressure John Johnston to contribute to his campaign.  Tr. 3721.  He said that the Johnston family were among his most reliable and generous supporters ever since his election in 2002. Tr. 3723.  In early 2008, Johnston had agreed to raise or contribute $100,000 to the Governor's campaign fund by the end of end of October 2008."  Tr. 3764-70.  Monk, Johnston's lobbyist, continually promised that the Johnstons would make good on their commitment any day.  Tr. 3776-85.  When the recapture bill arrived on his desk around Thanksgiving and was approved by his general counsel, Blagojevich became concerned about the timing of the bill signing.  When he had signed the 2006 recapture bill, "there were stories in the press that the Johnstons or the horse racing owners had contributed something

like $200,000 to my campaign." Tr. 3819, 3931.  Also, Blagojevich became concerned after a Thanksgiving day (11/27) phone call from his old friend and former fundraiser Chris Kelly, who was then under indictment for tax evasion.  Blagojevich was concerned that Kelly was trying to use the recapture bill as leverage to enlist the Johnston and the Steinbrenner families to support his bid for a presidential pardon.  Tr. 3800-06, 3809-16.

Blagojevich denied that he ever suggested to Gerald Krozell that he would approve a larger tollway expansion plan in exchange for fundraising.  Tr. 3936, 3984, 3992.  Rather, he made it clear to Krozell that he was pushing the Illinois legislature to pass a big public works or "capital" bill.  Tr. 3941, 3967, 3984-86.  Blagojevich's testimony was corroborated by a tape-recorded conversation from October 31, 2008, between himself and his chief of staff Harris which showed the Governor's sincere efforts to push for the capital bill.  Tr. 3946-53.  This recorded call was one of only five the defense was permitted to play.  Tr. 3431-3511, 3737-51, 3859-99, 4015.

Blagojevich denied that he ever used or held up the rate increase for pediatric doctors to pressure Patrick Magoon to raise funds for his campaign.  Tr. 4016.  Blagojevich conceded that it was his idea to approach Magoon based on his belief that Magoon might be willing to do a fundraiser since "we're doing something for them."  Tr. 4051.  On November 12, after his brother said Magoon was not returning his calls, Blagojevich said he would call Magoon.  But before calling Magoon, he called his deputy governor to check whether the rate increase had gone into effect and whether he (the Governor) still had discretion over it.  When Greenlee said they still had discretion, Blagojevich decided it would be inappropriate

to call Magoon and he never made the call.  Blagojevich never directed Greenlee to hold up the rate increase.  Tr. 4060-65.  It was not until after his arrest that he learned that the rate increase had been held up.  Tr. 4083.

On cross-examination, over objection, the government was permitted to impeach Blagojevich with his non-final conviction from the first trial for making a false statement during a March, 2005 interview with the FBI.  Tr. 3917, 4591.  In closing argument, the government referred to Blagojevich as "a convicted liar."  Tr. 5519-20.

**E.    The Government's Rebuttal Case.**

In rebuttal, the government was permitted to introduce three items of evidence over defense objection.  First, the government called FBI Agent Murphy to testify that he had offered to record the March, 2005 interview in which Blagojevich allegedly made the false statement, but Blagojevich's attorney declined the offer.  Tr. 5169-72.

Second, the court allowed Agent Cain to testify that cooperating witness John Wyma made a statement to the FBI that was consistent with his testimony at trial relating to a comment allegedly made by Blagojevich at an October 6 fundraising meeting about the road builders needing to fundraise for his campaign.  Tr. 5192.

Third, the court permitted the government to introduce the following stipulation, over defense objection: "For the entire year of 2008 defendant Rod R. Blagojevich had a personal attorney whose primary area of practice was criminal law representing him, this attorney did

not work for the State of Illinois.[6]" Tr. 5258. The court ruled that the evidence about the defendant's personal criminal defense attorney was relevant to rebut Blagojevich's testimony that one of his close advisors was his general counsel, Bill Quinlin. The court explained: "He did talk about his lawyer, he did say that he thought it was legal, and it's a back-door advice of counsel defense which he's not entitled to make." Tr. 5144.

Also in rebuttal, the government called two executives of a road building company to testify about a September 24, 2008 meeting with Blagojevich and Krozell. Tr. 5120-43. The government also recalled Magoon to rebut Blagojevich's testimony that Blagojevich had told Magoon not to talk about the rate increase because he (Blagojevich) was breaking his policy of cutting the budget. Magoon said Blagojevich never said this to him. Tr. 5155.

## F.    The Verdict and Post-Trial Motions.

Blagojevich was convicted of counts 1-10, 12-15, and 18-20. A mistrial was declared on counts 11 and 16. Blagojevich was acquitted of count 17. R. 847, 904. Blagojevich's motions for acquittal at the close of the government's case, at the close of evidence and his motions for acquittal and new trial after the verdict were all denied. 12/2/11 Tr., R. 802. In addition, throughout the trial, Blagojevich filed numerous motions for mistrial, all of which were denied. R. 714.

---

[6] The personal attorney referred to in this stipulation is Sheldon Sorosky, a member of the defense team at trial and long-time friend of the Governor.

**G.    The Sentencing.**

Blagojevich was sentenced to 168 months in the Bureau of Prisons for counts 3, 5-13, 15-17, 21 and 23; 60 months on counts 18 and 23; and 36 months on count 24. Blagojevich was also ordered to pay a fine of $20,000 along with $1800 in special assessments. Tr. 12/7/11 at 260-61.

Extensive pleadings were filed regarding the sentence, but the main issues of contention with regard to sentencing were the guideline calculations, specifically the calculation of intended loss (§2c1.1(b)(2)) and the enhancement for leader/organizer (§2B1.1). Tr. 12/6/11 at 13-63. The court found that the $1.5 million dollar figure connected to the Jackson allegations could be included with the $100,000 and $25,000 from Johnston and Magoon as intended loss. Tr. 12/6/11 at 51-53. As a result, the offense level increased 16 levels (not by 10 levels as calculated by Probation). Tr. 12/6/11 at 58.

The court also found that Blagojevich was eligible for a leader/organizer enhancement and a two-point reduction in the calculation for acceptance of responsibility. Tr. 12/6/11 at 30, 60-63, Tr. 12/7/11 at 245, 248-49. The resultant guideline range was 188 to 235 months. Tr. 12/7/11 at 244. The court sentenced Blagojevich to 168 months, or 14 years in prison. Tr. 12/7/11 at 259-60.

## SUMMARY OF THE ARGUMENT

The central charge against Blagojevich – that he attempted to sell Barack Obama's old Senate seat – is false. The evidence showed that Blagojevich attempted to make a political deal with Obama where Blagojevich would appoint Obama's choice for the Senate

and in exchange, Obama would make Blagojevich part of his Administration.   The government failed to prove any intent to defraud where Blagojevich openly discussed this proposed deal with Obama's representatives and made no effort to deceive Obama.  Nor was there evidence that Blagojevich attempted to sell the seat to Jesse Jackson, Jr., in exchange for campaign contributions.  The government's evidence merely established that an illegal offer was made to Blagojevich but never accepted.  The convictions relating to Blagojevich's attempts to raise campaign funds from Magoon and Johnston must be reversed because the government failed to prove an explicit quid pro quo agreement, as required under the law.

The false statements conviction must be reversed because the charge was ambiguous in that Blagojevich's understanding of the word "track" conflicted with the government's, and because the court erroneously excluded critical evidence as to the context of the defendant's statement.

The convictions also must be overturned because the jury was misinstructed as to the law of fraud, extortion, bribery, and good faith, and because the lower court erroneously excluded Blagojevich's legitimate defense that he had a good faith belief that his actions comported with the law.  Also, the lower court's evidentiary rulings deprived the defendant of a fair trial where critical evidence to rebut the central allegations was improperly excluded for the defense, while highly prejudicial and irrelevant evidence was improperly admitted for the government.  The lower court also erred in excluding critical impeachment of cooperating witnesses for bias.  The court further erred in failing to strike for cause prospective jurors who expressed bias towards the defendant.

Finally, the defendant's 14-year guidelines sentence erroneously includes, as a loss amount, an illegal offer of campaign funds despite the absence of any evidence that Blagojevich ever intended to accept the offer, and an enhancement for leader-organizer that is unsupported.

## ARGUMENT

### I.     THE EVIDENCE WAS INSUFFICIENT UNDER PROPER PRINCIPLES OF LAW TO PROVE ANY OF THE COUNTS OF CONVICTION.

**Standard of Review**: This Court reviews the denial of a motion for judgment of acquittal *de novo*.  *United States v. Pree*, 408 F.3d 855, 865 (7th Cir. 2005).  This Court "will overturn a jury verdict for insufficiency of the evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Stevenson*, 680 F.3d 854, 855–56 (7th Cir. 2012).

In the instant case, the government's evidence, in its most favorable light, did not establish that Blagojevich committed any federal crime.  He was therefore entitled to a judgment of acquittal on all counts.[7]  See *Jackson v. Virginia*, 443 U.S. 307, 313–14 (1979); *United States v. Farinella,* 558 F.3d 695, 700 (7th Cir. 2009).

### A.     The alleged scheme to trade the Senate seat for a political appointment.

The indictment alleges that Blagojevich conspired to commit fraud, bribery and extortion when he tried to exchange the Senate seat for a job.  The evidence at trial established that Blagojevich attempted to make a political deal with Barack Obama where

---

[7] The false statements conviction will be addressed in a subsequent section of this brief.

-32-

he would appoint Obama's choice for the Senate seat, Valerie Jarrett, in exchange for a job

in the Obama Administration or some other public service job.  The government failed to

prove that this proposed deal was a crime under the proper principles of law.[8]

To prove fraud, the government was required to prove that Blagojevich attempted to

obtain money or property by means of "false or fraudulent pretenses, representations, or

promises ...."  18 U.S.C. § 1343.  "Intent to defraud requires a wilful act by the defendant

with the specific intent to deceive or cheat ...."  *United States v. Sheneman*, 682 F.3d 623,

629 (7th Cir. 2012) (citation omitted).

Here, the record shows that Blagojevich's proposed exchange was an arm's length

political deal, described by Blagojevich as a political "horse trade," (Tr. 4133) between

himself and Barack Obama which Blagojevich believed was not only lawful, but also in the

public interest.  Blagojevich made no effort to conceal his plan but discussed it openly with

his advisors and with the emissary sent by Obama to urge the selection of Jarrett for the

Senate.  There was zero evidence that Blagojevich engaged in or intended any fraud or

deception in his negotiations with Obama's representatives.

In *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), a public employee was

convicted by a jury of fraud and bribery for failing to follow state procurement rules in

awarding a travel contract to a political ally of her boss.  The government's evidence

permitted the jury to find that the defendant received enhanced job security and a raise in

---

[8] The court also denied a motion to dismiss these counts.  R. 337, 347.

-33-

salary in return for her actions. This Court reversed her convictions finding two fundamental flaws in the government's proof. First, the government failed to prove a scheme to deceive or defraud where the employee's conduct, "as far as this record shows, was designed to pursue the public interest as the employee understood it ...." *Id.* at 884. See *United States v. Sorich*, 523 F.3d 702, 710 (7th Cir. 2008) (explaining that in *Thompson*, there was an "absence of a scheme to defraud"; whereas the evidence against Sorich established "specific intent and material misrepresentations"). Second, the *Thompson* Court found that the alleged benefit corruptly or fraudulently obtained by the defendant – enhanced job security and a raise in salary for a public employee "approved through above-board channels" – did not meet the requirements for "private gain" under federal fraud statutes. *Id.*

The government's evidence in the case at bar has similar defects. As in *Thompson*, the record here reveals that Blagojevich believed his proposed political deal with Obama was in the public interest. Blagojevich understood that Obama wanted his close friend Jarrett in the Senate to support Obama's policies, including an expansion of health care. In his private conversations, secretly recorded by the government and played for the jury, Blagojevich expressed his sincere belief that his own appointment to a post such as HHS would serve the public interest due to his unique qualifications to advocate for health care expansion as he had done in Illinois. Tr. 1358, 2224, 4285.

Further, as in *Thompson,* the alleged "private gain" was a salary from a hoped-for public service position, which would have been approved through above-board channels. Indeed, few jobs are more public and transparent than a Cabinet position such as HHS, which

requires a Senate confirmation hearing during which Blagojevich would be required to testify under oath about his political arrangements with Obama.

Indeed, in the case at bar, the government never even suggested that Blagojevich intended to defraud Obama or that his proposed political deal was not an arm's length exchange. Rather, it alleged that this proposed arrangement was "cheating the people of his honest services." Tr. 5310. To support this charge, the government pointed to Blagojevich's statements to the press that he was conducting a "deliberate" search for Obama's replacement in the Senate which, according to the government, conflicted with his attempts to work a political deal with Obama. This precise theory of fraud was rejected by the Supreme Court in *Skilling v. United States*, 130 S. Ct. 2896, 2932 (2010) (rejecting government's argument that honest services fraud encompasses the taking of official action "that furthers [defendant's] own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty").

Finally, the government never established that an arms-length deal between two politicians to make political appointments is a federal crime. No other U.S. case has been cited in which such a deal was prosecuted as fraud or bribery. This is so because the political deal proposed by Blagojevich was a proper and common[9] exchange under our democratic system of government. The government's characterization of this proposed deal as

---

[9] As Blagojevich testified outside the presence of the jury, history books reveal that this type of political deal is quite common in the United States. Tr. 4153 (offer of proof in which Blagojevich cited numerous historical examples of political deals in which appointments to jobs such as ambassadorships, cabinet positions and Supreme Court Justice were openly exchanged).

Blagojevich's attempt for "personal enrichment" was factually incorrect.  In Blagojevich's

first term as governor, he pushed through several important initiatives including the All Kids

insurance program which greatly expanded health care for children in Illinois.   Many

Illinoisans who supported Blagojevich in his second term did so because of his effectiveness

as a spokesperson for children.   But in the winter of 2008, Blagojevich was a lame-duck,

second-term Governor whose agenda was being blocked in the Illinois House by Speaker

Madigan. Tr. 1376.   Thus, for Blagojevich to use the opportunity to select Obama's

replacement in the Senate to send himself to Washington to advocate for children's health

care was not only proper under the law, it was good politics.  In fact, had Blagojevich simply

appointed Obama's friend to the Senate and not sought a political benefit in return, he would

have done a disservice to all of his supporters.

     For all these reasons, Blagojevich's conviction for the non-existent crime of attempted

political horse-trading cannot be allowed to stand.   See *Cooper v. United States*, 199 F.3d

898, 901 (7th Cir. 1999) (a conviction of a "nonexistent crime ... is a clear miscarriage of

justice") (citing *In re Davenport,* 147 F.3d 605, 611 (7th Cir. 1998)).   Counts 2-8 and 18-20

must be reversed.[10]

---

    [10] Further, the prosecution of Blagojevich for a common political exchange that has never before been considered a crime violated his due process right to "fair notice of what is prohibited ...." *Skilling*, 130 S.Ct. at 2935.  See also *United States v. McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012) (politicians have a "due-process right to know what political activity is legal").

    An important reason for the prior notice requirement is to discourage "arbitrary and discriminatory enforcement" of the nation's criminal laws. *Skilling*, 130 S.Ct. at 2928 (citation omitted).  Here, the government prosecuted Blagojevich for a political act which, while common

**B.    The alleged scheme to trade the Senate seat to Jesse Jackson, Jr., in exchange for campaign contributions.**

Blagojevich stands convicted of attempted fraud, bribery and extortion in connection with his alleged attempt to exchange the Senate seat to Jesse Jackson, Jr., for campaign contributions.  To convict Blagojevich based on his solicitation of campaign funds, the government was required to prove that the contribution was sought "in return for an explicit promise or undertaking by the official to perform or not to perform an official act."  *United States v. Giles,* 246 F.3d 966, 971 (7th Cir. 2001) (citing *McCormick v. United States*, 500 U.S. 257, 272 (1991)).

In its most favorable light, the evidence established that in late October, 2008, Blagojevich was made aware that a businessman named Raghu Nayak had offered to raise campaign funds if the Governor would appoint Jackson, Jr., to the Senate.  Nayak's offer was clearly illegal under *Giles* and *McCormick.*  More than a month later, Blagojevich told his brother (who was also his fundraising chairman) to tell Nayak that Jackson is "very much real realistic" and that "all these promises of help, ... he's had an experience with Jesse [in which Jackson] lied to him, ... then some of this stuff's got to start happening now." Tr. 4538.  The next day, Blagojevich told his brother to cancel his meeting with Nayak.

Nayak's illegal offer was never accepted, negotiated or even entertained by Blagojevich. The government's theory is that Blagojevich, in the above-cited conversations, attempted or conspired to accept an unsolicited illegal offer and thereby committed fraud and

---

and generally accepted, presumably offended the federal prosecutors and agents who were secretly listening to his calls.  This is the essence of arbitrariness.

a conspiracy to commit extortion.  To prove this crime, the government was required to prove

that Blagojevich had the intent to accept Nayak's illegal offer.  See *United States v. Jacobs*,

431 F.2d 754 (2nd Cir. 1970) (to be guilty of attempted bribery, the defendant must have the

"requisite intent to influence any official act").

The government's evidence established that Blagojevich understood that Nayak's

offer was illegal.  Tr. 2117.  But the government failed to prove that Blagojevich ever

intended to accept this illegal offer.  Had Blagojevich told his brother to "tell Nayak that

Jackson can have the Senate seat if you help us fundraise," this would have at least shown

a criminal intent.  But Blagojevich never said any such thing.  Rather, he told his brother to

tell Nayak that Jackson was a "realistic" candidate and that some of Jackson's promises of

support "got to start happening now."  Tr. 2135, 4538.

Blagojevich's directions to his brother were not evidence of any criminal intent.  Quite

to the contrary, by describing Jackson as a "realistic" candidate, Blagojevich communicated

his *unwillingness* to agree to any illegal quid pro quo.  Blagojevich's message to Jackson was

clear and lawful: Jackson could begin to show support and try to get back into the Governor's

good graces, but no promise could be made to him.  No reasonable jury could find from this

evidence the requisite quid pro quo for political fraud or extortion.

Under basic contract law, to prove Blagojevich's intent to accept the illegal offer, the

government had to prove that there was a "meeting of the minds" between Blagojevich and

Nayak.  See *Mays v. Trump Indiana Inc.*, 255 F.3d 351 (7th Cir. 2001).  A "communication

stating a first party's willingness to enter a bargain is not an offer if the second party has a

reason to know the communication was not intended to conclude a bargain without further manifestation of the first party's assent." *Janky v. Batistatos*, 559 F. Supp. 2d 923, 930 (N.D. Ind. 2008). Here, Blagojevich never even communicated his willingness to enter into any bargain with Nayak, much less an illegal bargain. Thus, even under contract law, Blagojevich could not be found liable.

Further, the government failed to prove that Blagojevich took a substantial step towards committing bribery or extortion. Here, the government's evidence established only that Blagojevich *talked about* Nayak's illegal offer, although he never once talked about accepting it. The fact that Robert set up and then cancelled a meeting to *talk to Nayak* was not a substantial step because there were never any negotiations with Nayak or even demonstrations of an intent to enter into an illegal transaction.

As this Court stated in *United States v. Gladdish*, 536 F.3d 646, 650 (7th Cir. 2008):

Treating speech (even obscene speech) as the "substantial step" would abolish any requirement of a substantial step. It would imply that if X says to Y, "I'm planning to rob a bank," X has committed the crime of attempted bank robbery, even though X says such things often and never acts. The requirement of proving a substantial step serves to distinguish people who pose real threats from those who are all hot air; in the case of Gladish, hot air is all the record shows.

For these reasons, the charges related to the alleged exchange of the Senate seat to Jackson for campaign contributions – Counts 2, 3, 10, 18, 19 and 20 – were not proven and must be reversed.

**C.    The alleged attempt to extort campaign contributions from the President of Children's Memorial Hospital, Patrick Magoon.**

Blagojevich stands convicted of fraud, attempted extortion and bribery based on his unsuccessful attempt to get Magoon to contribute to his campaign.  The government's evidence established that Magoon spent months lobbying for the rate increase which Blagojevich eventually approved following discussions with his advisors.  Five days later, on October 22, Blagojevich directed his brother to ask Magoon to help raise $25,000 for his campaign.

Blagojevich had a right under the law to ask Magoon for a contribution five days after delivering good news about the rate increase, just as Magoon had a right to refuse to contribute.  The Supreme Court in *McCormick* stated that a public official may lawfully "act for the benefit of constituents ... shortly before or after campaign contributions are solicited ...."  *McCormick*, 500 U.S. at 272.

After initially telling Robert that he would "give some thought" to this request, Magoon decided not to raise funds for the Governor -- presumably because the Chicago Tribune ran a story that Magoon's lobbyist was under federal investigation -- but he never told Robert about this decision.  Robert then left a couple of messages for Magoon requesting a return call, and then gave up.  At no time did Blagojevich or any member of his staff ever threaten Magoon or even suggest that the rate increase was contingent on the fundraising request.

Magoon's opinion that Robert's request for a donation was a "very strong suggestion"

and that it was "linked" to the rate increase did not prove the crime of extortion.  Tr. 2521,

2547.  The government was required to prove an explicit promise or quid pro quo which it

failed to do.  Whatever the evidentiary value of Magoon's opinion about Blagojevich's

intentions,[11] such evidence cannot support this conviction.  If Magoon's unsubstantiated

opinion that Blagojevich was linking the contribution and the rate increase were sufficient

to convict, public officials would risk federal prosecution every time they solicit campaign

funds, for fear that the potential donor might *believe* the donation is linked to some official

act.  The *McCormick* Court established the explicit quid pro quo requirement specifically to

prevent the government from criminalizing politics and interfering with a public official's

right to raise funds for his campaign.  See *United States v. Allen*, 10 F.3d 405, 410 (7th Cir.

1993) (Congress never intended for the Hobbs Act to make "commonly accepted political

behavior criminal").

Moreover, the record shows that Magoon's opinion was based on a misunderstanding.

Blagojevich told Magoon that the rate increase would take effect after January 1.  Five days

later, Robert asked Magoon if he could help the Governor with fundraising, and he told

Magoon that the money would need to be raised before January 1.  The record is clear as to

the reason Magoon was given this fundraising deadline: January 1, 2009, was the effective

---

[11] See *United States v. Noel*, 581 F.3d 490, 496-97 (7th Cir. 2009) ("a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence"); *United States v. Santos,* 201 F.3d 953, 962 (7th Cir. 2000) (government witnesses stepped outside the boundaries of their personal knowledge and invaded the province of the jury when they testified that they had "no doubt" or a "personal feeling" that defendant had ordered her employee to cut off contractors who failed to contribute).

date of the new ethics bill which likely would prohibit Magoon, or anyone benefitting from

State contracts, from raising money for the Governor.  But Magoon apparently misinterpreted

Robert's message.  He testified that when Robert mentioned January 1, Magoon recalled that

the Governor had also mentioned January 1 as the date the rate increase would take effect.

Magoon thus concluded that from "my point of view, ... the increase in rates to specialty

physicians was contingent upon a contribution of $25,000."  Tr. 2521.  As the *McGregor*

court warned, one-sided solicitation of campaign funds "can be misinterpreted."  *McGregor*,

879 F. Supp. 2d at 1319.  It thus imposed a higher burden of proof where the government

alleges that a mere request for campaign funds was extortionate so as to prevent unjust

convictions.  *Id.* at 1318.

The government's case essentially came down to the fact that Blagojevich asked

Magoon for a contribution while the issue of the rate increase was before the Governor and

that, therefore, Magoon might feel some pressure.[12]  But even if Magoon did feel some

---

[12]  The following excerpt from the government's cross-examination of Blagojevich is illustrative:

  Q. I want you to focus on my question. You understood and understand that when you deliver good financial news to someone, then turn around and ask them for a favor, they may feel some obligation to help you, yes or no?

  A. Every circumstance is different. It depends on the given situation. I don't think that I can give you a universal answer.

  Q. Now, just five days after you made this call to Mr. Magoon, you met on October 22nd at the Friends of Blagojevich office, correct?

  A. Yes.  ***

  Q. And you understood your brother was going to ask Mr. Magoon for fundraising for you,

pressure – obviously he didn't feel much because he refused to help fundraise or to even take

Robert's calls – to prove extortion, the government had to prove an explicit quid pro quo.

Finally, the evidence that after Magoon refused to return Robert's calls, the rate

increase was put on hold is immaterial because this information was never communicated to

Magoon or used in any way by Blagojevich or his staff to pressure Magoon for the

contribution.[13]   A reasonable jury might find that when Magoon refused to even return

Robert's calls, after promising to "give some thought" to his request, and after Blagojevich

had found money in a tight budget for a raise in pay for doctors at Magoon's hospital,

Blagojevich got angry and cancelled or delayed the rate increase.  The evidence supporting

such a finding was weak – the jury would have to believe Greenlee's testimony that when

Blagojevich said "good to know" that was an order to suspend the rate increase.[14]  But of

course, the jury was entitled to accept Greenlee's testimony and find that Blagojevich acted

---

correct?

  A. That's right. The operative word was "ask."

  Q. And to get it in before January 1st, correct?

  A. If he could, yes.

Tr. 4814-16.

  [13] Magoon testified he received no material "communications from the Governor's office" after speaking to Robert on October 22.  Tr. 2551.

  [14] Blagojevich's explanation was far more plausible.  He testified that "good to know" meant that he had a "good excuse not to call [Magoon]" since, as Greenlee told him, they still had discretion over the rate increase.  Tr. 4065.  This testimony was corroborated by the undisputed evidence that neither Blagojevich nor any of his staff called Magoon after his call with Greenlee.

vindictively towards Magoon.  Nevertheless, an act of vindictiveness is not the same as extortion.

**D.    The alleged attempt to extort campaign contributions from horse racing executive John Johnston.**

The evidence that Blagojevich tried to extort Johnston is similar, but not identical, to the evidence relating to Magoon.  Unlike Magoon, Johnston was a long-time, regular supporter of the Governor, who had contributed every year to the Governor since his election in 2002.  Tr. 3722-23.  In September, 2008, two months before the recapture bill passed the Illinois General Assembly and reached the Governor's desk, Johnston had made a commitment "to raise or contribute $100,000" for the Governor's campaign fund "by the end of end of October 2008."  Tr. 3770.  Thus, the solicitation of Johnston was, at least initially, unconnected to the recapture bill in which Johnston had an interest.  However, because Johnston did not fulfill his commitment, it was still outstanding on November 24, 2008, when the recapture bill was sent to the Governor.

As with the Magoon extortion charges, there was no evidence that Blagojevich or his associates ever communicated to Johnston any threat or any suggestion that the signing of the recapture bill was contingent on his contribution to the campaign.  The trial evidence was that Monk, Johnston's lobbyist, had been asking Johnston about fulfilling his fundraising commitment since at least October.  The alleged extortion took place on December 3, about a week after the recapture bill reached the Governor's desk, when Monk met with Johnston and again asked him to fulfill his commitment.  But during this conversation, Monk, at the

Governor's direction, told Johnston that the fundraising request was a "different subject matter" or a "separate conversation" from the bill signing.  Tr. 2781, 3032.

The government again relied primarily on the opinion of the prospective donor, a cooperating witness with immunity, to prove its case.  Johnston testified, over objection, that he believed that if he failed to make his contribution by the end of the year, "there would be, at a minimum, a delay in the bill signing and possibly, you know, no signature at all."  Tr. 2991.  Here again, to the extent that Johnston's opinion as to Blagojevich's unstated intentions had any evidentiary value, it was not sufficient to prove extortion.

The government also relied on a recorded conversation in which Monk told Blagojevich that he intended to tell Johnston that the Governor "feels like you're gonna get skittish [about making your commitment] if he signs the bill."  In closing argument, the government told the jury that merely speaking about the bill signing and the fundraising commitment in "a single sentence, tying the two" was proof of a "criminal scheme."  Tr. 5509.  But the mere fact that the fundraising and the bill-signing became connected[15] on November 24 when the bill reached the Governor's desk, was not proof of extortion.  Again, the government was required to prove an explicit quid pro quo.

Finally, the government relied on evidence that on November 26, Blagojevich's general counsel sent an email to his chief of staff stating that the recapture bill was "Okay to sign."  Tr. 1572.  In closing argument, the government told the jury that Blagojevich had

---

[15] In closing argument, the government told the jury: "And everybody involved understands he's connecting the two, John Harris, Lon Monk, John Johnston, they all get it."  Tr. 5364.

"absolutely no legitimate reason to delay the signing of this bill." Tr. 5364. But the record clearly shows that the Governor had 60 days to act on a bill once it reached his desk and was under no obligation to sign immediately. Tr. 2257, 3719. And while the record contains several reasons why Blagojevich didn't immediately sign the bill, a reasonable jury could find that Blagojevich delayed signing the bill because he thought there was a better chance that Johnston would fulfill his commitment if the bill was unsigned. But a delay in signing a bill to motivate a donor to fulfill a commitment is routine politics and not criminal extortion unless an explicit threat or promise was communicated to the donor. Here, there was not a drop of evidence that Blagojevich ever intentionally caused such a message to be communicated to Johnston. His convictions on Counts 9, 14 and 15 must be reversed.

## II.    THE JURY WAS MISLED AS TO THE LAW FOR FRAUD, EXTORTION AND BRIBERY.

**Standard of Review**: This Court typically reviews jury instructions *de novo*, but gives the district court substantial discretion to formulate the instructions "so long as [they] represent[ ] a complete and correct statement of the law." *United States v. Matthews*, 505 F.3d 698, 704 (7th Cir. 2007).

### A.    The court's instructions to the jury misstated the law.

#### 1.    There was no legal basis to instruct the jury that an arm's length exchange of an official act for a public service job is a federal crime.

A centerpiece of the government's case was that Blagojevich committed federal crimes by trying to make a deal with Barack Obama to appoint Obama's candidate for the Senate, Valerie Jarrett, in exchange for a job in the Obama Administration or for some other

public service job.  The lower court directly told the jury to convict the defendant if he attempted to make such a political deal.

The jury was instructed that a "public official commits bribery when he directly or indirectly demands, solicits, seeks, or asks for, or agrees to accept something of value from another person in exchange for a promise for or performance of an official act....  The term 'something of value' includes money, property, and prospective employment."  Tr. 5538.  The extortion instructions contained similar language, defining "property" as "any valuable right considered as a source of wealth."  Tr. 5542-45.  The wire fraud instructions encompassed the bribery and extortion counts.  Tr. 5537.  The bribery solicitation and conspiracy instructions similarly told the jury to convict if the defendant acted "with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties....  The term 'anything of value' may include campaign contributions and potential salaries from a job."  Tr. 5550-51.  Blagojevich's objections to these instructions were overruled.  Tr-I 5982; Tr. 3279-81.

The lower court's finding that any job that earns a salary is a "thing of value" which cannot lawfully be received in exchange for an official act is incorrect as a matter of law.  In *Sekhar v. United States*, No. 12–357, Slip op. at 5 (U.S. June 26, 2013), the Supreme Court limited the definition of "property" under federal extortion laws to items that are "transferable--that is, capable of passing from one person to another."  Thus, in *Sekhar*, the defendant's threat to expose the extramarital affair of a state official to obtain a recommendation for a lucrative state contract was not extortion because the recommendation

-47-

did not meet the definition of transferable property.  Here, Blagojevich's attempt to obtain

a public service job in the Obama Administration was not transferable property under the

*Sekhar* test.

Blagojevich sought a public service job in exchange for an official act.  The record

is clear that he believed he was well qualified for this job because of his success in passing

the All Kids health insurance program during his first term as Governor in Illinois.  See Tr.

1358, 1466, 3462-64, 4135.  In other words, the proposed exchange was in the public interest

as Blagojevich understood it.[16]  See *Thompson*, 484 F.3d at 884 (fraud conviction reversed

where state employee's actions in awarding a travel contract to a political ally of her boss

were "designed to pursue the public interest as the employee understood it").  The mere fact

that Blagojevich told his advisors, during private conversations, that he needed to earn

enough salary to support his wife and two daughters, did not *per se* transform a public service

job into a private gain.  As this Court found in *Thompson*, a raise in salary for a public

employee "approved through above-board channels" is not the kind of "private gain"

criminalized in the federal fraud statutes.  *Id*.  Had Blagojevich been primarily concerned

with salary over public service, he would have pursued a job in the private sector, like other

former governors have, where he could have made many times the salary.

The lower court also acknowledged the difficulty in distinguishing between politics

and "private gain" during arguments over Blagojevich's good faith defense, when it

---

[16] The lower court acknowledged at sentencing that Blagojevich's work improving
healthcare for children "was motivated by a true concern for the welfare of children."  Tr.
12/7/11 at 252.

conceded that public officials may lawfully exchange support for each others' bill. Tr. 4142. But even this type of political deal typically provides personal benefits to a lawmaker who uses his victory passing his bill to raise campaign funds, to win reelection, to receive more salary and benefits, etc.

In cases such as *Sorich*, *supra*, and *United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012), this Court made clear that jobs are "property" for purposes of federal fraud statutes. But in these cases, the victim of the fraud was the entity offering the jobs who was defrauded of its right to "get the employees that it wanted to hire and thus was cheated out of money." *Del Valle*, 674 F.3d at 704. Moreover, in these cases, there was evidence of the defendants' intent to deceive the victim. See *Del Valle*, 674 F.3d at 699 (defendants used "falsified ratings for applicants" and "conducted sham interviews to give the appearance of integrity to the process"); *Sorich*, 523 F.3d at 711 ("massive scheme to defraud, ... defendants created an illegitimate, shadow hiring scheme based on patronage and cronyism by filling out sham interview forms, falsely certifying that politics had not entered into their hiring, and covering up their malfeasance"). In the case at bar, Blagojevich's proposed exchange with Obama was an arm's length deal between two politicians, each of whom had the power to make political appointments. No evidence was presented of any attempt or intent to deceive Obama. Accordingly, neither *Sorich* nor *Del Valle* supported the court's instruction declaring Blagojevich's proposed political exchange to be a federal crime.

There are a few cases in which a public official or employee was charged with bribery for accepting employment from a private firm in exchange for his favorable treatment of that

firm.  See e.g. *United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999); *United States v. Bryant*, 655 F.3d 232, 237 (3rd Cir. 2011).  In the case at bar, the government offered no evidence that Blagojevich ever pursued a job in private industry in exchange for an official act favoring that industry.  Had there been such evidence, these cases would be applicable, and it would have then been appropriate to instruct the jury on this issue.

> **2.    The jury instructions omitted the quid pro quo requirement that the government prove that Blagojevich's requests for campaign contributions were made in return for an "explicit promise or undertaking" to perform or not perform an official act.**

Most of the charges against Blagojevich involved his solicitation of campaign funds.  More than twenty years ago, the Supreme Court required "a quid pro quo showing" in all cases in which a public official is alleged to have committed extortion based upon receipt of campaign contributions.  *McCormick v. United States*, 500 U.S. 257, 272 (1991). The *McCormick* Court further found:

> The receipt of such contributions is also vulnerable under the [Hobbs] Act as having been taken under color of official right, but only if the payments are made in return for an *explicit promise* or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

*Id*. at 273 (emphasis added).

In the case at bar, the lower court refused to instruct the jury as to *McCormick's* requirement that the government prove that the funds were solicited in exchange for an

explicit promise or quid pro quo.[17]

The lower court erroneously told the jury that "to prove attempted extortion or conspiracy to commit extortion the government must prove that the defendant attempted or conspired to obtain property or money knowing or believing that it would be given to him in return for the taking, withholding, or other influencing of specific official action."  Tr. 5545.  The jury was also told that there was no distinction between "money" and a "campaign contribution."  Tr. 5544.  The court told the jury: "However, if an official receives or attempts to obtain money or property believing that it would be given in exchange for specific requested exercise of his official power, he has committed extortion under color of official right even if the money or property is to be given to the official in the form of a campaign contribution."  Tr. 5544.

The instructions in the case at bar were nearly identical to the instructions found deficient in *McCormick*.  Blagojevich's jury was told to convict Blagojevich if he "believ[ed]" a campaign contribution "would be given in exchange for specific requested exercise of his official power."  The *McCormick* jury was "told that it could find McCormick guilty of extortion if any of the payments, even though a campaign contribution, was made ... with the expectation that McCormick's official action would be influenced for their benefit and if McCormick knew that the payment was made with that expectation."  500 U.S. at 274.

---

[17] Not only did the lower court refuse to instruct the jury about the "quid pro quo" requirement, it further prohibited defense counsel or defense witnesses from discussing the phrase.  Tr-I. 5913; 4/30/10 Tr., at 8-10; Tr. 3437-38.  On the other hand, prosecution witness John Harris was permitted to testify, over objection, about his understanding of the phrase and about his belief that Blagojevich was seeking a quid pro quo.  Tr. 1469-70, 1484.

Blagojevich's lawyers objected to the lower court's instructions and submitted proposed instructions that were similar to instructions given in the recent case of *United States v. McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012). R. 715. The defendant's objections were all overruled. Tr-I. 5983-84; Tr. 5039-63, 5220-42.

"Because campaign contributions implicate significant First Amendment rights, courts have fashioned heightened standards of proof to ensure that protected political activity is not criminalized or unduly chilled." *McGregor*, 879 F. Supp. 2d at 1312. Here, the lower court's instructions misled the jury by failing to explain the legal distinction between campaign contributions and bribes, as well as the higher burden on the government to prove that a request for the former was a federal crime.

In *McGregor*, elected officials in Alabama were charged with bribery, extortion and fraud for allegedly demanding campaign contributions in exchange for favorable action on a pending electronic bingo referendum." *Id*. at 1313. The court surveyed the post-*McCormick* extortion cases and found that an even more rigorous quid pro quo requirement is necessary in "promise or solicitation" cases where there is no actual "quid pro quo agreement" or "meeting of the minds." *Id*. at 1318.

In a detailed opinion explaining the legal principles underlying its instructions to the jury, the *McGregor* court found that because "one-sided offers can be misinterpreted, ... [a] higher threshold is ... appropriate in order to protect political speech." *Id*. at 1319. Thus, to be a crime, a solicitation of a campaign contribution must be "conditioned on the performance of a specific official action"; it must be "explicit"; and it must be "material."

-52-

*Id*. at 1311.

> The *McGregor* court thus instructed the jury as to the following principles of law:

> (a) For a defendant to be guilty under this statute, the government must prove that there was a quid pro quo.

> (b) Campaign contributions and fundraising are an important, unavoidable and legitimate part of the American system of privately financed elections.

> (c) The solicitation by an elected official of a campaign contribution does not, in itself, constitute a federal crime, even though the donor has business pending before the official, and even if the contribution is made shortly before or after the official acts favorably to the donor.

> (d) A solicitation of a campaign contribution may be an illegal quid pro quo, as well. But to be illegal (1) it must be a solicitation conditioned on the performance of a specific official action ... (2) it must be explicit; and (3) it must be material. To be explicit, the promise or solicitation need not be in writing but must be clearly set forth. An explicit promise or solicitation can be inferred from both direct and circumstantial evidence, including the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence, as well as the rational or logical inferences that may be drawn from them.

*McGregor*, 879 F. Supp. 2d at 1310-11.

These same legal principles should have applied to Mr. Blagojevich. The extortion charges against him are based on one-sided requests or "solicitations" for campaign donations. Cooperating witnesses testified as to their belief that these requests were connected to some official act despite the absence of any evidence of an explicit promise.[18] None of the charges allege any actual quid pro quo agreement or meeting of the minds

---

[18] The evidence at trial illustrated the precise danger expressed in *McGregor* that one-sided solicitations can be misinterpreted. As set forth in Section I of this brief, Magoon misinterpreted Robert Blagojevich's request that he raise funds before January 1, 2009, as if it were a threat when in fact Robert was referencing the effective date of the new ethics bill.

between Blagojevich and the potential donor.  Nor is there evidence that Blagojevich ever told a potential donor that there would be any negative consequence if they failed to contribute.

**B.     The government exploited the deficient instructions to mislead the jury.**

In assessing a claim of an erroneous instruction to the jury, this Court reviews the instruction "in the context of the overall trial and the arguments by counsel." *United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir. 1988).  See also *United States v. Toushin*, 899 F.2d 617 (7th Cir. 1990) (erroneous jury instruction in tax fraud prosecution was not harmless where trial court essentially prevented defendant from presenting to the jury his theory of defense).  In the case at bar, the government took every opportunity to mislead the jury about the law.

First, the government told the jury that Blagojevich's request for a job in the Obama Administration was the same under the law as a request for a bribe.  Beginning in opening statement, the government erroneously told the jury that the "high-paying job" sought by Blagojevich was the legal equivalent to a cash bribe because it provided him a "personal benefit." Tr. 1146-48, 1154.  In summation, the government continued to misstate the law:

> Now, just so it's clear, it doesn't matter if the defendant is asking for a car, for money, or a political job for himself in exchange for that Senate seat, any one of those is illegal. The law makes no exception for political jobs. As long as the defendant is trading an official action, trying to trade that official action for a personal benefit, it's a crime. So don't be confused into thinking that it's just politics somehow because this is a political job, it's not.

Tr. 5278.

-54-

Government Exhibit Ethics 2, that's the ethics training he took. They use examples in the training, you can't trade state actions for free bar drinks, you can't trade it in for free bar drinks. So somehow he was mistaken he could trade it for a cabinet-level position that paid over $100,000?

DEFENSE COUNSEL: Objection.

THE COURT: That argument can stand.

Tr. 5499.

Second, the government repeatedly misled the jury by equating requests for campaign donations to cash bribes. Again and again, the government compared Blagojevich's requests for campaign donations to a police officer's request for a cash bribe in exchange for tearing up a speeding ticket. Tr. 1165, 5264, 5279, 5283, 5286. The government continued to mislead the jury during its cross-examination of the defendant:

Q. And this [requested donation from Johnston] was money for your campaign fund, right?

A. Yes.

Q. To benefit you, correct?

A. Campaign fund, yes.

Q. Well, to benefit you?

A. How do you define it, politically, benefit me politically.

Q. I'm not saying you were going to take the money and personally spend it, but it was a benefit to you as a politician, correct?

A. Political benefit, yes.

Tr. 4767.

-55-

Q. And this [requested donation from Johnston] was money for you, correct?

A. Campaign funds.

Q. It was of value to you, correct?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

A. I was very scrupulous in never using campaign funds for personal use, so I don't view that as a value to me. It's political.

Q. Your campaign fund is not a value to you, sir?

A. It's a political campaign fund. I repaid it from time to time because I wanted to make sure –

Q. My question is simple. Is your campaign fund of value to you?

DEFENSE COUNSEL: Objection.

A. It's not of personal value to me.

Q. That's not my question. My question is, is it of value to you?

DEFENSE COUNSEL: Objection.

THE COURT: Objection is overruled.

A. My political campaign fund is not personal value to me.

Q. It was important to you, wasn't it?

A. That's undenied.

Q. You wanted as much money as you could possibly get there, correct?

A. As long as it was obtained legally.

Q. My question was, you wanted as much money as you could possibly get there,

didn't you?

A. I think, yes.

Q. And that's because it was of value to you?

DEFENSE COUNSEL: Objection.

A. Not of personal value to me.

THE COURT: The objection is overruled.

Tr. 4779-81.

Q. If someone offers you money to take a state action, you understand that's a bribe?

DEFENSE COUNSEL: Objection, Your Honor. Ask for sidebar.

THE COURT: Overruled.

A. Look, if you're offering me cash personally, that's clearly a bribe. If you're asking me what the laws are regarding campaign funds, I know that's illegal. I'm reluctance to give you an answer. If I get it wrong, I don't know what you'll do with that.

Tr. 4896.

These questions on cross-examination also misstated the evidence in the record.  As Harris testified, a governor's campaign war chest is important to demonstrate political strength and influence, not only to win reelection, but also to support the campaigns of other politicians who support his agenda.  Tr. 1289.  Blagojevich also testified about the importance of campaign resources in getting his message to the people and obtaining political support for his agenda items.  Tr. 3701-03.

Thus, in our political system, a governor does not raise campaign funds for personal

enrichment[19] – it is part of his job. A governor who cannot raise funds will be an ineffective leader and will have a difficult time enacting any of his initiatives or legislative priorities.

Third, the government misled the jury on the requirements to prove extortion, suggesting that the government only need prove that the request for a campaign contribution was "connected" to an official act. For example, in closing argument the government told the jury that when Blagojevich said to Wyma: "I'm gonna do the money for Children's, I want to get Magoon for 50. He has connected the two. They are in the same sentence." Tr. 5381. See also Tr. 5390 (Wyma's testimony "absolutely tells you the [rate increase and the request for a contribution] are connected.")

The fact that Blagojevich's decision to ask Magoon to help fundraise was *connected* to the rate increase did not make it a crime.[20] See *Citizens United v. Federal Elections Commission*, 558 U.S. 310, 359 (2010) ("It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors.") (citation omitted); *United States v. Allen*, 10 F.3d at 410-11 ("It would be naive to suppose that contributors do not expect some benefit--support for

---

[19] In this case, there is no evidence or allegation that Blagojevich ever used a penny of his campaign funds for personal enrichment. To the contrary, the record reveals that he even used his own money to pay for items such as clothing that he could have declared as a political expense and paid for out of his campaign fund. Tr. 2001-11.

[20] Wyma testified that it was Blagojevich's belief that the hospital "was in line to get some funding and, therefore, Children's Memorial Hospital might want to give a fundraiser for Rod because they were getting that funding." Tr. 2370, 2422.

favorable legislation, for example--for their contributions."); *United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999); *United States v. Taylor*, 993 F.2d 382, 383 (4th Cir. 1993) ("All payments to elected officials are intended to influence their official conduct.").

To convict Blagojevich, the government was required to prove an explicit promise or quid pro quo, not merely a "connection" between the contribution and the official act. The court's erroneous instructions of law require reversal.

## III.  THE LOWER COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING EVIDENCE OF THE DEFENDANT'S GOOD FAITH AND THEN MISSTATING THE GOOD FAITH DEFENSE IN ITS INSTRUCTIONS TO THE JURY.

**Standard of Review**:  This Court reviews a district court's evidentiary rulings for abuse of discretion.  *Romanelli v. Suliene*, 615 F.3d 847, 854 (7th Cir. 2010).  This Court typically reviews jury instructions *de novo*, but gives the district court substantial discretion to formulate the instructions "so long as [they] represent[ ] a complete and correct statement of the law." *United States v. Matthews*, 505 F.3d 698, 704 (7th Cir. 2007).

A criminal defendant is "unquestionably entitled to 'a meaningful opportunity to present a complete defense.'" *United States v. Alayeto,* 628 F.3d 917, 922 (7th Cir. 2010) (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)).  See also *California v. Trombetta*, 467 U.S. 479, 485 (1984); *California v. Green*, 399 U.S. 149, 176 (1970).  A defendant is also entitled to have the jury consider any theory of defense supported by law and evidence.  *United States v. Kelley*, 864 F.2d 569, 572 (7th Cir.1989).

**A.    Good faith is a defense to fraud, extortion and bribery.**

Good faith is a proper defense "in cases in which the government must prove some form of 'specific intent,' such as intent to defraud or willfulness."  Seventh Circuit Pattern Criminal Jury Instruction 6.10, Committee Comment.  Good faith is a recognized defense to the charges of fraud, bribery and extortion brought against Blagojevich.  See *Evans v. United States*, 504 U.S. 255, 278 (1992); *United States v. Warner,* 498 F.3d 666, 691 (7th Cir. 2007); *United States v. Crozier*, 987 F.2d 893 (2nd Cir. 1993); *United States v. Otto*, 850 F.2d 323, 326 (7th Cir. 1988); *United States v. Martin-Trigona*, 684 F.2d 485, 492 (7th Cir. 1982).

For federal crimes such as fraud, the government must prove the defendant's "knowledge of wrongdoing".  *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1994). See also *Cheek v. United States*, 498 U.S. 192, 204 (1991) (defendant's "good-faith belief that he was not violating any of the provisions of the tax laws" was a complete defense to a charge of "willfully attempting to evade" payment of income tax "even if the defendant's belief was mistaken or objectively unreasonable").  The *Cheek* Court further stated that "forbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision."  *Id.* at 203.

**B.    The lower court committed constitutional error in taking away Blagojevich's good faith defense.**

In the case at bar, the lower court initially acknowledged that the *Cheek* principle was applicable to Blagojevich.  Prior to trial and again during jury selection, the court said that, should Blagojevich testify, he may say "I looked at the law and I thought it was legal, I had

a good faith belief, I'm not excluding this." 4/14/11 Tr. at 19; Tr. 1028. At the close of the government's case, the court again ruled that, should the defendant testify, he would be permitted to rebut the government's evidence by testifying to "what John Cheek said, which is I honestly believed that what I was doing was legal." Tr. 3216.

But then when the defendant took the stand and began to testify, waiving his Fifth Amendment privilege, the court changed its mind and took away his good faith defense. The court initially required Blagojevich to preview his good faith defense outside the presence of the jury. Tr. 4149. Blagojevich advised the court that he intended to tell the jury that he honestly believed that trading the selection of the replacement Senator for a position in the Obama Administration was legal. Tr. 4151. Blagojevich explained that there were three things that helped form his understanding of the law. The first were his conversations with his advisors where they discussed the proposed exchange. Second, he relied on his experience in politics where "horse-trading" is often necessary to get something passed even when that something is "the right thing to do for the people." Tr. 4147. Blagojevich offered examples of "political horse-trading" used to pass programs such as his All Kids program. Tr. 4159-60.

Third, Blagojevich told the court that his understanding of the law was informed by his readings of history. Blagojevich is an avid reader of history and biographies of political leaders. Tr. 3565-68, 4153. He described six historical examples where leaders such as General Dwight Eisenhower, Gerald Ford, Abraham Lincoln, Barack Obama, Thomas Jefferson, and John F. Kennedy, all agreed to a political deal in which an appointment to a

job such as a Cabinet position, Ambassadorship, Senator, or even Supreme Court Justice, was

exchanged.  Tr. 4152-56.

After hearing Blagojevich's offer of proof, the court prohibited him from testifying

about his understanding of the law.  Tr. 4181-84.  The court stated:

[H]is legal opinion doesn't count, so it's out.

Tr. 4181.

So what the defense wants to do, as I understand it, is put him in a position where he
can say even if it is one for the other, I still acted in good faith, which I don't think he
can say. His opinions about the legality of something is out, and I don't want to see
that by implication.

Tr. 4182-83.

He's perfectly free to say I thought I could do this because I didn't think it was one
for the other. That's what he can say and that's what we're going to limit it to.

Tr. 4183-84.

This ruling was an abuse of discretion and it denied the defendant his right to present

a defense guaranteed by the Fifth and Sixth Amendments to the Constitution.  The reasoning

behind the court's ruling is not entirely clear from the record.  After initially telling the

defendant that he would be permitted to testify about "what John Cheek said," the court

changed its mind and found *Cheek* inapplicable because the tax laws applicable in *Cheek* are

"extremely complicated, you can step over the line in an instant. The line is not very clear."

Tr. 4177.

However, as set forth more completely in the preceding section of this brief, the laws

applicable to political corruption "are not a model of clarity."  See *McGregor*, 879 F. Supp.

-62-

2d at 1312 (it is a "murky field of federal law").  Whereas, the defendant in *Cheek* had

available to him published regulations and court opinions, there were no court opinions that

we could find available to warn Blagojevich that his proposed deal was a crime.  Compare

*United States v. Sorich*, 523 F.3d 702, 711 (7th Cir. 2008) ("although the defendants insist

that this prosecution is 'an unprecedented expansion' of honest services mail fraud, several

cases on the books provided them ample warning that they risked prosecution [for

patronage-in-hiring scheme]").

Moreover, it was for the jury and not the judge to decide whether or not the

defendant's testimony that he believed it was legal to trade the Senate seat for a job was

credible.  See *Cheek*, 498 U.S. at 203 ("Knowledge and belief are characteristically questions

for the factfinder, in this case the jury.")  Here, the court committed reversible error by taking

the issue away from the jury.

**C.    The court's revised "good faith" instruction to the jury misstated the law and sealed Blagojevich's fate.**

The lower court gave the jury the following modified good faith instruction:

Good faith on the part of the defendant is inconsistent with intent to defraud [or to commit extortion or act corruptly] an element of the charges. In the context of this case, good faith means that the defendant acted without intending to exchange official actions for personal benefits. The burden is not on the defendant to prove his good faith; rather, the government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud. The government is not required to prove that the defendant knew his acts were unlawful.

Tr. 5542, 5545, 5552.

The second and final sentences of this instruction are not part of this Court's pattern

-63-

instruction, 6.10.  These two sentences were drafted by the government and they misstated the law.  The court's erroneous "good faith" instruction applied to all counts of conviction at the retrial.

The final sentence of the instruction told the jury that the government is "not required to prove that the defendant knew his acts were unlawful."  But to prove fraud, the government was required to prove "knowledge of wrongdoing".  *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1994).  Thus, this sentence misstates the law.  Moreover, the government improperly characterized Blagojevich's good faith defense as an ignorance-of-the-law-is-no-excuse defense.  Tr. 5496.  Blagojevich has never asserted any such defense.  To the contrary, Blagojevich conceded that he knew the law and that he understood the principles of *McCormick v. United States*, 500 U.S. 257, that it was unlawful to exchange an official act for campaign contributions.  Tr. 2769, 3828-30.  Blagojevich's proposed good faith defense, excluded by the court, was that his conduct complied with the law as he understood it.  This was a proper defense which he should have been permitted to assert.

The second sentence of the modified instruction defined "good faith" to mean "that the defendant acted without intending to exchange official actions for personal benefits."  Another instruction told the jury that a "personal benefit" includes both "campaign contributions" and "potential salaries from a job." Tr. 5551.  Accordingly, these instructions told the jury that Blagojevich's proposed political deal with Obama was *per se* unlawful and that Blagojevich's understanding of the law was irrelevant.  As explained in the previous section of this brief, the prior case law precedents in political corruption cases contradict the

court's statement of the law.  There was no legal basis to tell the jury that an arm's length deal between two public officials exchanging appointments to public service jobs is unlawful merely because the job pays a salary.

**D.    The exclusion of the defendant's good faith defense and the erroneous instructions to the jury was not harmless error.**

The lower court committed constitutional error in denying Blagojevich his right to present a legitimate defense.  See *California v. Trombetta*, 467 U.S. 479, 485 (1984); *California v. Green*, 399 U.S. 149, 176 (1970) (compulsory process and confrontation clauses "constitutionalize the right to a defense as we know it").  However, as the Supreme Court has found, most constitutional errors are still reviewed for harmlessness.  *Neder v. United States*, 527 U.S. 1, 8 (1999).

Here, if the exclusion of Blagojevich's good faith defense does not require automatic reversal, this Court should find that the error was not harmless.  The lower court's erroneous statement of the law relating to good faith was devastating to Blagojevich's defense.  Blagojevich has never denied that he had an intent to exchange the Senate seat for a position in the Obama administration (i.e., a "job").  For example, on cross-examination, he was asked if his request for the HHS position was "connected to the Senate seat?"  He replied:

> If it was legal, who knows. We thought it was, I certainly did, everybody else seemed to think so, too, that's why we were talking about these things. But I was not yet in the position to decide it. I was gathering options.

The lower court then, *sua sponte*, struck the defendant's answer as "nonresponsive."  Tr. 4714-15.

-65-

Thus, the court's modified "good faith" instruction effectively told the jury that the defendant did not act in good faith, and even worse for the defendant, that it must convict him. And if the trial jury had any doubt as to its obligations under the erroneous instruction, the government removed these doubts with its closing argument, excerpts of which are set out below:

> [O]nce you find that he's trying to trade state action for personal benefit, you have found intent to defraud, and you have also found that he was not operating in good faith. You're going to get an instruction that what good faith means is that the defendant did not have the intent to exchange official acts for personal benefit.

Tr. 5317.

> [T]he defendant was fully aware that he was trying to trade state actions for personal benefits, and once you've found that, he does not have good faith.

Tr. 5318.

> Once you find that he's trying to get, he's trying to trade state action for something for him, there is no good faith. You have found a corrupt intent, once you found that he's trying to trade in that way, there is no good faith.

Tr. 5348.

> [G]ood faith simply means I did not think that I would [trade] one for the other. If you decide he was trying to or make efforts to, good faith is not a defense.

Tr. 5496.

The erroneous instruction was even more damaging here because the court initially announced its mistaken view of the law *after* Blagojevich had already taken the stand, thereby taking away his defense and making him appear incredible and foolish before the jury. After Blagojevich began his testimony, the lower court ruled that he would not be

permitted to tell the jury about his honest belief that the law permitted him to exchange an official act for a public service job. Instead, the court told Blagojevich that all he was permitted to say in his defense is that "I thought I could do this because I didn't think it was one for the other."[21] Tr. 4183-84.

Finally, had Blagojevich been permitted to present his good faith defense, it would have been a powerful defense, likely to produce an acquittal. Blagojevich's private conversations, recorded by the government, reveal that he made no attempt to conceal his intention to appoint Ms. Jarrett in exchange for a job in the Obama Administration. To the contrary, Blagojevich openly discussed his proposed deal with numerous advisors, including his general counsel, and with Tom Balanoff, the union executive who was actively pushing Blagojevich to appoint Ms. Jarrett to the Senate seat. Tr. 4133, 4680-84. Blagojevich even discussed making a "public announcement" of his proposed political deal. Tr. 1721-22, 4411-12. This evidence strongly supported Blagojevich's defense that he believed his actions comported with the law.

Moreover, the government could not have rebutted Blagojevich's good faith defense by pointing to published court decisions or rules declaring his proposed political deal to be a crime because no such opinions exist. Compare *Cheek,* 498 U.S. at 202 (government's

---

[21] In this ruling, the lower court was effectively inviting Blagojevich to lie to the jury, an invitation he did not accept. Just prior to issuing this ruling, Blagojevich had admitted to the court, outside the presence of the jury, that he did have an intent to exchange the Senate seat for a job in the Obama Administration. Tr. 4150-59. Thus, had Blagojevich testified, per the court's suggestion, that he "didn't think it was one for the other," he would have been committing perjury.

evidence rebutting Cheek's good faith defense included "court decisions rejecting his interpretation of the tax law", "authoritative rulings of the Internal Revenue Service," and the "contents of the personal income tax return forms and accompanying instructions that made it plain that wages should be returned as income").

For all these reasons, the lower court's exclusion of Blagojevich's legitimate good faith defense together with its improper instructions to the jury warrants reversal on all counts of conviction.

## IV.   BLAGOJEVICH'S CONFRONTATION RIGHTS WERE INFRINGED WHEN THE LOWER COURT PREVENTED CROSS-EXAMINATION OF GOVERNMENT WITNESSES AS TO THEIR BIAS.

**Standard of review:** When a district court's limitation of cross-examination directly implicates the values protected by the Confrontation Clause of the Sixth Amendment, this Court reviews the district court's ruling *de novo*; otherwise, it reviews the district court's limitation of cross-examination under the abuse of discretion standard.  *United States v. Martin,* 618 F.3d 705, 727 (7th Cir. 2010).

A trial court may impose reasonable limits on the scope of cross-examination, but the defendant's rights under the Confrontation Clause may be violated if those limitations completely foreclose a defendant from exploring the witness' bias or motive to testify. *United States v. Walker*, 673 F.3d 649, 657 (7th Cir. 2012).  In the case at bar, the judge's restrictions on exploration of bias of government witnesses were not reasonable.

The credibility of the cooperating witnesses was crucial to the case as the government relied heavily on their opinions that Blagojevich intended to break the law.  The government

bolstered the credibility of its cooperating witnesses by repeatedly telling the jury that their

cooperation agreements require them to tell the truth.  Tr. 1175, 1275 (if I lie, my "agreement

is off"), 2023 ("I have to tell the truth and nothing but the tru[th] or get perjury charge"),

2567, 2620 ("the only way I can get in trouble is if I lie"), 2629, 2695, 2696 (if I lie, my

agreement "becomes null and void").  In closing argument, the government told the jury:

> Lon [Monk's] plea agreement rests on him telling the truth. The only way he loses
> that plea agreement is if he lies under oath to you. He has every incentive to tell you
> the truth, unlike the defendant. The defendant has every incentive to come in here and
> lie. He's trying to save himself. Lon Monk, to save himself, needs to tell the truth.

Tr. 5360.

The court unfairly prevented the defense from rebutting this misleading evidence by

pointing out that the cooperating witnesses, such as Monk, had a strong incentive in this case

to provide testimony to help the government convict Blagojevich.  In the tape-recorded

conversations between Monk and Blagojevich, both men agree that Monk must make it clear

to Johnston that the issue of his contribution is "separate" from the issue of the recapture bill.

Yet on the stand, Monk testified that Blagojevich's unspoken message to Johnston was that

issues were linked and not separate.  Tr. 2776.

Monk conceded, during an offer of proof outside the presence of the jury, that after

his arrest and his decision to seek help from the government "in form of mercy," he learned

that "Blagojevich was target number one" and that anything Monk could say "against

Blagojevich" would help Monk with the government.  It was only after learning these facts

that Monk expressed his opinion that Blagojevich wanted him to deliver the extortionate

message.  Tr. 2958-63.  The court excluded this impeachment on the grounds that no "adverse inference" could be drawn from these facts.  Tr. 2968.  The defense was also precluded from asking Monk about the fact that his plea deal allowed him to avoid any enhancement to his offense level under the sentencing guidelines for the $70-90,000 in cash bribes he took from Rezko.  Tr. 2936, R. 195.  The court also precluded impeachment of Monk with his prior inconsistent testimony from the first trial that, in his recorded conversations with Blagojevich, they were "figuring out a way to make Johnston not feel extorted."  Tr-I 1429A, Tr. 2958-68.

All of this evidence was proper impeachment of a critical government witness which the lower court erroneously excluded.  See *United States v. Manske*, 186 F.3d 770, 778 (7th Cir. 1999) (district court erred when it prohibited defendant from asking questions directed at exposing biases of cooperating witnesses and their motive to testify against him).

John Wyma testified that he was motivated to cooperate with the government after he heard Blagojevich talking about asking Magoon for a campaign contribution.  Tr. 2372-73.  This testimony was highly misleading.  Before talking to the government, Wyma was under criminal investigation for his lobbying work on behalf of a client named Provena, and his association with Tony Rezko and Stuart Levine.  Tr. 2448-60.  Although the Provena investigation was unrelated to Blagojevich, once Wyma agreed to cooperate against the Governor, the other investigation was dropped and Wyma was given immunity from prosecution.  Tr. 2335, 2454.

These facts were highly relevant to bias, as defense counsel argued.  Tr. 2452-60.

Yet, the court prohibited the defense from cross-examining Wyma on these issues. The court

stated:

> Well, I don't know if whoever the prosecutors were who did this awful thing of issuing a Provena subpoena and talking to him about something else, if they were on trial might be relevant, but what's happening here is you're trying to put on trial somebody other than the defendant and some charges other than the ones that were returned, and this is irrelevant. You want to file a complaint against the U.S. Attorney's Office, file a complaint. It's not relevant to this defense.

Tr. 2452.

This ruling was in error. Wyma's motives to fabricate information about Blagojevich

to deflect attention from his own criminality was proper grounds for cross-examination. The

trial judge clearly misunderstood the purpose for which the defense sought to use the

evidence relating to the Provena subpoena, believing it was to launch an attack on the

government.

In *United States v. Santos,* 201 F.3d 953, 962 (7th Cir. 2000), this Court found that

where the trial court misunderstands the purpose for which evidence was being offered and

thus fails to exercise a properly informed discretion, its ruling excluding the evidence

"cannot be upheld unless it would have been an abuse of discretion for him to have admitted

the evidence ...." Here, the issue of the Provena investigation being dropped as soon as

Wyma told the government what it wanted to hear about Blagojevich was directly relevant

to Wyma's bias and should have been allowed for impeachment.

The lower court also improperly restricted impeachment of the alleged extortion

victims as to their prior histories of political fundraising and lobbying. Both Johnston and

Magoon were active in political fundraising and lobbying. Tr. 2554-62, 2717. Magoon claimed he felt pressured being asked to contribute while his rate increase was with the Governor. Yet he admitted, outside the presence of the jury,[22] that he hosted a fundraiser for Illinois Senator Cullerton while his bill was pending before the Illinois legislature. Tr. 2556-63. The court precluded cross-examination on these subjects on the grounds that "the fact that somebody has routinely contributed to other people, for years and years and years, does not excuse a different situation...." Tr. 2613. See also Tr. 2533, 2540, 2597, 3023, 3726. Here again, the court misunderstood the purpose for which the evidence was being offered and thus failed to exercise a properly informed discretion. The defense was not arguing that prior contributions "excused" extortion; but that they were relevant to rebut the government's claim that these experienced political players felt unduly pressured by Blagojevich's mere request for a campaign donation.

Finally, the prejudice to the defendant from the improper restrictions on cross-examination is enhanced here because of the double standard applied by the lower court, where almost no restrictions were placed on the government's impeachment of defense witnesses. For example, the government was permitted to impeach former Congressman Lipinski on the fact he was a financial supporter of Blagojevich, who later appointed his wife to serve on the Illinois Court of Claims. Tr. 5089-90. This evidence was not indicative of any wrongdoing; nor did it impeach Lipinsky's credibility. Rather, the only possible value

---

[22] The defense was required to get pre-approval for most of its cross-examinations by questioning the witness outside the jury's presence. Tr. 2353, 2611, 2718, 3025.

of this evidence was to make Blagojevich look corrupt.  In addition, the government was permitted to impeach Jackson Jr., by bringing out a story that in 2002, Blagojevich had refused to appoint Jackson's wife to a job and then later allegedly made an obnoxious comment to Jackson.  Tr. 3358-69.  The only possible relevance for this evidence was to make Blagojevich sound like a jerk, yet the trial court overruled defense objections.

When Blagojevich testified in his defense, the court allowed the government to impeach him with the non-final false statements conviction from the first trial.  Then in closing argument, the government described Blagojevich as a "convicted liar."  Tr. 5519-20.

In *United States v. Aloi,* 511 F.2d 585, 596-97 (2nd Cir. 1975), the Court noted a conflict in the Circuits on the impeachment use of a non-final (namely, still on appeal) conviction.  The Second Circuit adopted the rule that the trial judge has discretion to allow the use for impeachment purposes of a conviction under appeal.  Defendant could find no applicable case in this Circuit.  Nevertheless, to the extent that the lower court had discretion, it should have excluded this impeachment under Federal Rule of Evidence 403.  The finding of the prior jury on this charge had little value to the retrial jury in judging Blagojevich's credibility.  And to allow the government to characterize the Governor as a convicted liar was extremely prejudicial.

## V.    THE LOWER COURT'S ONE-SIDED AND ERRONEOUS EVIDENTIARY RULINGS PREJUDICED THE DEFENDANT.

**Standard of review**: This Court reviews a district court's evidentiary rulings for abuse of discretion. *Romanelli v. Suliene*, 615 F.3d 847, 854 (7th Cir. 2010).

The lower court openly conceded that it imposed a much harsher standard for evidentiary rulings on the defense than on the government. The court explained that its double standard was primarily in response to misconduct of the defendant's lawyers from the first trial. Tr. 2353-54, 3519, 5598. The court explained:

> There is no question, in fact the record is very clear, that I kept you on a shorter leash than I kept the government, but I want to reiterate the reason I did that is because of the conduct of the defense in the first trial and even in this trial.

Tr. 3519. This was not a proper basis to punish the defendant particularly where Blagojevich had different counsel at his second trial.

The government was thus permitted to introduce a large amount of highly prejudicial evidence that had almost no relevance to the case and/or was inadmissible hearsay. On the other hand, highly relevant and admissible evidence for the defense was routinely excluded.

Much of the government's case was based on its recordings of the defendant's conversations with his advisors. Government witnesses repeatedly offered their opinions, over defense objections, that Blagojevich had a criminal intent. Tr. 1787, 1804, 1873, 1880, 1886, 1932-33, 1938, 1964, 2097, 2128, 2264, 2584, 2738, 2781, 2939, 2941-42, 3151, 3367. Mostly they were asked for their "understanding" of what Blagojevich was saying or thinking. See e.g., Tr. 1873 (Scofield's understanding was that defendant was interested in

an "exchange" of senate seat "for something for himself, in this case a Cabinet position or specifically Health and Human Services"); 2782 (Monk's understanding was that Blagojevich was making a "connection between the contribution and the timing of the signing of the [recapture] bill"); 2939 (Monk's understanding was that Blagojevich "was using the 5-billion-dollar program as leverage to try and get the campaign contributions by the end of the year"); 2264 (Greenlee's understanding was that "Blagojevich believed that the main advantage to appointing Jesse Jackson, Jr., was that he would be able to receive campaign contributions").

Other times, government witnesses were permitted to give their opinion that Blagojevich sounded insincere or was lying.  Tr. 2128-29, 2266, 2582, 2788.  The court even allowed the government to admit recorded conversations that had no relation to the charges on trial but helped bolster the cooperating witness's opinion that Blagojevich was a liar because he had expressed a different view in the past.  Tr. 2271, 2284-89 (Greenlee explaining how prior conversation helped form his view that Blagojevich was lying about getting Washington politicians to help broker deal with Madigan).

It would take too much space to catalogue each erroneous evidentiary ruling by the lower court.  Instead the defendant will focus on certain rulings which caused particular prejudice to the defense.  As this Court stated in *United States v. Santos*, 201 F.3d at 965:

> [I]n assessing whether a conviction should be upheld despite the presence of error, a court is required to assess the harm done by the errors considered in the aggregate. We have even said that the cumulative effect of trial errors may deprive a defendant of his constitutional right to a fair trial.

**A.    The court erred in excluding nearly all of the tape recordings offered by the defense.**

A centerpiece of the government's case was that Blagojevich was misusing his power to appoint a senator for personal enrichment.  To rebut this theory, Blagojevich attempted to show that his first option was to work a deal with Speaker Madigan to appoint his daughter Senator in exchange for enacting Blagojevich's legislative priorities, such as a capital bill which Speaker Madigan had been blocking.  Throughout the trial, the government sought to diminish Blagojevich's plan to appoint Lisa Madigan because the legislative achievements he sought in exchange could not be characterized as a "personal benefit" to Blagojevich; and thus not a crime.  In closing argument, the government argued that Lisa Madigan was merely a "stalking horse" used by Blagojevich to try and get a better deal from Obama.  Tr. 5506.

However, there were dozens of tape-recorded conversations between Blagojevich and his advisors which revealed the Governor's sincere efforts to arrange the Madigan deal.  R. 608, 719, 775.  As can be heard on the tapes, during the ten days before his arrest, Blagojevich directs his staff to prepare a detailed list of proposed legislation to be exchanged for Ms. Madigan's appointment to the Senate, and discusses his plans for the deal with two prominent members of the U.S. Senate.  Tr. 3505, 3853.  The government fought hard to exclude this evidence and the court sided with the government.  Tr. 3434-50, 3462, 3474, 3480-94; Defense Tape Tabs 12, 17, 21-27, 29-30, 32-33, 38-41, 44.

There were other recorded conversations which demonstrated that Blagojevich's proposals were intended to serve the public interest rather than Blagojevich's own interests.

For example, on November 12, Blagojevich told a trusted advisor about his vision for a 501(c)(4) organization that "would advocate healthcare for children, healthcare for working parents, and use that vehicle to ... help Obama ... in Washington and help me here in Illinois, you know, push healthcare." Tr. 3462, Defense Tape Tab 12. This evidence was also excluded at trial on the government's motion. Tr. 3462-68; Defense Tape Tab 13.

The above-described evidence was admissible under the state of mind exception to the hearsay rule. Rule 803(3) exempts from the bar on hearsay "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed...." Fed. R. Evid. 803(3). The lower court conceded that many of the defense-proffered tapes did meet the technical requirements of the state-of-mind exception. Tr. 3482, 3483, 3449, 3470. But the court invented new rules, applicable only to a politician like Blagojevich, requiring him to prove that his statements on the tapes were truthful. Tr. 3479 (tape evidence excluded because we can't assume Blagojevich is "speaking the truth"), 3483 (excluded because Blagojevich was not "subject to cross-examination" when he made the prior tape-recorded statements), 3488 ("there's almost no way to judge credibility in what's in the tapes, because as any politician in these circumstances has some ulterior purpose"). Other times, the court ruled that because of his skills as a politician, Blagojevich should be able to make his point from the witness stand without playing any tapes. Tr. 3466, 3482, 3484 ("just have him testify to this stuff .... I would be surprised if he cannot defend himself. You know, what he

did for a living ....").  But as defense counsel repeatedly pointed out below, the tapes were

necessary to corroborate Blagojevich's testimony because the jury might decide to accept the

government's word over his.  Tr. 3492, 3737.

As this Court stated in *Santos*, 201 F.3d at 962, a defendant is entitled to admit

evidence "to cast doubt on the government's theory".  "It is improper to prevent a party from

countering possibly false testimony favorable to his opponent even if that testimony should

not have been admitted."  *Id*.

Prejudice to the defendant from these erroneous rulings is clear from the record.

Because all contrary evidence was excluded, the government was left free to falsely tell the

jury during summation that Blagojevich only got interested in a Madigan deal "after

November the 13th [when it was] clear to the defendant he's not going to be able the

leverage Valerie Jarrett[23] for something for himself."  Tr. 5297.  The government further told

the jury:

> You'll have the calls, November 1st through November 13th. Go back and look at the
> calls and see how many times Lisa Madigan is actually mentioned.... how often is she
> mentioned in a way that she is not a stalking horse, and you're not going to find it.
> She was a stalking horse.

Tr. 5506.

But as the government well knew, the reason there were no tapes of Blagojevich

talking about a Lisa Madigan deal during the first half of November was because the court

had excluded those tapes on the government's motion.  See R. 784 and 785; Tr. 3434-46,

---

[23] November 13 is the date Ms. Jarrett withdrew her name from consideration for the
Senate seat.

Defense Tab 4 (November 5 call -- Blagojevich talking to former Speaker of the House Denny Hastert about Madigan deal); Tr. 3447-50, Defense Tab 5 (November 8 call – Blagojevich talking to Rahm Emanuel about Madigan deal); Tr. 3460-62, Defense Tab 12 (November 12 – Blagojevich talking to Bill Knapp about Madigan deal).

The due process clause forbids prosecutors from obtaining guilty verdicts "by means of statements that are seriously misleading or that otherwise prevent the jury from deliberating rationally about the defendant's guilt." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)*; Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009). This Court looks to see whether the misleading and inflammatory arguments were likely to have swung the jury against the defendant. *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997).

Here, the government told the jury to reject Blagojevich's testimony that he was more concerned with the public interest than personal enrichment because there were no tapes to corroborate the defendant. But as the government knew, there were lots of tapes which corroborated Blagojevich's testimony but the government had persuaded the court to exclude them all. Defendant was doubly prejudiced here, first by the improper exclusion of evidence critical to support his defense, and second by the government's unfair and misleading attack on his credibility.

To make matters worse for the defendant, the court had repeatedly told him that if he testified, he would be allowed to use the tapes to corroborate his testimony. 3/17/10 Tr., at p.17, 2/23/11 Tr., at p.4, 3/21/11 Tr., 4/14/11 Tr. This promise from the court played a big

part in his decision to take the stand. But then on the day before the defendant began his testimony, the court went through each of the 33 tape excerpts offered by the defense and excluded 32 out of 33. Tr. 3427-3511. The next morning Blagojevich began his testimony. The defense was eventually permitted to play five tapes. Tr. 3732-50. The government had played more than 70 in its case.

**B.     Erroneous exclusion of evidence which would have refuted the charge that Blagojevich intended to accept the illegal offer to appoint Jesse Jackson, Jr., to the Senate in exchange for campaign contributions.**

The defense sought to admit a tape-recorded conversation from December 6 which directly refuted the government's charges relating to Jesse Jackson, Jr. In the following excerpt from this call, Blagojevich and his brother discussed Robert's plans to meet with Raghu Nayak:

> ROD BLAGOJEVICH Yeah, that's all. You know, if he [Nayak] says, I can do a lot more money, say, that's you know, you answer that and just say, uh, look one, you know, that's, that's your decision…
>
> ROBERT BLAGOJEVICH One is not tied to the other. One is not tied to the other. And if you want to, obviously, we want to help you do that.
>
> ROD BLAGOJEVICH Yeah, that's good. I like that. But you..yeah, that's good.

Defense Tab 48; Tr. 3879 (excluded by the court).

This tape was direct evidence rebutting the government's claim that Blagojevich had the intention to accept Nayak's illegal offer to exchange campaign contributions for Jackson's appointment. This evidence would have powerfully supported the defense position that Blagojevich's intent was to make it clear to Nayak that no promises could be made to

Jackson, Jr., regarding the Senate seat.

## C.    Erroneous rulings relating to advice of counsel.

The advice of counsel defense can be asserted, when appropriate, to "negate the mental state required for some crimes, including fraud." *United States v. Van Allen,* 524 F.3d 814, 823 (7th Cir. 2008) (citation omitted).  In the case at bar, Blagojevich did not assert this defense, presumably because he did not meet its strict requirements to make a "full and accurate report to his attorney of all material facts" prior to acting.  See *id*.  Instead, Blagojevich relied on a good faith defense, that he acted in conformity with the law as he understood it.

The lower court's rulings related to advice of counsel were erroneous in two respects. First, the government was allowed to attack the defendant for his alleged failure to listen to his lawyers.  Bill Quinlin, Blagojevich's general counsel, did not testify at trial. Nevertheless, the government introduced Quinlin's alleged hearsay statements disapproving of defendant's conduct.  Harris testified over objection, that Quinlin warned Blagojevich in late October that he couldn't exchange the seat for a "donation to ... a charitable foundation in which he could benefit" and not to "talk about the two in the same sentence, not even if he was joking about it."  Tr. 1316-18, 1505.

The government also played a tape recorded conversation in which Quinlin told Harris that Blagojevich's delay in signing the recapture bill "is what you think."  Tr. 1582-83. Harris then told the jury that Quinlin "was telling me that the reason for the delay ... [was] that he [Blagojevich] was holding the bill because he wanted to talk to Lon about getting

campaign contributions from the racetrack owners before he signed the bill." Tr. 1583. The court instructed the jury not to consider Quinlin's statements for their truth. Tr. 1585. However, in closing argument, the prosecutor told the jury: "Bill Quinlan confirms that's exactly what the defendant is doing"; i.e., holding up the bill to get a campaign contribution. Tr. 5353. This argument was misconduct. Having persuaded the court to admit the hearsay statements of Quinlin "only for the purpose to explain [Harris's] state of mind or ... actions," the government "must limit its use of the evidence to the purpose proffered." *United States v. Richards,* 2013 WL 2991897, *14 (7th Cir. 2013). In *Richards*, this Court vacated the defendant's conviction where the government obtained the admission of Rule 404(b) evidence "for a specific, non-propensity purpose," but then improperly used the evidence to argue propensity during its closing argument. *Id*. Blagojevich was similarly prejudiced by the misconduct in this case where the government used inadmissible hearsay evidence to argue that Blagojevich's attorney believed he was committing extortion.

Second, the court allowed the government to attack Blagojevich for his alleged failure to consult with the lawyers who were around him. Thus, the court allowed in evidence that the Blagojevich campaign owed the law firm of Winston & Strawn approximately $1.3 million, and settled for $750,000 on July 15th, 2008. Tr. 2332. Then in its rebuttal case, the government offered evidence that "Blagojevich had a personal attorney whose primary area of practice was criminal law representing him" during 2008. Tr. 5258.

These attacks on Blagojevich were highly misleading. The tape recordings reveal that Blagojevich regularly consulted with attorneys, including Quinlin and Harris, and discussed

all of his proposals, including his proposed exchange of the Senate seat for a position at a not-for-profit.  Tr. 3432, 3454, 3464; Defense Tab 3 (Blagojevich and Quinlin discussing proposal to exchange appointment of Jarrett to Senate), Tab 6 (same), Tab 13 (Blagojevich tells Quinlin of his plan to have Tom Balanoff pitch his 501(c)(4) proposal; Quinlin responds: "Good. He's the right guy to work through.").  But the court excluded all of this evidence thus preventing the defendant from responding to the government's unfair attacks.

The defense was not even allowed to mention that there were attorneys in the room, or on the phone, who "didn't say anything when he made proposals." Tr. 1027, 1029.  The court threatened that if the defendant disobeyed, "I will give an instruction to the jury which says that you can't infer approval from silence and then tell them that it's an illegitimate defense, which is the only way to stop them from going down that path." Tr. 1027-28.  When defendant testified, he was not permitted to even mention that he had consulted with Quinlin about his plans for the Senate seat or about the rules for a 501(c)(4).  Tr. 4198, 4426.

The advice of counsel defense was intended as a shield for defendants, not as a sword for the government to use to attack the defendant.  The lower court's misinterpretation of this defense prejudiced the defendant.

**D.     The government was allowed to introduce irrelevant evidence to smear the defendant.**

While critical evidence for the defense was excluded, the court allowed the government to introduce almost any evidence, no matter how irrelevant, to paint the defendant in a negative light.  First, the court erred in admitting Blagojevich's prior

statements to the press, offered by the government to show the jury that Blagojevich's public statements did not always match what he was saying in private. Tr. 1094, 1124, 1127, 1220, 1253, 1320, 1407, 1940, 1978. Evidence that the public statements of a politician did not match up with what was in his head had no relevance to this case and was highly prejudicial. Second, the court erred in allowing testimony that the Blagojeviches spent over $400,000 on clothing during the six years he was governor. Tr. 2003-05. Third, the court erred in allowing Lon Monk to testify that Blagojevich was present during two conversations in 2003-04 with Monk, Tony Rezko and Chris Kelly, where they all talked about "making money together." Tr. 2709. This evidence was vague, irrelevant and highly prejudicial. Fourth, the court erred in allowing the government to play the recorded conversation in which Robert Blagojevich told a staffer that he had had the campaign office swept for electronic bugs. Tr. 2309, 5306. This evidence was both hearsay and irrelevant, and highly prejudicial because it wrongly suggested that a public official would not care if he were being recorded unless he was committing crimes.

## VI.    BLAGOJEVICH'S FALSE STATEMENTS CONVICTION FROM HIS FIRST TRIAL MUST BE OVERTURNED.

**Standard of Review**: This Court reviews *de novo* a district court's denial of a defendant's motion to dismiss, but accepts the district court's underlying factual findings unless they are clearly erroneous. *United States v. Ellis*, 622 F.3d 784 (7th Cir. 2010). This Court reviews the district court's evidentiary rulings for abuse of discretion. *Romanelli v. Suliene*, 615 F.3d 847, 854 (7th Cir. 2010).

**A.**  **The court erred in denying defendant's motion to dismiss where the alleged false statement was ambiguous; alternatively, Blagojevich's answer to the ambiguous question about whether he "tracked" campaign contributors was insufficient as a matter of law to support the conviction.**

The false statements charge alleges that Blagojevich knowingly and willfully made a materially false, fictitious and fraudulent statement when he told an FBI interviewer that he "does not track, or know, or want to know, who contributes to him or how much they contribute."  R. 561.

An indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  In the context of false statement prosecutions, a defendant's answers to "fundamentally ambiguous questions should not [be] submitted to the jury, nor can those that were literally true form the basis of the perjury conviction." *United States v. Lighte*, 782 F.2d 367, 376 (2nd Cir. 1986).  See also *Bronston v. United States*, 409 U.S. 352, 362 (1973) ("literally true but unresponsive answer [must be] remedied through the 'questioner's acuity' and not by a federal perjury prosecution").

Here, the term "track" is ambiguous.  It is clear from the context of the interview that Blagojevich stated he did not track fundraising because there were campaign staffers whose jobs were to actually track fundraising – he did not do this.  The full sentence in the FBI interview report reads: "He [Blagojevich] noted that when he attends his events he becomes aware of some of those who are supporting him, but he does not track .... However,

-85-

sometimes this information 'splashes on you.'" R. 572 at 17, 573. Clearly, Blagojevich's

understanding of "track" was different from the interviewer. Blagojevich understood "track"

to mean "keep detailed records," while the interviewer understood "track" to mean "have

knowledge of."

Accordingly, Blagojevich's alleged false statement was in response to an ambiguous

question and was literally true. See *Lighte*, 782 F.2d 375-76 (defendant's response to

question which was "fundamentally ambiguous" under theory advanced by government could

not be perjurious). The lower court erred in denying defendant's motion to dismiss this

charge. Tr-I 5850-52; R. 433, 589. Alternatively, it should be reversed for insufficient

evidence.

**B.    The Court abused its discretion in excluding evidence to provide the jury with necessary context to evaluate whether Blagojevich's statement was willfully and materially false.**

In a false statements prosecution, the "context of the question and answer is often of

critical importance if it is claimed the question was ambiguous or was misunderstood as it

is in this case." *United States v. Martellano*, 675 F.2d 940, 943 (7th Cir.1982). Here, when

the statement is read in the context of the entire interview, it is clear that it was not willfully

and materially false. 18 U.S.C. § 1001(a)(2). To determine materiality, the question is

whether the statement was capable of influencing the FBI. *United States v. Brantley*, 789

F.2d 1322, 1326 (7th Cir. 1986).

The government's evidence was Agent Murphy's testimony that the statement "was

material." Tr-I 3908. The defense was not permitted to cross-examine Murphy regarding the

full context of this statement, contradicting the alleged materiality.  Tr-I 3930, 3936-37, 3941.  The statement, in context included:

> He will attend fund-raising events, but he does not collect any of the checks. Furthermore, he does not track who contributes to him. He noted that when he attends his events he becomes aware of some of those who are supporting him, but he does not track, or want to know, who is contributing or how much they are contributing to him. However, sometimes this information 'splashes on you.'

R. 572 at 17, 573.  Blagojevich also told the FBI that he "currently helps to raise money [for the campaign]", he provided information about Chris Kelly, Tony Rezko and others, and he provided the names of campaign employees whose job it was to "track the contributions." R. 573.

Blagojevich's statements *in toto* were not materially false and led the FBI directly to the very people the government ultimately called as witnesses against him.  When taken in context, Blagojevich did not willfully mislead the FBI; nor was the statement capable of doing so.

## VII.   THE TRIAL COURT ERRED IN REFUSING TO STRIKE BIASED JUROR.

**Standard of Review**:  This Court reviews the district court's rulings on juror challenges for abuse of discretion.  *Griffin v. Bell*, 694 F.3d 817 (7th Cir. 2012).

A defendant is guaranteed due process and trial by an impartial jury. U.S. Const. Amend. V, VI; *United States v. Brodnicki*, 516 F.3d 570 (7th Cir. 2008).  A juror must be dismissed for cause if he cannot render impartial jury service.  *Id.*, 28 U.S.C. § 1866(c)(2). Indeed, "a juror [who] has formed an opinion as to the issue to be tried," must be removed. *Reynolds v. United States*, 98 U.S. 145, 155 (1878).  A biased juror can only survive a cause

challenge if he provides unequivocal assurance that he can put aside any prior biases and judge the case fairly. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *United States v. Allen*, 605 F.3d 461, 465 (7th Cir. 2010).

Juror 174 testified in voir dire that ". . . I just figured possibly him to be guilty. . ." Tr. 547. When questioned by the court, the juror was unsure and uncertain as to whether he could "leave aside" his beliefs. Tr. 548, 594. The court denied defendant's motion to strike Juror 174 and because Blagojevich exhausted all peremptories, Juror 174 wound up on the jury. Tr. 594-95, 1121, 5663.

Juror 174 had formed an opinion as to the ultimate issue to be tried – the defendant's guilt. He should have been struck for cause. See *Reynolds*, *supra*; *Allen*, 605 F.3d at 464-65. The court's error allowed a biased juror to deliberate Blagojevich's fate.

The convictions in the instant case should be overturned due to Juror 174's presence on the jury. If a jury contains a juror who should have been struck for cause, the error is structural and a new trial is required. *Gray v. Mississippi*, 481 U.S. 648 (1987).

## VIII. THE DEFENDANT'S 168-MONTH SENTENCE MUST BE VACATED WHERE THE LOWER COURT ERRONEOUSLY APPLIED THE GUIDELINES.

**Standard of Review**: The Court reviews the district court's factual findings at sentencing for clear error, and reviews the application of the Sentencing Guidelines to those facts *de novo*. *United States v. Womack*, 496 F.3d 791, 797 (7th Cir. 2007).

**A.    The Court erred in including as loss the speculative evidence of an offer to raise $1,500,000 in exchange for the appointment of Jackson, Jr., to the Senate.**

The court erred by increasing the offense level by 6 levels when it determined that, under § 2C1.1(b)(2), the government proved that the "value to be obtained" included $1,500,000 from Jackson supporters.  12/6/11 Tr. 51-58.  The court rejected the finding of the Probation Officer that the $1.5 million Jackson offer was not sufficiently proven and should not be in the calculation.  PSR at 18.

The government is required to prove the loss amount by a preponderance of evidence.  See generally *United States v. Sapoznik,* 161 F.3d 1117 (7th Cir. 1998).  The law does not support punishing a defendant based on unreliable or speculative numbers.  See *United States v. Vitek Supply Corp.*, 144 F.3d 476, 492 (7th Cir. 1998) ("the district court cannot punish the defendants for this harm by including speculative losses").

In the case at bar, the evidence established only that a vague offer was made that a businessman named Nayak would raise "a lot of money for the campaign" if "Jesse Jackson, Jr., was appointed to the Senate seat."  Tr. 2039.  Three days later, Blagojevich mentioned an offer to raise "500 grand" and that "other guy would raise a million if I made him a senator."  Tr. 2110.  It is unclear from the record where these numbers came from.  More than a month later, Blagojevich told his brother to "talk to" Nayak and tell him "some of this stuff's got to start happening now."  The next day, Blagojevich told his brother to cancel the meeting.

The probation officer correctly found that this evidence was too speculative to hold

Blagojevich accountable for the $1.5 million dollar loss enhancement.  The lower court erred in rejecting that finding.

## B.        The lower court erred in applying a four-level enhancement for leader/organizer.

A four-level enhancement under §3B1.1 applies to a defendant who was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  Application Note 4 sets out seven factors the court should consider which "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, App. Note 4.

While Blagojevich certainly had decision-making authority, the other factors do not support the enhancement.  Blagojevich constantly sought and relied on advice from aides, advisors, consultants, friends, and political allies.  Many of his alleged offenses were based on proposals brought to Blagojevich, such as Harris's idea that he request a leadership position in the Change To Win campaign in exchange for the Senate appointment, and Nayak's offer to raise campaign funds in exchange for the appointment of Jackson, Jr.  For all these reasons, the 4-level leader/organizer enhancement, over and above the enhancements already received for being a high public official, were unwarranted here.

**CONCLUSION**

WHEREFORE, based on the foregoing, Rod Blagojevich moves this Honorable Court to reverse his conviction and sentence, remand for a new trial, or for a new sentencing hearing.

Respectfully submitted,

/s/ Leonard Goodman
Leonard C. Goodman

Leonard C. Goodman
Len Goodman Law Office LLC
53 W. Jackson, Suite 1650
Chicago, Illinois 60604
(312) 986-1984

Lauren Kaeseberg
158 W. Erie
Chicago, IL 60654
(773) 517-0622

*Counsel for Appellant Rod Blagojevich*

# RULE 30(d) CERTIFICATION

LEONARD C. GOODMAN, the attorney for the Defendant-Appellant, Rod Blagojevich, certifies that all of the materials required by Circuit Rules 30(a) and (b) are included in this appendix.

*/s/ Leonard Goodman*
LEONARD C. GOODMAN

Leonard C. Goodman
Len Goodman Law Office LLC
53 West Jackson Blvd.
Suite 1650
Chicago, Illinois 60604
(312)986-1984

July 15, 2013

# CERTIFICATE OF COMPLIANCE WITH RULE 32

The undersigned, counsel of record for Defendant-Appellant, Rod Blagojevich, hereby certifies that this brief complies with the type volume limitations of Fed. R. App.P. 32(a)(7)(b), in that the brief contains 24,960 words from the "Jurisdictional Statement" through the Conclusion. Counsel used Word Perfect Version X6 to prepare the brief. The font style is Times New Roman and the size of the type is 13 point.

*/s/ Leonard Goodman*
LEONARD C. GOODMAN

Leonard C. Goodman
53 West Jackson Blvd.
Suite 1650
Chicago, IL 60604
(312) 986-1984

July 15, 2013

## CERTIFICATE OF SERVICE

I, Leonard C. Goodman, hereby certify that on July 15, 2013, I caused two copies and a

digital version of this brief to be served on the following by first-class postage prepaid mail:

Debra Bonamici
Assistant United States Attorney
219 S. Dearborn Street, 5th floor
Chicago, IL 60604

Respectfully Submitted,

_____
Leonard C. Goodman
Counsel for Rod Blagojevich
53 West Jackson Blvd., Suite 1650
Chicago, IL 60604
(312) 986-1984

**SHORT APPENDIX**

# SHORT APPENDIX TABLE OF CONTENTS

Judgment Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  App.1-6

Transcript of the Court's July 22, 2010 Oral Ruling Denying Motion to Dismiss and Denying Motion for Judgment of Acquittal in the First Trial. . . . . . . . . . . . . . . . . . . . . . . App. 7-9

Transcript of the Court's December 2, 2011 Oral Explanation of its Denial of Blagojevich's Post-Trial Motions in the Second Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 10-45

Rule 30 (d) Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  App. 46

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| ROD BLAGOJEVICH | ) | Case Number: 08 CR 888 - 1 |
| | ) | USM Number: 40892-424 |
| | ) | Sheldon Sorosky |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)    3, 5-13, 15-18, 21-24 of the second superseding indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1343 & 1346 | Wire Fraud | 12/9/2008 | 3, 5-13 |
| 18:1951 (a) & 2 | Conspiracy/attempted extortion | 12/9/2008 | 15,17,21, |
| 18:1951 (a) & 2 | Conspiracy/attempted extortion | 12/9/2008 | 22 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    20 of the second superseding indictment.

☑ Count(s)    remaining    ☐ is   ☑ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/7/2011
Date of Imposition of Judgment

Signature of Judge

JAMES B. ZAGEL        U.S. District Judge
Name of Judge            Title of Judge

12/13/2011
Date

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1A

DEFENDANT:  ROD BLAGOJEVICH
CASE NUMBER:  08 CR 888 - 1

Judgment—Page ___2___ of ___6___

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:666(a)(1)((B) | Corrupt solicitation of funds | 12/9/2008 | 16 |
| 18:371 | Conspiracy to corruptly solicit funds | 3/16/2005 | 18, 23 |
| 18:1001 | Making false statements | 3/16/2005 | 24 |

AO 245B    (Rev. 09/11) Judgment in Criminal Case
           Sheet 2 — Imprisonment

DEFENDANT: ROD BLAGOJEVICH
CASE NUMBER: 08 CR 888 - 1

Judgment — Page __3__ of __6__

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

one hundred sixty-eight (168) months. Said term consists of one hundred sixty-eight months on second superseding counts 3, 5-13, 15,17, 21 and 22; sixty (60) months on second superseding counts 16, 18 and 23; and thirty-six (36) months on second superseding count 24. Said terms to be served concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

incarceration at FCI Englewood, CO. Participation in RDAP while incarcerated.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on __3/15/2012__ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

App. 3

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 3 — Supervised Release

DEFENDANT: ROD BLAGOJEVICH
CASE NUMBER: 08 CR 888 - 1

Judgment—Page   4   of   6

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

twenty-four (24) months. Said term consists of twenty four months on each of second superseding counts 3, 5-13, 15-18, 21-24, to be served concurrently.

     The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑   The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

App. 4

AO 245B    (Rev. 09/11)(Design)(Chicago)
          Sheet 5 — Criminal Monetary Penalties

DEFENDANT:  ROD BLAGOJEVICH                                    Judgment — Page    5    of    6
CASE NUMBER:  08 CR 888 - 1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 1,800.00 | $ 20,000.00 | $ |

☐   The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |

| **TOTALS** | $ 0.00 | $ 0.00 |  |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑   the interest requirement is waived for the   ☑  fine   ☐  restitution.

☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

App. 5

DEFENDANT: ROD BLAGOJEVICH
CASE NUMBER: 08 CR 888 - 1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __21,800.00__ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

1  was the testimony of Agent Murphy.  There was no
2  followup and there was no attempt to clarify what
3  was meant by firewall.  And, you know, the jurors
4  take into deliberations their common sense.  The
5  word "firewall" could mean different things to
6  different people.  What matters is what it meant to
7  Rod Blagojevich on March 15, 2005, when he said it,
8  and there's no evidence as to what he meant by that
9  phrase.  The FBI certainly could've clarified that
10 at the interview and he didn't.
11         THE COURT:  What I'm going to do now is, let
12 me start with Count 24.  Arguably, you could make a
13 case with ambiguity with respect to the first
14 statement, although it's not the argument you're
15 actually making.  The argument you're making is is
16 that firewall is an ambiguous word and I don't think
17 that carries the day.
18         I know there was an attempt here to inject a
19 dictionary into trial.  A lot of reasons why we
20 don't allow that, not the least of which is is the
21 authority of the dictionary is subject to some
22 question.  I don't think there's anything
23 particularly ambiguous about "firewall."  In fact, I
24 think there's nothing ambiguous about "firewall."
25         I thought the ambiguity argument was going to

be he's tried to maintain a firewall between
politics and government, and that could be true if
you add to that "but he failed miserably at doing
it," that possibly could be an ambiguity.

But I do not think there's anything ambiguous
about the second one, particularly the references to
"does not track," "does not want to know."

What I am willing to do so that we don't run
into a particular problem here is the verdict form
on Count 24, we'll ask the jury which, if either of
those two clauses, or both, they found to be false.

With respect to the rest of the motion, I am
unpersuaded by the Change to Win argument.

With respect to the fees, there is
circumstantial evidence that the fees were
disproportionate to any work that was done.  And I'm
not too sure there's much evidence that any work was
actually done.  So I am unpersuaded by this motion.
But what I am going to do what I customarily do with
respect to motions of this sort, and that is I'm
entering and continuing it.

Sometimes my mind with respect to these
motions has been changed by what happens in closing
argument.  And there's some cases in which the
nature of the verdict a jury returns indicates that

1 perhaps there was something that I did not perceive

2 at first that would possibly affect my ruling.  So

3 it is entered and continued.

4       But I currently, with one exception with

5 respect to the verdict form, am unpersuaded by the

6 motion.

7       Anything further we have to do other than the

8 instruction conference which we begin tomorrow?

9       MR. SCHAR:  Judge, there were three tabs in

10 the binder which were not published to the jury.

11       THE COURT:  Right.

12       MR. SCHAR:  So what we would ask is to go in

13 and whatever Your Honor's preference is but to

14 remove those calls that were never actually

15 published.  Obviously, we'll do it in the defense

16 presence.

17       MR. GOLDSTEIN:  Your Honor, we do object to

18 removing those three tabs, specifically one of the

19 tabs the government is proposing is tab 20.

20       THE COURT:  That's in book 1?

21       MR. SCHAR:  Yes.

22       MR. GOLDSTEIN:  It is.  And that is a

23 November 5th call and that's between Rod Blagojevich

24 and Mr. Greenlee.  While it was not published as far

25 as the audio was played, Mr. Greenlee was

:43AM

:43AM

:43AM

:43AM

:44AM

 1          THE CLERK:  2008 CR 888 - 1, United States
 2  versus Rod Blagojevich.
 3          MR. SCHAR:  Good morning, Judge.
 4          Reid Schar, Chris Niewoehner and Carrie
 5  Hamilton on behalf of the United States.
 6          MR. SOROSKY:  Your Honor, all the lawyers of
 7  record are present on behalf of Mr. Blagojevich, and
 8  I would like to introduce to you Carolyn Gurland who
 9  is the newest member of our team and she
10  participated heavily in the sentencing presentations
11  to Your Honor.
12          THE COURT:  I have two motions before me.
13  And since you were here when I originally denied the
14  post-trial motions for acquittal, a new trial, and
15  unsealing of records, I think I indicated to you,
16  verbally, that I was going to offer some additional
17  words of my own on this, and since you're here, I'll
18  do it.  I'll do it after we're done with this other
19  stuff.
20          Let's start with the reconsideration of the
21  denial of post-trial motion and motion to vacate and
22  to dismiss the indictment.
23          What I have is, I have the original motion, I
24  have the government's response, so it would be a
25  good time for the defense reply.

```
 1          MR. SOROSKY:  There's no reply.
 2          THE COURT:  Okay.
 3          Anything you would like to add in the way of
 4  argument?
 5          MR. SOROSKY:  No, we would stand on our
 6  written motions.
 7          THE COURT:  The motion is untimely, it is
 8  denied for that purpose.  Were it not to be
 9  untimely, I deny the motion on its merits.  With
10  respect to the grand jury process, it is the
11  customary law that a trial verdict moots that issue.
12          With respect to what I would refer to as a
13  manipulative process, accused manipulative process
14  by the government in charging the case, if the
15  motion were not untimely, I would deny that as well.
16  And I would deny that as well because, essentially,
17  the odd structure of trials in this case was, in my
18  view, primarily due to the death of one of the
19  defendants who was a primary link, and, for all
20  practical purposes, the issue would be of no
21  relevance to this defendant, so that's denied.
22          Now, the John Wyma motion.  The issue is
23  whether you want to make a reply to what they said.
24          MR. SOROSKY:  No, we do not.
25          THE COURT:  You're just standing on it.
```

:46AM

:47AM

:48AM

:48AM

:48AM

1        MR. SOROSKY:  We replied to what they said
2   and we stand on our written motion.
3        THE COURT:  I think the threshold for this
4   has not been met, and, that is, the evidence has to
5   be new, and I don't think the evidence is new.  And
6   I don't think, in fact I'm quite sure, that there is
7   nothing that foreclosed or limited the
8   cross-examination of the witness in any meaningful
9   way, so that motion, too, is denied.
10       This leaves me with some notes with respect
11  to the denied post-trial motions.  And I don't,
12  actually, intend to speak to every issue raised,
13  and, for all practical purposes, I'm reciting
14  nothing new here, I'm just pointing out things that
15  happened in the course of the trial, and also
16  comment on the style of the defense motion.
17       In the defense motion for a new trial and for
18  acquittal, the defendant repeatedly asserted that he
19  waives no claims, and I don't precisely understand
20  why that was done.
21       If the claim was properly presented at trial,
22  it's ordinarily not waived simply by virtue of not
23  including it in the post-trial motion.  What may be
24  waived is the right to offer new grounds or
25  arguments beyond those presented in the trial court.

1  And, in fact, specific claims which are undeveloped,

2  undeveloped claims or arguments made in a post-trial

3  motion may be waived, as well, even if somebody says

4  I'm not waiving them.

5       The claims--and this is one of the reasons

6  why a lengthy written ruling was not required--the

7  claims that were made often consists of vague

8  reference to constitutional prescriptions and

9  non-specific arguments about how they were violated.

10  And I think this was so because defense counsel

11  understood that the rules of evidence and the case

12  law don't support their assertions of improper

13  exclusion of certain proffered material.

14       The motion rested, in part, on an implicit,

15  and I think incorrect premise, that

16  cross-examination cannot be limited, which is really

17  not founded in decided cases.  Examination of

18  witnesses can be unfair or unlawful, so, too,

19  there's no unlimited right to present any defense.

20       In many respects, the motion represents

21  probably the only thing that's available to counsel

22  who have no case law to support their claims, and

23  that is to use the word "constitution" as often as

24  you possibly can, and to the extent that you do it

25  verbally, to see if you can put a capital "C" in

1 front of the word "constitution."

2      Those vague assertions don't help.  I thought
3 the most striking example of the vague assertion of
4 constitutional concept rather than constitutional
5 law, which are two separate things, was the
6 defendant's attempt to invoke double jeopardy.

7      The constitutional clause itself is not
8 invoked, but rather, and this is the word the
9 defense used, "its spirit," which is another way of
10 saying the defense counsel would have preferred a
11 different reading of the clause than one provided by
12 the Supreme Court of the United States.

13      There's also, I thought, some harsh combative
14 language in defense counsel's lengthy motion.  There
15 was some of that, too, but a great deal less in the
16 prosecution response.

17      What occurred to me when I read it was a line
18 from what was then a very recent civil opinion in
19 the Seventh Circuit, the case is The Nature
20 Conservancy versus Weiler Corporation of Delaware,
21 and the quote, which I like very much:

22    "... there is a maxim that in appellate briefing
23     bluster is inversely proportionate to
24     merit ..."
25 and this is true in the trial courts, as well.

1     A principal defense strategy was to attack
2 rules governing hearsay as unfair.  And there are
3 cases where this may be so, but they are few and far
4 between.  And the rules are the rules, and even then
5 they aren't absolutely rigid, in particular with
6 respect to hearsay, there is an escape clause in
7 Rule 807, which was invoked and which I found did
8 not apply here.
9     I also note that the rules against which the
10 defendant protested are quite clear on hearsay
11 admissibility, partly because these rules have
12 evolved at decades of successive reexamination by
13 highly competent committees, followed by a period of
14 public comment before they were reviewed and
15 approved by the Supreme Court of the United States,
16 and, if not changed, by the Congress of the United
17 States which has the power to do so.
18     Whether a specific piece of evidence is
19 admissible in light of the rules and of its fitness
20 in any particular case is a judicial determination.
21 If rules could be mechanically applied, neither
22 counsel nor court would have had to consider
23 hundreds of pages of recording transcripts.
24     Some of the specific issues raised by the
25 defense motion, the first one made several times

during the course of the trial was that the
defendant was the victim of biased rulings because I
ruled for the prosecution much more often than I
ruled for the defense.  We've covered this issue
before in the record.

The established case law teaches the judicial
bias cannot be inferred from the judge's legal
rulings alone.  If comparative winning statistics
counted, the practice would add a new element of
gamesmanship to trials.  If one side loses more
arguments than the other, gaming tactics will force
that other side to make frivolous motions to be
denied to even out the count.  Trials one side may
often have a better set of facts and far more
favorable precedent than its opponents and should
win the vast majority of the rulings.

The situation here was aggravated by the
defense view that it should make repeated arguments
on points that it lost before.  I don't actually
attribute this to a deliberate effort by the defense
to lose more rulings than the prosecution did.  I
think it is more traceable to the concern that
defense had that somehow they might be deemed to
waive a point and so repeatedly made the same point
over and over again.

And it is true that some lawyers will still
complain about losing too many motions, which was a
complaint made in open court here, but they do this
for tactical, and understandable tactical, not legal
reasons, to wit, to incline a judge to give the
lawyer something to even out the count for
appearances sake or simply out of some sense of
sympathy for the lawyer who finds himself or herself
in a position where the law goes against them.  This
technique may be a good one for resolving disputes
between 10-year old children, but not for trials.
The larger number of rulings for one side is the
only record basis for judicial bias in this case and
it is insufficient.

Related to the argument about unfairness is
the protest of the defense against my unwillingness
routinely to accept defense counsel's assurances
that it will conduct itself in compliance with my
rulings.

When a court rules, right or wrongly, that a
lawyer may not do something, the lawyer is obliged
to comply as he or she moves on in the case.  The
remedy for legal error is to challenge it on appeal
should the lawyer lose the case.  There were
instances in both trials where a lawyer violated

:57AM

:58AM

:58AM

:58AM

:59AM

pretrial rulings.  In the second trial, a
significant one occurred when defense counsel
examined, and early and I think maybe even the first
witness.  On other occasions, I allowed lawyers to
ask specific questions that they presented to me
only to see them asked different and objectionable
questions.  I did exercise close supervision over
these lawyers because my judgment in the manner in
which they were conducting parts of the defense made
it imperative that I do so to preserve compliance
with the law.

There were times when the defense in this
case bore family resemblance to a political contest.
Motions were filed with argumentative and
unconventional titles that lawyers seldom used.  For
example, something like "a motion to allow defendant
to prove his innocence," this, I think, based on the
expectation that the media might reprint the title.

The defense lawyer who took the laboring oar
in the first trial explicitly sought to influence
future jurors in the second trial to vote not guilty
in his public statements.  I entered an order
prohibiting the lawyers from public comment on this
case.  I refused to bar the defendant from doing so,
despite the prosecution's protests.

1    He often spoke, often uttering a mantra that
2 he was innocent or would prove his innocence.  I
3 considered these statements, short and repetitive,
4 would not interfere with the selection of a jury.
5    The defendant also sought public exposure on
6 television and radio hoping perhaps that people
7 would find him likable perhaps as he accepted, as
8 did his lawyer, the proposition that juries are more
9 lenient with celebrities.
10    According to an article in the ABA Journal,
11 one of the defense lawyers, at least in the first
12 trial, is reported to have said, "jurors don't like
13 to convict celebrities, we learned that with O.J.,
14 and O.J. was accused of doing a lot worst things
15 than Rod was."
16    This belief is unproven and there are a lot
17 of counter-examples, but lawyers are guided by the
18 beliefs of this sort simply because there are little
19 proof that any of the massive collection of trial
20 lawyers' various rules are either wrong or right.
21 There has been no scientific study of the folklore
22 of trial practices.
23    The strategy of putting the defendant
24 forward, described in greater length in that
25 article, in the ABA Journal, was pursued in a tandem

with a strategy of claiming that the selected jury,
and perhaps any jury, was contaminated by adverse
publicity.  The root cause of all contamination,
according to the defense, were statements made by a
federal prosecutor in 2008, starting a few days
flurry of unfavorable publicity for the defendant.
I'm actually making the assumption that there was
unfavorable publicity because of my reluctance to
actually read any coverage of the case while it is
on trial.  To my knowledge, no further substantive
statements were made by prosecutors or agents since
late 2008.

In 2009, however, the defendant was impeached
by the Illinois House and convicted by the Illinois
Senate, thus removing him from office.

Surely, the fact of indictment and an
impeachment would not have fully faded away by the
time of the 2010 trial, which led to another flurry
of media coverage, or the 2011 trial, but the
public's memory of details would certainly fade.
The defendant's status as a big story would also
fade in the absence of new details about him.

What the defendant chose to do was to keep
his name and his "celebrity" in the public eye with
radio and television appearances, the existence of

some of which I was unaware of until after the trial
ended, but it's all there on electronic media today.

All of this worked to keep memories fresh, to
stimulate new reports about him, which, in turn,
included a rehash of some of the details of the
criminal charge.

His lawyer had told the ABA magazine that, in
the lawyer's opinion, this was good for his client.
It was also good for raising claims about juror
exposure to publicity about this case.  If there had
been a contaminated jury, and there was not one in
this case, a good deal of its cause was the conduct
of the defendant.

There was, in fact, no contaminated jury.
There's a litany of claims about jurors who were
wrongly seated and whom the defendant argues should
have been excused for cause.  All these claims are
based primarily on the words uttered by the
prospective jurors and defense counsel's
interpretation of their meaning.  The briefs address
the issue at length, as is implicit in my denial of
the motion on a previous date.

I accept the prosecution's analysis as both
accurate and credible, the prosecution's analysis of
the selection process and the sufficiency of the

questionnaire, and I have some other observations on
the issue.  It is not and should not be the specific
one-by-one selection analysis of the questionnaire
that I speak of here.  The selection of a jury in
any case, especially high profile cases, requires
close attention by any judge who undertakes it.

        The words the prospective juror speaks are
highly important, but they are not the end-all of
the matter.  High profile cases are uniquely
difficult for impanelling a jury.  Not everyone is
willing to sit on a kind of case that draws
relentless publicity, not everyone knows what
sitting on a jury entails in any case or what rules
apply.

        Prospective jurors come to court with a
variety of contradictory impressions.  They will or
they won't be locked up in hotel rooms, they will or
they won't be paid, they will or they won't be
bothered by media, they can't be on a jury if
they've heard or read anything about the case, they
don't know if their job will be secure or their
children cared for, and they don't know if they can
sit in judgment of another human being.  In a high
profile case, there may be someone eager to sit to
gain personal status, maybe a book contract.  There

are other variables, as well.

Lay persons, in fact, rarely understand the presumption of innocence, which is not a duty imposed on society, in general.  The presumption does not require anyone other than 12 jurors and a judge to presume innocence.  For them, the presumption does not require a personal belief in innocence, but, rather, a method of judging and deciding a case in which you must think and act as if the defendant is innocent and convict the defendant only if the evidence proves beyond a reasonable doubt that he or she is guilty.

This demands, above all, withholding judgment, but does not require a personal belief in innocence.  It requires that you must start your process of deciding the case as if the defendant is innocent, and you may not convict until the evidence against the defendant proves his guilt beyond a reasonable doubt.

In examining the qualifications of prospective jurors, I listened to each one considering a variety of characteristics: Intelligence, experience in life, the way they consider answers before giving them, the attentiveness and the ability to work cooperatively,

the level of education, the ability to communicate,
to understand what is relevant to a question, the
ones I asked, and what is not and truthfulness.
There are other characteristics, too, that signal
the presence of someone fit or unfit to be a juror
in a case to be tried.

The transcript of jury selection never tells
us enough about why some jurors qualify and others
do not.  Even if the jurors were filmed during
questioning, you could not know the effect of the
often intangible atmosphere in the courtroom or
gauge the reaction of the juror when he or she first
enters a crowded courtroom, some with confidence,
some with discomfort.  The net result is that two
jurors can give exactly the same answers to same
questions and a judge will properly accept one and
not the other.

I made these individual decisions with extra
care in this case because many in the jury pool had
some opinions or knowledge about the case.  This
jury was fully capable of doing it the right way.  I
have no doubt they took their time, played by the
rules, and delivered a reasonable verdict based on
evidence, not on prejudgment, while following the
rules of law, a diligent and fair-minded jury.

1    There's another argument here that my rulings
2 impelled the defendant to take the witness stand in
3 his own defense because I did not allow him to
4 attempt to "prove his innocence through inadmissible
5 hearsay."  To the extent he wanted to make the
6 defense, he did.  It was the law that required him
7 to testify subject to cross-examination if, and only
8 if, he thought it important for his version of what
9 happened be heard by the jury.  A judgment he makes
10 and no one else does.
11    The defendant, in fact, had enormous
12 incentive to testify even if the hearsay he offered
13 had been admitted.  First, he had the knowledge that
14 several very serious charges came within one vote of
15 conviction in his first trial, and that one vote may
16 have come from an honest but mistaken view of the
17 legal rules that govern political dealing, or of the
18 view that the political realities establish a legal
19 standard.
20    While the events in the jury room of the
21 first trial have no legal significance, they do have
22 great value in assisting the trial lawyers, and, in
23 this case, the defendant, how best to present their
24 cases at the retrial.  And it is common knowledge
25 that lawyers for both sides take into account in

terms of arriving at strategic decisions what they
hear and learn from jurors in the first trial.

In light of history of this case and the
events of this trial, the defendant was, in fact,
the only one who could win his case and he had to do
it from the witness stand.  There he would have a
chance to show the jury by his speech and demeanor
that he was a decent person who may have committed
an honest mistake but not a criminal act.

The performance of the defendant was crucial
in another way.  Anyone listening to the tapes,
those played and those offered, would hear several
disturbing passages, passages which show the
defendant is an unsavory character.  Obviously, the
defendant understood this.  Once on the witness
stand, the defendant demonstrated he realized this
when he apologized to the use of the "f" word by
telling the jury that he was an f'ing idiot.

There were many moments on tape where his
tone of voice, the pacing and content of his speech,
and the words he used could be found by many to
manifest anger, impatience, desperation, obsessive
concern with personnel welfare above all else,
intense personal dislike of those who stood in his
way, and other unattractive characteristics of a

1 personality.  By testifying extensively, he could
2 present to the jury a live, close-at-hand view of a
3 man who had some tough moments but was, in the end,
4 decent and likable.

5        If this succeeds, and some jurors later said
6 in an interview session that they did like him, it
7 would increase his chances of acquittal.  Like
8 prospective jurors on voir dire, what he says is
9 important, but so is his conduct as he says it.

10        There is a recurring theme in the trials and
11 in the motions that certain recordings, if played,
12 would prove his innocence.  Standing alone, this
13 cannot be true.  There are only a tiny number of
14 recordations in law or life that can, standing
15 alone, prove innocence.

16        What comes to mind is a person accused of
17 acting alone to rob and murder a convenience store
18 clerk and the store surveillance tape shows that the
19 lone shooter is a foot shorter and of a different
20 race than the accused.  Interpretation and
21 explanation are not required in these extremely rare
22 cases.  Recordings of conversations in this case,
23 standing alone, prove nothing.  Sworn interpretation
24 and explanation are crucial.  One offer of proof
25 that was formally made came in the first trial when

one defense counsel took a transcript he wanted in
evidence, put it up on the screen, reading out loud
word for word, when it ended he stopped and sat
down, which I regarded as a reliable indication of
how the defense wanted to use its choice of
recordings.  The recording alone neither proved nor
disproved innocence.  Something else was needed and
not offered.  The lawyer could offer his opinion of
what the defendant meant, but he could do so only as
a part of closing argument, which is not evidence
and not a valid basis on which a jury could decide
the case.

Indeed, when the defendant took the stand, he
did offer explanations of what he meant.  It was
always clear in this case that sworn explanation and
interpretation were key to understanding the
conversations.

The defense relies heavily on my assumption
that my remarks of May 20th, 2011, was a ruling
about what the defendant can say in testimony, and
the defendant relied on my remarks when he decided
he would take the witness stand.

In legal terms, I had made no ruling, I had
held nothing.  I had, at best for the defense,
uttered dicta addressed to an issue not specifically

presented, and, for this reason, not formally argued
by the prosecution.  In this very proceeding, it has
been observed that people need not take action in
reliance on judicial comments, which the Court of
Appeals has, quote, "musings."  My comments may have
been viewed as a prediction of my ruling when the
issue became ripe for decision, but it was not a
ruling.

        The basis of my comments was my recollection
of the 1992 retrial of John Cheek, a well-known tax
protester, after the Supreme Court disapproved the
Seventh Circuit precedence barring a sincere belief
in the legality of one's conduct as a defense in
Cheek's tax evasion case.  That ruling is made in
1991.

        The Supreme Court ruling, which I had last
read in 1992, is based on two elements:  The
complexity of the tax laws and the requirement that
"willfulness" be proved to convict for criminal tax
code violations.

        Willfulness is not required to convict the
offenses charged here.  My comments were an accurate
description of the rule in Cheek.  I did not state
that the statute at issue here were similar, because
they were not similar.

1      Defense counsel clearly knew that the
2 applicable precedent was Cheek.  Even if defense
3 counsel did not read Cheek, which I find almost
4 impossible to believe, if they didn't read Cheek and
5 did not perceive the possibility that Cheek was a
6 questionable basis for my comment in this kind of
7 case, there was a simple solution to any
8 uncertainty:  Defense counsel could have made a
9 motion in limine before defendant took the stand,
10 they could have asked me to rule on what exactly the
11 defendant could and could not say, we would then
12 have had the very same formal argument and early
13 ruling that occurred after he had already begun his
14 testimony.

15      Knowing that the basis for my comments was
16 the Cheek case, I think the defense can make no
17 valid claim that they were misled.  What they may
18 have decided to rely on is the hope that having said
19 what I did, I would be unwilling to correct myself,
20 particularly after the defendant was on the witness
21 stand.  I was not unwilling.  In any event, on the
22 record before me, I do not credit the assertion that
23 defendant would not have testified had I not made my
24 comments.  His best chance for acquittal, as I have
25 shown, was to testify.  I believe that both he and

:16PM
:16PM
:17PM
:17PM
:17PM

1 his lawyers knew this.

2      In the end, the complaint that he couldn't
3 tell the jury he believed his conduct was legal is,
4 in fact, inconsequential in this case.  He said, in
5 many ways, that he did believe his conduct was
6 legal.  And the truth is that if the defendant had
7 been permitted to testify more explicitly that his
8 conduct was legal, then the prosecution would be
9 entitled, and is entitled, to an instruction that a
10 defendant does not have to know what he is doing is
11 illegal in order to be guilty of the offense.
12 Perhaps the defendant may have hoped for a jury to
13 disregard this instruction, but he has no right to
14 ask them to do so.

15      Second, by the time he left the stand, he
16 had, in fact, told the jury that he believed his
17 actions were legal, and more than once.  Some of
18 that was the object of successful objections, but
19 not all of them.  And I gave the instruction in the
20 end that defendant did not have to know the conduct
21 was illegal, an instruction I would not have given
22 had it not been perfectly clear to the jury that he
23 was arguing that he should be found not guilty
24 because he did not know his conduct was illegal.

25      The issue, in any event, was an obvious red

herring in the context of this case.  There was no
disagreement between the defendant and the
government about the law in question.

The defendant understood the applicable legal
concepts, he knew the illegality of quid pro quo.
And I'm not speaking now of defendant in the sense
that his lawyer spoke for him, I'm speaking of what
defendant said in his own voice when he was on the
witness stand.  He understood the illegality of quid
pro quo dealings and fundraising, he also said so in
some recordings, he testified to this, he swore that
he did not engage in such dealings, he adopted the
proposition he believed in good faith that he did
not engage in "this or that proposals."  This
defense he was entitled to and did make.  The fact
that the jury did not believe it does not vitiate
the fact that he was allowed to offer that defense.

Finally, the defendant wanted to bolster his
good-faith defense by citing the failure of lawyers
on his staff to tell him not to go forward with some
of his plans.  The prosecutors prevailed in their
objections to this gambit on the grounds that it
constituted an attempt to import an "advice of
counsel defense" for which both sides agreed there
was no legal basis.

1      Defense counsel had declared that what was
2 attempted was not a back-door advice of counsel
3 defense, he was merely attempting to show why his
4 acts were taken in good faith.  This particular line
5 is itself a kind of mere fig leaf.
6      If defendant's gambit was not a disguised
7 advice of counsel defense, there would have been no
8 need for him to pepper his testimony with repeated
9 assertions that this or another high ranking staff
10 member was a lawyer and went to some well-known law
11 school.  Defense counsel do not confine their
12 argument to lawyers on staff; instead, their
13 position was, never once did any of these people in
14 his circle, the defendant's circle, tell the
15 defendant that he could not engage in conduct for
16 which he now stands convicted.
17      As an explanation of their position in court,
18 it makes little sense.  How could a jury expect that
19 these non-lawyers, the ones on the staff who weren't
20 lawyers, would know the rules or expect that they
21 would give a legal opinion in a roomful of lawyers,
22 including the defendant himself.  The value of the
23 claim that staff failed to stop defendant or warning
24 him away from doing something illegal exists only
25 because the defendant was talking to lawyers, this

1 is why it was clearly a back-door advice of counsel

2 defense.

3         There were some protests during the trial

4 over my attempts to keep the defendant's testimony

5 within appropriate legal bounds, that is to remind

6 him to answer the question asked without further

7 providing answers to questions not asked, to answer

8 a question "yes" or "no" when it was possible to do

9 so, and to avoid incorporating repetition of

10 previous answers.

11         I used, for the most part, a neutral tone of

12 voice in giving these reminders for which there was

13 a legitimate need.  There was at least one occasion

14 on which I used a sharper tone of voice when the

15 defendant talked about the occasion of having his

16 cousin die at Children's Memorial hospital, he did

17 this after I explicitly told him not to do so.  His

18 ostensibly reason for bringing it up was that his

19 cousin's experience was a source of his personal

20 devotion to the hospital.  He never, interestingly

21 enough, made an offer of proof as to why his

22 cousin's dying at a hospital would lead to his high

23 regard for the hospital.  He was, in my view, simply

24 seeking personal sympathy.

25         In the earliest part of direct examination, I

did not enforce the rule against narrative answers
and overruled the prosecution's objections
explaining my rationale in open court.  These
answers, in the way they were presented by the
witness I said, might give the jury some idea of the
experience and character of the defendant.

The defendant's desire to speak at length,
which in all honesty is understandable and one whose
through most of his career was seeking and holding
public office, it's a characteristic of most public
officeholders, but his desire to speak at length
made it difficult for him to follow the rules which
required "yes" or "no" answers to many questions.
If there was a particular justification for any of
the longer answers, I wasn't aware of it because the
defendant was not, with one notable exception,
making offers of proof.

When a witness is on the stand, the best
method of an offer of proof is to excuse the jury
and elicit the answers which might change a ruling.
This was rarely called for by his lawyers.  It may
be that repetition of points made in prior answers
stems from the need of most political candidates to
be repetitive to make sure their message is heard.
Voters do not all pay attention at the same time,

and the ones who have heard the message in months
before they vote might forget it by election day.
In this trial, we are measuring time in days, not
months, and the jurors, unlike voters, are paid to
listen carefully in order to do so.

          The defense made some claims that I had made
factual findings during the trial, findings which
could be made only by a jury.  I made no factual
findings which bound the jury or which were known to
the jury.  The factual findings I made concerned the
state of the record and the conduct of counsel.

          A particular complaint is directed to a
remark I made about high-ranking staffers who one of
them testified told the defendant "don't even joke
about it," which referred to a fundraising
proposition at a time when the defendant spoke about
possible personal benefits he might secure in return
for his actions.

          Defense counsel contends that I had found
that the conversation occurred despite the
defendant's denial of its existence.  A denial
which, incidentally, started not as a denial but a
simple failure to recall.  It would not matter much
if I had found the staffer's testimony to be true
since the comment occurred outside the presence of

the jury and could not influence their verdict.  In
reality, my statement was not a decision that the
staffer's testimony was correct, it was a factual
observation that the testimony was in evidence and
not favorable to the defense.  A fact the defense
recognized, as well, when it elicited the
defendant's denial that it was true.

The defense in the course of the first trial
proceedings wanted to be given the absolute right in
its case to play recordings of its choosing so long
as it did not exceed a specified by a very large
time limit.  Consuming all of the time would have
taken, recordings alone, would have taken weeks of
trial by a jury.  I refused permission, envisioning
a jury listening to hours of recordings with no
sworn witness to answer questions about context and
meaning.

The requested procedure would, in time, give
rise to a valid and repeated objections based on
Rule 403 of the Federal Rules of Evidence which bans
unnecessary duplication of evidence.

More importantly, this is a central objection
of the defendant to my enforcing the rules against
hearsay.  The clear general rule provides in civil
and criminal cases that one party, here the

prosecution, can admit the out-of-court unsworn
statements of an opposing party without putting that
party, here the defendant, on the witness stand.
Federal Rule of Evidence 801 explicitly provides
that statements personally made by a party opponent
are not hearsay.  It is a significant rule in
criminal cases where the prosecution has no right to
require the defendant to take the witness stand, and
thus no right to confront him or her with
out-of-court statements as a prerequisite to its
use.

Out-of-court statements can be used against
the person who uttered them in somewhat the same way
that statements against one's own interest are
deemed to be reliable enough to admit.  If there's
good reason to dispute reliability, the person who
made the statement can assume the stand or to
explain or to deny his own statements.

Use of a criminal defendant's statements is
supported, in part, by a general understanding that
people rarely lie when they say bad things about
themselves.  Individuals rarely have anything to
gain from doing that as opposed to the view that
people often lie when saying good things about
themselves, but reliability is not the only

rationale for this rule.  It is also based on the
nature and importance of cross examination, and
where the party opponent does testify under oath,
then the other party may cross-examine and observe
the true demeanor of the witness.

Yet, this is not the end of the applicable
aid of Rule 801 provisions.  The rule does not
authorize the admission of prior statements even
when an opposing party like the defendant does take
the stand.  Rule 801 further limits admissibility
only to prior statements that are consistent with
the witness' testimony, and only for the purpose of
rebutting a charge that the witness' testimony is
recent fabrication.  In this case there was no
prosecution claim of recent fabrication.  The
defendant was not charged with devising a new
version of facts for purposes of trial.

The interplay of these rules prevented the
defendant from admitting the prior recordings on the
grounds that the rules of evidence had declared them
to be non-hearsay, that invocation was not available
to the defendant.

The defendant might still seek admissibility
under another rule which admits hearsay statements
under exception to the no hearsay rules.  What the

1 defendant says in so many of the tapes does not fall
2 within the exceptions to the hearsay rules itemized
3 in 803.  None of this was argued, to my
4 recollection.  And, in any event, none of the
5 obvious candidates would apply on the set of facts
6 here:  present sense impression, excited utterance,
7 existing state of mind.

8         The defendant often used the phrase "state of
9 mind" in ordering recordings, but the state of mind
10 exception under Rule 803 applies, generally, to
11 direct statements, such as "I am happy."  The
12 substance of the prior statements defendant wanted
13 to admit was cumulative of what the jury had already
14 heard in the recordings played by the prosecution,
15 this is particularly so where defendant described
16 his good faith intent, and purpose, and his plans in
17 great depth from the witness stand.  The prosecution
18 never contended that any bit of it was recent
19 fabrication.

20         None of the rules contained in the many
21 exceptions to the hearsay rule apply in this case,
22 except possibly one because it applies in all cases,
23 and that is the safety valve rule of 807 for
24 exceptional cases.  In this case, Rule 807 would let
25 an otherwise admissible hearsay if, and only if, the

hearsay is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts and the general purpose of these rules and the interest of justice will best be served by admission of the statement into evidence.

Having examined each of the transcripts proposed by the defendant to be offered prior to evidence being offered in the first trial and rehearsed in the second, I found that none of them were more probative than any other testimony which the defendant already had, his own.  I found, too, that none of the offered transcripts offered meaningful corroborations of the truth of the defendant's testimony.

The transcripts do show defendant's repetition of the same things he said on the admitted recordings and in his testimony.  It does not corroborate the defendant was consistent, but the prosecution never charged him with recent fabrication.  The defendant did repeat some rogue statements that what he did had to be legal as in some of the recordings already played.  The value of statements like this to the defense as corroboration is nonexistent since he never claimed that he asked

1 any of the lawyers around him to research the
2 question for him or look up the law himself and it
3 is undisputed that he never sought advice of
4 counsel.
5        This led me to conclude that his prior
6 statements that favor his own case did not possess
7 appropriate guarantees of trustworthiness.  The
8 interest of justice did not support the admission of
9 the statements.  There were a handful, I thought,
10 would be appropriate and permission was given.
11        There is no dispute that the vast majority of
12 proposed recordings were excluded after I considered
13 the application of the hearsay exception rules 803
14 and 804, and the 807 escape clause to each of the
15 recordings offered.
16        There are some other things that deserve, I
17 think, brief observations.  Defense counsel
18 complained that I imposed timing restraints on his
19 direct examination of the defendant.  I did impose
20 restrictions, but they were not restrictions with
21 respect to timing.  I informed him that at the end
22 of his direct examination, I would allow the
23 prosecution one hour to begin its cross-examination.
24 I did this because it was clear to me that defense
25 counsel was running that day's clock because he did

not want his client subjected to cross-examination that day.

    That preference is understandable from the defense perspective.  His client had been on the witness stand for quite a while and a further preparation session with his client might be useful. It was the means by which counsel sought to serve his goal that precipitated my actions.

    He was running out the clock by taking longer pauses to put questions, longer than he had done before, slowing the pace that had not been slowed before, and, on many occasions, he asked the same question twice, sometimes more than twice.

    There might be specific neutral explanations for this conduct, but defense counsel did not raise them at the time.  Running the clock may have been a good idea for defense counsel, it wasn't his legal right to do it.

    Defense counsel challenged some of the limits I placed on the scope of examination of witnesses. The objections to my rulings on several of these points were made at sidebar before a witness took the stand.  Once defense witness, in particular, did testify and defense counsel believed he should have been able to ask more questions.  After the belief,

1 I guess at the post-trial motions, that he should
2 have been able to ask more questions.  This
3 particular witness completed his testimony, and
4 after testimony was complete defense counsel made no
5 effort at an offer of proof even though the jury
6 could have been sent out and the defense counsel
7 could have brought out the actual testimony he
8 wanted to elicit from the witness who was still in
9 the courtroom rather than rely on his own belief as
10 to what the witness might say based on reports of
11 interviews.  Live offers of proof put the Court in a
12 better position to judge whether the proposed
13 testimony should be heard by the jury.

14        With that, I want to ask counsel for the
15 defense and for the prosecution what it is they
16 intend to do on Tuesday and Wednesday of next week?
17 More importantly, it's not so much what, it's the
18 order in which you want to do it.

19        We can begin with the general kinds of
20 mitigation that exists in most sentencing cases or
21 we can begin with resolution of objections to the
22 probation officer's Presentence Report.

23        Ordinarily, we begin with the objections, and
24 I'm willing to do that, but should there be a
25 witness to be called for either side and it would be

1 convenient for everyone to have the witness done

2 first, I'm willing to do that.

3         So from the point of view of the government?

4         MR. SCHAR:  Judge, we'll defer to whatever

5 Your Honor prefers.  We are not expecting to call

6 any witnesses.  We feel, for the most part, the

7 guidelines issues were fairly briefed, but we'll go

8 ahead and argue those issues and be prepared to

9 argue other sentencing factors, but I don't believe

10 we'll be presenting any evidence.

11         MR. SOROSKY:  If I could ask the Court a

12 question?  I would presume the Court would want

13 guideline arguments from both sides before we would

14 get into the more traditional statutory factors, is

15 that correct or incorrect?

16         THE COURT:  That's the general rule, but I

17 don't want to put anybody in a position of losing an

18 opportunity to provide mitigation evidence because

19 we're doing the guidelines.

20         MR. SOROSKY:  Okay.

21         THE COURT:  If you have mitigation evidence

22 that would not be affected in any way by doing the

23 guidelines first, then we're doing the guidelines

24 first.

25         MR. SOROSKY:  So let me presume for the sake

## RULE 30(d) CERTIFICATION

LEONARD C. GOODMAN, attorney for the Defendant-Appellant, Rod Blagojevich, certifies that all of the materials required by Circuit Rule 30(a) and (b) are included in this appendix.

/s/ Leonard Goodman
LEONARD C. GOODMAN

Leonard C. Goodman
Len Goodman Law Office LLC
53 West Jackson Blvd.
Suite 1650
Chicago, Illinois 60604
(312)986-1984

July 15, 2013

App. 46

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2013, I electronically filed the foregoing Defendant-Appellant Rod Blagojevich's Brief and Short Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Leonard Goodman*
LEONARD C. GOODMAN

Leonard C. Goodman
53 West Jackson Blvd.
Suite 1650
Chicago, IL 60604
(312) 986-1984

July 15, 2013