In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 11-3853

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**ROD BLAGOJEVICH,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 888 — James B. Zagel, *Judge.*

# BRIEF AND APPENDIX OF THE UNITED STATES

GARY S. SHAPIRO
Attorney for the United States,
Acting Under Authority Conferred
  by 28 U.S.C. § 515
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

MARK E. SCHNEIDER
Assistant United States Attorney
Chief of Appeals, Criminal Division

DEBRA RIGGS BONAMICI
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

JURISDICTIONAL STATEMENT ..................................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................................. 2

STATEMENT OF THE CASE ............................................................................ 3

STATEMENT OF FACTS .................................................................................. 6

SUMMARY OF ARGUMENT ......................................................................... 33

ARGUMENT ........................................................................................................ 35

    I.    The Jury's Verdicts of Guilty Were Supported by Abundant
Evidence. ......................................................................................... 35

        A.    Standard of Review .................................................................. 35

        B.    Analysis ..................................................................................... 36

            1.    Appointment of Valerie Jarrett as Senator ............................ 36

            2.    The Appointment of Jesse Jackson, Jr. as Senator ............... 44

            3.    Exchange of Medicare Rate Increase for Campaign
Contributions ......................................................................... 47

            4.    Exchange of Racing Bill for Campaign Contributions ........... 48

    II.    The Jury Was Properly Instructed Regarding the Elements of
Extortion ......................................................................................... 50

        A.    Standard of Review .................................................................. 50

        B.    Analysis ..................................................................................... 52

            1.    Meaning of "Property," as Used in the Hobbs Act ................. 52

            2.    Proof of Illegal Exchange ........................................................ 55

3. The Challenged Instructions Were Not Improperly "Exploited." ................................................................... 58

III. The District Court Did Not Abuse Its Discretion in Excluding Certain Testimony of the Defendant and Instructing the Jury Regarding Good Faith ........................................................... 59

 A. Standard of Review ....................................................... 59

 B. Background ................................................................... 59

 C. Analysis ....................................................................... 68

  1. Exclusion of Evidence ............................................ 68

  2. Instruction ............................................................ 74

IV. The District Court Did Not Abuse Its Discretion in Imposing Limits on the Defendant's Cross-Examination of Witnesses. .......... 76

 A. Standard of Review ....................................................... 76

 B. Analysis ....................................................................... 77

  1. Cross-Examination of Monk .................................... 78

  2. Cross-Examination of Wyma .................................... 81

  3. Cross-Examination of Magoon and Johnston .......... 83

  4. Rulings Regarding the Government's Cross-Examination ........................................................ 85

V. There Was No Abuse of Discretion in the District Court's Evidentiary Rulings. ..................................................... 89

 A. Standard of Review ....................................................... 89

 B. Analysis ....................................................................... 90

  1. Testimony Regarding Recordings ............................ 90

  2. Recorded Conversations Offered by the Defense .................... 92

VI.   Blagojevich's False Statement Conviction Should Be Affirmed. ..... 97

   A.   Standard of Review ................................................................ 97

   B.   Background ............................................................................ 98

   C.   Analysis ................................................................................. 99

        1.   The Charged Statement Was Not Fundamentally
             Ambiguous. ................................................................. 100

        2.   Overwhelming Evidence Showed that the Charged
             Statement Was False, and Defendant Knew It. ................. 101

        3.   Blagojevich Was Not Improperly Precluded from
             Contesting Materiality. .......................................... 104

VII.  The District Court Did Not Abuse its Discretion in Declining
      to Strike Juror 174 .................................................................. 106

   A.   Standard of Review .............................................................. 106

   B.   Analysis ............................................................................... 106

VIII. The District Court Correctly Determined the Defendant's
      Advisory Guidelines Range and Any Error Was Harmless ........... 110

   A.   Standard of Review .............................................................. 110

   B.   Background .......................................................................... 110

   C.   Analysis ............................................................................... 111

        1.   The District Court Correctly Determined that the Value
             of the Benefit Defendant Sought to Obtain from the
             Offenses. ................................................................... 111

        2.   The District Court Correctly Determined that Defendant
             Acted as a Leader and Organizer. ........................................ 113

        3.   Any Error in Calculating the Advisory Range Was
             Harmless. ................................................................... 115

CONCLUSION ............................................................................. 118

## TABLE OF AUTHORITIES

### CASES

*Bronston v. United States*, 409 U.S. 353 (1973) ............................................ 103

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ................................................ 69

*Cheek v. United States*, 498 U.S. 192 (1991) ...................................... 64, 65, 70

*Delaware v. Fensterer*, 474 U.S. 15 (1985)...................................................... 77

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986).................................................. 77

*Evans v. United States*, 504 U.S. 255 (1992)...................................... 44, 56, 57

*Griffin v. Bell*, 694 F.3d 817 (7th Cir. 2012)................................... 106, 107, 110

*Irvin v. Dowd*, 366 U.S. 717 (1961) .............................................................. 106

*McCormick v. United States*, 500 U.S. 257 (1991) ...................................... 55, 56

*Neder v. United States*, 527 U.S. 1 (1999) ...................................................... 51

*Nevada v. Jackson*, —U.S.—, 133 S.Ct. (1990) ......................................... 68, 92

*Oswald v. Bertrand*, 374 F.3d 475 (7th Cir. 2004)........................................ 106

*Patton v. Yount*, 467 U.S. 1025 (1984)........................................................... 107

*Rock v. Arkansas*, 483 U.S. 44 (1987) ............................................................ 69

*Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003) .... 52

*Scrushy v. United States*, 130 S. Ct. 3541 (2010)............................................ 56

*Sekhar v. United States,* — U.S. —, 133 S.Ct. 2720 (2013)............................ 52

*Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896 (2010) ...... 39, 106, 110

*Taylor v. Illinois*, 484 U.S. 400 (1988) ........................................................... 68

*Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001) .................... 110

*United States v. Abbas*, 560 F.3d 660 (7th Cir. 2009).................................... 117

*United States v. Allen*, 605 F.3d 461 (7th Cir. 2010) ............................ 107, 110

*United States v. Brown*, 726 F.3d 993 (7th Cir. 2013) ...................................... 51

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ..................................... 37

*United States v. Burge*, 711 F.3d 803 (7th Cir. 2013) ..................................... 98

*United States v. Canaday*, 466 F.2d 1191 (9th Cir. 1972) ............................... 87

*United States v. Ceccerelli*, 350 F. Supp. 475 (W.D. Pa. 1972) ..................... 101

*United States v. Chambers*, 642 F.3d 588 (7th Cir. 2011) ............................... 46

*United States v. Chapin*, 515 F.2d 1274 (D.C. Cir. 1975) ............................. 101

*United States v. Cox*, 536 F.3d 723 (7th Cir. 2008) ...................................... 100

*United States v. Curescu*, 674 F.3d 735 (7th Cir 2012) ............................. 90, 91

*United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012) ................................ 37

*United States v. DiSantis*, 565 F.3d 354 (7th Cir. 2009) ................................. 52

*United States v. Duncan*, 598 F.2d 839 (4th Cir. 1979) ................................. 88

*United States v. Eberhart*, 388 F.3d 1043 (7th Cir. 2004) .............................. 78

*United States v. Fletcher*, 634 F.3d 395 (7th Cir. 2011) .............................. 106

*United States v. Giles*, 246 F.3d 966 (7th Cir. 2001) ................................. 54-57

*United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008) ................................. 45

*United States v. Gray*, 521 F.3d 514 (6th Cir 2008) ...................................... 111

*United States v. Green*, 350 U.S. 415, 76 S.Ct. 522 (1956) ............................ 54

*United States v. Greve*, 490 F.3d 566 (7th Cir. 2007) ................................... 98

*United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) ...................................... 54

*United States v. Hassebrock*, 663 F.3d 906 (7th Cir. 2011) ........................... 98

*United States v. Hible*, 700 F.3d 958 (7th Cir. 2012) ..................................... 52

*United States v. Hosseini*, 679 F.3d 544 (7th Cir. 2012) .................................. 35

*United States v. Johns*, 686 F.3d 438 (7th Cir. 2012) ..................................... 35

*United States v. Johnson*, 729 F.3d 710 (7th Cir. 2013) ................................. 35

*United States v. Joshua*, 648 F.3d 547 (7th Cir. 2011) ....................... 72, 90, 95

*United States v. Kelley*, 461 F.3d 817 (6th Cir. 2006) ................................ 37, 54

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) ....................................... 57

*United States v. Klein*, 560 F.2d 1236 (11th Cir. 1977) .................................. 87

*United States v. Kuecker*, 740 F.2d 496 (7th Cir. 1984) .................................. 89

*United States v. Lea*, 249 F.3d 632 (7th Cir. 2001) ........................................ 69

*United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986) .................................... 101

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010) ................................. 104

*United States v. Martin*, 195 F.3d 961 (7th Cir. 1999) ................................... 37

*United States v. McGregor*, 879 F. Supp. 2d 1308 (M.D. Ala. 2012) .............. 57

*United States v. Mitchell*, 886 F.2d 667 (4th Cir. 1989) ................................. 88

*United States v. Morris*, 549 F.3d 548 (7th Cir. 2008) ................................... 46

*United States v. Olano*, 507 U.S. 725 (1993) ................................................. 51

*United States v. Paneras*, 222 F.3d 406 (7th Cir. 2000) ................................. 45

*United States v. Ramirez-Fuentes*, 703 F.3d 1038 (7th Cir. 2013) ................. 51

*United States v. Reese,* 551 F.3d 657 (7th Cir. 2008) .................................... 100

*United States v. Reeves*, 695 F.3d 637 (7th Cir. 2012) .................................. 110

*United States v. Rose*, 526 F.2d 745 (8th Cir. 1975) ....................................... 88

*United States v. Rosen*, 726 F.3d 1017 (7th Cir. 2013) .......................... 111, 114

*United States v. Sanders*, 708 F.3d 976 (7th Cir. 2013) ...................... 51, 76, 77

*United States v. Scheffer*, 523 U.S. 303 (1998)...............................................69

*United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009)...........................56

*United States v. Simon*, 727 F.3d 682 (7th Cir. 2013) ........................59, 90, 98

*United States v. Smith*, 623 F.2d 627 (9th Cir. 1980)......................................88

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) ....................................37

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013)................................44, 58

*United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007).................. 40, 42, 52

*United States v. Turner*, 651 F.3d 743 (7th Cir. 2011) ...................................95

*United States v. Van Allen*, 524 F.3d 814 (7th Cir. 2008) ..............................72

*United States v. Vanderbosch*, 610 F.2d 95 (2d Cir. 1979) ............................88

*United States v. Westerfield*, 714 F.3d 480 (7th Cir. 2013)............................35

*United States v. Yasak*, 884 F.2d 996 (7th Cir. 1989)...................................101

## STATUTES

18 U.S.C. § 1001.................................................................... 99, 102, 104

18 U.S.C. § 1951.............................................................................. 53, 55

18 U.S.C. § 3231.................................................................................... 1

18 U.S.C. § 3553(a) ...............................................................................116

18 U.S.C. § 3742(a)(2) .............................................................................. 1

18 U.S.C. § 666(c) ........................................................................... 39, 52

18 U.S.C. § 1962(c)................................................................................. 4

18 U.S.C. § 371...................................................................................... 1

28 U.S.C. § 1291..................................................................................... 1

28 U.S.C. § 515...................................................................................... 1

**RULES**

Fed. R. Crim. P. 7(c)(1) .................................................... 100

Fed. R. Evid. 401 ............................................................. 80

Fed. R. Evid. 403 ........................................................ 69, 89

Fed. R. Evid. 609 ........................................................ 87, 88

Fed. R. Evid. 701 ............................................................. 91

Fed. R. Evid. 803(3) ......................................................... 94

U.S.S.G. § 2B1.1 ............................................................ 112

U.S.S.G. § 2C1.1 ............................................................ 116

U.S.S.G. § 2C1.1(b)(2) ...................................................... 111

U.S.S.G. § 2C1.1(b)(3) ...................................................... 111

U.S.S.G. § 3B1.1 ............................................................ 114

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct.

Defendant was charged in a second superseding indictment with violations of 18 U.S.C. §§ 371, 666(a)(1), 1001(a)(2), 1343, 1346, 1349, 1951(a), 1962(c), and 1962(d). R. 231.[1] The district court had jurisdiction pursuant to 18 U.S.C. § 3231. After a trial, a jury convicted defendant of a single count, and failed to reach a verdict on the remaining counts. R. 561. After a retrial, the jury convicted defendant of 17 counts. R. 754. Defendant was sentenced on December 7, 2011, and the district court's final judgment and commitment order was entered on the docket on December 21, 2011. R. 904. Defendant timely filed a notice of appeal on December 20, 2011. R. 902. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

---

[1] Citations to the Original Electronic Record on Appeal are to "R.," followed by the document number. Citations to transcripts of Blagojevich's first and second trials are to "1Tr.," and "Tr.," respectively, followed by the page number. Citations to transcripts of other district court proceedings are to "Tr.," preceded by the date and followed by the page number. Citations to exhibits introduced by the government during the second trial and the Presentence Investigation Report are to "GX _:" and "PSR," respectively, followed by the page number. Citations to defendant's opening brief and appendix are to "Br." and "App.," followed by the page number. Citations to the government's appendix are to "G. App.," followed by the page number.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's verdict on the fraud, bribery, and extortion charges.

2.      Whether the district court plainly erred in instructing the jury that the term "property" as used in the extortion statute includes any valuable right that is a source of wealth.

3.      Whether the instructions as a whole fairly and accurately stated the proof necessary to satisfy the *quid pro quo* element of the extortion offenses involving campaign contributions.

4.      Whether the district court abused its discretion in excluding the defendant's testimony that he "honestly believed" his conduct was legal.

5.      Whether the district court abused its discretion in instructing the jury regarding good faith.

6.      Whether the district court abused its discretion in ruling on certain evidentiary issues, prejudicing Blagojevich's substantial rights.

7.      Whether Blagojevich's statement during an FBI interview that he "did not track, or want to know, who contributed to him, or how much they contributed" was fundamentally ambiguous, immaterial, or literally true.

8.     Whether the district court abused its discretion in crediting Juror 174's assurance that he would disregard everything he had previously heard about the case, and in declining to strike him from the jury.

9.     Whether the district court clearly erred in determining, for purposes of calculating defendant's advisory range, that the value of the benefit defendant sought to obtain included $1.5 million in campaign contributions offered by supporters of Jesse Jackson, Jr.

10.     Whether the district court clearly erred in determining that defendant acted as a leader or organizer of the criminal activity for purposes of calculating defendant's advisory range.

## STATEMENT OF THE CASE

On February 4, 2010, a grand jury returned a second superseding indictment charging defendant, together with co-defendants Alonzo Monk, John Harris, and Robert Blagojevich, with various offenses arising out defendant's misuse of his power as Governor of Illinois to obtain financial benefits for himself and others.[2] R. 231. The second superseding indictment charged defendant with racketeering and racketeering conspiracy (Counts 1 and 2), wire fraud (Counts 3 through 13), attempted extortion (Counts 14, 15, 19, and 22), extortion conspiracy (Counts 17 and 21), solicitation of a bribe

---

[2] Defendant and Harris were originally charged by complaint (08 CR 1010 R. 1), and subsequently were charged, together with Monk, Harris, Robert Blagojevich, Christopher Kelly, and William Cellini, in a superseding indictment (R. 37).

3

(Counts 16 and 20), conspiracy to solicit a bribe (Counts 18 and 23), and the making of false statements to federal agents (Count 24), in violation of 18 U.S.C. §§ 1962(c) and (d), 1343, 1346, 1951(a), 666 (a)(1), 371, and 1001(a)(2), respectively, and included two forfeiture allegations. *Id.* [3]

Defendant, together with co-defendant Robert Blagojevich, proceeded to trial on June 3, 2010. R. 421. On August 17, 2010, the jury convicted the defendant of making false statements to federal agents (Count 24). R. 561. The jury failed to reach a verdict on the remaining counts, and the district court declared a mistrial as to those counts. *Id.* On October 27, 2010, the district court denied defendant's motion for judgment of acquittal or a new trial as to Count 24. R. 572, 589.

Prior to the second trial on the remaining counts, the district court dismissed Counts 1, 2, and 4, and Forfeiture Allegation 1, on the government's motion. R. 625. The second trial was conducted between April 21, 2011, and June 27, 2011. R. 675, 754, 755. Defendant testified during the second trial. R. 722, 730. At the conclusion of the second trial, the jury returned a verdict of guilty of: (a) ten counts of wire fraud (Counts 3, 5, 6, 7, 8, 9, 10, 11, 12, 13); (b) two counts of attempted extortion (Counts 15 and 22);

---

[3] The counts are numbered consistently with the second superseding indictment and the judgment. *See* R. 231, 904. In his opening brief, Blagojevich refers to the counts of conviction by the numbers used in the renumbered and redacted indictment and verdict form provided to the jury in the second trial. *See* R. 892; Br. 36, 39, 46.

(c) two counts of conspiracy to commit extortion (Counts 17 and 21); (d) two counts of conspiracy to solicit a bribe (Counts 18 and 23); and (e) one count of solicitation of a bribe (Count 16). R. 754, 755. The jury acquitted the defendant of one count of soliciting a bribe (Count 20), and failed to reach a verdict on two counts of attempted extortion (Counts 14 and 19). *Id.* After the verdict was returned, on motion of the government, the district court dismissed the remaining forfeiture allegation in the indictment. R. 754.

On September 26, 2011, the district court denied defendant's motion for judgment of acquittal or new trial on the counts of conviction in the second trial. R. 774, 802.

On December 7, 2011, at the conclusion of a two-day sentencing hearing, the district court imposed a sentence of 168 months' imprisonment,[4] a fine of $20,000, and special assessments totaling $1,800. R. 904. The term of imprisonment imposed by the district court was well below the advisory Guidelines range of 360 to life, calculated based in part on the district court's determination that the value of the benefit the defendant sought to gain was $1,625,000, and that defendant was an organizer or leader of the offense. 12/6/11 Tr. 30, 51-53, 58; 12/7/11 Tr. 244.

---

[4] This sentence included the following terms of imprisonment: 168 months each on Counts 3, 5,-13, 15, 17, 21, and 22; 60 months each on Counts 16, 18, and 23; and 36 months on Count 24, all to run concurrently. R. 904.

## STATEMENT OF FACTS[5]

*Overview*

### *The Senate Seat*

On November 4, 2008, Barack Obama, then a United States Senator from Illinois, was elected President of the United States. Tr. 1304-05. At that time, defendant Rod Blagojevich was the Governor of Illinois and, as such, had the power to appoint a replacement to fill Obama's Senate seat. Tr. 1305.

In the months preceding the election, Blagojevich had discussed this possibility with a number of trusted individuals, including his Chief of Staff, John Harris; General Counsel to the Governor, Bill Quinlan; his Deputy Governor, Bob Greenlee; his former Deputy Governor, Doug Scofield; and one of his pollsters, Fred Yang. *Id.*; Tr. 1307, 1316, 1345, 1462.

On November 3, 2008, Harris told Blagojevich that Rahm Emanuel (then a Congressman but widely recognized as likely to be named Obama's Chief of Staff should Obama win the election) had indicated to Harris that Obama was interested in Valerie Jarrett (a close friend and advisor to Obama) being named as his replacement as Senator for Illinois. Tr. 1324.

---

[5] The relevant facts are summarized based on the record of the second trial, which resulted in all but one of the substantive convictions. The facts relevant to Blagojevich's false statement conviction are described *infra* in Section VI, based on the record of the first trial. Given space limitations, we focus on the evidence that is directly relevant to the challenged counts of conviction. The government will move to supplement the record on appeal with transcripts of the intercepted conversations introduced by the government, and will move to supplement the record with any other materials as necessary.

Information concerning Obama's interest in having Jarrett replace him in the Senate led to a series of conversations in early to mid-November between Blagojevich and a small number of trusted deputies regarding what he could personally get from Obama in exchange for making Jarrett the Senator. GX 7-19. Among the options Blagojevich raised and discussed were his own appointment to an ambassadorship or a cabinet post, including Secretary of Health and Human Services ("HHS"), and a number of highly paid positions in private entities. *Id.* In the course of these discussions, Blagojevich talked repeatedly about problems he was facing in his own life, including financial stress, his lack of interest in remaining Governor of Illinois, his inability to run for any higher-level elected political positions, and the danger he faced from the ongoing federal investigation that had led to the conviction, five months earlier, of Tony Rezko, a former Blagojevich fundraiser and advisor. *E.g.*, GX 12, 13, 15, 18; Tr. 1381. Blagojevich compared various appointment options, taking into account whether and how well each would solve one or more of the personal problems with which he was struggling. *Id.*

After strategizing with his deputies, Blagojevich requested the HHS position in exchange for naming Jarrett Senator, and, when that did not happen, he asked for millions of dollars to be put into an organization that he would control. GX 36. Part of Blagojevich's well-thought-out strategy was to

7

make Obama and others believe that, in fact, he was seriously considering candidates other than Jarrett, in an effort to increase his leverage and motivate Obama to accede to his requests. *Eg.*, Tr. GX 8:4, 18. One of the potential candidates he used for this purpose was Lisa Madigan. GX 8:4, 13:4, 18.

When, ultimately, neither of Blagojevich's demands were met and it no longer appeared as if Jarrett was interested in the Senate seat, Blagojevich turned his attention to accepting an offer, made more than a month earlier, of $1.5 million in campaign contributions from the Indian fundraising community in exchange for Blagojevich appointing Jesse Jackson, Jr. Senator. GX 65, 66, 67, 69. On December 4, 2008, at Blagojevich's direction, Blagojevich's brother and campaign manager, Robert Blagojevich, scheduled a meeting with Raghu Nayak, the Jackson supporter who had made the offer. GX 69, 70.

On the evening of December 4, 2008, reporters from the Chicago Tribune called for comment about a report that John Wyma, a lobbyist and Blagojevich fundraiser (and Blagojevich's Chief of Staff as a Congressman), was cooperating with federal authorities, and that authorities had obtained recordings of Blagojevich as part of their investigation. GX 71; Tr. 1494, 2138. Blagojevich directed his brother to cancel his meeting with Nayak. GX 72-74.

### *The Racing Bill and Children's Memorial Hospital*

During the same period in which Blagojevich was attempting to strike a deal with regard to the Senate seat, he was involved in fundraising discussions with, among others, John Wyma and Lon Monk, both of whom were lobbyists and longtime friends of Blagojevich's, regarding efforts to collect as much money as possible in campaign contributions by the end of the year. John Johnston, a racetrack owner and longtime Blagojevich campaign contributor, and Patrick Magoon, the CEO of Children's Memorial Hospital ("CMH"), were among those from whom Blagojevich was attempting to obtain contributions.

In November 2008, the legislature passed a bill that provided subsidies to the horseracing industry funded with revenues of the Illinois casino industry (the "Racing Bill"). Although the 2008 bill extended a subsidy approved in 2006, it was not passed in time to become effective before the 2006 bill expired. Blagojevich was told that members of the racing industry were losing large amounts of money during the subsidy's lapse, and Johnston had communicated to Blagojevich that his company was losing $9,000 per day. Nevertheless, when on November 26, 2008, the bill was placed on Blagojevich's desk for signature, Blagojevich delayed signing it. In the meantime, Blagojevich directed Monk (the fundraising point person for Johnston) to make efforts to collect a $100,000 contribution from Johnston.

9

Blagojevich told Monk that he feared that Johnston would not make a contribution once Blagojevich signed the Racing Bill, and suggested that Monk could tell Johnston that Blagojevich would sign the bill, with other pending bills, after the first of the year. Tr. 2775-76. Blagojevich then instructed staff members to hold the Racing Bill, together with the other pending bills, and told Monk to "get it done" (meaning collect Johnston's contribution). *Id.*

Blagojevich approved Monk telling Johnston that, although the contribution and signature were "two different subjects," Blagojevich was concerned that Johnston would get "skittish" about making the contribution once Blagojevich signed the bill. *Id.* Monk understood these statements to mean that Blagojevich was delaying signing the Racing Bill to put pressure on Johnston to make his contribution. *Id.* When Monk delivered this message, Johnston reached the same conclusion, and promised to try and get his contribution in by the end of the year. Tr. 2991. At the time of Blagojevich's arrest, Blagojevich had not signed the Racing Bill. Tr. 2791.

Patrick Magoon, the president and CEO of CMH, had been working for years to obtain an increase in Illinois State Medicaid reimbursement rates for pediatric specialty physians. As Governor, Blagojevich had the power to implement the increase without any need for legislative approval.

In September 2008, Magoon spoke with Blagojevich regarding this matter, and Blagojevich asked him for background information about CMH's proposal. Tr. 2507-10. Around the same time, Blagojevich directed Greenlee to investigation the matter, and ultimately authorized him to move forward with the rate increase proposal, which they expected would take effect on January 1, 2009. Tr. 2154. Shortly thereafter, Blagojevich told John Wyma, a lobbyist for CMH, that he was going to give the hospital $8 million, and he wanted Wyma to get Pat Magoon for 50." Tr. 2364. On or about October 17, 2008, Blagojevich called Magoon personally and told him that the rate increase would take effect on January 1, 2009. However, Blagojevich asked Magoon to keep the increase quiet until the end of the year.

When Wyma failed to follow up with soliciting a contribution from Magoon, Blagojevich directed his brother and campaign manager to do so. On or about October 22, 2008, Magoon returned a call from Robert Blagojevich (with whom he had had no prior dealings), whereupon Robert Blagojevich asked Magoon to raise $25,000 for the governor. Tr. 2519. Robert Blagojevich pressed Magoon to arrange the contribution, saying that it needed to be done by January 1st. Tr. 2519. Thereafter, Magoon cut off all further communications with him. Tr. 2523.

When Robert informed Blagojevich that Magoon was not returning his calls, Blagojevich called Greenlee. GX 41. Upon Blagojevich's inquiry,

11

Greenlee confirmed that they had discretion over the rate increase and could pull it back. GX 41. Blagojevich responded that was "good to know." GX 41. Interpreting Blagojevich's statements as an indication that Blagojevich was no longer interested in the rate increase, Greenlee called the head of the responsible state agency and told him to put a hold on the rate increase. Tr. 2162, 64.

As of the date of Blagojevich's arrest on December 9, 2008, he had not directed that any work on the Medicaid rate increase resume or go forward, and no further work had been done. Tr. 2165.

### Offense Conduct

#### Efforts to Exchange Jarrett Appointment for Various Benefits

When Blagojevich learned that President Obama had a definite interest in Valerie Jarrett being appointed to fill his Senate seat, Blagojevich immediately saw it as a "good" development. GX 7:2. When in a November 3 telephone conversation, Harris broached the topic, Blagojevich immediately asked,

> . . . Now, we should get something for that, couldn't I? . . . How about Health and Human Services? Can I get that? . . . What can I, honestly . . . have a shot at?

GX 7:2-3. From that point on, Blagojevich's sights with respect to the Senate seat focused on "negotiating" a deal with President Obama to get something

in return for appointing Jarrett. On November 3, 2008, Blagojevich, Harris, and Scofield met with officials of SEIU (Service Employees Internation Union), Tom Balanoff and Andy Stern, whom Blagojevich understood to be acting as Obama's emissaries, to discuss the appointment. Tr. 1360-64.

On November 5, 2008, in anticipation of a second meeting with Balanoff, Blagojevich had multiple conversations with Harris and others and also about jobs Blagojevich might obtain in exchange for the Jarrett appointment. GX 13-17. Blagojevich broached the topic of possible jobs in the private sector, asking Harris whether the president-elect could do "something big" for him in the "private sector" in exchange for the appointment. GX 14:9. Blagojevich and Harris discussed various private sector jobs Blagojevich might want. GX 14:9-13. Blagojevich directed Harris to start researching private foundations where Blagojevich could get a job "right away" and to "see what they pay." GX 14:11. Blagojevich told Harris that either Harris or Greenlee should do the research, and that word should not get around about the project. GX 14:12.

In a subsequent conversation, GX 15, Harris and Greenlee informed Blagojevich that they were investigating private foundations over which the president-elect might have influence, where there would be a "buffer" between Obama and Blagojevich, and Blagojevich's placement would not appear to be a "deal" for the Senate seat. GX 15:1. When Greenlee asked

13

whether Blagojevich was looking for this job for now or for after Blagojevich left office in 2010, Blagojevich answered, "now." *Id.* Blagojevich expressed enthusiasm for the private-foundation option, stating, "something like that would be great," and then asked, "What does that pay?" GX 15:4. Greenlee reported back to Blagojevich later that day regarding his research. GX 17; Tr 2090. As Blagojevich and Greenlee discussed this issue further, Greenlee also suggested that Blagojevich could sit on other boards to make additional money if he took a job with a private foundation, and told Blagojevich about the director of one foundation who sat "on two corporate boards" and made "around $250,000 a year, in addition to her salary." GX 17:1-2. Blagojevich responded, "Yeah, see that's what we'd want. That's it." *Id.*

Blagojevich also spoke to Scofield about his interest in getting a private foundation job. GX 16. Blagojevich told Scofield that SEIU and the president-elect could remove the head of a particular foundation and give the position to Blagojevich. GX 16:1. Blagojevich also told Scofield that, although it was unlikely that he would be able to get a cabinet position in exchange for the Senate seat, he would take Health and Human Services "in a second." GX 16:3.

On November 6, 2008, Harris provided Blagojevich with another idea for a job President Obama could help him obtain in exchange for making Jarret Senator—appointment as the paid national coordinator for Change to

14

Win, an organization partially funded by SEIU. GX 18:14-24. Blagojevich described Change to Win to his wife as, potentially, a four-year contract for a salary of $750,000 to $1 million. GX 19: 6. If money were a problem, Blagojevich believed that Change to Win would simply get it from Obama who had "excess money." *Id.*

A second meeting with Balanoff was scheduled for November 6, 2008 and, that morning, Blagojevich and Harris rehearsed how Blagojevich would handle it. GX 18. Blagojevich went into the second meeting with a plan to communicate to Balanoff, "Give me the Cabinet spot and give her, we'll give her the Senate." Tr. 1443, 1887, 2105-07; GX 13, 14, 18:5. During the meeting, Blagojevich made the request. GX 25:5, 7 ("So I said to him, you know, I told him . . . "Health & Human Services . . . and if that was available to me I could do Valerie Jarrett in a heartbeat. . . . She now knows that she can be a US Senator if I get, uh, Health & Human Services."). *See also* GX 22:2, 25:4-5, 7, 26:14. Balanoff understood that Blagojevich was conditioning the appointment on his receipt of the HHS job. Tr. 1799. On November 7, 2008, Blagojevich confirmed to several individuals that he had requested the exchange as planned. *E.g.*, GX 26:14 ("I asked for Health & Human Services."); Tr. 1886-87.

On November 11, 2008, Blagojevich was told that, "the President elect would be very pleased if you appointed Valerie and he would thankful and

appreciative." GX 29:2. Blagojevich's response made it clear that he did not intend to appoint Jarrett unless he received something in return. Tr. 1504. GX 29:4 ("So we know he wants her. They're not wiling to give me anything except appreciation. Fuck them.").

### *Millions of Dollars for a §501(c)(4) Organization*

Immediately thereafter, Blagojevich turned his sights to obtaining in exchange for the Senate appointment millions of dollars of seed money for a new §501(c)(4) corporation he would control and receive a high salary. GX 30:4, 6-7, 33:5-6.

On November 11, 2008, Blagojevich mentioned the idea of a §501(c)(4) to Harris as a place for Blagojevich "to ultimately be," as well as one that would advocate for health care while Blagojevich was still governor. GX 28. Later on November 11, 2008, Blagojevich told Scofield that the §501(c)(4) corporation would have "a Board that, you know, I'm comfortable with and then when I'm no longer governor I go over there." GX 29:7. Blagojevich also suggested that they should see if J.B. Pritzker, a wealthy Chicagoan, would fund the §501(c)(4) corporation in exchange for the appointment. GX 29:7, 10. Blagojevich enlisted both Scofield and Wyma to communicate the §501(c)(4) proposal to Emanuel. GX 29:2-10.

On November 12, 2008, Blagojevich informed Harris of reports that Jarrett was going to take a position in the White House. Tr. 1509; GX 30.

Blagojevich and Harris discussed the possibility that this was just a rumor meant to make it harder for Blagojevich to negotiate something of value in exchange for naming Jarrett to the Senate seat. GX 30. Later, in reference Jesse Jackson, Jr. supporters, Blagojevich commented that "what [Jackson, Jr.] got third parties saying to me is a heck of a lot more substantial than what we're getting from the Obama people, okay?" Tr. 1525; GX 30:9.

Later on November 12, 2008, Blagojevich spoke to Yang. GX 33. Blagojevich explained his §501(c)(4) idea to Yang and stated it would be a place for Blagojevich to get a job after he was governor, like Change to Win. GX 33:6. Yang told Blagojevich that Yang liked Change to Win better because it had the "fewest fingerprints."  GX 33:5-7. Blagojevich stated his concern with Change to Win was that it might not be there in two years while the §501(c)(4) was something Blagojevich could "control." GX 33:8.

Shortly thereafter Harris advised Blagojevich that Rahm Emanuel had confirmed that Jarrett was, in fact, going to take a position at the White House. GX 34:1. Blagojevich immediately made a direct effort to obtain money for his §501(c)(4) in exchange for naming Jarrett to the Senate seat.  GX 34:4. Blagojevich called Balanoff, whom Blagojevich understood was communicating with Obama and Jarrett. GX 36. During the call, Blagojevich informed Balanoff that "one thing" Blagojevich would be interested in was the creation of a "§501(c)(4)" issue advocacy organization. GX 36:5.

Blagojevich stated the organization would be there if he were not governor anymore and that, right now, it would be run by people he trusts and it would be a health care organization. GX 36:5-6. Blagojevich told Balanoff that certain wealthy individuals could put $10, $15, or $20 million into the organization overnight. GX 36:7. Blagojevich then stated that he and the organization could "help our new Senator, [Jarrett], go out" and push an agenda. *Id.* Balanoff understood that Blagojevich was offering to exchange the funding of the §501(c)(4) organization for naming Jarrett to the Senate. GX 36.

On November 13, 2008, Blagojevich participated in several calls with Scofield in which he continued to push his idea of obtaining funding for a §501(c)(4) in exchange for naming a candidate favored by Obama to the Senate vacancy. GX 44, 46. In one call, Blagojevich directed Scofield to reach out to Wyma to have Wyma pass a message to Emanuel that Blagojevich wanted help with the funding of a §501(c)(4) organization. GX 46. Blagojevich made clear that the request for funding was in connection to Blagojevich naming a Senator of Obama's choosing, but noted that he did not want to be too direct with the message. GX 46:1-2. Scofield understood that Blagojevich was willing to trade the Senate seat to whomever Obama wanted if Obama would fund his §501(c)(4) organization, and passed a message to Wyma regarding Blagojevich's request. Tr. 1938-39.

18

### *Efforts to Exchange Jackson Appointment for $1.5 Million in Campaign Contributions*

On or about October 28, 2008, Rajinder Bedi met with Robert Blagojevich to discuss the logistics of an "Indian Steering Committee luncheon" scheduled for October 31, 2008. Tr. 2035, 2108. During that meeting, Bedi informed Robert Blagojevich that Raghu Nayak and others would be very interested in raising a great deal of money for Blagojevich if he were to appoint Jesse Jackson, Jr. Senator. Tr. 2038-39. Bedi did not specify the amount of money that would be raised. Tr. 2040. Robert told Bedi that, if Nayak were interested, he should speak with Blagojevich. Three days later, at the luncheon, defendant spoke with Nayak.  Tr. 2042. That evening, Blagojevich reported to Bob Greenlee:

> [W]e were approached, pay to play. That, you know he'd raise me 500 grand, an emissary came, then the other guy would raise a million, if I made him a senator.

Tr. 2109-10; GX 5.

After it became clear that Jarrett was going to take a position in the White House and that Blagojevich was not getting a response from Obama to his requests for personal financial benefits in exchange for the Senate seat, Blagojevich spent several weeks discussing a variety of potential candidates without taking any particular action with respect to filling the Senate vacancy. Tr. 1598. From time to time during this period, Blagojevich

considered various candidates to fill the Senate seat, but he kept his options open. After several weeks of general discussions, Blagojevich began to consider an option he initially had discounted: Raghu Nayak's proposal to exchange the appointment of Jesse Jackson, Jr. for $1.5 million in campaign contributions. Tr. 1599; GX 65-69.

On December 4, 2008, Blagojevich informed Harris that he felt that he had dismissed Jackson, Jr. too early and was now going to "objectively honestly" consider Jackson. Blagojevich informed Harris that Jackson, Jr. had come to Blagojevich "through third parties, you know, with offers of campaign contributions and help . . . . You know what I mean $1.5 million they've, they're throwin' numbers around." GX 66:1-2.

Later that day, Blagojevich had a series of conversations with Greenlee and Yang. GX 65, 67, 68. In one call, in relation to naming Jackson, Jr. to fill the Senate seat, Blagojevich told Yang, "there are tangible things that can happen before" Blagojevich named Jackson, Jr. to the Senate seat. GX 67:5. Yang asked if the deal was essentially one in which Jackson, Jr. would support Blagojevich for reelection. GX 67:5. Blagojevich responded, "no, there's more to it." When Yang asked, "What else," Blagojevich stated, "There's tangible, concrete tangible stuff from supporters." GX 67:6. Yang continued to try to understand Blagojevich, who ultimately stated that he was talking about "Specific amounts and everything. GX 67:6. And while,

you know, I don't know that all of that is achievable, there is, some of it up-front." GX 67:6. Blagojevich did not share the specific amount of the offer, however. GX 67:6.

Shortly thereafter, Blagojevich spoke to Robert Blagojevich. Tr. 1357; GX 69. Blagojevich told Robert that Blagojevich was elevating Jackson, Jr. Robert Blagojevich stated that if Blagojevich did appoint Jackson, Jr. then Robert Blagojevich wanted to focus fundraising on the "money centers . . . in the black community." GX 69:5. Blagojevich told Robert Blagojevich to "talk to [Nayak]," who Blagojevich understood was an individual willing to provide the $1.5 million in campaign contribution bribes in exchange for naming Jackson, Jr. the senator. Blagojevich told Robert Blagojevich to tell Nayak that naming Jackson, Jr. to the Senate seat was "realistic" and possible, "but . . . some of the stuff's gotta start happening now." GX 5-6. Blagojevich added, "And we gotta see it." GX 69:6.

Blagojevich provided some specific directions to Robert regarding the meeting. GX 69:6. He told Robert, "Now you gotta be careful how you express that. And assume everybody's listening, the whole world's listening." GX 69:6. Blagojevich stated, "But if there's tangible political support like you've said, start showing us now." GX 69:6. Robert Blagojevich stated he would make the call to Nayak that afternoon. GX 69:6. Blagojevich stated, "I would do it in person. I would not do it on the phone." GX 69:6. Blagojevich stated Robert

Blagojevich should make clear to Nayak there is an "urgency to it." GX 69:7. Thereafter, Robert Blagojevich called Nayak and set up a meeting for the following day.

Late on the evening of December 4, 2008, Blagojevich learned that the Chicago Tribune was going to print an article suggesting that Blagojevich had been recorded in relation to an ongoing federal criminal investigation. Tr.4073-75; GX 71.

Early on the morning of December 5, 2008, Blagojevich directed Robert Blagojevich to cancel the meeting with Nayak because the request for campaign contributions was now "too obvious." GX 72:2. Thereafter, Robert Blagojevich cancelled the meeting with Nayak. GX 74.

### *Attempted Extortion of Hospital Executive*

Children's Memorial Hospital ("CMH") provides a full range of medical care for approximately 140,000 children per year, many of whom recieve Medicaid benefits. Tr. 2499-2501. In the fall of 2008, CMH was facing a serious problem due to the low reimbursement rates being paid to doctors who treat children who recieve Medicaid benefits. *Id.* As a result, CMH, along with other major pediatric care providers, had lobbied the State of Illinois, to get the State to raise its reimbursement for Medicaid patients. Tr. 2504. As part of those efforts, senior executives from CMH met with State of Illinois staffers in the summer of 2008 to advocate for increasing the Medicaid

reimbursement rates for pediatric specialists, which could be done by the Governor without any need for legislative approval. Tr. 2144.

Patrick Magoon, the president and CEO of CMH, made efforts to communicate with Blagojevich personally in about June 2008 regarding increasing the Medicaid reimbursement rates, but was unsuccessful. Tr. 2506. On September 23, 2008, Blagojevich talked with Magoon, told him he wanted to help, and asked Magoon to send him some background information about CMH's proposal. Tr. 2507-10.

In either late September or early October 2008, Blagojevich spoke by phone with Greenlee, who was the Deputy Governor responsible for health policy matters, about the proposed rate increase. Tr. 2151. Blagojevich asked if Greenlee had heard about the issue and asked what Greenlee thought. Tr. 2152. Greenlee said that they had to look at it from a budgetary perspective, but it was a good thing to do. *Id.* Greenlee told Blagojevich that the rate increase would cost approximately $8 to $10 million. *Id.* Blagojevich directed Greenlee to look into doing the rate increase, which Greenlee understood as meaning that Blagojevich was interested in doing it and they should move forward with it. Tr. 2153. As a result, Greenlee contacted the head of the responsible state agency and directed the agency head to move forward with the rate increase proposal, which they expected would take effect on January 1, 2009. Tr. 2154.

23

On October 8, 2008, Blagojevich met with Wyma, who was a lobbyist for CMH, Robert Blagojevich, and Monk at the Offices of Friends of Blagojevich (FOB). Tr. 2362. At one point in the meeting, during a discussion of CMH, Blagojevich said to Wyma that he was going to give the hospital $8 million, and he wanted Wyma to get Pat Magoon for 50." Tr. 2364. Wyma understood Blagojevich to be making a reference to the cost of the pediatric rate increase and to be saying that Blagojevich wanted to approach Magoon for a $50,000 contribution to FOB.  Tr. 2364. In response, Wyma said that CMH was a non-profit organization, $50,000 was a very hard number, and now was not the time. Tr. 2367. Wyma suggested giving Magoon more time before soliciting any donation. *Id.* In response, Blagojevich said words to the effect, "how much time do you mean," and he suggested that he might consider waiting a few days. Tr. 2367-68.

On October 9, 2008, Robert Blagojevich left a voicemail for Wyma in which Robert Blagojevich indicated that he was following up to determine what the next steps were with Children's Memorial, and to make sure Wyma got it done, and he finished by saying, "you know I'm jerking your chain but ah, I ah, I think they have a potential to do well by us." GX 1.

On or about October 17, 2008, Blagojevich initiated a call to Magoon. Tr. 2511-12. In that conversation, Blagojevich said he had approved a $10 million increase in the Medicaid payments that would be made to pediatric

24

doctors. Tr.2512. Blagojevich told Magoon that the increase in payments would take effect on January 1, 2009, and asked Magoon not to bring any attention to the increase until the end of the year. Tr. 2513.

On or about October 22, 2008, Wyma met again with Blagojevich and Robert Blagojevich at the FOB office. Tr. 2376. Blagojevich said that he did not want to directly ask Magoon for money because he wanted to maintain a line between government and fundraising, Tr. 2377, and then asked whether Wyma or Robert Blagojevich should be the person to ask Magoon for money. R. 2427. Wyma understood that Blagojevich was, in effect, saying that CMH had gotten the money they wanted and, therefore, were going to be asked to make a contribution to FOB. *Id.*

On or about October 22, 2008, Magoon received a message that he should call Robert Blagojevich. Tr. 2516-17. Magoon had not had prior dealings with Robert Blagojevich but recognized the name as the brother of the Governor. Tr. 2518. When Magoon returned the call, Robert Blagojevich said that he wanted Magoon to arrange $25,000 in fund raising for Blagojevich. Tr. 2519. In response, Magoon said that he knew that Blagojevich supported CMH but that he would have to give the fundraising some thought. *Id.* Magoon had no intention of raising funds for Blagojevich, but was afraid that if he said no directly Blagojevich might rescind his commitment to increase the pediatric Medicaid rates. Tr. 2520-22. Robert

Blagojevich encouraged Magoon to arrange the contribution, saying that a contribution needed to be done by January 1st. Tr. 2519.

On November 12, 2008, at approximately 8:43 a.m., Blagojevich was intercepted speaking with Robert Blagojevich. GX 32. In that call, Robert Blagojevich said that he had never heard back from Magoon even though he had left three messages for Magoon. *Id.* Blagojevich indicated that he would call Magoon. *Id.*

On November 12, 2008, at approximately 2:14 p.m., Blagojevich spoke with Greenlee. GX 41. The call started with Blagojevich asking about the pediatric doctors' reimbursement, which Greenlee understood to be a reference to the CMH reimbursement issue. *Id.*; Tr. 2160. Blagojevich asked Greenlee if it had happened or was still on hold. *Id.* Greenlee responded that it was set for January 1st. *Id.* Blagojevich asked Greenlee if they had discretion over the rate increase and Greenlee confirmed that they did. *Id.* Blagojevich then asked Greenlee if they could "pull it back if we needed to—budgetary concerns—right?" *Id.* Greenlee told Blagojevich that they could pull it back. *Id.* Blagojevich stated that was "good to know." *Id.*

Based on Blagojevich's statements, Greenlee understood that Blagojevich was no longer intersted in moving forward with the rate increase and on that basis Greenlee resolved to make sure it did not go forward. Tr. 2162. Greenlee did not believe this was based on budgetary reasons, as

26

Blagojevich had never before cited to Greenlee budgetary concerns as a reason to hold off on healthcare initiatives, and the amount of money being discussed for the rate increase was not nearly as significant as a number of other budget issues that were being addressed. Tr. 2162-64. After the phone call with Blagojevich, Greenlee called the head of the responsible state agency and told him to put a hold on the rate increase.  Tr. 2164.

As of the date of Blagojevich's arrest on December 9, 2008, he had not directed that any work on the Medicaid rate increase resume or go forward, and no further work had been done. Tr. 2165.

### *Attempted Extortion of Racetrack Executive*

In about May 2006, Illinois House of Representatives Bill 1918 was passed, which established a subsidy for the Illinois horse-racing industry from the revenues of the Illinois casino industry. Tr. 2774. Blagojevich signed the 2006 bill in just one day after it arrived on his desk. Tr. 2745. Under the 2006 bill, a percentage of the money that the top four casinos collected was distributed to the horse-racing industry. Tr. 2983-85. The bill provided, however, that the subsidy would only be collected for two years, so it ended in about May 2008. Tr. 2746. John Johnston, who was a part owner and an executive of two different horse-racing tracks that benefitted from the 2006 bill, was involved in lobbying in support of the bill. Tr. 2756.

Before the 2006 bill expired, Johnston talked with Monk, a lobbyist for his racetrack companies in 2007. Tr. 2985. Monk knew that Johnston wanted to get legislation passed that would extend the life of the subsidy. Tr. 2756.

In November 2008, the Illinois legislature considered a bill that would extend the casino subsidy of the horse-racing industry for another three years. Tr. 2746.

Monk had a number of conversations with Johnston about a potential $100,000 contribution that Blagojevich and Monk though they would get from Johnston. Tr. 2743, 2747. In those conversations, Johnston did not commit to a contribution. Tr. 2748. Monk reported to Blagojevich and Robert Blagojevich about Monk's conversations with Johnston about raising money. Tr. 2748-51. On November 20, 2008, the Illinois legislature passed the Racing Bill, which extended the subsidy from the casino industry to the horse-racing industry for another three years. Tr. 2750. On November 24, 2008, the Racing Bill was sent to Blagojevich's office, which meant that Blagojevich could sign the bill and make it law. Tr. 2753. The Racing Bill was reviewed by Blagojevich's deputies and was approved for Blagojevich's signature by November 26, 2008. Tr. 1572-78.

Once the Racing Bill passed, Johnston began to urge Monk to try to get Blagojevich to sign the Racing Bill as soon as possible. Tr. 2756. Johnston told Monk that his racetracks were losing about $9,000 for each day that the

28

bill was not signed into law. *Id.* As a result, Monk began to push Blagojevich to sign the Racing Bill. Tr. 2757-59.

Monk also spoke with John Harris, who was then Blagojevich's Chief of Staff, about the Racing Bill. Tr. 2756-57. By November 26, 2008, Harris was aware the Racing Bill was ready to be signed and understood that Blagojevich supported the bill. Tr. 1578. On November 26, 2008, Harris spoke with Blagojevich about Blagojevich signing the Racing Bill. GX 54. Blagojevich told Harris to hold the bill, but did not provide any reason why Harris should hold the bill as opposed to immediately signing the bill. GX 54:2.

On December 3, 2008, Monk went to the FOB offices for a meeting with Blagojevich and Robert Blagojevich about fundraising. When Monk arrived, Blagojevich indicated that he wanted to talk with Monk alone. Tr. 2762. Blagojevich talked to Monk about Johnston and the Racing Bill. *Id.* Monk raised a concern that Johnston would not make any contribution once Blagojevich signed the Racing Bill. Tr. 2766. Blagojevich suggested that Monk could tell Johnston that Blagojevich would sign the Racing Bill, with other pending bills, after the first of the year. Tr. 2766-67. Blagojevich then called a member of his staff and confirmed that there were approximately 30 bills waiting for his signature and that Blagojevich could have signed them all that day. Tr. 2771. Blagojevich instructed the staffer to hold all the bills,

as Blagojevich would do them all together. Tr. 2771-72. Blagojevich then told Monk to "get it done," which Monk understood was an instruction to get Johnston to make the contribution. Tr. 2772. After Monk indicated that he would go see Johnston immediately, Blagojevich asked Monk what he would say. Tr. 2775. Monk indicated that he would say, "Stop screwing around, get me the money," and that he would tell Johnston "the concern is, is that, um he's holding back and wants to group all these bills together, but what's affecting him is that he feels like you're gonna get skittish if he signs the bill." *Id.*

In other words, Monk intended to tell Johnston that Blagojevich was concerned that if Blagojevich signed the Racing Bill, then Blagojevich would not get his $100,000 from Johnston. *Id.* Blagojevich agreed with Monk's proposed extortionate language to Johnston. *Id.* Blagojevich further suggested that Monk indicate that Blagojevich would like a week's separation between obtaining the $100,000 contribution and the signing of the bill. Tr. 2776-77. In other words, Blagojevich wanted to communicate to Johnston that Johnston would still have to wait a week for the Racing Bill to be signed after Johnston made his $100,000 contribution. *Id.* Monk recognized that telling Johnston that the Racing Bill would not be signed until a week after a contribution was made would put even more pressure on

30

Johnston to make the contribution sooner, as Johnston had said he was losing $9,000 a day each day the Racing Bill was not signed. *Id.*

Monk understood from Blagojevich's statements that Blagojevich was going to delay signing the Racing Bill to put pressure on Johnston to contribute to FOB. Tr. 2779.

Monk then drove to meet with Johnston at one of his racetracks. Tr. 2778. There, Monk told Johnston that he had talked with Blagojevich and that Blagojevich was concerned that Johnston would be "skittish" about making a donation if Blagojevich signed the bill. Tr. 2784. Monk indicated to Johnston that the fundraising and the signing of the Racing Bill were two different subjects, but Monk knew that they were not because Blagojevich had tied the two together. *Id.*

In response, Johnston said words to the effect of "I knew it. I knew it was something like that." *Id.* Johnston talked about the possibility of making part of his contribution after the end of the year, but Monk pushed him to make the entire contribution before the end of the year. Tr. 2785. Johnston said he was going to leave town in a few weeks, but suggested that he would get the contribution done before he left town. Johnston understood from Monk that Blagojevich was concerned that if Blagojevich signed the bill, then Johnston would not have any incentive to make the contribution and would not make it. Tr. 2989.

31

Johnston also did not believe Monk when he indicated that the contribution and the bill signing were two separate matters. Tr. 2989, 2992. Monk asked if Johnston could make a contribution before the end of the year. Tr. 2991. Johnston felt pressure to make a contribution, but did not directly refuse the request because Blagojevich had not yet signed the Racing Bill. Tr. 2991.

After Monk left Johnston's office, he called Blagojevich and described to Blagojevich his conversation with Johnston. GX 63. After Monk told Blagojevich that Monk had delivered the message they had agreed upon (that Blagojevich was concerned that if Blagojevich signed the Racing Bill then Johnston might not make the $100,000 contribution), Blagojevich said "good." Tr. 2786; GX 63:2.

On the morning of December 4, 2008, Monk spoke again with Blagojevich. GX 64. In that call, Monk suggested that Blagojevich call Johnston directly, in part so that Johnston would feel more pressure to make the contribution. Tr. 2787-88; GX 64:3. Blagojevich agreed to call. Tr. 2787-88; GX 643. Blagojevich suggested that he would tell Johnston that Blagojevich would do an event downstate to sign the bill, which Monk recognized would put more pressure on Johnston to contribute, as it would take time to schedule such an event and show that Blagojevich was not going to sign the bill immediately. Tr. 2787-88; GX 64:3.

Monk also informed Blagojevich that he had gotten in Johnston's "face" about the contribution. Tr. 2787-88; GX 64. Blagojevich responded "good." GX 64:3. Neither Monk nor Blagojevich had any further conversations with Johnston prior to the December 9, 2008 arrest of Blagojevich. At the time of Blagojevich's arrest, Blagojevich had not signed the Racing Bill. Tr. 2791

## SUMMARY OF ARGUMENT

Blagojevich claims that he was convicted based on acts constituting nothing more than common, everyday political horse trading, well outside the scope of the conduct prohibited by the federal fraud, bribery, and extortion statutes. Br. 35-36. In light of the evidence, this is an extraordinary claim. In exchange for appointing Valerie Jarrett a United States Senator, Blagojevich attempted to obtain from the newly elected President of the United States money in the form of a salary from a government job or a private foundation, or funding for a new §501(c)(4) organization. Rather than "good politics" (Br. 36), Blagojevich's actions fit comfortably within the core of conduct regularly prosecuted under the statutes of conviction. Blagojevich offers, and research reveals, no legal authority supporting his contention that an exchange of official acts for money or property is authorized or insulated from prosecution so long as the money or property is provided by another public official, or so long as the money is to come in the form of a salary from a job in the public sector. No matter the price he charges, a public official who sells his office

33

engages in crime, not politics.   The verdicts were supported by abundant evidence, and the defendant received a fair trial.

The district court did not plainly err in instructing the jury that, for purposes of the extortion charges, the term "property" means any valuable right that is a source of wealth, and did not abuse its discretion in instructing the jury with respect to the requisite quid pro quo in the context of extortion. The district court also correctly instructed the jury regarding good faith and did not abuse its discretion in crafting language that took account of the evidence and arguments that had been made in the case. The defendant suffered no prejudice from any possible error in the instructions.

The district court did not abuse its discretion in any of its evidentiary rulings. The defendant sought to present evidence and arguments that were inadmissible and improper, and that posed a substantial risk of unfair prejudice.   The district court carefully crafted limits that preserved the defendant's right to present a defense and confront witnesses, while preserving the integrity of the trial.

The defendant was properly convicted of making material false statements to the FBI. The statement in question was not ambiguous and the evidence showed that it was materially false, and that defendant knew it.

The district court did not abuse its discretion in declining to strike a juror for cause, where the juror gave unequivocal assurances, which the

district court properly credited, that he could decide the case based solely on the evidence and the law provided by the court.

The district court correctly determined the defendant's advisory range and any error is harmless.

## ARGUMENT

### I.     The Jury's Verdicts of Guilty Were Supported by Abundant Evidence.

#### A.     Standard of Review

This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal, *United States v. Westerfield*, 714 F.3d 480, 484 (7th Cir. 2013), applying the same standard applicable to sufficiency challenges on direct review, *United States v. Johns*, 686 F.3d 438, 446 (7th Cir. 2012).

The Court will "overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Johnson*, 729 F.3d 710, 714 (7th Cir. 2013) (internal quotation omitted). "[W]hen a defendant challenges the sufficiency of the evidence by motion for judgment of acquittal and makes specific arguments in support of that motion, any arguments omitted are thereby forfeited" and reviewed for plain error only. *United States v. Hossein*i, 679 F.3d 544, 550 (7th Cir. 2012).

**B.    Analysis**

**1.    *Appointment of Valerie Jarrett as Senator***

Blagojevich argues that the evidence was insufficient to prove him guilty of Counts 5-11 and 21-23[6] because it failed to prove (1) that the exchange he proposed with respect to the appointment of Valerie Jarrett as Senator involved an effort to obtain "personal enrichment;" and (2) that he acted with criminal intent with respect the Senate appointment, the pediatric reimbursement rate increase, or the Racing Bill.

First, Blagojevich makes the overarching claim that the evidence proved that Blagojevich sought to make a mere "political deal." Blagojevich concedes, as he must, that the Senate seat appointment was an official act he was empowered to perform in his official capacity, and that this Court has held that jobs (and their corresponding salaries) are money or property for

---

[6] Counts 5-11 charged wire fraud; Counts 21 and 22 charged conspiracy to commit extortion and attempted extortion, and Count 23 charged conspiracy to solicit bribes. Counts 5-11 charged a broad mail fraud scheme to deprive the people of Illinois of the honest services of Blagojevich and others by obtaining personal financial benefits in exchange for various official acts including, but not limited to, the Senate appointment. The executions charged in Counts 5 and 6 (calls excerpted in GX 25 and 26) were telephone calls in which the co-schemers discussed various jobs Blagojevich could get in exchange for the appointment; the executions charged in Counts 7-11 (GX 33, 36, 38, 44, and 46) were telephone calls related to attempts to obtain the §501(c)(4) funding. Counts 21, 22, and 23 charged extortion conspiracy, attempted extortion, and conspiracy to solicit a bribe with respect to Blagojevich's attempts to obtain jobs, campaign contributions, or other things of value from various people in exchange for the Senate appointment. None of the counts were limited to attempts to get jobs, much less any specific job, and none were limited to exchanges for the appointment of Jarrett.

purposes of mail fraud. *See United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008); *United States v. Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012). This Court and others have upheld convictions based on evidence showing that a public official exchanged official acts for jobs and salaries. *United States v. Martin*, 195 F.3d 961 (7th Cir. 1999) (implicit promise of future employment); *United States v. Bryant*, 655 F.3d 232, 237 (3d Cir. 2011) (honest services fraud, mail fraud, and bribery convictions based on exchange of official acts for "low-show" job created for official). Courts have also upheld convictions on extortion charges where the object of the extortion was a job. *E.g.*, *United States v. Kelley*, 461 F.3d 817, 826 -827 (6th Cir. 2006) (public official extorted multiple financial benefits, including jobs for himself and his son). Moreover, as previously noted, the benefits Blagojevich attempted to obtain in exchange for appointing Jarrett as Senator were not limited to jobs; Blagojevich sought millions of dollars in seed money for a new §501(c)(4) from which he would eventually draw a salary. Blagojevich cites, and research reveals, no authority creating an exception from the federal fraud, bribery, and extortion statutes based on the fact that the money, property, or thing of value to be obtained is a goverment or public service job, or on the presence of high level public officials on both sides of a transaction.

Blagojevich's arguments fail to distinguish between the separate offenses of which he was convicted and their various discrete elements, as

well as between the discrete means by which he committed those offenses. As one consequence, Blagojevich fails to directly address the sufficiency of the evidence of his efforts to exchange the Senate appointment for millions of dollars in seed money for a new §501(c)(4) corporation to support his convictions on the Senate-related counts. As previously noted, the Senate-related bribery and extortion counts, as well as five of the fraud executions, rested specifically on Blagojevich's efforts to obtain the §501(c)(4) money. R. 231 at 70-74, 90-104. These efforts clearly and unambiguously were directed at obtaining money—not a political appointment or public service job—in exchange for an official act. Because Blagojevich has not made, much less developed, a claim that evidence showing that he attempted to exchange the appointment for the §501(c)(4) funding was insufficient to support his convictions on Counts 5-11 and 21-23, any such claim is waived.[7] *See, e.g., United States v. Irons*, 712 F.3d 1185, 1190 (7th Cir. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation omitted). Even if not waived, the claim would be frivolous as there is no basis for arguing that Blagojevich was entitled to exchange the Senate appointment for millions of dollars—regardless of how the money was to be used.

---

[7] As noted *infra*, Blagojevich's brief is replete with perfunctory statements and undeveloped arguments that are insufficient to raise an issue with this Court and therefore waived.

By lumping together claims without regard to the separate elements of the charged statutes, Blagojevich also has conflated the elements of proof necessary to support the convictions. For example, one of Blagojevich's primary claims is that the government has not proven that he sought private gain or personal enrichment, although such proof is potentially relevant only in the context of honest services fraud and, even there its relevance after *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896 (2010), may be debatable. To prove honest services fraud, the government must establish that the defendant acted with intent to defraud the victims of their right to honest services, through bribery or kickbacks. *Skilling*, 130 S.Ct. at 2933. "Personal enrichment" is not an element of bribery. 18 U.S.C. § 666(a)(1).

Likewise, intent to defraud is an element only of the fraud charges and thus any failure to prove such intent is relevant only to Blagojevich's convictions on those charges. Blagojevich's suggestions with respect to the fraud charges—that the government was required to prove that he intended to defraud Obama, and that in this context intent to defraud the people of Illinois of their right to Blagojevich's honest services is insufficent under *Skilling*—are both incorrect. Evidence showing that Blagojevich intended to to defraud the people of his honest services by obtaining a bribe in exchange for the Senate appointment was bountiful. An undisclosed conflict of interest

is insufficient under *Skilling*; an undisclosed bribe scheme is not. *See, e.g.,*
*Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012).

As to the other aspects of the charges related to the potential
appointment of Valerie Jarrett as Senator, Blagojevich argues, relying on this
Court's decision in *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir.
2007), that the government's evidence concerning his attempt to make a
bargain related to the Jarrett appointment was fatally deficient in two
respects: (1) it failed to show that Blagojevich sought personal enrichment or
private gain in exchange for the official act of appointing Jarrett;[8] and (2) it
failed to show that Blagojevich acted with the *mens rea* required to sustain
convictions under the charged statutes. Br.32-36. Neither claim has any
merit.

In *Thompson*, a supervisor in the State Bureau of Procurement was
charged with honest services fraud, based on her conduct in awarding a
contract for travel services in violation of State administrative procedures. *Id.*
at 878-80. There was no evidence (nor any allegation) of any bribe or
kickback (on Thompson's part or anyone else's), and the only benefit the
employee could be shown to have received was a $1,000 salary increase,

---

[8] Blagojevich challenged the sufficiency of evidence to support the jury's verdicts in
a motion for acquittal (R. 718), but did not make the specific claim made here, that
the evidence showing that Blagojevich sought to exchange the Senate appointment
for a "public service job" was insufficient to establish that he sought personal
enrichment or private gain. Thus, this issue is reviewed for plain error only.

approved through normal civil service channels. This Court held that such a raise, following as it did in Thompson's case, a mere "incorrect application of state procurement law" (and no evidence of a bribe), could not be treated as a "private gain," because to do so would be to "imply that every time a court sets aside a decision under the Administrative Procedures Act, a crime has occurred if anyone involved in the administrative decision received a good performance review that led to a step increase under the General Schedule of compensation." *Id.* at 883.

As noted above, private gain is a relevant concept in the context of bribery and extortion only insofar as such gain derives from a bribe or is obtained by extortion; in other words, it is the exchange that matters for bribery, and the taking and obtaining that matters for extortion. We do not mean to argue semantics here; in simplest terms, because the evidence amply proved that Blagojevich sought to exchange official acts for money, property, and things of value, the evidence was sufficient to permit the jury to find the defendant's guilt on all of the charged offenses. The fact that these things were sought for Blagojevich's own benefit is evidence of his criminal intent. And that evidence was overwhelming.

Blagojevich's conduct and motives also are easily distinguished from those of the defendant in *Thompson*. This Court found that at worst Thompson violated technical rules, and that her actions "were designed to

41

pursue the public interest as she understood it." *Thompson*, 484 F.3d at 884. Here, the evidence overwhelmingly showed, in contrast, that from the very beginning Blagojevich's primary interest in making the appointment was what he could personally get in return that would alleviate some of the many legal, financial, and political difficulties he faced at the time. *See, e.g.*, GX 12:2-3, 13:6-7, 9, 17:2, 26.

Based on selected recorded calls, Blagojevich argues that the evidence showed that he acted in the public interest "as he understood it" because he "sincerely believed" that he was qualified for the HHS post and the other positions he sought to obtain in exchange for the Senate seat. Br. 48. Not surprisingly, Blagojevich offers no authority for the proposition that belief in one's qualifications for a particular job excuses an attempt to obtain that job through fraud, bribery, or extortion. In any event, the evidence cited by Blagojevich does not support—much less compel—a finding that he did in fact sincerely believe he was qualified for the various positions he sought, much less that his sole or primary goal in seeking those positions was to serve the public. These calls relied upon by Blagojevich (Br. 34) primarily reflect "war gaming" with Harris and others various means of sugar-coating the planned extortionate message, and later reporting on having delivered the extortionate message as rehearsed. *E.g.*, GX 8; Tr. 1359. Others reflect expressions of anger and frustration at being disrespected and left behind.

42

Whatever Blagojevich's views of his own qualifications, the intercepted calls made clear that his priority in selecting Obama's replacement was to benefit himself and his family—legally, personally, and politically, "in that order"— not to benefit the public. GX 40:1.

Nor was there anything transparent about Blagojevich's attempt to exchange the Senate seat appointment for something for himself. The evidence before the jury showed that Blagojevich intentionally misled the public regarding his process for selecting a new Senator, including through false statements in a press conference (Tr. 4593-94), and efforts to plant false rumors in the press. Tr. 4586-87. Moreover, the evidence clearly established that Blagojevich did not discuss the proposed exchanges openly with Obama's representatives, or even with his trusted deputies. Instead, he carefully crafted the "ask" to Balanoff, intentionally incorporating information regarding alternative candidates in order to mislead and manipulate Balanoff and Obama (GX 7). The evidence showed that Blagojevich picked and chose what he told whom. GX 72 (waiting for Quinlan to get off the phone before talking with his campaign manager about the Nayak meeting), GX 15 (directing Harris and Greenlee to keep research to themselves). And it showed that, when necessary, Blagojevich affirmatively misrepresented information to his advisors. GX 68 (misrepresenting to Greenlee his reasons for elevating Jackson). There was abundant evidence of deception and

misrepresentation by Blagojevich, and the jury was fully equipped to determine the true nature of Blagojevich's conduct and intent. *See Evans v. United States*, 504 U.S. 255, 274-75 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ("The criminal law in the usual course concerns itself with motives and consequences, not formalities."); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (question of intent generally one of "inferences from what the participants say, mean and do, all matters that juries are fully equipped to assess.").

In sum, Blagojevich has not come close to demonstrating insufficiency with respect to the appointment of Valerie Jarrett.

## 2.    The Appointment of Jesse Jackson, Jr. as Senator

Blagojevich argues that, although the offer of campaign contributions he received from supporters of Jesse Jackson, Jr. was clearly illegal and Blagojevich knew it, the evidence failed to show that Blagojevich intended to accept the offer, or took a substantial step toward obtaining the money from Jackson's supporters. Defendant relies on unsupported assertions that are contradicted by the record, and essentially requests that this Court re-evaluate the evidence as though it were the jury. As this Court has said many times, that is not the purpose of appellate review. *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) ("[c]ompeting characterization[s] of the evidence" provides no basis for setting aside the jury's verdict).

As Blagojevich concedes, he sent his brother—his campaign manager—to see Nayak—the bribe offerer—to tell him that there was a realistic possibility that his specifically requested official act could happen, but that it would be necessary for the promised "support" to "start happening now." Tr. 2135, 4538. Once again, the evidence was more than sufficient to permit the jury to determine what Blagojevich meant by these statements, based on context and all the other evidence, and the jury was fully capable of making that determination.

Defendant argues that his actions with respect to the appointment of Jackson were nothing more than "talk," and that "talk" cannot satisfy the legal requirement of a substantial step. While it is true that speech fairly characterized as "hot air" or "just talk" is insufficient to constitute a substantial step, *United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008), it is not the law that a defendant can never take a substantial step through speech. Whether particular speech amounts to a substantial step depends on the nature of the speech and the nature of the crime. *Compare Gladish*, 536 F.3d at 650 (holding explicit communications over the internet with individual he believed to be a minor, without inviting her to meet or indicating any willingness to travel to meet her, insufficient to establish substantial step toward inducing a minor to engage in sexual activity) *with United States v. Chambers*, 642 F.3d 588, 594 (7th Cir. 2011) (holding efforts

45

to groom a minor for a sexual encounter by discussing sexual activities as well as plans to meet by phone and email and obtaining the victim's home address and inquiring about hotels in the area, amounted to a substantial step toward the commission of the same crime). Indeed, in the context of extortion, or solicitation of bribes, spoken solicitations and threats can amount not only to substantial steps, but also to completed crimes. The evidence  amply supported the jury's conclusion that defendant was a "doer" who fully intended to complete the charged attempt crimes, rather than a "talker" who merely blew "hot air." *United States v. Morris*, 549 F.3d 548, 550 (7th Cir. 2008).

Blagojevich's cancellation of the Nayak bribe, if anything, adds rather than detracts from the evidence of his guilt. Blagojevich took a substantial step toward accepting the bribe from Nayak when he sent his brother to meet with Nayak and tell Nayak that he would need to begin performing in order for the appointment to be made. As a legal matter, the subsequent cancellation does not undo Blagojevich's prior actions. More importantly, however, the cancellation—precipitated by reports that Blagojevich's conversations may have been recorded (and thus that law enforcement agents may be aware of his plans)—was powerful evidence of Blagojevich's consciousness of guilt and intent to avoid detection by law enforcement. The jury was entitled to find that, had the meeting been entirely on the up and up

46

as Blagojevich contended, there would have been no reason to cancel the meeting.

In sum, Blagojevich has not come close to establishing that no rational jury could convict based on the evidence. To the contrary, the evidence of his guilt was abundant.

### 3. Exchange of Medicare Rate Increase for Campaign Contributions

The evidence showed that, on September 23, 2008, Blagojevich spoke with Magoon to discuss the CMH reimbursement rate, and then several weeks later called him personally to tell him the good news that the increase was being authorized. Tr. 2509-10, 2512. During this conversation, Blagojevich told Magoon that the increase would come through on January 1, 2009. Five days later, Blagojevich's brother and campaign manager, a person Magoon did not know, called Magoon directly and told him that Blagojevich would like him to arrange $25,000 in campaign contributions before Jan 1, 2009—the date the increase was scheduled to take effect. Magoon understood this request as extortionate—given its timing, five days after Blagojevich had called him personally about the rate increase, and given the deadline that matched the date when the increase was scheduled to take effect. Tr. 2517-22.

On November 12, 2008, Blagojevich called Bob Greenlee and asked whether the rate increase had gone through and whether he still had total discretion over the money to CMH, and could pull it back if he wanted to, "for budgetary concerns." Tr. 2159-2162. When Greenlee answered yes, Blagojevich responded, "Good to know." Tr. 2161. Blagojevich testified about this call and asserted that it was an effort to *avoid* making a personal request for fundraising before the rate increase went through.  Tr. 4065.

The jury could rationally conclude based on this and related evidence that Blagojevich attempted to extract $25,000 in fundraising from Magoon based on the implicit threat that, unless he produced the requested fundraising by January 1, 2009, the increase would not take effect. Blagojevich argues, as he argued to the jury (Tr. 5469), that Magoon "apparently misinterpreted Robert's message" and "Blagojevich's explanation was far more plausible." Br. 42-43. This argument is unavailing on appeal; the jury was entitled to, and did, make the necessary credibility findings and made its decision based on substantial evidence.

### 4.    Exchange of Racing Bill for Campaign Contributions

As of November 24, the new 2008 Racing Bill to help the struggling horse racing industry had passed the Illinois House and Senate.  The exact same bill had passed the House and Senate two years before, and on that occasion, defendant signed the bill the very next day.  Blagojevich's staff had

reviewed the 2008 bill and had given Blagojevich a green light to sign it immediately. The bill was sitting on Blagojevich's desk, awaiting his signature. Blagojevich did not have to sign the bill for it to take effect, but he did have to sign it for it to take effect immediately. And he was told that every day he failed to sign the bill, John Johnston lost $9,000.

Johnston had promised a contribution to Blagojevich, and Monk (who worked as a lobbyist for Johnston as well as a fundraiser for Blagojevich) was the point person for getting Johnston's contribution. One of these conversations was a December 3, 2008 recorded call in which Blagojevich and Monk rehearsed what Monk would say to Johnston about the contribution. Monk told Blagojevich that he would say that Blagojevich "feels like you're [Johnston] gonna get skittish if he signs the bill, get me?" GX 60. In other words, Blagojevich was concerned that if he signed the bill, Johnston wouldn't come through with the campaign contribution. Blagojevich directed Monk to mention that Blagojevich wanted "some separation between that and signing the bill," in other words, get your contribution in quickly because there will be a wait before the signing, and the later Johnston made the contribution, the more money Johnston would lose.

John Harris testified that there was no legitimate reason for Blagojevich to put a hold on the Racing Bill and that, when he asked Blagojevich about it, Blagojevich admitted that he was sitting on the bill (and

49

gave Harris an excuse that made no sense to Harris). GX 54. Harris said that he suspected that defendant was holding up the bill until a contribution was received from Johnston, and that he spoke about his concerns to Bill Quinlan. In a subsequent call, Quinlan told Harris that he had confirmed that Blagojevich's reason for delaying signing the bill was the outstanding contribution. GX 56.

The jury could easily find based on this and other evidence that Blagojevich delayed signing the Racing Bill as a means to extort $100,000 in campaign funds from Johnston. Blagojevich's assertion that there was "no evidence" that Blagojevich or anyone else communicated an extortionate message to Johnston, ignores Monk's conversation with Johnston, rehearsed in advance with Blagojevich. His argument (not made to the jury) that the jury could have found that Blagojevich delayed signing the bill in order to motivate Johnston to fulfill his commitment (rather than delivering an explicit threat) also fails. This was the jury's call, and it was entitled to make it.

## II.    The Jury Was Properly Instructed Regarding the Elements of Extortion.

### A.    Standard of Review

This Court reviews *de novo* whether jury instructions "fairly and accurately summarize the law," and will reverse only if the instructions,

taken as a whole, so misguided the jury that they prejudiced the defendant. *United States v. Brown*, 726 F.3d 993, 997 (7th Cir. 2013). The Court also reviews questions of statutory interpretation *de novo*. *United States v. Sanders*, 708 F.3d 976, 992 (7th Cir. 2013). The Court reviews the specific wording of an instruction for abuse of discretion. *Brown*, 726 F.3d at 997.

Ordinarily, an error in jury instructions, including the omission of an element of the offense, is subject to review for harmless error. *Neder v. United States*, 527 U.S. 1, 19 (1999). Where a defendant forfeits a claim, however, the Court reviews only for plain error. *United States v. Olano*, 507 U.S. 725, 733-34 (1993). Under plain error review, this Court will reverse a conviction only if the instructional error was an obvious error that "represented a miscarriage of justice such that [the defendant] probably would have been acquitted but for the [error]." *United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1042 (7th Cir. 2013). In addition, the error must have "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* "[P]lain-error review is particularly light-handed in the context of jury instructions, since it is unusual that any error in an instruction to which no party objected would be so great as to affect substantial rights." *United States v. DiSantis*, 565 F.3d 354,361 (7th Cir. 2009). When a party waives a claim, the waiver extinguishes any error and

precludes appellate review. *United States v. Hible*, 700 F.3d 958, 961 (7th Cir. 2012).[9]

**B.     Analysis**

**1.     Meaning of "Property," as Used in the Hobbs Act**

The instructions given by the district court defined the term "property" as used in the elements instruction for extortion as including "any valuable right considered as a source of wealth." Tr. 5537, 5542-45. Contrary to Blagojevich's contention, this instruction correctly stated the law, and was appropriate in the context of the evidence in this case.

Defendant first claims, without explanation or development, that the Supreme Court's discussion of the meaning of the term property as used in the Hobbs Act in its recent decision in *Sekhar v. United States*, — U.S. —, 133 S.Ct. 2720 (2013), establishes that the jobs and salaries defendant sought to obtain in exchange for the appointment of Valerie Jarrett as Senator are beyond the reach of the Hobbs Act because they are not "transferrable." If not waived, this argument lacks merit.

---

[9] Here, defendant offered an instruction based on *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007) and 18 U.S.C. § 666(c) (Defense 31), which stated that a salary paid in the usual course of business is not a bribe. Tr. 715 at 45. Blagojevich did not, however, make the claim, available to him under *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003) (*Scheidler II*), that he had not sought to obtain a thing of value he could exercise, transfer, or sell. Thus, this claim was waived or forfeited.

The Hobbs Act, 18 U.S.C. § 1951(a), defines extortion as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).  In *Sekhar*, the Supreme Court held that the defendant's use of blackmail to compel a lawyer to recommend that his employer approve an investment did not constitute extortion under the Hobbs Act because the object of the defendant's conduct was not "obtainable property" as required under the Act. Three justices, Justice Alito, Justice Kennedy, and Justice Sotomayor, concurred in the judgment. In an opinion authored by Justice Alito, the concurring Justices took the view that, even if the lawyer's right to make a recommendation was transferrable, it nevertheless did not constitute "property," as that term is used in the Hobbs Act.

Blagojevich argues that his "attempt to obtain a public service job in the Obama Administration was not transferable property under the *Sekhar* test," but offers no explanation, argument, or supporting authority, and thus waives any error. Br. 48. In any event, jobs and money paid in salary to the jobholder, unlike the right to make a recommendation at issue in *Sekhar*, clearly are transferrable, or "capable of passing from one person to another." In previous cases, courts have upheld extortion convictions where the object of the extortion included a job. *E.g.*, *United States v. Green*, 350 U.S. 415, 76 S.Ct. 522 (1956) (extortion of employer to obtain money paid in wages for

53

unwanted, superfluous, and fictitious services of laborers); *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001) (benefits obtained by alderman including a summer job for his son); *United States v. Kelley*, 461 F.3d 817, 826-827 (6th Cir. 2006) (public official extorted multiple financial benefits, including jobs for himself and his son); *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) (sheriff employed friend of judge in exchange for campaign contributions from judge).

Blagojevich repeats his claim, discussed above, that presidential appointments and "public service jobs" are exempt from federal fraud, bribery, and extortion prohibitions. However, he offers no legal authority for this proposition (or for the proposition that defendant's conduct in this case was a "proper and common exchange under our democratic system of government," and "good politics."). Br. 35-36. Exchanges of official acts for personal financial benefit are plainly excluded from the political activity protected under the First Amendment. Blagojevich's suggestion that a paying public service job is not "personal enrichment" is baseless. In fact, there is no basis in this context to distinguish between jobs in the public and private sectors. And, of course, this argument has no application to the millions of dollars in funding Blagojevich sought to create a new §501(c)(4) corporation where he could receive a high salary after leaving the Governor's office.

### 2.    Proof of Illegal Exchange

Blagojevich challenges (Br. 50-54) the instructions that set forth the elements of extortion under color of right (Tr. 5542-5543) on the ground that they omit a proper discussion of the *quid pro quo* element. The challenged instructions were consistent with this Court's current pattern instructions and this Court's decision in *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 1992).[10] The challenged instructions made clear that a *quid pro quo* was required, and specified that, where campaign contributions were concerned, the defendant could be convicted of attempted extortion only if he "receive[d] or attempt[ed] to obtain money or property believing that it would be given *in exchange for a specific requested exercise of his official power*." Tr. 5544 (emphasis added). This language accurately described the applicable "*quid pro quo*" requirement, and conformed to the requirements of *McCormick v. United States*, 500 U.S. 257, 273 (1991).

*McCormick* held that a campaign contribution violates the Hobbs Act only if it is paid "in return for an explicit promise" of an official act. Since *McCormick*, courts have made clear that an "explicit" promise means a "specific" promise. *See Evans*, 504 U.S. at 258 (upholding jury instruction

---

[10] Blagojevich quotes from the Extortion instructions given by the district court. Br. 51; Tr. 5544-45, which were consistent in all material respects with this Court's 2012 pattern instructions. *See* Seventh Circuit Committee 18 U.S.C. § 1951 Color of Official Right—Elements (2012).

referring to "[a] specific requested exercise of his or her official power"); *Giles*, 246 F.3d at 972 (holding that there is no requirement of an expressly stated *quid pro quo*); *United States v. Siegelman*, 561 F.3d 1215, 1226-27 (11th Cir. 2009) (holding that the agreement must be explicit, but not express, and collecting cases) (vacated on other grounds in *Scrushy v. United States*, 130 S. Ct. 3541 (2010)).

Contrary to Blagojevich's contention (Br. 51), the extortion instructions provided to the jury in this case were not "nearly identical" to the instructions found deficient in *McCormick*. Those instructions required only that the contribution at issue was made "with the expectation that McCormick's official action would be influenced for [the payor's] benefit" and that "McCormick knew that the payment was made with that expectation." 500 U.S. 274. Here, in contrast, the challenged instructions required that the contribution be "exchanged" for a "specific requested exercise of his official power" (in other words, a *quid pro quo*). Tr. 5544. The instruction's use of modern English rather than Latin-based legalese in no way eliminated the requirement of a "*quid pro quo*." [11]

---

[11] Blagojevich does not develop, and therefore arguably waives, any argument concerning the instructions related to bribery and wire fraud. In any event, special *quid pro quo* instructions applicable to campaign contributions were included for bribery and fraud offenses as well. *See* Tr. 5539, 5551.

Regardless of whether the bribe took the form of campaign contributions, the government was not required to allege (or prove) that the bribe payer and the official expressed their agreement to exchange official acts for personal benefits in any particular words. As the Supreme Court has recognized, requiring the official and payor to "state the *quid pro quo* in express terms" would result in allowing the law's effect to be "frustrated by knowing winks and nods." *United States v. Evans*, 504 U.S. 274 (Kennedy, J., concurring); *accord United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001); *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007). The law does not require more than what was required by the instructions given in this case.

Citing *United States v. McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012), Blagojevich argues that he was entitled to additional instructions to overcome the risk of misunderstanding inherent where the charge is a rejected solicitation, but fails to explain how the specific instructions he offered would have made a difference.[12] Where, as here, the instructions accurately and fairly treated the relevant issues, Blagojevich cannot establish an abuse of discretion in the district court's rejection of the particular language he offered. Thus, there was no error and any error was harmless.

---

[12] Defendant argues (Br. 53, n. 18) that Magoon misinterpreted as a threat Robert Blagojevich's request that Magoon raise funds before January 1, 2009, whereas the "deadline" was based on the effective date of the new ethics bill. The question of the defendant's intent was a matter that the jury was fully capable of deciding, based on all of the evidence. *See Terry*, 707 F.3d at 613.

### 3.    The Challenged Instructions Were Not Improperly "Exploited."

The government did not improperly "exploit" the instructions or otherwise mislead the jury. Defendant contends (Br. 54) that, in argument, the government improperly treated a high-paying job, including a high-paying "political" job, as the legal equivalent of a cash bribe. These arguments could only prevail if there actually were an exception that permitted a public official to trade official acts for a "political" or other job for him or herself. There is none. The challenged instructions correctly state the law, and the government's arguments were consistent with those instructions.[13]

Finally, Blagojevich's complaint (Br. 58) about the government's use of the term "connected" in argument is semantic. The word was used in a colloquial sense to refer to defendant's extortionate message. It did not, and could not, interfere with the jury's application of the law as stated in the instructions.

---

[13] Although it is recognized that campaign fundraising is a necessary evil of our political system, campaign funds nevertheless qualify as "money or property" and "things of value" for purposes of the relevant statute. Moreover, contrary to Blagojevich's claim on appeal and his testimony at trial (Br. 3; Tr. 4779-81) Blagojevich derived political benefits from his campaign fund. As the record reflects, defendant used at least $ 750,000 from the fund to pay his personal criminal legal expenses in 2008 (Tr. 1287, 2331-32) and was permitted to apply the remaining funds to pay for legal representation in this case. R. 83.

## III. The District Court Did Not Abuse Its Discretion in Excluding Certain Testimony of the Defendant and Instructing the Jury Regarding Good Faith.

### A.    Standard of Review

Evidentiary rulings of the district court are reviewed for abuse of discretion. *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013).

### B.    Background

Prior to trial, the government moved in *limine* to require that defendant disclose his intentions regarding a potential advice of counsel defense, so that the issue could be litigated and any necessary investigation be conducted prior to trial.  The issue was addressed on multiple occasions and, ultimately, Blagojevich conceded that he had no proper advice of counsel defense.

Despite the innumerable motions, objections, rulings, violations of rulings, lengthy discussions in court, instruction disputes and other proceedings regarding issues related to advice of counsel and mistake of law, Blagojevich chose to testify without seeking advance rulings delineating what would be permitted with respect to these issues. Defendant then proceeded repeatedly to introduce before the jury, in violation of the court's prior rulings, defenses based on advice of counsel and "politics as usual." the defendant interjected these matters despite (1) his prior concession that he could not establish the elements of the advice of counsel defense, and the

59

court's ruling based on the evidence presented through various motions and responses that no advice of counsel defense was appropriate; and (2) the court's prior ruling that no evidence or arguments could be presented that raised the specter of "politics as usual." Thus, defendant repeatedly tied his alleged good faith belief in the legality of his conduct to (1) information and advice he received from "advisors" who were lawyers; and (2) his perception of the way things are done in the world of "politics."

The following are examples of the comments made by defendant during his testimony relevant to the issue of advice of counsel:

- Tr. 3089 ("I immediately had Mary [Stewart] find Bill Quinlan for me *so that I could talk to Bill Quinlan my lawyer, the governor's lawyer, about what do I do about this, how do I handle this, because I wanted to be very careful that I don't get caught up in something that I'm not aware of that isn't — that is potentially wrong and could very well be wrong.*")

- Tr. 4074 (testifying that, after learning of the Wyma article, "I immediately sought — began to try to find Bill Quinlan to get — to call me. *That was my first instinct was to get ahold of my lawyer, Bill Quinlan, and find out what he knew and kind of share some insights with me.*")

- Tr. 4078 (Regarding the call of December 5, after defendant learned about the imminent Tribune article about Wyma, admitted by the defense as an excited utterance, "And then I was reconstructing for Bill Quinlan, *my lawyer,* basically, you know, spilling whatever I knew, whatever was coming into my mind to him about that call, about that conversation about the fundraising requests from Patrick Magoon in connection with Dusty Baker calling me. And so I was relating this to Bill Quinlan and the Vondra part of it as well because I was basically trying to find out from Quinlan do you think I said something

60

wrong? *Could I have done — could I have stumbled into crossing a line of some sort? . . . .I talked to him about everything that was remotely connected to anything that was on legal issues or pending investigation and all the rest because I wanted to be careful not to do anything wrong.*")

• Tr. 4079 (In relation to talking to Bill Quinlan about defendant's conversation with Wyma about CMH: "Q: Why were you telling Bill Quinlan that? A: Because Bill Quinlan's my general counsel, *he's my lawyer* and he was in many ways, you know, a — he was in many ways — you know, he — *I talked to him about everything that was remotely connected to anything that was on legal issues or pending investigation and all the rest because I wanted to be careful not to do anything wrong."*)

• Tr. 4092 ("Defendant testifies about people he relied on to make decisions, specifically including Bill Quinlan, ". . . Bill Quinlan who was my general counsel, and there was nothing I would do of any magnitude that I felt I needed to discuss with my general counsel, my lawyer Bill Quinlan.")

• Tr. 4096 (testifying regarding Bob Greenlee, "He's an Ivy leaguer, Yale University, University of Chicago law school, and he was a lawyer who clerked for federal district court judge in Indiana . . . )

• Tr. 4112 ("Q: Did you also have several conversations with Bill Quinlan about the Senate seat? A: Yes. *I talked to Bill Quinlan about it constantly, continuously, almost every day*. Almost every day. Q: Did you have conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat? A: I had several conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat.")

(Emphasis added.)

This testimony obviously implied that defendant viewed the advice of his advisors as legal advice. The government objected to the testimony on the ground that the defendant had not shown, and conceded he could not show,

that he had affirmatively sought legal advice, provided his lawyer with all relevant information, and then acted consistently with the legal advice he was given. In fact, the defendant was represented by personal criminal counsel at all relevant times, and he had not waived the attorney-client privilege with respect to his communications with that counsel.

After testimony concluded on the afternoon of May 31, 2011, the government raised with the district court concerns about defendant's continuing efforts to interject into the proceedings the unsupported and improper issues of advice of counsel and politics as usual.  The government gave as examples the defendant's: (1) repeated references to Quinlan as "his" lawyer; (2) failure to mention that he had private criminal counsel at all relevant times; and (3) use of the phrase "horse trading." Tr. 4138. The government also argued that defendant's proposed testimony would also interject the issue of "politics as usual." *Id.*

The district court agreed that defendant had suggested in his testimony that because nobody stopped him, he thought his conduct was legal, even if he never said those exact words, and that this suggestion amounted to an implicit advice of counsel defense. Tr. 4139. The court noted that this presented a problem for the defense because defendant could not satisfy the elements of an advice-of-counsel jury instruction. *Id.* The court stated that, in light of defendant's testimony, he might instruct the jury that there was no

advice of counsel defense in this case. Tr. 4139-41. The district court also found that defendant's testimony suggested that horse trading is normal in politics, which misleadingly suggested, standing alone, that all horse trading is legal. Tr. 4141-42.

The district court requested an order of proof in order to assess the relevance of the proposed testimony. Tr. 4149. The district court explained that an order of proof was necessary because some of what defendant proposed appeared relevant, while other parts did not, and because without an order of proof, the jury would be exposed to unanticipated, and non-responsive testimony that was improper. Tr. 4148-49.

Defendant's testimony on *voir dire* included the statement that he believed everything he was doing, and all his trades, were legal. Tr. 4151. Defendant then went on to give examples of what he considered legitimate political horse trades, that is, trades that did not involve personal benefits but, rather, that involved trading of support on legislative issues. Tr. 4152-56.

To begin with, the court found that the accuracy of some of defendant's examples of legitimate political horse trading were speculative, and that others were not analogous to the charged offenses. Tr. 4168-69. The district court also expressed concern that presenting to the jury recorded conversations with certain lawyers, and claiming that his understanding of

63

what was legal and what was not was based on those conversations, would open the door to waiving privilege with respect to conversations he had had with other lawyers. Tr. 4167-68. The district court then explained that *Cheek v. United States*, 498 U.S. 192, 199 (1991), the case upon which the defense relied in seeking permission to introduce this testimony, presented a different situation and therefore was not controlling.[14] *Id.*, Tr. 4175-77.

The government then argued that allowing defendant to express his opinion (at the time of relevant events) regarding the legality of his actions would confuse and mislead the jury because none of the charged offenses required defendant to know that his conduct was illegal. Tr. 4161-62, 70.

The district court then took into consideration the fact that defendant had previously testified, and stated in many of the recorded conversations, that he was aware that exchanges of official action for personal benefits, "one for the other," were not legal, and found that this testimony was distinct from the testimony defendant was now offering, namely, that he "thought [such exchanges were] okay." Tr. 4176.  The district court then considered the proposed testimony in the context of the §501(c)(4) proposal. There the

---

[14] The Supreme Court held in *Cheek* that a defendant's good faith belief that his conduct was legal was a valid defense to certain criminal tax laws requiring a finding of "willfulness," meaning, a finding that the defendant knowingly and intentionally violated a legal duty of which he was aware. *Cheek*, 498 U.S. 192. None of the offenses of which defendant was convicted include a comparable willfulness element.

evidence established, and defendant did not contest, that the proposal was a trade "one for the other." Tr. 4178. The government argued that the general statement "I thought it was legal" would be misleading and not relevant in that context. Tr. 4179-80. Of course, excluding general testimony that he thought the trade was legal did not rule out the admission of more specific testimony—such as, that defendant believed that the trade was legal because the §501(c)(4) was not a personal benefit.

Ultimately, in light of the fact that it was not necessary to prove that defendant knew his conduct was illegal, and therefore the question of whether or not defendant thought he was acting legally was not relevant, and in light of defendant's prior testimony establishing that he knew that "one for the other" trades involving personal benefits were illegal, the district court precluded defendant from testifying that he honestly believed that "one for the other" was legal. Tr. 4181-83. On the other hand, the court made clear that defendant was free to testify, consistently with his testimony up to that point, that he did not believe that "it was one for the other" (Tr. 4183) (and thus by implication that he did not think he was acting illegally.) The district court ruled that although defendant would be precluded from testifying generally that he believed his conduct was "legal," he was "perfectly free" to say that "I thought I could do this because I didn't think it was one for the other." Tr. 4183.

Despite the court's ruling, the defendant continued to insert comments concerning his belief of legality into his testimony.  For example:

- Tr. 3660 (testifying that he followed his oath and the law)

- Tr. 3716 (testifying that before the State Ethics bill went into effect "*it was perfectly, absolutely legal*, and it was a common practice" to accept contributions from individuals with State business.)

- Tr 3779 (insisting that all of his fundraising efforts were meant to "raise as much campaign funds *legally* as we could by the end of the year.")

- Tr. 3831-32 (stating with respect to the 12/3/08 conversation with Monk at FOB's offices: "Again, be careful, *follow the law, don't cross any lines, don't condition the promise of campaign contributions on me signing the bill*.  Don't—be careful, be careful how you convey it, be careful how you say it, be careful you *follow the law*.")

- Tr. 4120 (stating that, when he said "pay to play" in October 31, 2008 call with Greenlee he was saying "*That's illegal*.  That's not something that I want to do and he shouldn't want to do.")

- Tr. 4132-33 (Explaining that he was saying to Harris, "I'm asking John Harris his advice and his opinion on whether or not if, in fact, there's an interest by President Obama or Rahm or whomever for Valerie Jarrett, is there a potential horse trade — *legal, always predicated on being legal* — where there's something that I might be able to get as part of that horse trade.  That's what I'm asking him, what does he think about that.")

- Tr. 4294 ("I was facing, the dynamic as I saw it, what I was talking about, you know, if they — if there was pressure to appoint President Obama's senator and it wasn't something that was *legally good*, in my mind, that I can always appoint myself senator.")

- Tr. 4192-93 (testifying, "I would speak to Bill Quinlan constantly and continuously, I think on average three times a

day, some days I would speak to him five times a day, there may be days where I spoke to him more than that . . . . Yes; I spoke to Bill Quinlan about the Senate seat throughout this whole period of time and even before this period of time, constantly, continuously, repeatedly, and repetitively.")

•Tr. 4403-04 (Stating that when he said, 'How do you make a deal like that?" he meant "*it's got to be legal, obviously*, but, but it's very commonplace, is it not, doing things like this?' When you say 'how do you make a deal like that, it's gotta be legal obviously,' what were you saying there, Rod?  A: *Any decision I would ultimately make on the Senate seat had to be legal, obviously*.")

• Tr. 4407 (Regarding Tab 29, "Q: Did you think you could do good by having a 501(c)(4)?  A: I thought the idea of doing that, *that would be legal*, obviously, could do a lot of good.")

• Tr. 4436 (Explaining his reference to "our legal situation" in the context of criterion for selecting a new Senator," Again, very fearful of what was happening and *making sure that whatever we did was legal* and so I don't cross because I feel I'm going to get my clean bill of health.")

• Tr. 4691-92 ("which I also said how do you do a deal like this, it has to be legal, obviously.  I said that earlier in the same call, and everything I talked about was predicated on that very simple proposition . . . .")

• Tr. 4715 ("It's got to be legal obviously, If it was legal, who knows.  We thought it was, I certainly did, everybody else seemed to think so, too, that's why we were talking about these things.  But I was not yet in the position to decide it.  I was gathering options.")

(Emphasis added.)

### C.    Analysis

#### 1.    Exclusion of Evidence

While the defendant has a Constitutional right to present a defense, that right is not without limitation. *Nevada v. Jackson*, —U.S.—, 133 S.Ct. 1990, 1992 (2013). The defendant has no right to introduce evidence that is irrelevant. *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). A defendant's right to present relevant evidence also "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). Relevant evidence offered by a defendant in a criminal case may be excluded under applicable procedural and evidentiary rules which, "[u]nder the Constitution, state and federal rulemakers have broad latitude to fashion[.]"*United States v. Lea*, 249 F.3d 632, 642 (7th Cir. 2001) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). Such rules are not "deemed to abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve,'" *Lea*, 249 F.3d at 642-43 (quoting *Rock*, 483 U.S. at 56). There is no violation of a defendant's Sixth Amendment rights when a court excludes defense evidence under Fed. R. Evid. 403, where the "probative value [of that evidence] is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," or where the

evidence is "repetitive, . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 318, 326-27 (2006) (internal quotations omitted).

The district court's ruling was reasonable and correct under Fed. R. Evid. 401 and 403, and in no way precluded defendant from presenting his defense. To the contrary it allowed Blagojevich to pursue the good faith defense he had pursued all along, without straying into areas that could well lead the jury to decide the case on improper bases. *See* Tr. 4175-76; 4180-81; 4182-84.

The proposed testimony was problematic for a host of reasons. First, and most importantly, as a legal matter, none of the charges in the second superseding indictment required proof that defendant knew his actions were illegal. Thus, testimony that defendant believed his actions were legal (or did not know his actions were illegal) was irrelevant to any issue in the case. *See Cheek*, 498 U.S. 192 (generally, a defendant's mistaken understanding of what the law requires is no defense to a criminal prosecution).[15] The statutes involved here, as applied to Blagojevich's conduct are not complicated like the

---

[15] After the trial, defendant claimed that he would have testified that Bill Quinlan told him these things, R. 774:72. However, in his *voir dire*, defendant did not include legal advice from Quinlan as one of the bases for his purported belief that his conduct was legal at the time of the offenses. Nor has the defendant ever proffered any specific conversation with Quinlan on the subject in support of his claim.

tax code. The proposed testimony tended to suggest that mistake of law was a defense to the charges, which was incorrect. And given that mistake of law was not a defense, the testimony served only the purpose of eliciting nullification.

Second, because Blagojevich claimed to have relied in part on discussions with the lawyers on his staff in coming to the belief that his conduct was legal, the proposed testimony misleadingly suggested an advice of counsel defense. As the district court found, such a defense was not supported by the evidence, and indeed, Blagojevich never sought to present evidence showing that, prior to the charged offenses, he sought the advice of counsel, provided the lawyer with all relevant information, and then acted in conformance with the lawyer's advice. Instead, he conceded that he had done so. What Blagojevich did do during and after the trial was to strenuously

disavow any reliance on advice of counsel as a defense,[16] and to insist that he intended only to present a good faith defense to negate intent to defraud. Yet the factual underpinning of his good faith defense included the argument that he relied on the advice of his advisors, who were licensed lawyers, and as noted above, Blagojevich highlighted that fact at every opportunity. Combined with defendant's repeated comments regarding "legality," Blagojevich clearly and unmistakenly suggested that he believed, based on advice of lawyers, that his conduct was lawful—and he had done so well before he proposed to specifically state to the jury that he believed his conduct was legal.

As this Court has noted, advice of counsel is not a "free-standing defense." *United States v. Joshua*, 648 F.3d 547, 554 (7th Cir. 2011) (citing

---

[16] In order to show that the defendant relied upon the advice of counsel in good faith, a defendant must satisfy five elements:

(1) before taking action,

(2) defendant in good faith sought the advice of an attorney whom he considered competent,

(3) for the purpose of securing advice on the lawfulness of possible future conduct,

(4) and made a full and accurate report to his attorney of all material facts which the defendant knew, and

(5) then acted strictly in accordance with the advice of his attorney.

*United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008).

71

*United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008)).  Thus, when a defendant says that his state of mind was affected by advice he received from lawyers, he presents an advice of counsel defense.  Here, defendant conceded he could not satisfy the required elements.  Moreover, the testimony defendant proposed was inconsistent with his own testimony, recorded statements, and public comments, indicating that he knew he could not exchange official acts for personal benefits. In light of this testimony, vague and general testimony that defendant "believed that his conduct was legal" posed a serious risk of hopelessly confusing and misleading the jury.

Vague reliance on an advice of counsel defense was particularly misleading and problematic in this case because it omitted any reference to advice the defendant had received from any one of the criminal defense lawyers he had on retainer at all relevant times, several of whom had assisted him in connection with the FBI interviews conducted as part of the investigation that led to the instant charges, and one of whom was one of his trial attorneys. It was misleading in that it tended to suggest (incorrectly) that it was reasonable for Blagojevich to rely on lawyers with no experience in criminal law, employed by the State and not by Blagojevich personally, and most of whom were not even working in a legal capacity, and also that he did not consult with other lawyers on these issues.

Worse, Blagojevich chose not to waive privilege with respect to his private criminal counsel, and this prevented his testimony from being fully tested before the jury. The law is clear that a defendant asserting an advice of counsel defense waives the privilege with respect to advice received from other lawyers on the same subject. Here Blagojevich was represented by private criminal counsel in connection with the investigation that led to the instant charges; in order to assess the veracity of the proposed testimony, the jury would be entitled to hear whether Blagojevich consulted with criminal counsel on these issues and, if so, what advice he was given. The district court did not abuse its discretion in prohibiting this unfair and misleading tactic.

In addition, Blagojevich never suggested that he had come to the realization that his beliefs were mistaken and so as a practical matter the testimony he proposed likely would have confused and mislead the jury about what the law does and does not proscribe, and lead them to decide the case on an improper basis.

In any event, as a practical matter, Blagojevich was not precluded from testifying that he did not exchange official acts for personal benefits, or that he did not intend to do so. In fact, he testified to both facts repeatedly, as described above. And he also repeatedly told the jury that he believed his actions were legal, that he relied on "his" lawyers, and that he at all times

73

attempted to stay within proper legal boundaries, that he did not intend his requests for campaign contributions to be understood by Magoon or Johnston as extortionate; and likewise, that he did not intend to exchange the Senate seat appointment for personal financial gain but, rather, as a means by which both he and the President's preferred candidate effectively could serve the public.

If believed, any of this testimony, when combined with the good faith and other instructions provided to the jury, would have pointed to acquittal. The jury simply did not believe it.

### 2.     Instruction

The good faith instruction given to the jury provided that (1) good faith was inconsistent with the requisite mental state for each of the charged offenses; (2) the burden was not on the defendant to prove his good faith; rather, the government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud; (3) the government was not required to prove that the defendant knew his acts were unlawful; and (4) "in the context of this case, good faith means that the defendant acted without intending to exchange official actions for personal benefits." The defendant challenges only the fourth element of the instruction.

The language of this instruction was added as a result of Blagojevich's repeated efforts to put before the jury claims suggesting that he could not, or

should not be convicted because (1) he did not know his conduct was unlawful; (2) he relied in good faith on the advice of lawyers; and (3) he believed his conduct was nothing more than commonly accepted legal political activity. Based on this conduct, the district court offered to instruct the jury on the elements of the advice of counsel defense which, given the defendant's inability to satisfy the elements, might have been understood as directing the jury to disregard all of the evidence regarding defendant's discussions with staff members who were lawyers. The government was reluctant to accept the offered instruction because, at the time, the government could locate no direct precedent for the giving of such an instruction and had some concern that it could be misconstrued by the jury to the defendant's detriment and, for this reason, the government took a more conservative approach and suggested the language that was ultimately used, which focused on evidence the jury could rely on in finding good faith, rather than evidence of good faith the defendant had failed to present.[17] The instruction used here was considerably more favorable to the defense.

Blagojevich contends that the instruction misstated the law and amounted to directing the jury to convict him. Not so. In reality, the instruction tracked the defense he actually presented, and allowed for the

---

[17] Since the time of the trial, this Court approved such an instruction in *Joshua*.

argument that, even if the defendant actually did exchange official acts for personal financial benefit, if he did not intend to do that, then he lacked the requisite *mens rea* and could not be convicted. The challenged language did not prevent him from arguing that, as a matter of fact, he did not offer "one for the other," that he would not and *did not* trade official actions for personal benefits and that, in any event, he did not believe he was doing so. Moreover, as indicated above, defendant managed to present the jury with the claim he claims he was precluded from making.

## IV. The District Court Did Not Abuse Its Discretion in Imposing Limits on the Defendant's Cross-Examination of Witnesses.

### A. Standard of Review

This Court reviews limits placed on the defendant's cross-examination of witness for abuse of discretion unless such limits "directly implicate[] the core values of the Confrontation Clause," in which case, review is *de novo*. *E.g.*, *United States v. Sanders*, 708 F.3d 976, 990-91 (7th Cir. 2013) (internal quotation marks and citation omitted). Where a violation of the Confrontation Clause is shown, the court considers whether the violation was harmless, considering "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise

76

permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

### B.   Analysis

"[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Thus, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross examination based on concerns about, among other things, harassment, prejudice, [and] confusion of the issues." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Although "exposing witness bias" lies within the protected "core" of the Confrontation Clause, "where a defendant reveals a witness's motive to lie, 'how much opportunity defense counsel gets to hammer that point down to the jury' becomes 'peripheral' for Sixth Amendment purposes," and review is for abuse of discretion. *Sanders*, 708 F.3d at 991. Only where "the defense is completely forbidden from exposing the witness's bias" are the core values of the Confrontation Clause implicated. *Id.*

Defendant's challenges to the limits placed on his cross-examination lack merit. The court's rulings were correct and possible error, whether considered singly or in combination, could not possibly have jeopardized defendant's substantial rights. *United States v. Eberhart*, 388 F.3d 1043,

1048 (7th Cir. 2004), overruled on other grounds by *Eberhart v. United States*, 546 U.S. 12 (2005).

### 1.     Cross-Examination of Monk

Contrary to Blagojevich's contention, the district court did not abuse its discretion in precluding certain questioning of Monk. Monk testified on direct examination, among other things, that he understood that Blagojevich wanted him to deliver an extortionate message to Johnston. The defense extensively cross-examined Monk on a host of issues bearing on his credibility and his potential bias, including: (1) Monk's secret receipt of between approximately $70,000 to $90,000 cash in increments of $10,000 from Tony Rezko over a period of approximately one year while he was working for the defendant, and concealed those payments from both the defendant and the IRS, Tr. 2719-22, 2824, 2849-50; (2) when controversy over Rezko began, Monk never told Blagojevich to cut ties with Rezko, in part because the payments he received from Rezko biased him in Rezko's favor, Tr. 2832; (3) when interviewed by the FBI in 2005, Monk concealed the payments and effectively lied about having received them, Tr. 2834; (4) he never told law enforcement about the cash payments until after Blagojevich was charged, Tr. 2842; (5) Monk testified in the grand jury that he received the payments but looked at them as gifts, Tr. 2844; (6) Monk told the jury in the first trial that he viewed the payments as salary advances, Tr. 2845-46;

78

(7) Monk lied to Blagojevich regarding his communications with Johnston, making his conversation sound more aggressive than they were, and exaggerated the prospects of Johnston making a contribution Tr. 2856-59; (8) Monk lied to both Blagojevich and Johnston, Tr. 2860; and (9) Monk lied to Blagojevich about his whereabouts on December 3, 2008, Tr. 2862.

Blagojevich complains that the district court precluded cross-examination of Monk on the fact that he did not report to the government that he understood that Blagojevich wanted him to deliver the extortionate message to Johnston until after Blagojevich was arrested and Monk "learned [during an interview conducted after Blagojevich's arrest] that Blago was 'Target No. One,' and that anything he said to hurt Blagojevich would help him." *See* Tr. 2962-63. After hearing an offer of proof, the district court reasonably determined that, since Monk understood that what he and Blagojevich were doing was illegal, the fact that Monk did not disclose his understanding earlier proved only that until the time when he chose to cooperate with the government (which followed Blagojevich's arrest) he was not willing to implicate himself. Tr. 2968. Under those circumstances, it did not make it more or less likely that Monk was lying or shading his testimony based on "new" information that defendant was, in the questioner's words, "Target No. 1;" and thus the questioning was properly precluded under Fed. R. 401. *Id.* In reality, the defense had already developed all of the relevant

evidence necessary to argue the point; Monk had admitted that he first told agents about his understanding of Blagojevich's directives after Blagojevich was arrested and Monk decided to cooperate. *See* Tr. 2968. Because the proposed questioning was not probative of bias and Blagojevich was permitted to, and did, pursue other lines of questioning designed to expose potential bias, any error was clearly harmless.

The district court correctly sustained objections to defendant's attempt to question Monk regarding his purported ability to avoid any an enhancement to his sentence based on cash bribes obtained from Rezko. Blagojevich was entitled to and did question Monk regarding the illict payments he received from Rezko but was precluded from asking about the fact that Monk's plea agreement did not address the issue. Although the record does not reflect the details, the issue was raised with the district court in advance, and the court precluded the questioning on the basis that Monk received no benefit because the government's only information regarding the payments was proffer protected. This was not an abuse of discretion and any error was harmless in light of defense counsel's extensive questioning regarding the payments themselves.

The court correctly precluded cross-examination based on his testimony in the first trial because the statement was not inconsistent and was not impeaching. Monk testified in the first trial that the goal was to

80

convey the extortionate message without making it blatant. Tr-I 1429A. The court precluded defense counsel from confusing the witness and misleading the jury by questioning Monk about a statement taken out of context, and suggesting that it carried a meaning exactly opposite from the meaning conveyed by Monk at the time. There was no error. Tr. 2958-68.

### 2.    Cross-Examination of Wyma

Blagojevich argues that the district court improperly restricted his ability explore Wyma's motive to fabricate information against him in order to deflect attention away from his own criminality, that is, his purported involvement in the payment of a bribe involving a client named Provena. Br. 70. Defense counsel's questions asserted that (1) the government's investigation of the Provena matter was dropped as soon as Wyma started cooperating, and that (2) Wyma was interviewed eight times before he was ever asked about Provena. Tr. 2451, 2453-54. The first question incorporated a faulty premise, namely, that the Provena investigation was "dropped" as soon as Wyma began assisting the government with the investigation of Blagojevich. In the district court the government questioned defense counsel's good faith basis for asking the question, reported to the court that the premise of the question was false and that the defense had been provided with reports of interviews with respect to the investigation, and thus were aware that the investigation was not "dropped" in favor of pursuing

Blagojevich. Tr. 2453-55. The defense did not challenge the information presented by the government. The district court observed that it looked like the defense was attempting to mislead the jury. Tr. 2453.

The defense question about the "eight reports" went even further afield—and was formulated so as to elicit purported information about the intent of the agents, rather than of Wyma. The district court noted this distinction between efforts to show bias and efforts to attack the government:

> If you want to think that he made a deal because of Provena, *fine*, but the fact that they allegedly questioned him eight times before they got to Provena is not a relevant fact.

Tr. 2453.

Blagojevich claims that court's ruling was an abuse of discretion in that the court misunderstood the purpose of the proposed questioning. Br. 71. There was no misunderstanding. As the court correctly noted, it was proper to expose bias based on the fact that Wyma himself had been investigated and had received immunity. As the court observed, however, defense counsel's questions focused on the agent's intent and motives, rather than Wyma's. *See* Tr. 2452 ("the government took a very sympathetic view toward his involvement with Provena, that's the significance of this"). In fact, defense counsel's questions voiced a repeated defense theme that the government was out to "get" Blagojevich. *See*, *e.g.*, Tr. 1179 (Defense Opening: "You will see the lengths at which they will go to get this man."); Tr. 1257 (suggesting that

agents conducted wiretap in a biased manner by asking, with respect to the wiretaps, "So is it fair to say it was up to the agent to determine what was actually recorded?"). Blagojevich was entitled to test Wyma's bias, but he was not entitled to mislead the jury. The court did not err, much less abuse its discretion, in prohibiting this questioning.

### 3.     Cross-Examination of Magoon and Johnston

Defendant's complaints about the limits placed on his cross-examination of Patrick Magoon lack merit.[18] Defendant questioned Magoon about his personal wealth, his salary, his involvement in politics on behalf of the hospital. The general theory of this questioning was that he was an experienced "political insider" who could not be made to feel pressured to make campaign contributions. See Defense Opening at Tr. 1184-85:

> Now, the government also talked to you about John Johnston and told you about this racetrack, they also talked to you about these so-called victims, Patrick Magoon and John Johnston and Jerry Krozel. They want you to believe that these political insiders and millionaires are victims, that's what they want you to believe. Far from it.

Questioning based on the false premise that a person who is rich or experienced cannot be extorted is properly precluded.

---

[18] Blagojevich specifies no errors with respect to his cross-examination of Johnston. Therefore, any error is waived. If not waived, such challenges lack merit for the same reasons as apply to challenged questioning of Magoon. As in the case of Magoon, there was no evidence that even remotely suggested that any prior contributions were made by Johnston under circumstances analogous to those presented in this case. Thus the proposed questioning was irrelevant.

The defendant's attempt to question Magoon regarding historical contributions he made to other politicians was properly stopped for similar reasons. As Blagojevich argues, the purpose of the questioning was to "rebut the government's claim that these experienced political players felt unduly pressured by Blagojevich's mere request for a campaign donations." Br. 72. The problem once again is that the question rests on a faulty and misleading premise—that the prior fundraiser was held in comparable circumstances. The court correctly noted that, ". . . the fact that somebody has routinely contributed to other people, for years and years and years, does not excuse a different situation where an individual is feels compelled to make it for reasons other than the reasons he went into before." Tr. 2613. This was correct. Proof of routine contributions says nothing about how the donor would likely react in non-routine circumstances in which he feels compelled to make a contribution for reasons that he did not have before. Magoon did not testify that he felt pressured based on the mere fact that the rate increase was pending; thus, defendant's proposed cross-examination would tend to improperly suggest (as defendant had argued elsewhere) that a history of making political contributions insulates the contributor from feeling pressure when he is later extorted. Blagojevich purports to make the same arguments with respect to other listed passages (Tr. 2533, 2540, 3023, 3726), but these passages are not analogous and any error is waived.

84

### 4.     Rulings Regarding the Government's Cross-Examination

Defendant's claims of a double standard are undeveloped as well as unsupported by the record. In reality, the district court's rulings with respect to the government's cross-examination of defendant's witnesses were correct.

The government questioned defense witness former Congressman William Lipinski regarding (1) his recollection of assistance he provided to the defendant in fundraising over the years, Tr. 5081-89; and (2) the fact that Blagojevich appointed his wife to a paid position with the Court of Claims, knowing of Lipinksi's significant fundraising support, Tr. 5089. The cross-examination was an appropriate means of testing the witness's memory and potential bias, and defendant suffered no possible prejudice from any error.

Defendant argues that the district court improperly allowed the government to cross-examine Jesse Jackson, Jr. about an incident in which defendant indicated to Jackson that defendant did not hire Jackson's wife for a state job because Jackson had refused to make a $25,000 contribution to defendant.  Tr. 3358-69. According Blagojevich, the only possible relevance of this examination was to "make Blagojevich sound like a jerk." Not so.

Jackson's testimony presumably was presented to establish the point that when Jackson met with Blagojevich on December 8, 2008, no mention of campaign contributions was made by either party, and to establish that the relationship between the men was sufficiently strained that it was unlikely

Blagojevich would accept a bribe from, or give the appointment to, Jackson. Blagojevich was given fair warning of the potential that presentation of this testimony could open the door to the very cross-examination now challenged, and made the strategic decision to take the risk. The district court did not err by allowing the cross-examination and, in any event, the rest of the evidence of defendant's guilt was so strong, any error could not have substantially affected the jury's verdict.

Finally, Blagojevich challenges the district court's ruling permitting the government to cross-examine the defendant concerning his conviction by the jury of making false statements to FBI agents during an interview in 2005. Contrary to defendant's contention, the district court's ruling was well within the court's discretion and was correct.

Rule 609(a)(2) of the Federal Rules of Evidence provides that:

> For the purpose of attacking the character for truthfulness of a witness . . . evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.

The fact that a court has not yet imposed sentence or entered judgment on a jury's verdict in no way precludes the admission of a conviction for impeachment purposes under Fed. R. Evid. 609(a)(2). A jury's verdict is sufficiently final and certain to warrant a "presumption of correctness," *see*

Advisory Committee Notes to Rule 609(e), particularly where, as here, the district court has rejected the defendant's motion for judgment of acquittal or new trial.

It is the jury's verdict of guilty that proves that the defendant committed an offense involving an act of dishonesty or false statement, and it is the commission of the offense that is probative of defendant's character for untruthfulness. Neither the entry of formal judgment nor the imposition of sentence adds anything to the conviction's probative value. *See United States v. Klein*, 560 F.2d 1236, 1241 (11th Cir. 1977) ("Where the guilty verdict is introduced for impeachment purposes, . . . it can be distinguished from a conviction only on the basis of a procedural requirement which is 'nothing more than a ministerial act.'") (quoting *United States v. Canaday*, 466 F.2d 1191 (9th Cir. 1972)). Thus the admission of a conviction upon which formal judgment has not yet been entered serves the purpose intended by Fed. R. Evid. 609, that is, to ensure that the jury has access to evidence directly relevant to the defendant's credibility.  Although this Court has not had occasion to address the issue, at least four other circuit courts have rejected the notion that entry of judgment on a finding of guilt is required before a conviction may be utilized under Rule 609. *See, e.g.*, *United States v. Mitchell*, 886 F.2d 667, 670-71 (4th Cir. 1989) (upholding district court's order permitting cross-examination of defendant based on prior convictions on

which defendant had not yet been sentenced, and for which the time for appeal had not yet run) (citing *United States v. Duncan*, 598 F.2d 839, 864 (4th Cir. 1979) (holding that a court's acceptance of a jury's verdict is "a sufficient predicate for the use of the 'verdict' for impeachment" in a subsequent trial). *Accord*, *United States v. Smith*, 623 F.2d 627, 630–31 (9th Cir. 1980); *United States v. Vanderbosch*, 610 F.2d 95, 96-97 (2d Cir. 1979); *United States v. Rose*, 526 F.2d 745, 747 (8th Cir. 1975). The reasoning of these cases has particular force where, as here, the district court already had denied a motion for judgment of acquittal or new trial. Excluding the evidence would have elevated form over substance, and thwarted the purpose that Fed. R. Evid. 609 is intended to serve.

Pursuant to the plain language of the rule, evidence of a conviction involving dishonesty or false statement is automatically admissible for impeachment purposes under Fed. R. Evid. 609(a)(2), without regard to the probative value/prejudicial effect balancing test applicable under Fed. R. Evid. 609(a)(1), and without regard to Fed. R. Evid. 403. *United States v. Kuecker*, 740 F.2d 496, 501 (7th Cir. 1984) (holding that trial court has "no discretion to prevent introduction, for impeachment purposes, of evidence of prior convictions for crimes involving dishonesty or false statement"). Convictions of crimes involving dishonesty and false statements are singled out for mandatory admission because such convictions are so "peculiarly

probative of credibility," *see* Advisory Committee Notes to 1974 Enactment, that their probative value conclusively outweighs any risk of unfair prejudice. Thus, there was no balancing to be done, and the district court properly admitted this evidence.

Moreover, defendant asserts without support that it was improper to allow the government to ask whether the defendant was a "convicted liar" during cross examination. The question was fair. *See United States v. Turner*, 651 F.3d 743, 752 (7th Cir. 2011) (holding prosecutor does not err by referring to defendant as "liar" in argument) (internal quotations omitted). Here, the credibility of the defendant was squarely at issue, and the government was entitled to use the evidence. The jury received a proper limiting instruction, and is presumed to have followed the court's instructions. *See United States v. Joshua*, 648 F.3d 547, 554 (7th Cir. 2011). There was no error in the district court's handling of this issue.

## V.    There Was No Abuse of Discretion in the District Court's Evidentiary Rulings.

### A.    Standard of Review

Evidentiary rulings of the district court are reviewed for abuse of discretion. *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013).

## B.    Analysis

Blagojevich argues that the government was permitted to introduce a "large amount of highly prejudicial evidence that had almost no relevance to the case and/or was inadmissible hearsay," while "highly relevant and admissible evidence" offered by the defense was "routinely" excluded. These claims are utterly unfounded.

### 1.    Testimony Regarding Recordings

The district court correctly allowed testimony concerning the understanding of certain witnesses of statements made by the defendant during conversations to which the witnesses were parties. The challenged testimony provided needed background and context, explained shorthand expressions and references to earlier events and conversations and, in some instances, explained cryptic statements meant to be unintelligible to eavesdroppers. Such testimony is proper, even when it includes inferences about the meaning intended by the speaker. *United States v. Curescu*, 674 F.3d 735, 740 (7th Cir 2012). Fed. R. Evid. 701 permits lay witnesses to offer opinions that are "rationally based on the witness's perception" and a witness's testimony regarding what he or she understood another speaker to mean, based on the speaker's words, expression, and body language, and on any relevant previous conversations and events, is admissible under this rule. Indeed, it is not uncommon for a recorded conversation to require the

explanation of a participant to establish its relevance and admissibility in court.

As this recognized in *Curescu*, without the testimony of a participant, many overheard conversations, particularly conversations between parties engaged in illegal transactions, would be unintelligible to outsiders:

> Anyone who's overheard conversations on the street or in a restaurant knows that conversations between strangers are often unintelligible. There is the public language we employ when talking to strangers and the elliptical private language that we use when talking to people whom we know. Strangers need an interpreter, and a party to the conversation is the obvious choice to be that interpreter. There is no difference between using a private language for the sake of brevity and using it to conceal meaning from strangers—or the authorities . . . .

*Curescu*, 674 F.3d at 740.

In this case, the need for explanations concerning recorded conversations was greater than usual in light of the extraordinary number of calls in which ploys were used to confuse and mislead outsiders—and other participants. *See* Tr. 1373-74; GX 13:5 ("play"), Tr. 1337-38; GX 7:4 (Sneed), 4586 ("misdirection play in politics"), Tr. 1929-31; GX 44:4 ("unsaid"). Indeed, an important feature of Blagojevich's defense was the claimed use of "negative leverage" and "political misdirection" to accomplish defendant's goals. As a result, virtually none of the recordings could reliably be understood without a participant to explain what was said, and what actually intended or understood.

## 2.     Recorded Conversations Offered by the Defense

As discussed above, the defendant's right to present testimony is properly limited by the enforcement of procedural and evidentiary rules that are neither arbitrary nor disproportionate. *Nevada v. Jackson* 133 S.Ct. at 1992.

For the reasons discussed above, the district court properly excluded recordings offered by the defense or conditioned their admission on the laying of a proper foundation of relevance, *i.e.*, to establish that they actually were, as defendant argued, relevant to defendant's state of mind. The exclusion of this evidence in no way affected the defendant's ability to present a defense, or impinged on the defendant's right to determine whether to exercise his rights under the Fifth Amendment. As to the latter issue, defendant's claim that he relied to his detriment on the court's tentative rulings concerning the admissibility of certain recordings in determining whether to testify is perplexing in that, as he himself states, the court excluded 33 of the recordings he sought to admit before he took the stand.  The argument made by the defendant here is undeveloped and entirely devoid of analysis, and the number of calls he merely lists by number is too great to be treated adequately in this response.  All of the proposed calls were inadmissible as ambiguous and/or not probative of state of mind. The district court carefully analyzed each item, and excluded most of them without prejudice. The calls

defendant sought to admit during or after his testimony were clearly irrelevant to establishing his state of mind. In most cases, the government did not challenge the defendant's testimony in such a way as to preclude any need for corroboration as, for example, a prior consistent statement.

Blagojevich contends, as he did in the district court, that numerous excluded calls supported his claim that he made sincere efforts to arrange the Madigan "deal." Br. 76. The district court reviewed transcript of the calls offered by defendant one by one and correctly determined that the calls did not evidence defendant's state of mind, at least without explanatory testimony. Defendant suffered absolutely no prejudice as he testified concerning nearly every call, and was generally not challenged on his description of the substance of call, only the inferences he sought to have the jury draw.

Blagojevich argues that he should have been permitted to play a recording of a conversation between him and his brother on December 6, 2008 (Defense Tab 48), and presents a short excerpt which he claims would have been powerful evidence of the defendant's intent not to exchange the Senate seat for campaign contributions from Jesse Jackson supporters. That call was properly excluded on multiple grounds and was inadmissible under Fed. R. Evid. 803(3) because it was not probative of Blagojevich's state of mind at the only relevant time, the time of the offenses, and instead was probative only of

his state of mind at a time after the offenses had been committed, and after he had learned that law enforcement agents may be recording his calls. Blagojevich had time to reflect between the criminal conduct and the statement, and motive to do so given the recent reports of developments in the criminal investigation. Thus Blagojevich had the time and the motive to choose his words carefully and "cover his tracks," and also to "perhaps misrepresent his situation." *United States v. Jackson*, 780 F.2d 1305, 1313-15 (7th Cir. 1986).

Moreover, the call would not have corroborated Blagojevich's testimony which was that the official act mentioned was a mortgage foreclosure bill, not the Senate seat, and would not have refuted the charge that Blagojevich intended to accept the bribe offer from Jackson's supporters. The call was properly excluded.

There was no error in the district court's handling of the advice of counsel issue. First, as discussed above, Blagojevich's good faith defense, connected as it was to his claim that he relied on the advice (or the silence) of his lawyers, was an advice of counsel defense. *Joshua*, 648 F.3d at 554-55. Second, also as discussed above, neither the evidence presented at trial nor the evidence Blagojevich sought to introduce, reflected that Blagojevich sought legal advice from the "advisors" he claimed to have relied upon. As the district court noted at sentencing, 12/07/11 Tr. 249-50, there was not a single

recording in which Blagojevich asked any of his advisors whether his purported plans were legally sound; what Blagojevich sought was tactical, not legal advice. Likewise, the advice Blagojevich obtained from his advisors was tactical. Given, however, Blagojevich's repeated suggestion that he relied on the same advisors for legal advice, there was nothing inappropriate in pointing out to the jury that he did not listen to their legal advice either.

Blagojevich's complaint regarding the government's reference in closing argument to Quinlan's having confirmed Harris's fears takes the statement out of context. The government referred to Quinlan's comment for the exact purpose for which was introduced—to explain the chronology of events and why Harris stepped away from dealings on the racing bill. It was not offered, or used in argument as, an opinion regarding the legality of Blagojevich's conduct. In any event, the reference was a minute portion of the government's evidence and arguments, and could not possibly have affected the judgment of the jury.

The government pointed out numerous times throughout the litigation that Blagojevich would need to waive the attorney-client privilege with respect to legal advice he received from his criminal counsel regarding relevant issues in order for him to be able to make out an advice of counsel defense in order to allow the jury to properly evaluate the claim. Not

surprisingly, Blagojevich never provided such a waiver.[19] Under these circumstances, the district court properly cabined the proposed presentation on advice of counsel, in order to prevent the jury from being confused and misled.

In any event, as discussed above, Blagojevich did in fact testify, repeatedly, that there were attorneys in the room during meetings and calls, that they did not say anything when he made his proposals, and that he consulted with Quinlan regarding the §501(c)(4) corporation, despite the district court's rulings. For this reason, as well as the strength of the government's evidence, there is no possible way that the district court's rulings on any of these evidentiary rulings prejudiced the defendant.

Finally, every piece of evidence challenged by Blagojevich (Br. 83-84) was properly admitted. The government properly introduced Blagojevich's statements to the press as evidence of his intent to defraud the people of Illinois of their right to his honest services, as well as establish Blagojevich's knowledge and intent in committing the charged offenses. Tr. 1094, 1124, 1127, 1220, 1253, 1320, 1407, 1940, 1978.

Likewise, the government properly introduced evidence demonstrating that Blagojevich was in debt, and that he had brought that debt on himself.

---

[19] Indeed, the circumstances were further complicated by the fact that, during much of the relevant period, Blagojevich was represented by one of the lawyers who represented him at his criminal trials.

This evidence corroborated the rcorded conversations and established the defendant's motive in committing the offense. The government took a conservative approach, and presented a very small amount of evidence of this type. Thus, there could be no prejudice.

The court properly admitted Lon Monk's testimony regarding the corrupt conversations Blagojevich participated in in 2003 and 2004, which were including in the indictment, and explained the nature of Blagojevich's relationships with Monk, Rezko, and Kelly, and the true nature of Blagojevich's thinking about trading official actions for personal benefits.

Evidence showing that the FOB office swept for bugs after the report regarding Wyma and the recording of defendant was published was properly introduced to show Blagojevich's and his brother's consciousness of guilt. Blagojevich the opportunity to present an innocent explanation during his testimony, but chose to leave the issue alone. There was no abuse of discretion in admitting the testimony.

## VI.  Blagojevich's False Statement Conviction Should Be Affirmed.

### A.  Standard of Review

This Court reviews questions of law in a district court's ruling on a motion to dismiss an indictment *de novo*, and factual findings for clear error. *United States v. Burge*, 711 F.3d 803, 808 (7th Cir. 2013); *United States v. Greve*, 490 F.3d 566, 570-71 (7th Cir. 2007). Evidentiary rulings of the district

court are reviewed for abuse of discretion. *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013), and sufficiency challenges are reviewed by determining whether, considering all the evidence in the government's favor, no "rational trier of fact could have found the defendant to have committed the essential elements of the crime." *United States v. Hassebrock*, 663 F.3d 906, 918 (7th Cir. 2011) (citations omitted).

**B.    Background**

On March 16, 2006, Blagojevich was interviewed by FBI agents and prosecutors in the offices of Blagojevich's personal counsel, Winston & Strawn. 1Tr. 3899-3901. Before beginning their questioning, agents offered to record the interview; through counsel, Blagojevich declined the offer. 1Tr.3900-3901.

The interview was conducted as part of the FBI's investigation of whether Blagojevich and his associates were soliciting or demanding contributions from individuals and businesses in exchange for appointments, state jobs, or state business. 1Tr.3901-02. Matters material to the investigation included whether Blagojevich was being kept apprised of who was contributing to him and how much they were contributing while he was Governor, because agents were "looking at whether or not, in fact, [Blagojevich] was using [contributions] as a criterion for issuing state contracts, appointments and such . . . ." 1Tr. 3902, 3902.

  
During the interview, Blagojevich told agents that, "early on in his administration he tried very hard to maintain a firewall between politics, which he defined as fundraising, and government work[.]" 1Tr. 3907-08. In response to certain questions,[20] Blagojevich "specifically said that he does not track who contributes to him and does not want to know and does not keep track of how much they contribute to him." 1Tr. 3908.

Blagojevich was charged in Count 24 of the second superseding indictment with knowingly and willfully having made to agents of the FBI materially false statements concerning a matter within the FBI's jurisdiction, in violation of 18 U.S.C. § 1001(a)(2), including the following:[21]

> Since the time that he became governor, Rod Blagojevich does not track, or want to know, who contributes to him or how much they are contributing to him.

R. 231 at 106-107.

## C.    Analysis

Contrary to Blagojevich's contention (Br. 84-87) Count 24 was properly charged, and his conviction was supported by abundant evidence.

---

[20] The agent was not questioned concerning the precise wording of the question in response to which Blagojevich made the challenged statement. *See* 1Tr. 3908, 3938-39 (asking on cross, "You and the other agents and the other U.S. Attorneys asked him about whether or not he tracked fundraising, correct?")

[21] The indictment charged Blagojevich with making two false statements, but the jury specifically rested its verdict solely on the quoted statement.

## 1.  The  Charged  Statement  Was  Not  Fundamentally Ambiguous.

An indictment properly states an offense and meets all Constitutional requirements if, "reviewed on a practical basis and in [its] entirety, rather than in a hypertechnical manner": "(1) the indictment states all of the elements of the crime charged; (2) it adequately apprises the defendant of the nature of the charges so that he may prepare a defense; and (3) it allows the defendant to plead the judgment as a bar to any future prosecutions for the same offense." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (citations and internal quotation marks omitted); U.S. Const. amend VI; Fed. R. Crim. P. 7(c)(1). Count 24 easily met these standards. *Id.*; *United States v. Reese*, 551 F.3d 657, 662 (7th Cir. 2008) (stating elements of offense under § 1001).

As the district court correctly held (R. 589) the false statement upon which the jury based its verdict was not ambiguous, much less "fundamentally" so. Standing alone, the verb "track" is plainly and ordinarily understood as meaning to "keep track of," "observe the progress of" or "follow." This meaning is one which persons "of ordinary intellect" can agree upon and use "with mutual understanding by a questioner and answerer." *See United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (finding fatal ambiguity where question and answer failed to make a crucial distinction

between actions taken by the defendant in different capacities). Blagojevich's ability to come up with an alternative interpretation after the fact (Br. 87) does not change the equation. *See United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) (stating that the court is "not required to indulge every imaginable twist or contortion of the words or language used" by the defense in resolving a motion to dismiss a perjury charge); *United States v. Chapin*, 515 F.2d 1274, 1279-80 (D.C. Cir. 1975) (noting that "almost any word or statement can be interpreted in different ways when subjected to ingenious scrutiny after the fact") (quoting *United States v. Ceccerelli*, 350 F. Supp. 475, 478 (W.D. Pa. 1972)). Moreover, Blagojevich has never contended, and does not argue here, that there was any ambiguity in the portion of the charged statement in which he represented that "he did not want to know" the identity of his contributors or the amounts of their contributions. For all these reasons, there was no error in the court's denial of defendant's motion.

### 2. Overwhelming Evidence Showed that the Charged Statement Was False, and Defendant Knew It.

To prove a violation of 18 U.S.C. § 1001(a)(2), the government was required to prove that the charged statement was false, material, knowingly and willfully made, and that it concerned a matter within the jurisdiction of a federal department or agency. *See United States v. Turner*, 651 F.3d 657, 662

(7th Cir. 2008). The evidence presented at trial amply supported the jury's finding with respect to each of these elements.[22]

Witness after witness testified during the first trial regarding Blagojevich's interest in, and close tracking of, the progress of fundraising efforts targeted at obtaining specific amounts of money from specific donors throughout his first term as Governor. The testimony of four witnesses in particular (Kelly Glynn and Danielle Stilz, FOB finance directors collectively covering the years 2002 through 2007, and Lon Monk and John Wyma, fundraisers throughout the relevant period) demonstrated that Blagojevich routinely attended fundraising meetings in which lists of specific actual and prospective donors and amounts were discussed in detail, that he commented on individual contributors and contributions and sometimes made personal calls seeking contributions, and that Blagojevich's knowledge and interest in these matters remained constant throughout his tenure as Governor. 1Tr. 1165-66, 3950-70, 3977-4063; R. 583:11-17 (summarizing testimony). In addition, a fifth witness, Ali Ata, testified about a conversation in July 2003 in which Blagojevich referenced both a campaign contribution made by Ata and Ata's request, through Tony Rezko, for a job in Blagojevich's administration. 1Tr. 2017. This and other evidence overwhelmingly

---

[22] Blagojevich has challenged sufficiency with respect to only two of these elements: falsity and materiality.

demonstrated that Blagojevich tracked and wanted to know about his contributors and their contributions and, thus, that Blagojevich knew that the charged statement was false when he made it.

In the face of this evidence Blagojevich asserts (Br. 86) that he "clearly" interpreted the term "track" to mean "keep detailed records," but no record evidence or argument supports that assertion. Indeed, as the district court observed, the statement upon which the jury based its verdict went entirely "undefended" in the defendant's closing argument. 10/22/10 Tr. 10.

Blagojevich also makes the undeveloped (and waived) argument that, in context, his statement was "literally true," or at least not materially false. Br. 86. In reality, neither the context of other topics addressed in the interview, nor that of the evidence concerning Blagojevich's knowledge of and participation in fundraising, provide any basis for challenging the material falsity of the charged statement, much less establishing its literal truth. *See, e.g.*, *Bronston v. United States*, 409 U.S. 353, 362 (1973). The statement for which Blagojevich was convicted was not rendered true or immaterial by virtue of the fact that Blagojevich did not personally enter contribution data in a computer, or by Blagojevich's identification of other persons who did so, or by any other information provided by Blagojevich during the interview. No "context" even remotely suggests that Blagojevich actually did not want to know about campaign contributors and their contributions.

103

In sum, it was obvious that convincing agents that Blagojevich had insulated himself from fundraising activities could deflect the agents' suspicions and make them less likely to conclude that Blagojevich was trading campaign contributions for official acts. The jury was entitled to conclude from the evidence that Blagojevich understood this and that, therefore, he knowingly and willfully made the charged materially false and misleading statement.

### 3.    Blagojevich Was Not Improperly Precluded from Contesting Materiality.

"To be 'material' for purposes of 18 U.S.C. § 1001, a statement 'must have a natural tendency to influence, or be capable of influencing, the decision of the decision making body to which it was addressed.'" *United States v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010) (citing *Turner*, 651 F.3d at 663) (quotation omitted)). Contrary to Blagojevich's cryptic and undeveloped, (and therefore waived) claims (Br. 86-87), Blagojevich's statements were not presented to the jury out of context, and the district court did not abuse its discretion in prohibiting cross-examination relevant to the issue of materiality.

As an initial matter, the bulk of the "context" Blagojevich complains about being excluded actually was presented to the jury. *See* Tr. 3909-10 (noting that Blagojevich said that, although he did not seek out information

about contributors or the amounts they contributed, he attended fundraising events and, when he did, information regarding contributors and contributions sometimes "splashed on him"). And the other information cited by Blagojevich had no conceivable bearing on the issue of materiality.

Likewise, the cross-examination of which Blagojevich claims to have been unfairly deprived was irrelevant to the issue of materiality. The proposed inquiries were properly excluded under applicable evidentiary rules and the district court's previous rulings. All of the challengd inquiries misstated the evidence, went beyond the scope of direct, and/or were intended to elicit inadmissible hearsay in violation of the district court's prior rulings. *See* 1Tr. 3907, 3930, 3936, 3937, 3947, 3907. Two lines of questioning (1Tr. 3937, 3941) were also intended to improperly suggest unfairness on the part of the government—by suggesting that agents had questioned the defendant unfairly, and that the government had improperly withheld from the jury exculpatory passages from the agent's report. There was no abuse of discretion in any of the challenged evidentiary rulings and any error was clearly harmless given the overwhelming evidence that the charged statement was materially false.

For all of these reasons, Blagojevich's false statement conviction should be affirmed.

## VII.  The District Court Did Not Abuse its Discretion in Declining to Strike Juror 174.

### A.    Standard of Review

This Court reviews the district court' denial of a challenge for cause for abuse of discretion, and will overturn a conviction based on the district court's failure to remove a juror only if the defendant can show prejudice. *Griffin v. Bell*, 694 F.3d 817, 821 (7th Cir. 2012) (citing *United States v. Fletcher*, 634 F.3d 395, 409 (7th Cir. 2011), *cert. denied*, 132 S.Ct. 398 (2011)).

### B.    Analysis

The defendant is Constitutionally entitled to a trial by an impartial jury, that is, one that "determines guilt on the basis of the judge's instructions and the evidence introduced at trial, as distinct from preconceptions or other extraneous sources of decision." *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir. 2004). *See also Skilling*, 561 U.S. 358, 130 S.Ct. at 2912-13; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  It is not the case, however, that a prospective juror must be excused merely because he is familiar with the case or has formed an opinion about the defendant's guilt or innocence based on news accounts. As long as the juror is able to "lay aside his impression or opinion and render a verdict based on the evidence presented in court," he may serve. *See Irvin*, 366 U.S. at 722-23. As the Supreme Court has recognized:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

*Id.* In *Griffin*, this Court explained:

> Everyone brings to a case a set of beliefs that may incline him in one direction or another. A person told that X had been indicted, and asked whether he thought X guilty, might reply that he thought X probably was guilty because few innocent people are indicted. That would be a prior [belief]. It would be a bias only if it were irrational or unshakable, so that the prospective juror would be unable to faithfully and impartially apply the law, . . . or "adamant, in our hypothetical if, for example, the person added, "Nothing will ever convince me that the government would indict an innocent person."

*Griffin*, 694 F.3d at 824.

Where a prospective juror gives "full and unequivocal assurances, deemed credible by the judge, that for purposes of deciding the case, she can "set aside any opinion [she] might hold," Constitutional requirements are satisfied. *United States v. Allen*, 605 F.3d 461, 464-65 (7th Cir. 2010) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).

In this case, Juror 174 stated during *voir dire* that he read the Sunday newspaper mainly "for sports or advertisements," that he "really didn't" watch the news on TV, and that he got the news on the internet "only if it pop[ped] in front of [him]." Tr. 546. When asked if he had heard of this case before, Juror 174 confirmed that he had, but stated that he did not really

107

follow it on the television or in the news, and that he saw only "[w]hatever would just pop up." Tr. 547. When asked whether he had "ever form[ed] an opinion about this case, about how it ought to turn out?" Juror 174 said,

> Not really. I was—the way things seemed like they were going, I just figured possibly him to be guilty, but I wasn't–that's my only guess at it.

*Id.* Upon further questioning by the district court, Jury 174 confirmed that he understood that he must "leave aside anything from the past that [he was] were told or that [he] heard." *Id.* Juror 174 told the court that he believed he could do that, and stated that he would do that. *Id.* In deciding the defendant's cause challenge, the district court credited Juror 174's assurances. Tr. 595 (stating, "He said he would disregard it and I believe it.").

Rather than bias, what Juror 174 expressed during *voir dire* was a "prior belief," and a weak and tentative one at that. He qualified that belief, noting that he "just figured possibly" the defendant was guilty, but that it was "only a guess." Tr. 547. Thereafter, the juror confirmed that he understood that he "had to decide this case on the basis of what [he heard] in the courtroom and on nothing else," and that if he "had some kind of opinion, no matter how offhanded it was or how weak it was or how tentative it was, [he had] to put it out of [his] mind and decide this case basically on the evidence here in the courtroom." *Id.* Finally, Juror 174 confirmed—unequivocally—that he believed he could, and that he would, "set aside

anything from the past that he was told or heard . . . ." *Id.* Nothing in the juror's comments suggested that he had an "irrational or unshakeable bias" reflecting an inability or unwillingness to faithfully and impartially apply the law. Thus, the district court acted well within its discretion in declining to strike Juror 174 for cause.

In ruling on Blagojevich's motion for a new trial, the district court described the process it used in examining the qualifications of the prospective jurors, saying that it

> listened to each one considering a variety of characteristics: Intelligence, experience in life, the way they consider answers before giving them, the attentiveness and the ability to work cooperatively, the level of education, the ability to communicate, to understand what is relevant to a question, the ones I asked, and what is not and truthfulness. There are other characteristics, too, that signal the presence of someone fit or unfit to be a juror in a case to be tried.
>
> \*           \*           \*
>
> . . . . I made these individual decisions with extra care in this case because many in the jury pool had some opinions or knowledge about the case.

9/11/12 Tr. 14-17.

In light of the court's "unique opportunity" to assess the credibility of the jurors during *voir dire* examination, and "their demeanor throughout the course of the trial," the district court's finding is entitled to deference. *Griffin*, 694 F.3d at 821 (citing *Allen*, 605 F.3d at 464). *See also Skilling*, 561 U.S.

358, 130 S.Ct. 2896, at 2903 (in "reviewing claims of this type, the deference due to district courts is at its pinnacle"); *Thompson v. Altheimer & Gray*, 248 F.3d 621, 626 (7th Cir. 2001) (trial judge is best situated to determine competency to serve impartially). Where, as here, the district court has conducted jury selection with special care, such deference is particularly appropriate. In any event, any error was harmless, as the defendant has not shown—or even alleged—facts reflecting that he suffered any prejudice as a result of Juror 174's presence on the jury.

## VIII. The District Court Correctly Determined the Defendant's Advisory Guidelines Range and Any Error Was Harmless.

### A.    Standard of Review

This Court reviews the facts underlying a sentencing challenge for clear error, and any surrounding question of law *de novo*. *United States v. Reeves*, 695 F.3d 637, 639 (7th Cir. 2012). The value to be received as a result of a bribe, and whether a defendant exercised a leadership or managerial role in the charged offense, are factual determinations reviewed for clear error. *United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008); *United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013).

### B.    Background

The district court calculated Blagojevich's advisory Guidelines range as 360 to life (12/7/11 Tr. 244; G. App. 19), based on the following: the court

began with a base offense level of 14, pursuant to U.S.S.G. § 2C1.1, and then added: (a) 2 levels pursuant to U.S.S.G. § 2C1.1(b)(2) because the offense involved more than one bribe; (b) 16 levels pursuant to U.S.S.G. § 2C1.1(b)(2) because the value to be obtained by the bribes totaled $1,625,000; (c) 4 levels pursuant to U.S.S.G. § 2C1.1(b)(3) because Blagojevich was an elected public official; and (d) 4 levels pursuant to U.S.S.G. § 3B1.1(a) because Blagojevich was an organizer or leader of the offense; and (e) 2 levels based on Blagojevich's false statements and perjury. PSR 16-21; 12/06/11 Tr. 51-60; G. App. 5-14.

Blagojevich challenges only the court's decision to include in its calculation the $1.5 million offered in exchange for the appointment of Jesse Jackson, Jr. Br. 89. As demonstrated below, Blagojevich's challenges to the district court's calculations lack merit and, in any event, any error was harmless.

## C.    Analysis

### 1.    The District Court Correctly Determined that the Value of the Benefit Defendant Sought to Obtain from the Offenses.

Under U.S.S.G. § 2C1.1(b)(2), the sentencing court is directed to increase the offense level if the "value of the payment" or "the benefit received or to be received in return for the payment" exceeds $5,000, by reference to the table in U.S.S.G. § 2B1.1. In determining the defendant's

advisory Guidelines range, the district court correctly found that the "value to be obtained" from defendant's bribe scheme included $1,500,000, the amount of campaign contributions offered by supporters of Jesse Jackson, Jr. in return for Jackson's appointment as Senator, 12/6/11 Tr. 51-58; G. App. 5-12, and rejected the Probation Officer's finding (PSR at 18) that the facts related to the $1.5 million bribe were not sufficiently proven, 12/6/11 Tr. 53-54, 58; G. App. 7-8, 12. The district court determined that the value of the benefit Blagojevich sought to obtain also included (a) $25,000 based on the CMH offenses; and (b) $100,000, based on the Racing Bill offenses. 12/06/11 Tr. 51; G. App. 5.

Contrary to Blagojevich's contention, neither the evidence concerning the dollar amount of the offer, nor the evidence concerning Blagojevich's dispatching of his campaign manager to begin the process of obtaining the offered contributions was vague or speculative, and the district court's determination was not clearly erroneous. As the district court correctly found (12/06/11 Tr. 53-54; G. App. 7-8), there was no uncertainty about the dollar figure offered for Jackson's appointment; in fact the amount was proven by the defendant's own words in multiple recorded conversations starting with October 31, 2008 and ending on December 4, 2008, the day Blagojevich sent his brother to meet with the supporters. *See* GX 5, 69:2. Indeed, Blagojevich admitted this amount on the witness stand. Tr. 4498.

The district court likewise correctly rejected the Probation Officer's analysis and found, based on ample evidence and consistent with the jury's verdicts, that Blagojevich intended to accept the bribe when he sent his brother (the campaign manager) to meet Nayak (the bribe payer) and tell him that Jackson was a realistic possibility but "stuff's gotta start happening now"—a conversation that was caught on tape. GX 69:6. *See also* Tr. 2035, 2038-39, 2040, 2108-10; GX 5, 65:1-2, 66:2, 67:5-6.

Accordingly, the court correctly determined that Blagojevich sought to obtain the $1.5 million bribe offered by Jackson's supporters and, therefore, that figure was appropriately included in the court's estimate of the value defendant sought to obtain from the offense. *See* 12/06/11 Tr. 51-54; G. App. 5-8.

## 2. The District Court Correctly Determined that Defendant Acted as a Leader and Organizer.

U.S.S.G. § 3B1.1(a) provides that where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the offense level should be increased by 4 levels. The district court found that Blagojevich met the applicable standard. 12/06/11 Tr. 60-63; G. App. 14-17. Contrary to

Blagojevich's contention (Br. 90),[23] the district court did not clearly err in determining that Blagojevich acted as a leader and organizer of the offense.

"The 'central concern' of § 3B1.1 is the defendant's relative responsibility for the commission of the offense." *Rosen*, 726 F.3d at 1024-25 (citations omitted). Factors relevant to this determination include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n. 4. For the enhancement to apply, the defendant must have exercised some degree of control over other participants, or organized others in carrying out the crime. *See id.*

Here, Blagojevich led, organized, and directed substantially more than five government and fundraising employees and outside consultants, whom he used to assist him in exchanging official acts for personal benefits. As the district court correctly found, Blagojevich's "role as a leader [was] clearly shown by his actions and not merely his badge of office." 12/06/11 Tr. 61; G. App. 15. Rather than a "nominal boss" manipulated by those he purportedly supervised (*see* R. 868:15), Blagojevich was the one who

---

[23] Blagojevich has abandoned the argument, made in the district court and rejected, that imposition of enhancements under § 3B1.1 and § 2C1.1(a)(1) constituted double counting. *See* Br. 90; R. 868:17-19.

formulated most of the ideas, *see, e.g.*, GX 7:2-5 (suggesting getting HHS or ambassadorship for appointment);[24] who directed activity, *e.g.*, GX 15 (directing Greenlee to conduct research); GX 69 (directing his brother to meet with Nayak); and the only one who stood to benefit from the offenses. 12/06/11 Tr. 62; G. App. 16. Indeed, as the district court noted, it was "absurd to contend that his staff and advisers would devise criminal schemes whose only aim was to benefit the defendant." *Id.* Based on the evidence and on Blagojevich's demeanor on the witness stand, the district court correctly found that, far from being led by the nose by his staff, Blagojevich was "not a supplicant." *Id.* The court did not err, much less clearly err, in imposing the enhancement.

### 3.    Any Error in Calculating the Advisory Range Was Harmless.

The district court concluded, consistent with the position of the government, that the applicable advisory range was too high, and that the advisory range calculated by the Probation Office (based on value figure of $175,000), 188 to 235 months, was more appropriate. 12/7/11 Tr. 244; G. App. 19. Thus the court elected to regard 188 to 235 months as the "effective"

---

[24] Blagojevich notes that Harris originated the Change To Win idea (Br. 90), but fails to acknowledge that Harris made this suggestion only after Blagojevich suggested the idea of exchanging the appointment for a personal benefit and directed Harris to research private foundations where Blagojevich could get a job "right away." *See* GX 13, 14, 18. As for Nayak, Blagojevich's once being on the receiving, rather than soliciting, end of a bribe does not affect the analysis, particularly since Blagojevich directed his brother to accept the offer. *See* GX 69.

guideline range in this case. 12/07/11 Tr. 248-49; G. App. 13-14. After hearing the defendant's allocution, the district court decided that a 2-level reduction for acceptance was warranted, pursuant to U.S.S.G. § 3E1.1. 12/07/11 Tr. 249; G. App. 14, notwithstanding the government's position that the reduction was inapplicable given defendant's having proceeded to trial and testified falsely. Accordingly, the court reduced the "effective guideline" to 151 to 188 months' imprisonment. *Id.*

The district court reviewed the relevant factors under 18 U.S.C. § 3553(a), and made lengthy, detailed remarks regarding its views of those factors, including in particular, the history and characteristics of the defendant and the nature and seriousness of, and the serious damage caused by, the offenses. 12/7/11 Tr. 249-260; G. App. 24-35. The district court imposed a total sentence of 168 months' imprisonment—a sentence 192 months below the low end of the applicable advisory range, as calculated by the court, and 20 months below the advisory range erroneously calculated by the Probation Office, yet still very serious. R. 260.

Based on the rationale offered by the district court for the sentence, the prosecutor inquired whether the sentence would be the same regardless of any error in calculating the advisory range under the Sentencing Guidelines. 12/07/11 Tr. 263; G. App. 38. The district court agreed that its "sentence would be as it is today." *Id.*

116

Given the thoroughness with which the sentencing proceedings in this case were conducted, the detailed explanation given by the court for its choice of sentence, the drastic variance from the advisory range reflected by the sentence imposed, and the court's statement that its sentence would be the same even if a Guidelines error were later found, it is clear that any Guidelines error "did not affect the district court's selection of the sentence imposed." *See, e.g.*, *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009).

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court affirm the defendant's conviction and sentence.

Respectfully submitted,

GARY S. SHAPIRO
Attorney for the United States,
Acting Under Authority Conferred
 by 28 U.S.C. § 515

MARK E. SCHNEIDER
Assistant United States Attorney
Chief of Appeals, Criminal Division

/s/ Debra Riggs Bonamici
DEBRA RIGGS BONAMICI
Assistant United States Attorney

118

# RULE 32 CERTIFICATION

I hereby certify that:

    1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 27, 934 words.

    2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

                    Respectfully submitted,

                    GARY S. SHAPIRO
                    Attorney for the United States,
                    Acting Under Authority Conferred
                     by 28 U.S.C. § 515

By:          /s/ Debra Riggs Bonamici
                    DEBRA RIGGS BONAMICI
                    Assistant United States Attorney
                    219 South Dearborn Street, 5th Floor
                    Chicago, Illinois
                    (312) 353-3741

# APPENDIX

# INDEX

October 27, 2010 Order Defendant's Motion for
    Judgment of Acquittal Denied ........................................................G. App. 1

December 6, 2011 Sentencing Transcript Excerpt ..............................G. App. 3

December 7, 2011 Sentencing Transcript Excerpt ............................G. App. 18

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 CR 888 | **DATE** | October 27, 2010 |
| **CASE TITLE** | UNITED STATES v. ROD BLAGOJEVICH | | |

**DOCKET ENTRY TEXT:**

Defendant's motion for judgment of acquittal, arrest of judgment or new trial [572] is denied.

---

### STATEMENT

   Defendant Rod Blagojevich filed a post-trial motion for judgment of acquittal, arrest of judgment, or new trial as to his conviction on Count 24. Defendant asserts that the evidence presented at trial demonstrated that he did not lie to the FBI, and moreover, that the alleged false statement was not material. Rather, defendant Rod Blagojevich argues that his conviction on Count 24 was obtained by the government as a result of an unfair trial, improper objections, and the prevention of the defense from engaging in meaningful cross examination. Defendant Rod Blagojevich's motion is denied.

   I address only those arguments in defendant Rod Blagojevich's post-trial motion which are developed in the motion itself, and I do not consider the objections and arguments which Defendant simply "adopts and incorporates by reference" without further specification or argument. The arguments made here are weak in themselves. Defendant's motion is founded in substantial part on the well-known principle that if a lawyer cannot attack the law or the facts in a criminal prosecution, the only recourse is to attack the prosecutor. One aspect of the case that makes it clear that the defense had no attack on the law or the facts with respect to Count 24 is that defense counsel did not, and correctly so, choose to attack the evidence of defendant's culpability of the offense for which he was found guilty.

   It is proper to allege two false statements in a single count and proper for the jury to find a violation of law if it is unanimous on the falsity of only one of the statements. *United States v. Kincaid*, 571 F.3d 648, 655-56 (7th Cir. 2009). There was no ambiguity in the statement. The statement clearly used the word "or" in a context when it means "and" – as in I did not do this or that. If Defendant had thought there was ambiguity, he could have requested that the jury be instructed to decide which individual clauses, if any, were to be found false. The suggestion that a verdict form requiring a separate jury finding as to each of the two alleged false statements was not opposed by defense counsel. That action signaled to the defense the possibility of asking to have each of the "or" clauses be similarly separated. Defense counsel did not ask for such separation because they knew the statement was not ambiguous.

G. App. 001

The defense complains that the evidence does not sustain the charge unless there was a transcript or recording of the statement.  This is not a requirement in any event, but here it was the defendant who refused the offer to have the interview recorded with equipment brought by the agent.

That defendant "Blagojevich does not track, or want to know, who contributes or how much they are contributing to him" was supported by many witnesses who testified to Defendant's personal knowledge of contributors and amounts. The statements to the FBI were, beyond dispute, material to the agency's investigation.

The complaint about sustained objections is wrong on principle since it assumes the trial judge has no power to control examination of witnesses.  In this case, defense counsel sought to use questions to convey information to the jury regardless of the answer.  It is the answer, not the question, that is given under oath. One example here is the question which asked an FBI agent whether "such and such a date was the first occasion you had to clarify and amplify the defendant's statements."  This question assumes a fact not in evidence, i.e., that there was a need to clarify or amplify, and any answer, either yes or no, implies that there was such a need; just like the question about when someone stopped beating his spouse.  The complaint is that I sustained many objections to defense questions, but there is no specific argument about why the objection was wrong.  More importantly, there was no offer of proof even when the witness was on the stand, and the offer could have easily been made.  Some defense counsel followed a path of asking questions that, based on previous rulings, they knew were objectionable.  Even then they made no showing of what the answer might be that would aid their case. There is no good legal reason to do this.  The tactical (and base) reasons to do so I do not recite here.

I do not find that there was prosecutorial misconduct during trial.  I do not pause to address the many details about defense counsel's out of court statements cited by the prosecutors to show that defense counsel are simply pots calling the kettle black.  If any of these allegations should be dealt with, this is not the time to do it.

The motion for judgment of acquittal, arrest of judgment or new trial is denied.

I will order a presentence investigation at an appropriate time.

49

 1  there might be.  There was, in fact, the person who

 2  said this on the witness stand, I don't recall

 3  cross-examination on this.  So what you've got is a

 4  series of recordings that are dominated by your

 5  client, and the possibility that on some issues the

 6  staff marched him along.  But there's no indication

 7  that on this issue they did, this is no indication

 8  with Harris how many times this happened.  So I

 9  don't know how much weight you can attach to that

10  one example, particularly when what you've got is

11  one example and one adviser.

12       At any rate, anything else you would like to

13  say?

14       MS. GURLAND:  Just in closing, that I believe

15  that some of the same information about being the

16  one who is calling the shots being a supervisor is

17  accounted for within 2C1.1 guideline because it does

18  punish the person who is in the supervisory role.

19       THE COURT:  Okay.

20       I think I'm ready to rule on the guideline

21  issue, and then we'll break for a while.

22       If you begin with the general structure of

23  the guidelines, you could read the guidelines, take

24  the position that you find out how much somebody

25  stole, or somebody took, and that's the value you

50

:02AM

:03AM

:03AM

:04AM

:04AM

1    attach to it.  And some people thought, at least in
2    the beginning, that was the beginning and end of the
3    guideline.  But it's not.  What somebody attempted
4    to get but didn't is significant.  This is why the
5    phrase "intended loss" counts.  And it's why if both
6    sides to an agreement in a transaction are guilty of
7    an offense and they have different views of what the
8    deal is going to be worth to them, these two people
9    who might be guilty in other sense will have
10   different guidelines, because one's intent may
11   differ from the others.
12        And there has been a theme, and this is an
13   issue in mitigation as opposed to a guideline issue,
14   that the defendant's sentence ought to be lesser
15   because he didn't get any money.  Got nothing to put
16   in his pocket.  To which the government makes a
17   response that it would have happened if we hadn't
18   intervened.  But it doesn't matter, the government
19   doesn't have to establish that.
20        The probation officer noted that the lack of
21   an actual exchange of benefit doesn't mean that no
22   levels could be added.  The Sentencing Commission
23   notes specifically says this, failure to complete an
24   offense does not necessarily lessen a defendant's
25   culpability.

1    So the probation officer, based on this

2  principle, accorded a benefit value of $125,000,

3  $25,000 with respect to Children's Memorial and

4  $100,000 with respect to the racetrack bill, these

5  numbers are supported by the record, and the fact

6  that Magoon might never have paid and Johnston might

7  never have paid does not stop them from being taken

8  into account.  And for purposes of this hearing, I

9  am assuming that neither of these two benefits would

10  have been paid.  That assumption may be

11  counterfactual.  I only assume it because under

12  ordinary circumstances you can't, and we don't know,

13  but I'm assuming it because it simplifies the

14  calculation.  In fact, the government of Illinois

15  had a significant power to inflict penalties on

16  those who did not pay, and maybe Johnston and Magoon

17  refused, but there's no way of knowing if for

18  example the government had not been conducting this

19  investigation that finally they may very well have

20  paid on the assumption that it was better to pay

21  than to suffer the consequences.  So the two

22  benefits are included despite my assumption that

23  they would not have been paid.

24    Some of the evaluations here with respect to

25  what was done would be extremely difficult to

:04AM

:05AM

:05AM

:05AM

:06AM

1  calculate.  The value of an appointment of another

2  person is a very different type of thing to evaluate

3  the value of an appointment to a seat in the United

4  States Senate, and on top of that the value various

:06AM  5  on the character of the candidate.  The exchange

6  rate with respect to the Senate proposals did differ

7  from person to person.  For one, the defendant would

8  receive legislative assistance in passing programs

9  into law, for another person the defendant would

:07AM  10  receive cabinet level or ambassadorial appointment,

11  or some employment for the defendant after he left

12  office.  I discount them because, in my view, they

13  fell by the wayside fairly quickly, but they were

14  alive for a while.

:07AM  15       For a third person the benefit was

16  contributions to the defendant's campaign finance

17  entities.  The defendant said he would receive 1 and

18  a half million dollars in exchange for that person's

19  appointment to the Senate.  There is evidence that

:07AM  20  that figure might have been much higher, but the

21  recorded voice of the defendant speaks only of

22  $1.5 million.  It is true, on occasion, the

23  defendant seemed to recognize that maybe that would

24  not occur, but that was the benefit he had in mind.

:07AM  25  And I don't think it calls for distinguishing

1 between hoped for, which is language that the

2 defense used, or believed in.  It was a price that

3 he put on it, a price he expected to receive.  It

4 was, in a very real sense when he said it, what he

5 regarded as the demand.  And if there had been more

6 evidence with respect to this, if his brother had

7 not apparently misunderstood the value of the offer,

8 it might have been more.

9        The probation officer believed that there was

10 no evidence that the defendant would receive this

11 money or thought he could receive such a sum.  I

12 disagree.  The persistence of the defendant in

13 pursuit of benefits wasn't successful but it was

14 pretty relentless.  And he spoke of his intent and

15 expectation that he would receive the benefits he

16 wanted, and there is plenty of evidence as to what

17 the Senate seat appointment could mean to him

18 personally.

19        The strongest evidence is the defendant's own

20 understanding of the $1.5 million was on the table

21 if he pointed a certain person to the Senate and

22 that is the figure that should be entered into the

23 calculation of offense levels.

24        Might it be less if he settled for something

25 less?  Sure.  Might he have gotten more?  Sure.  But

54

1   this is precisely the kind of area where you make a

2   reasonable valuation, and the reasonable valuation

3   in this case is based on his words.

4          And, in fact, I don't think that any other

5   deal was on the table.  I don't think he could

6   reasonably believe that any other deal was on offer

7   or would be an offer.  He hoped there might be

8   another, but the $1.5 million is the only amount he

9   could've intended to obtain.  The probation officer

10  did not accept this because of her conclusion that

11  the defendant had decided not to take it.  I think

12  this is incorrect.  It is based on the notion that

13  he would not have accepted the bribe because someone

14  else was his first choice.  Even if this were true,

15  it does not mean that the defendant had abandoned

16  someone who was a second choice.  There are a

17  variety of reasons this is so.  The demands for

18  legislative assistance in exchange for the Senate,

19  which were put into evidence at trial, were quite

20  extensive.  And he really had no indication at all

21  that the provider of this support would be willing

22  to agree to these demands or even consider them.

23  All the defendant had to go on were offers from

24  intermediaries who would try to broker a deal, but

25  they had no information as to whether their attempts

:09AM
:10AM
:10AM
:10AM
:11AM

1    would be successful or whether their attempts even

2    could be made.  And there is no indication that any

3    of them had any idea what the contours of that

4    proposal were.

5           They did not know whether the proposed

6    political leader would, in fact, provide legislative

7    support had any interest in any deal at all.  The

8    1.5 million was very much still on the table, and it

9    was the amount that the defendant expected to obtain

10   if he made the appointment expected by the donors.

11   And, in fact, it doesn't actually require that the

12   appointment be made.  All it required is that he got

13   the money and he could get the money and not make

14   the appointment, which meant that the fact that he

15   had a first choice and assuming that first choice

16   went through, it doesn't mean he's not going to get

17   the money.

18           And, in all honesty, I don't think the

19   evidence supports a conclusion that the proposed

20   choice was in fact his first choice.  It actually

21   points in the other direction.  It is true that the

22   defendant said so, but his actions don't back up his

23   word.  The proposal that he later deemed to be his

24   first choice is treated as an outlier, maybe even a

25   last choice from the very beginning accompanied when

:11AM
:11AM
:12AM
:12AM
:13AM

1  it was mentioned by extraordinarily unkind words, a

2  euphemism, for both Attorney General Madigan and her

3  father.  The idea that it was his first choice was

4  also compromised by a lawyer's comment that, quote,

5  "he was afraid of having the idea ejected."

6          The defendant did testify that the night

7  before he was arrested his thoughts before bed were

8  that tomorrow he would begin, and emphasized the

9  word "begin," his effort to make a deal to appoint

10  Lisa Madigan as the United States Senator.  I think

11  this is untrue.  I thought it was untrue when he

12  said it and I still think so.  I conclude that he

13  seized on this particular detail, particularly at

14  trial, because it was one of the few moves available

15  to him that may well have been legal, that is to say

16  appointing a qualified candidate for the Senate,

17  which the Attorney General of Illinois was, in

18  exchange for legislative votes for programs that

19  benefited the People of the State of Illinois as

20  opposed to putting money in his pocket or his

21  campaign fund.

22          And interestingly enough, the defendant

23  himself offers evidence that the Madigan deal was

24  not his first choice.  The defendant cites a

25  conversation between the two of the chief aides in

1    which they concluded that the defendant's first

2    choice was appointing himself, not the Madigan deal.

3    And, in fact, the defendant had stated, I believe on

4    the day before his arrest, that he was considering

5    appointing himself.  I don't think his assertion

6    that he was committed to his claim first choice is

7    credible.

8            And with respect to appointing himself, there

9    were some significant benefits to him for doing

10   this.  It was virtually the only thing that could

11   get him away from the resistance of the general

12   assembly on legislative matters and possibly that

13   things could degenerate to impeachment which would

14   be damaging ven if it were not successful.  He

15   indicated more than once how unhappy he was as

16   Governor, he said living with two more years of

17   legislative stalemate was, and I quote, "gonna be

18   miserable," he would have, if he went to the Senate,

19   almost 2 years to make a new political life and

20   reputation.  The only thing wrong with the plan is

21   that senators, in fact, make less money than

22   governor's of Illinois, nor do they have the help

23   and protection of large security details, which

24   makes me think that appointment of himself wasn't

25   his first choice either.

1    I can understand that by saying the Madigan

2  deal was his first choice he might have meant that,

3  in some respects, he considered it the best deal,

4  although I don't think this is true.  It is improper

:16AM    5  to conclude, as the probation officer did, that the

6  defendant considered it the only deal he would

7  accept, or the most likely deal, or even that it was

8  a deal.  The use of the phrase "first choice" by the

9  defendant did not have the meaning or significance

:16AM    10  that the probation officer assigned to it.

11    I think my conclusion in this is consistent

12  with the verdict of the jury.  The Presentence

13  Report is inconsistent with the jury's conclusions

14  as to what have been proved beyond a reasonable

:17AM    15  doubt, perhaps this is so because the officer was

16  convinced the defendant would, in fact, never

17  appoint the man who supporters were offering

18  campaign contributions, I reiterate maybe this is so

19  but it does not mean that he had resolved not to

:17AM    20  take the money, just that he resolved not make the

21  appointment.

22    I find that the offense level should be

23  increased not by 10 levels but by 16.

24    While this argument has been made with great

:17AM    25  vigor on both sides, the fact remains that it is

59

1  effectively moot.  The government says that the

2  guidelines of 30 years to life is too high, it's

3  inappropriate, it calls for a sentence which under

4  its own terms and under the terms of congressional

5  statute is far more than the defense justifies.

6  What, in fact, the government recommends is a

7  sentence that is essentially within the guideline

8  computed by the Probation Office, although on its

9  low end the government's recommendation is lower

10 than the minimum in that guideline, and at the high

11 end of the government's range is a sentence that is

12 a few months longer than the top of that guideline

13 range.  But, basically, we are talking about a

14 single guideline range.

15        And it should be noted that I agree with the

16 government, and with the defense for that matter,

17 that the guideline that I believe is correctly

18 computed for this, which is 30 years to life, is

19 simply not appropriate in the context of this case.

20        The more important difference, for practical

21 purposes -- oh, since the government has mentioned

22 it and it's a technical detail, I think the

23 government is correct in its objection to some of

24 the language in the Presentence Investigation

25 Report.  The PSR statement includes other statements

Case: 11-3853    Document: 99      Filed: 11/12/2013    Pages: 169

1    that should be qualified by stating that the

2    substance of these statements are what "the

3    defendant contends," this is true of all of the

4    examples listed at Pages 21 through 23 of the

5    government's sentencing memorandum except the

6    following which I designate by their place in the

7    PSR, those should be stricken in their entirety:

8    Page 11, lines 282 to 286, Page 18, lines 532 to

9    lines 534, Pages 18 lines 543 -- I'm sorry, 532 I

10   think through 534; Page 18, lines 543 to 544,

11   Page 19, line 585.

12          The more important debate between the two

13   parties, arguments between the two parties,

14   considering the government's position on its

15   recommendation, is the leader organizer, because

16   that's four points that do make a difference, a

17   meaningful difference.

18          The probation officer increased the offense

19   level by four because she found the defendant to

20   have been an organizer and leader of criminal

21   activity involved five or more participants or was

22   otherwise extensive.

23          Considering the number of the governor's

24   staff that were assisting in an effort to find a

25   place for the defendant to land and to secure

1  campaign contributions and the number of outside

2  consultants, his assistance, the defendant called

3  upon, and his own brother, the criminal activity

4  more than meets the standard of extensive criminal

5  activity, let alone the five-person number.

6        The purpose of this widespread effort was to

7  secure personal benefits to the defendant or his

8  spouse, both political and private spheres, all in

9  exchange for promise of official actions for the

10  Governor of Illinois.  His role as a leader is

11  clearly shown by his actions and not merely his

12  badge of office.

13        If John Harris were the Governor and the

14  defendant was the Chief of Staff recorded

15  conversations would demonstrate that Rod Blagojevich

16  was the leader and organizer, except of course the

17  benefits would have been flowing to the Chief of

18  Staff as opposed to the Governor.

19        The defense argument in this respect with its

20  fairly new argument that he was an easily

21  manipulated officeholder, it is not consistent with

22  what we heard on the recordings, for from the

23  testimony of the witnesses, or, for that matter,

24  what we heard from the defendant on the witness

25  stand.  Indeed, there was testimony that intimated

1  from several of the witnesses that they would rather
2  avoid talking to the Governor as opposed to
3  demanding a chance to whisper into his ear and guide
4  his actions.

5       He has said that his staff should have
6  stopped him in one way or another.  Frankly, based
7  on those tapes, I don't think he was an easy man to
8  stop.  He rattled on for a very long time, was
9  endlessly repetitive, and there is no question that
10  his tone of voice was demanding, he was not a
11  supplicant.

12       He did not testify that his ideas and goals
13  were planted in his mind.  Those I don't think he
14  could deny, they came from him.  I do believe that
15  it is absurd to contend that his staff and advisers
16  would devise criminal schemes whose only aim was to
17  benefit the defendant.  The plan to get $1 million a
18  year from a union did not include a cut for his
19  advisers, nor did any other idea contain a personal
20  reward for key aides.  He promised them nothing, he
21  was interested in himself.

22       There is no substance to the argument that
23  the defendant is receiving two separate
24  enhancements, one for leadership and the other for
25  holding the office of the Governor, the leader

:23AM
:23AM
:23AM
:24AM
:24AM

Case: 11-3853    Document: 99    Filed: 11/12/2013    Pages: 169

63

1  organizer enhancement of four levels was

2  appropriately done.

3        With that, we will take a recess of ten

4  minutes and begin again.

:25AM  5        That session may not last a particularly long

6  time because we will have a short lunch break.

7        Mr. Walker.

8        THE CLERK:  All rise.

9        This court is now in recess.

:25AM  10

11

12

13

14      (Luncheon recess taken from 11:35 o'clock a.m.

:29AM  15       to 12:35 o'clock p.m.)

16

17

18

19

20

21

22

23

24

:10AM  25

 1          THE COURT:  Please be seated in the
 2 courtroom.
 3          There are several things I have to say, some
 4 have to do with some remaining legal matters.  I
 5 intend to speak them, and then the last thing I do
 6 is, I'm going to ask the defendant to rise and I'm
 7 going to announce the sentence.
 8          One observation that was made in the very
 9 beginning was about general deterrence.  The
10 instance that was given to me by Ms. Gurland was
11 that say if the penalty for governmental corruption
12 was 5 years in prison, how many people out there
13 would actually engage in corruption if they knew
14 that they were going to spend 5 years in prison.
15          Probably very few.  Some who might think
16 5 years in prison is worth compiling a fortune that
17 they can spend after their release, but not many.
18 But the example is a flawed example, because a
19 5-year price for corruption is not inevitable.
20          Some are never caught.  And then to cite a
21 not so hypothetical example, after they die, huge
22 amounts of cash are found in their closets.  If you
23 think you're not going to get caught, you do it.
24          The problem with deterrence always is that
25 you have not only the price to be paid if you are

:00PM

:00PM

:01PM

:01PM

:02PM

1  caught, but the chances of your being caught.  And

2  while economists know how to discount this

3  probability, we don't have reliable statistics on

4  the good way to do it.  If you are a corrupt public

:02PM 5  official and you are an optimist, there's a much

6  better chance you're going to do it than if you're a

7  pessimist.

8        So the issue of who would trade 5 years in

9  prison to be corrupt is 10 to 20 years, whatever the

:02PM 10  figure is, is not the question that we are supposed

11  to ask.

12        A brief comment on the guidelines in this

13  case.  The official guideline is 30 years to life,

14  360 months to life.  The government thinks that that

:03PM 15  guideline is inappropriate.  I agree.

16        The guideline they propose is 180 months to

17  240 months, which is, practically, the same as the

18  one the probation officer fixed, which is 188 months

19  to 235 months.  So I'm regarding the 188 to 235 as

:03PM 20  the effective guideline in this case.

21        I don't think that the defendant is going to

22  object to the proposition that they don't want to

23  accept that the government's opinion that it should

24  be lower than 360 to life.  They, of course, would

:04PM 25  like it to be a lot lower than 188 to 235, but, on

1 | that, I have not sustained their position.

2 | There is an issue that has arisen in light of

3 | the allocution, and that is whether the guideline

4 | should be affected by application of acceptance of

5 | responsibility, and the defendant did use the word

6 | acceptance of responsibility.

7 | The rule in the guidelines says, and I quote:

8 | "This adjustment is not intended to apply to a

9 | defendant who puts the government to its burden

10 | of proof at trial by denying the essential

11 | factual elements of guilt if he's convicted,

12 | and only then admits guilt and expresses

13 | remorse ...."

14 | the general policy.

15 | The note also goes on to say that:

16 | "... conviction by trial, however, does not

17 | automatically preclude a defendant from

18 | consideration for such a reduction.  In rare

19 | situations, a defendant may clearly demonstrate

20 | acceptance of responsibility for his criminal

21 | conduct even though he exercise his

22 | Constitutional right to a trial ...."

23 | So the issue is is whether this case falls

24 | within two categories:  One, that what he did

25 | constitutes acceptance of responsibility, and, two,

1  whether or not it comes too late.

2       The first, and by far the single most

3  important act that constitutes acceptance of

4  responsibility, is truthfully admitting the conduct

:06PM    5  comprising the offense of conviction.

6       And this presents, because the facts of this

7  case, an interesting point of judgment, because the

8  vast majority of facts in this case were not

9  disputed.

:06PM    10      It's very difficult to dispute what was on

11  the recordings.  And there was no contention that

12  the recordings had been tampered with.  So,

13  basically, the only way the defendant could -- let

14  me correct that.  The only way the defendant could

:07PM    15  deal with this, for the most part, for the far

16  greater part, is to say:  Yes, I said all of these

17  things, I'm not denying it, but I didn't mean it.  I

18  didn't want these people to do what they thought I

19  meant.  And, also that, to the extent I meant it, I

:07PM    20  was maneuvered by my assistance, it was not really

21  my will.

22      So the crucial facts in this case are whether

23  he meant what did happen and whether the

24  responsibility is less his than those of people who

:08PM    25  were around him.

247

1          The second one, in many respects, is more
2   important because that's what acceptance of
3   responsibility means.
4          I believe that he did, in fact, accept the
5   proposition that what he asked these people to do
6   was, in large part, if not entirely, what they did.
7   And it's quite clear that he's not blaming them for
8   doing it.
9          So the first requisite of acceptance of
10  responsibility truthfully admitting the conduct that
11  in this particular case apprises the offenses of
12  conviction, the single exception of Count 24.  That,
13  however, does not end the matter.  There is one
14  negative, and that is one of the things that is a
15  factor is voluntary resignation from the office of
16  the position held during the commission of the
17  offense, that's a negative on his side.
18          The more important factor is is that it comes
19  late.  And is there a reason for this not to bar his
20  acceptance of responsibility?  And, I think, in this
21  particular case, there is a reason, and that had to
22  do with his position.
23          It's an awful Hill to climb as Governor to
24  admit this.  And bear in mind, most acceptance of
25  responsibility issues arise in cases where there's

:08PM

:09PM

:09PM

:10PM

:10PM

1  absolutely no one in the courtroom and no one in the
2  public, as a whole, present, maybe some family
3  members, when the defendant makes an attempt to
4  accept responsibility.  The world doesn't care.  And
5  in a lot of those cases, I have noticed that
6  frequently the family doesn't show up because the
7  person who is accepting responsibility doesn't want
8  to do it in front of them.

9           And I think in this particular case, his
10 particular status as the Governor and an extremely
11 well-known public figure, made it so difficult for
12 him to do so that this rationally explains his delay
13 in doing it.

14          The reason, incidentally, I am according him
15 this benefit from his holding the office of Governor
16 is because, in some respects, his holding the office
17 of Governor, in fact in many respects, holding the
18 office of Governor is responsible for some of the
19 things I'm going to say and for the sentence I will
20 ultimately impose, because abuse of the office of
21 Governor, as I will mention briefly, is more
22 damaging than the abuse of any other office in the
23 United States except president.

24          So I am giving him the 2 points for
25 acceptance of responsibility, which means that, for

:10PM

:11PM

:11PM

:11PM

:12PM

1  my purposes, the effective guideline is 151 months

2  to 188 months.

3       Having said that, I have some comments on the

4  defense position.  There was a persistent reference

5  to statements made to the defendant from which

6  during trial he claimed he could infer that his acts

7  were not illegal.

8       And as I said before, he did manage to

9  present this claim to the jury even though he had no

10  advice of counsel defense.  He could not make a

11  legitimate advice of counsel defense because he

12  never gave enough details for a lawyer to give

13  competent advise and he did not ask for legal

14  advice.  He asked, essentially, the same kinds of

15  questions to non-lawyers, which is a pretty good

16  indication that he wasn't seeking legal advice.

17       He asked if something was okay.  Tactical

18  advice is what he sought, not legal advice.  He did

19  pronounce, on a few occasions, that what he did had

20  to be legal, but none of it was focused on any

21  particular issue.

22       He never asked if something, some specific

23  plan was legal at a pertinent time.  I don't recall

24  a single instance in which he specifically asked a

25  lawyer if something was legal.  A simple question

250

1  which he, a lawyer, knew would cause a lawyer to

2  ask, in turn, "what exactly do you intend to do?"

3         The lawyer defendant in this case understood

4  that he did not want to ask the question "is it

5  legal," because the answer might stop some of the

6  schemes in their tracks.

7         A few of his plans may, arguably, have been

8  legal.  The ones he was convicted of were not.  In

9  the end, his defense morphed into a claim that he

10  did not believe his proposals were "quid pro quo,"

11  which he did know was an illegal exchange.  The jury

12  did not believe him and neither do I.

13         It's true that one adviser once said that

14  they did lead the Governor to take certain steps;

15  Harris said so.  If that's asked as a general

16  question to any governor's Chief of Staff, and I've

17  known a few, or general counsel, and I've known a

18  few of them, too, I doubt that there is any one of

19  them who will tell you that they never did that from

20  time to time, but this is not the situation here.

21         The Governor was not marched along this

22  criminal path by his staff.  He marched them and

23  ruined a few of their careers, and, more than that,

24  in the process, except for his brother, and that

25  recently he seems not to have noticed this.

1          He was told by Harris and Quinlan that he

2     should not deal for any personal benefit, not even

3     joke about it.  He denies hearing this or perhaps

4     denies remembering it, but I'm sure he did hear it,

5     and I believe he ignored it because it was

6     inconsistent with one of his primary goals.  Having

7     heard that is one reason I believe he decided never

8     to ask for a lawyer's opinion on his scheme.

9          He talks about his schemes as, I think the

10    word is "lengthy musings," I think that's the word

11    he uses in one of his briefs.  So he asked the jury

12    and now me to believe that he made the phone calls

13    and arranged meetings with others so that they could

14    hear his musings.  "Musings" are the kinds of

15    statements made when somebody wanders into your

16    office maybe at the end of the day and you and your

17    staff have exchanged idle thoughts and speculations.

18    Musings are talks without purpose, not the material

19    of arranged meetings and repeated phone calls.

20         The jury, and I, did not believe these were

21    musings.  I do accept his apology for the position

22    he took in his testimony in assigning responsibility

23    for his acts to others.  He probably should have

24    named more people than he did, but I suspect he may

25    very well regret the fate of others.

1    Every Governor, even our worst, helps someone
2  and does good things for people.  You never actually
3  know whether that comes from personal commitment or
4  from a calculation of political benefit.  In my
5  calculus, it doesn't matter.  If something is good,
6  it's good regardless of why it was done.

7    I do also believe that what he did for
8  children's health was motivated by a true concern
9  for the welfare of children and these actions, in my
10 mind, a mitigating factor.

11   I'm about to say some things, and before I
12 say them I want to tell you that they remind me of a
13 maxim known by many lawyers, doctors, reporters,
14 editors, and judges:  pretty much we all know how to
15 be kind to people, and pretty much we all know how
16 to tell the truth, but very few of us know, and I
17 don't, that there are some times when you cannot do
18 both at the same time.

19   The letter submitted to me by the defendant
20 tend to emphasize his devotion to his children, a
21 couple to children, in general.  I don't doubt his
22 devotion to children.  But this is not an unusual
23 situation.  Counsel for the defense said this is
24 exceptional.  It is not exceptional, it's not
25 exceptional in my own experience.  I see case after

:18PM
:18PM
:18PM
:19PM
:19PM

1   case where good fathers are also bad citizens and

2   wind up in jail.  There is no question that the

3   innocent children of felons suffer, and I am

4   sympathetic to the plight the defendant's children

5   have endured over the last 3 years.

6           And this is tragic, but, as he admits, the

7   fault for this lies with the defendant alone.  Why

8   did the devotion as a father not deter him from

9   engaging in such reckless conduct.

10          I know the thoughts of children weigh heavily

11  on his mind as he faces punishment, but now it is

12  too late.  The same thought should have stopped him

13  from even approaching the line that divides lawful

14  from criminal.  If it is any consolation to his

15  children, he does not stand convicted of being a bad

16  father.

17          The fact is, the defendant did not want to

18  take the risk for being told that a particular plan

19  was illegal.  So he did not ask for legal research

20  to be done, nor did he do it on his own.  Instead,

21  he preserved his ability to claim that he did not

22  know that something was a crime.  In effect, he

23  allowed his family to assume a different risk, the

24  one that he would be caught and convicted.

25          Some of these letters discuss the good things

1  the defendant has done, most of them are from people

2  who personally benefited from acts and specific

3  favors conferred by the government, and, in some

4  cases, by the General Assembly.

5          Their gratitude is actually reasonable and

6  appropriate, but the request for exceptional

7  leniency are based on the idea that someone who does

8  good things cannot also do bad things or that the

9  good directly offsets the bad.

10         Very few criminals are all bad.  Many are

11 decent spouses, parents, family members, good

12 friends, sometimes good employees.  But in a

13 criminal court, the judgments are made upon the

14 criminal acts, usual the worse things that the

15 accused has done.  Good works do not offset criminal

16 misconduct, though they may mitigate it.  If this

17 were not so, there would be a great moral hazard, a

18 criminal might decide that if he does enough good

19 deeds, he will get a pass on his criminal conduct.

20         We see this, occasionally, in cases of

21 criminal gangs who build basketball courts for the

22 community and contribute in other ways.  It's not

23 enough.

24         Whatever good things you did for people as

25 Governor, and you did do some, I am more concerned

1 with the occasions when you wanted to use your
2 powers to do things that were good only for
3 yourself.
4        Some of the letters, I have to say,
5 particularly some of those from people who held
6 highly responsible positions in life, fall into a
7 category properly described in an old phrase seldom
8 used these days, and I quite, "damning with faint
9 praise."  They speak about specific instances where
10 something exemplary was done, or character traits
11 they admire, without ever endorsing your general
12 character.
13        There are letters from people who have known
14 you for a very long time.  I have found them
15 thoughtful in the description of some of your
16 characteristics as a child and an adult.  These
17 views suggests that your personality may not be
18 entirely suitable for public service.  Much of what
19 I heard in the recordings and both heard and saw in
20 your testimony support this view, some unfortunate
21 elements of immaturity.  The willingness to admit,
22 even to yourself, that you have done something
23 seriously wrong until you are forced to do so,
24 blaming others for your misconducts, the impatience,
25 the endless talking, the lack of focus, and the need

256

1  for praise and plaudits say from people whose

2  grandmothers got a free ride on the free bus.

3        And, in all honesty, this observation is not

4  very different from a mitigation argument offered by

5  your own lawyers.  One theme from the defense is

6  that you were just the person who got elected, did

7  not know how to pick the right staff, were unable to

8  see that the staff was leading you down the wrong

9  path.  They're not traits suitable for a Governor.

10        I have called you Governor when I spoke to

11  you.  Your own lawyers don't, the government

12  doesn't.  By protocol you are entitled to that

13  honorific if, for no other reason, you won election

14  as Governor twice.  But I also do it because it

15  serves as a reminder to those of us who vote and

16  those of us who don't.  It reminds the voters of the

17  maxim the American people always get precisely the

18  government that they deserve.  Your case is another

19  lesson for us.

20        I'm going to comment also on the way you

21  responded to the indictment.  Although, I have to

22  tell you that I accept your apology.  I think you

23  understand how wrong it was, but at the time you

24  thought it was appropriate to reduce this case to a

25  personal battle, much like a political campaign

:23PM
:24PM
:24PM
:24PM
:25PM

1  between you and the prosecutor in this district.

2      To you this case was not to be decided on

3  admissible evidence by an impartial jury, but on the

4  public perception of the deeds and personalities of

5  yourself and the prosecutor.

6      In a political campaign contribution, this

7  tactic had a great benefit for you because you faced

8  the prosecutor who could not speak publicly after

9  the first statements when the indictment was

10 announced.  So you are campaigning against somebody

11 who could not put up his own billboards and give his

12 own interviews.  You sought to lead the general

13 public for whom the jury would be drawn to think

14 better of you than they think of the prosecutor.

15     And the general public really has no

16 obligation to be impartial in an election or even to

17 pay any attention to a political contest.  The jury,

18 though, does have an obligation of impartiality,

19 does have to pay attention to the evidence, and

20 decide on the basis of the evidence, not on emotion

21 nor personal preference.

22     These were foolish and unworthy tactics in

23 treating the charges as you did.  And the reason I

24 mention it now is it evinced a disrespect for our

25 citizens, Illinoisans all, called to serve as

:25PM

:25PM

:26PM

:26PM

:26PM

1  jurors.

2         I cannot comprehend that you seem to argue at

3  first, and I think even underline the argument, the

4  proposition that even if guilty, there was no harm

5  to Illinois.  This is not the kind of case where,

6  for example, a state employee plans to break into

7  CMS.  For those of you who are not familiar with

8  Illinois government, it's the Central Management

9  Services.  Seeks to break into a CMS garage to steal

10  state-owned vehicles and is foiled before he can use

11  his bolt cutter on the lock.  There is no monetary

12  loss to the government.  The harm here is not

13  measured in the value of money or property.  The

14  government makes an argument that, in fact, people

15  were harmed monetarily.  They make that argument,

16  which I think is a valid one, almost as an

17  afterthought, because the government's position, and

18  I think the position that ought to be everyone's

19  position, is not how you measure what happened here

20  in the value of money or property.  This is one of

21  the principal reasons why the original guideline 360

22  to life was just not appropriate.  Able of loss

23  really did not encompass the real damage in this

24  case.  The harm is the erosion of public trust in

25  government.

1          In your argument, your attorneys rightly

2   agree that the financial harm is not the full

3   measure of damage.  Confidence in and trust of

4   government is diminished.

5          If confidence in the integrity of the highest

6   ranking officer of the state, a sovereign officer,

7   is lost or diminished, things will get worse and not

8   better.

9          In the United States we don't much govern at

10  gunpoint.  We require willing and creative

11  cooperation and participation to prosper as a civil

12  society.  This happens most easily when people trust

13  the person at the top to do the right thing most of

14  the time and, more important than that, to try to do

15  it all of the time.

16         If a state Senator takes a bribe, that's one

17  person out of 59, even if a lesser state-wide

18  officer can go bad, people accept and move on

19  without much worry.  You are not to be compared with

20  those who hold lesser positions in government, even,

21  for example, the head of a major co-department in

22  the State of Illinois.

23         You, as the Governor, are seen to control all

24  of them, though I can see, in practice, you don't.

25  You are seen to control what happens.  The image of

260

1  corruption in a Governor seeps into the fabric of
2  nearly all of them.  When it is the Governor who
3  goes bad, the fabric of Illinois is torn and
4  disfigured and not easily or quickly repaired.  You
5  did that damage.
6           Sentence:  On counts 3, 5 through 13, 15 to
7  17, 21 and 23, 168 months in the custody of the
8  Bureau of Prisons.
9           On counts 18, 23, 60 months in the custody of
10 the Bureau of Prisons.
11          On Count 24, 36 months in the custody of the
12 Bureau of Prisons.
13          All of these sentences are to run
14 concurrently.  These are to be followed by a period
15 of supervised release of 2 years, and I believe on
16 all counts they are to run concurrent, as well.
17          Within 72 hours of your release from custody,
18 you will report to the Probation Office in the
19 district where you are released.  The standard
20 conditions of this court will apply under those
21 circumstances.  Although, I think it is unnecessary,
22 I have to order standard drug testing, random drug
23 testing not to concede 104 tests per year.
24          You will have to submit to a DNA test, if
25 ordered.  You may not possess a firearm or other

:30PM
:30PM
:30PM
:31PM
:31PM

1    destructive device while on supervised release.

2          You may not commit a crime under the law of

3    any jurisdiction, state, municipal or federal.

4          I am imposing a fine on of $20,000.  If the

:32PM    5    payment has not been made by the time you have been

6    released, you shall pay the fine in installment

7    payments that are at least 10 percent of your

8    monthly income.

9          This is a case in which the nature of the

:32PM    10   charges and the proof does not justify restitution.

11   I regard restitution as inapplicable in this case.

12         There's a special assessment of $100 for each

13   count, that is an assessment of $1,800.

14         With that, I want the defendant and counsel

:32PM    15   to come to the lectern.

16      (Brief pause).

17         THE COURT:  First I want to inform the

18   defendant that you have the right to appeal both the

19   convictions and the sentence.  If you want to do so,

:33PM    20   speak with your lawyer, they'll tell you how to go

21   about doing it.

22         Surrender date?

23         MS. GURLAND:  Your Honor, what we had spoken

24   about is a request for February 15th, which is I

:33PM    25   think about 60 days.

262

1          THE COURT:  Yes, it has to be at least

2    42 days out because they won't be able to designate

3    by then.  February 15th is fine.

4          MR. SOROSKY:  Could we make it the 16th?

:33PM    5          THE COURT:  Sure.

6          MS. GURLAND:  And there's a couple of other

7    housekeeping things, Your Honor.  Because of the

8    uncertainty about whether defense would be above or

9    below the -- what I understand to be the 10-year cut

:34PM   10    off for the designation of camp versus low, we would

11    like Your Honor to make a recommendation, but if we

12    could have a little bit of time to think about what

13    that recommendation would be, we would very much

14    appreciate it.

:34PM   15          THE COURT:  I'm likely to agree with that.

16    You can have the time.  What time do you want?

17          MS. GURLAND:  When would you like us to get

18    back to you?  Could we get back to you tomorrow?

19          MR. SOROSKY:  Could we make it Friday?  Is

:34PM   20    Friday okay?

21          THE COURT:  Friday is fine.

22          Anything from the government.

23          MR. SCHAR:  Judge, several things.

24          We have a special assessment in the fine, in

:34PM   25    legal language, do you want it payable immediately

Case: 11-3853    Document: 99    Filed: 11/12/2013    Pages: 169

1 with the additional understanding --

2          THE COURT:  Yeah, it is due and payable

3 immediately.

4          MR. SOROSKY:  Could we have pay that Friday?

5          THE COURT:  $1800, Friday is fine.

6          MR. SCHAR:  And the $20,000?

7          THE COURT:  $20,000 is an issue that we have

8 to determine later if there's an obvious inability

9 to pay it.

10          MR. SCHAR:  I think there are two counts

11 remaining.  We move to dismiss those two remaining

12 counts.  There were two hung counts.

13          THE COURT:  I remember that.  Do you remember

14 the number of the counts?

15          MR. SCHAR:  I'll get them to you.

16          THE COURT:  That will be fine.

17          MR. SCHAR:  And just for record purposes,

18 Judge, assuming even if for some reason there was an

19 error in the guidelines, your sentence will be as it

20 is today.

21          THE COURT:  My sentence would be as it is

22 today.

23          MR. SCHAR:  And although you have not hit on

24 every single mitigation argument, because obviously

25 there were many, you have taken them all into

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2013, I electronically filed the foregoing Brief and Appendix of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

By:  /s/ Debra Riggs Bonamici
   DEBRA RIGGS BONAMICI
   Assistant United States Attorney
   219 South Dearborn Street, 5th Floor
   Chicago, Illinois
   (312) 353-3741