No. 11-3853

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **) Appeal from the United States** |
| | **) District Court for the** |
| **Plaintiff-Appellee,** | **) Northern District of Illinois,** |
| | **)** |
| **vs.** | **)** |
| | **)      No. 08 CR 888** |
| **ROD BLAGOJEVICH,** | **)** |
| | **) Honorable James B. Zagel** |
| **Defendant-Appellant.** | **) Judge Presiding.** |

---

## REPLY BRIEF FOR DEFENDANT-APPELLANT
## ROD BLAGOJEVICH

---

Leonard C. Goodman
Len Goodman Law Office LLC
53 West Jackson Blvd.
Suite 1650
Chicago, IL 60604
(312) 986-1984

Lauren Kaeseberg
158 W. Erie
Chicago, IL 60654
(773) 517-0622

*Attorneys for Defendant-Appellant Rod Blagojevich*

# TABLE OF CONTENTS

I.     THE EVIDENCE WAS INSUFFICIENT UNDER PROPER PRINCIPLES OF
       LAW TO PROVE ANY OF THE COUNTS OF CONVICTION.. . . . . . . . . . . . 1

A.     Appointment of Valerie Jarrett as a Senator.. . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.     The alleged scheme to trade the Senate seat to Jesse Jackson, Jr., in exchange for
       campaign contributions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C.     The alleged attempt to extort campaign contributions from Patrick Magoon. . . . . . . . . . 6

D.     The alleged attempt to extort campaign contributions from John Johnston.. . . . . . . . . . . 7

II.    THE JURY WAS MISLED AS TO THE LAW FOR FRAUD, EXTORTION AND
       BRIBERY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A.     There was no legal basis to instruct the jury that an arm's length exchange of an official
       act for a public service job is a federal crime.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B.     The extortion instructions were defective for failing to require proof that Blagojevich's
       solicitations of campaign contributions were "made in return for an explicit promise" to
       perform an official act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.     The government exploited the deficient instructions to mislead the jury.. . . . . . . . . . . . 10

III.   THE LOWER COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING
       BLAGOJEVICH'S GOOD FAITH DEFENSE AND BY MIS-INSTRUCTING THE
       JURY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A.     The lower court committed constitutional error in taking away Blagojevich's good faith
       defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B.     The court's revised "good faith" instruction to the jury misstated the law and sealed
       Blagojevich's fate.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.    THE LOWER COURT ERRED IN EXCLUDING CROSS-EXAMINATION OF
       GOVERNMENT WITNESSES AS TO THEIR BIAS.. . . . . . . . . . . . . . . . . . . . . . 15

V.     THE LOWER COURT'S ONE-SIDED AND ERRONEOUS EVIDENTIARY RULINGS
       PREJUDICED THE DEFENDANT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A.     The court erred in excluding nearly all of the tape recordings offered by the defense.. . . 18

i

B. Erroneous rulings relating to advice of counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI. BLAGOJEVICH'S FALSE STATEMENTS CONVICTION FROM HIS FIRST TRIAL MUST BE OVERTURNED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A. Blagojevich's answer to the ambiguous question about whether he "tracked" campaign contributors was insufficient as a matter of law to support the conviction... . . . . . . . . . . 22

B. The Court improperly excluded evidence to provide the jury with necessary context.. . . 23

VII. THE TRIAL COURT ERRED IN REFUSING TO STRIKE BIASED JUROR.. . . . . . . 24

VIII. THE DEFENDANT'S 168-MONTH SENTENCE MUST BE VACATED WHERE THE LOWER COURT ERRONEOUSLY APPLIED THE GUIDELINES.. . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## CASES

*Bryan v. United States*, 524 U.S. 184 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cheek v. United States*, 498 U.S. 192 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Evans v. United States*, 504 U.S. 255 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gray v. Mississippi*, 481 U.S. 648 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Griffin v. United States*, 502 U.S. 46 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McCormick v. United States*, 500 U.S. 257 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Reynolds v. United States*, 98 U.S. 145 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sekhar v. United States*, 133 S. Ct. 2720 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . 24

*United States v. Allen*, 605 F.3d 461 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Black,* 625 F.3d 386 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Bryant*, 655 F.3d 232 (3rd Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Giles,* 246 F.3d 966 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*United States v. Gladdish*, 536 F.3d 646 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Green*, 350 U.S. 415, 420 (1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Joshua*, 648 F.3d 547 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. LeDonne*, 21 F.3d 1418 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 13

*United State v. Leonard-Allen*, 2013 WL 4573140 (7th Cir. 2013). . . . . . . . . . . . . . . . . 19

*United States v. Martin*, 195 F.3d 961 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. McGregor*, 879 F. Supp. 2d 1308 (M.D. Ala. 2012). . . . . . . . . . . . . . 7, 14

*United States v. Richards,* 719 F.3d 746 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Turner*, 651 F.3d 743 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Yasak*, 884 F.2d 996 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES AND OTHER AUTHORITY

18 U.S.C. § 3553(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S.S.G. § 5K1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Seventh Circuit Pattern Criminal Jury Instruction 18 U.S.C. § 666(c) BONA FIDE
COMPENSATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Seventh Circuit Pattern Criminal Jury Instruction 18 U.S.C. §§ 1341, 1343 & 1346
RECEIVING A BRIBE OR KICKBACK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**ARGUMENT**

I.     **THE EVIDENCE WAS INSUFFICIENT UNDER PROPER PRINCIPLES OF LAW TO PROVE ANY OF THE COUNTS OF CONVICTION.**

A.     **Appointment of Valerie Jarrett as a Senator.**

The government does not dispute that a deal between two politicians to exchange appointments, such as the deal Blagojevich sought with President-elect Obama, has never before been prosecuted as a federal crime. No similar case precedent has been cited. Instead, the government cites *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), and *United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012), where this Court found that jobs are "property" for purposes of federal fraud statutes. Govt. Br., at 36-37. However, *Sorich* and *Del Valle* do not involve political deal-making or an exchange of an official act for a job. Rather, they involve public officials who award jobs to political patrons and defraud the entity offering the jobs by falsely claiming to be filling the jobs with the best qualified candidates. These cases thus do not support the government's position that Blagojevich's proposed deal was a federal crime.

Next, the government points to cases such as *United States v. Martin*, 195 F.3d 961 (7th Cir. 1999), and *United States v. Bryant*, 655 F.3d 232 (3rd Cir. 2011), where political officials have been convicted of bribery for accepting employment from a private firm in exchange for favorable treatment of that firm. Govt. Br., at 37. These cases have little in common with Blagojevich's alleged crimes. *Martin* and *Bryant* involve clear abuses of public office -- trading favorable treatment of a private, for-profit firm for private gain. The

evidence against Blagojevich showed his proposed deal to be political -- trading the appointment of Obama's choice for the Senate for a place in the Obama Administration where he could continue his work reforming health care. No rational jury, properly instructed, would find that this was a corrupt deal, designed for private gain.

The government argues that Blagojevich "offers no legal authority" for his "claim ... that presidential appointments and 'public service jobs' are exempt from federal fraud, bribery, and extortion prohibitions." Govt. Br., at 54. This argument should be rejected for two reasons. First, it is undisputed that Blagojevich is the first elected official in this country to be prosecuted for trying to make a political deal with another elected official involving an exchange of political appointments. Under these circumstances, the burden should not be on Blagojevich to prove his proposed deal was not criminal.

Second, Blagojevich has cited legal authority. In *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), this Court rejected the government's argument that a raise in salary for a *public* employee was a "private gain" under federal fraud statutes. The government argues that while Ms. Thompson's actions in awarding the travel contract to a political ally of her boss "were designed to pursue the public interest as she understood it", Blagojevich's primary interest in making the appointment "was what he could personally get in return ...." Govt. Br., at 42. But the tapes played at trial clearly show that Blagojevich was pursuing public interest as he understood it, the same as Ms. Thompson. In his private conversations, Blagojevich expressed his sincere belief that his own appointment to a post such as HHS

would serve the public interest due to his unique qualifications to advocate for health care expansion as he had done in Illinois. Tr. 1358, 1466, 2224, 3462-64, 4135, 4285. The mere fact that in private conversations he expressed his desire to support his family does not separate him from Ms. Thompson or from any other public servant.

Blagojevich also cites *Sekhar v. United States*, 133 S. Ct. 2720 (2013), where the Court held that the object of an extortion must be transferable property. The government erroneously argues that the jobs sought by Blagojevich "clearly are transferable ...." Govt. Br., at 53. While a make-work job for a private firm might be deemed "transferable," a cabinet position such as HHS, which requires Senate confirmation, surely is not.

Further, this Court's current pattern jury instruction for bribery states that "bona fide salary [or] wages ... [do] not qualify as a thing of value [solicited or demanded] ... by the defendant." Seventh Circuit Pattern Criminal Jury Instruction 18 U.S.C. § 666(c) BONA FIDE COMPENSATION. In the case at bar, Blagojevich sought nothing more than the bona fide wages associated with a public service job in exchange for the appointment of Valerie Jarrett.

The government alternatively argues that, even if the proposed deal for the cabinet job was political, Blagojevich's discussions about using the Senate appointment to set up a "501(c)(4)" was "clearly and unambiguously ... directed at obtaining money—not a political appointment or public service job—in exchange for an official act." Govt. Br., at 38. This argument should be rejected for several reasons.

First, Blagojevich's idea for a 501(c)(4) was not clearly and unambiguously non-political, as the government suggests. Quite to the contrary, the evidence shows he wanted to establish a not-for-profit to "help [him] push" health care expansion "at the federal level which helps us in Illinois" (Tr. 1800); and to "advocate children's healthcare" which was a top priority of his Administration. Tr. 1909. These are political policy goals and not private gain.

Second, the jury was clearly and unambiguously told that any deal for any job that earns a salary is criminal. Tr. 5278, 5499, 5551. No distinction was ever made between public service job and foundation job. And the evidence was much stronger that Blagojevich actually attempted to exchange the seat for a cabinet job as opposed to the 501(c)(4) position. The evidence related to the later was more theory than action. E.g., Tr. 1836 ("What do you think about that concept, that idea?"); Tr. 1911 ("How do you make a deal like that? I mean, it's got to be legal, obviously, but it's very commonplace, is it not, doing things like this."). Where the evidence suggests the jury convicted on an improper theory, the conviction must be overturned notwithstanding alternate theories. See *e.g., Griffin v. United States*, 502 U.S. 46 (1991); *United States v. Black,* 625 F.3d 386 (7th Cir. 2010).

In its brief, the government erroneously asserts that Blagojevich sought to keep "control" over the funds in his imagined 501(c)(4). Govt. Br., at 7. In support of this claim, the government cites GX 36. But there is nothing in this or any conversation suggesting that Blagojevich wanted control over the funds donated to his imagined organization. The

-4-

government's assertion is apparently based on Blagojevich's comment to Balanoff that the 501(c)(4) would be "run by people we trust."  *Id.*, at 6.

Finally, the government argues that Blagojevich's proposed deal to appoint Ms. Jarrett was not an "arms length exchange" because Blagojevich "misled the public regarding his process for selecting a new Senator ...."  Govt. Br., at 43.  "Arms length exchange" means Blagojevich did not try to trick his negotiating partner, Obama, into giving him a cabinet job on false pretenses.  The fact that Blagojevich did not tell the press about all of his private negotiations over the Senate seat is irrelevant.  Alternatively, the government argues that Blagojevich did try "to mislead and manipulate Balanoff and Obama (GX 7)."  Govt. Br., at 43.  The cited evidence, GX 7, is a November 3 conversation in which Blagojevich and John Harris discuss negotiating strategy.  There is no discussion in this call about trying to defraud Obama.

## B.     The alleged scheme to trade the Senate seat to Jesse Jackson, Jr., in exchange for campaign contributions.

The government attempts to distinguish *United States v. Gladdish*, 536 F.3d 646 (7th Cir. 2008), on grounds that Blagojevich "took a substantial step toward accepting the bribe from Nayak when he told his brother to meet with Nayak and tell Nayak that he would need to begin performing in order for the appointment to be made."  Govt. Br., at 46.  This argument is unsupported by any citation to the record and is in fact a distortion of the evidence.  Blagojevich never told his brother to tell Nayak that he would need to begin performing *in order for the appointment to be made*.  Rather, Blagojevich said to tell Nayak

that Jackson Jr. was "very much real realistic" and that "some of this stuff's got to start happening now."  Tr. 2135, 4538.  Blagojevich's message to Nayak was identical to the message delivered to many persons seeking a political appointment to a position such as the ambassadorship to a European country – 'no promises can be made but if you show support for the president (ie., raise funds) you will be a realistic candidate for this appointment.' Blagojevich's message to Nayak was a lawful message.

**C.      The alleged attempt to extort campaign contributions from Patrick Magoon.**

The government argues that it introduced evidence that an "implicit threat" was delivered to Magoon "that, unless he produced the requested fundraising by January 1, 2009, the increase would not take effect."  Govt. Br., at 48.  But, as pointed out in our opening brief, what Magoon interpreted as a threat was in fact an innocent comment by Robert Blagojevich relating to the fundraising deadline imposed by the new State ethics bill.  Other than this innocent comment, misinterpreted by Magoon, there was no evidence that any threatening message was ever delivered to Magoon.

The government does not dispute the fact that Robert Blagojevich's comment about the January 1 deadline was indeed a reference to the legislative deadline and was not intended as a threat.    Rather, the government argues that the issue of Magoon's misinterpretation of the message is "unavailing on appeal [because] the jury was entitled to, and did, make the necessary credibility findings ...."  *Id*.  This argument must be rejected. Magoon's credibility is not at issue.  Even if Magoon truly believed that the reference to

January 1 was a threat, his mis-reading of an innocent remark was not competent proof to sustain an extortion conviction. See *United States v. McGregor*, 879 F. Supp. 2d 1308, 1319 (M.D. Ala. 2012) (noting that because one-sided solicitations of campaign donations can be misinterpreted, a higher threshold is appropriate in order to protect political speech).

**D.    The alleged attempt to extort campaign contributions from John Johnston.**

The government's response points to evidence that Blagojevich had a "green light to sign" the racing bill which "was sitting on Blagojevich's desk," while he was trying to get Johnston to fulfill his fundraising commitment. Govt. Br., at 48-49. Thus, the government argues the "jury could easily find ... that Blagojevich delayed signing the Racing Bill" to pressure Johnston. Govt. Br., at 50. But as pointed out in our opening brief, a public official does not commit extortion merely by delaying the signing of a bill to encourage a contribution absent evidence of an explicit threat or promise. The government does not dispute this fact. But it says: "This was the jury's call, and it was entitled to make it." *Id*. This is incorrect. Due process demands that the government submit sufficient proof to sustain a conviction. *Jackson v. Virginia*, 443 U.S. 307 (1979). Moreover, the Blagojevich jury was badly misled about the law and erroneously told that Blagojevich committed extortion if his solicitation of a contribution was "connect[ed]" to the racing bill. Tr. 5364, 5509.

## II.    THE JURY WAS MISLED AS TO THE LAW FOR FRAUD, EXTORTION AND BRIBERY.

### A.    There was no legal basis to instruct the jury that an arm's length exchange of an official act for a public service job is a federal crime.

For the reasons set forth in Section I, the political deal Blagojevich attempted to make with President-elect Obama was not a federal crime.  Thus it was error for the lower court to instruct the jury that "potential salaries from a [public service] job" were a thing "of value" under bribery, fraud and conspiracy laws.  Tr. 5538, 5550-51.  It was also error to instruct that: "In the context of this case, good faith means that the defendant acted without intending to exchange official actions for personal benefits."  Tr. 5542, 5545, 5552.  Further, the government compounded the error by exploiting these erroneous instructions during summation when it told the jury that Blagojevich's request for a public service job from Obama was just the same as "asking for a car, for money .... [A]ny one of those is illegal. The law makes no exception for political jobs."  Tr. 5278, 5499.  The lower court also erred in overruling well-founded objections.  Tr. 5499.

In defense of the court's instructions and its arguments to the jury, the government argues that "[t]his Court and others have upheld convictions based on evidence showing that a public official exchanged official acts for jobs and salaries."  Govt. Br., at 54.  But none of the cases cited by the government involve a political deal between two elected officials. In *United States v. Green*, 350 U.S. 415, 420 (1956), a union was convicted of extortion for using "threats of force or violence" to induce an employer to provide make-work jobs for its

members.  In *United States v. Giles,* 246 F.3d 966 (7th Cir. 2001), an alderman was convicted of extortion and fraud for accepting $81,000 in illegal payments and a job for his son from a private company called Niagra in exchange for intervening with the city to protect Niagra's illegal dump in the Alderman's ward.  Neither these nor any other cases cited by the government bear any similarity to the case at bar.

**B.     The extortion instructions were defective for failing to require proof that Blagojevich's solicitations of campaign contributions were "made in return for an explicit promise" to perform an official act.**

The government asserts that the "challenged instructions were consistent with this Court's current pattern instructions and this Court's decision in *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 1992)."  Govt. Br., at 55.  This is incorrect.  In its current pattern instructions, this Court states:

> When the alleged bribe is in the form of a campaign contribution, an additional instruction may be required. In *McCormick v. United States*, 500 U.S. 257, 273 (1991), the Court held that the jury should have been instructed that the receipt of campaign contributions constitutes extortion under color of official right, 18 U.S.C. § 1951, "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act."

Seventh Circuit Pattern Criminal Jury Instruction 18 U.S.C. §§ 1341, 1343 & 1346 RECEIVING A BRIBE OR KICKBACK, Committee Comment.  This Court cites *Evans v. United States*, 504 U.S. 255 (1992), for an example of a proper instruction.  There, the jury was told: "[I]f a public official demands or accepts [a campaign contribution] in exchange for [a] specific requested exercise of his or her official power" he commits extortion.  *Id*.

The Blagojevich jury was not told that to be guilty of extortion, Blagojevich must

-9-

have demanded a campaign contribution in exchange for a specific official act. Rather it was told to convict if Blagojevich asked for a donation "knowing or believing that it would be given to him in return for the taking." Tr. 5545. This instruction imposed a far lower burden on the government and did not meet the standard imposed in *McCormick*.

The lower court's "knowing or believing" instruction would have been appropriate if the case against Blagojevich involved cash bribes or gifts. This Court did indeed approve a similar instruction in *United States v. Giles*, 246 F.3d at 973. But in *Giles*, the defendant Alderman took more than $80,000 from a private company which this Court found "were not campaign contributions ...." *Id*., at 971. Thus the government's burden in *Giles* was lower than in a case like the one at bar involving solicitation of campaign contributions.

## C. The government exploited the deficient instructions to mislead the jury.

The government argues that its repeated assertions throughout the trial that requests for campaign contributions are the same under the law as requests for cash bribes, were not misleading because Blagojevich used his campaign funds to pay his lawyers. Govt. Br., at 58 n.13. This argument has no merit. In May, 2009, the government indicated that it did "not object" to an "order that permits the FOB funds to be used under the CJA" to pay lawyers. R. 85 (Government's Response Regarding Funding Issues). Thus, as the government agreed after-the-fact that Blagojevich could use his campaign funds to pay his lawyers, there is no basis to say that his use of those funds transformed campaign donations solicited in 2008 into cash bribes. Moreover, the testimony at trial, from government

-10-

witnesses, established that the Governor solicited campaign funds to demonstrate political strength and influence necessary to push his legislative agenda. Tr. 1289, 2342. No evidence was offered that he ever used campaign funds for private gain.

The government also defends its arguments to the jury that Blagojevich is guilty of extortion if requests for campaign donations are "connected" to official acts. The government does not dispute that, under *McCormick*, it was required to prove more than just a connection. Nevertheless, it contends its arguments were not misleading because the prosecutor used "connected" in a "colloquial sense to refer to defendant's extortionate message." Govt. Br., at 58. To the contrary, the government clearly told the jury that Blagojevich was guilty of extortion if he connected the solicitation with an official act by, for instance, speaking about them in the "same sentence." Tr. 5381. These arguments were misleading and improper.

## III. THE LOWER COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING BLAGOJEVICH'S GOOD FAITH DEFENSE AND BY MIS-INSTRUCTING THE JURY.

### A. The lower court committed constitutional error in taking away Blagojevich's good faith defense.

Unable to defend the lower court's rulings, initially approving Blagojevich's good faith defense but then reversing itself after Blagojevich had already begun his testimony leaving him without a viable defense, the government has chosen to rewrite history. According to the government, Blagojevich was at fault because he "chose to testify without seeking advance rulings delineating what would be permitted ...." Govt. Br., at 59. This is

untrue. Blagojevich did receive advance rulings from the court as to what would be permitted. At least four times, on the record, the court told the defense that if Blagojevich testifies he may say, "I looked at the law and I thought it was legal, I had a good faith belief." Tr. 1028; 4/14/11 Tr. at 19; Tr. 1840; Tr. 3216 (defendant may testify to "what John Cheek said, which is I honestly believed that what I was doing was legal.").

Next, the government suggests that the lower court's reversal of its ruling after Blagojevich took the stand was somehow justified because during Blagojevich's testimony which preceded the court's reversal, Blagojevich several times mentioned discussions he had had with his General Counsel, Bill Quinlin, or with his Deputy Governor, Bob Greenlee, who was also a lawyer. Govt. Br., at 59-63. This argument has no merit. The court's explanation for its reversal of its ruling on the good faith defense makes no mention of Blagojevich's testimony about his discussions with lawyers. Further, of the six references to discussions with lawyers cited by the government, four drew no objection whatsoever. Tr. 4074, 4078, 4079, 4112. The two times the government did object, the objection was not based on any claim that Blagojevich was not allowed to mention discussions with lawyer, but rather that Blagojevich mentioned extraneous information about Quinlin's father (Tr. 4093), and Greenlee's legal training. Tr. 4096.

Moreover, the government has not cited any authority for its claim that a defendant who asserts a good faith defense but does not assert an advice of counsel defense should be *precluded* from mentioning any discussions with lawyers. As this Court explained in *United*

*States v. Joshua*, 648 F.3d 547, 554 (7th Cir. 2011), testimony about legal advice "sheds light on the question whether the [defendant] had the required intent to defraud" and whether he "acted in good faith and thus not with the intent to defraud." Thus, there was no legal basis for the lower court to sanction Blagojevich for mentioning conversations with his lawyers.

Next, the government argues that the trial court properly excluded Blagojevich's good faith defense because his honest belief that his actions comported with the law was not a proper defense. Govt. Br., at 69. This argument should be rejected.

The government was required to prove that Blagojevich "knowingly" defrauded the "public of its right to the honest services" by attempting to exchange official acts for private gain (bribery) and by attempting to extort campaign donations "under color of official right". Tr. 5534, 5542. Blagojevich's proffered good faith defense was entirely proper. While the government may not have been required to prove that Blagojevich knew and understood the applicable criminal statutes, as was required in *Cheek v. United States*, 498 U.S. 192, 204 (1991), it was required to prove knowledge of wrongdoing. See *Bryan v. United States*, 524 U.S. 184 (1998); *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1994). Accordingly, Blagojevich was entitled to tell the jury that about his honest belief that his proposed deal with Obama was a lawful political deal and was not self-dealing. He was also entitled to tell the jury of his honest belief that his requests for campaign donations from Johnston and Magoon were lawful and proper exercises of his constitutional right to raise funds for his campaign.

-13-

Note that Blagojevich did not seek to tell the jury that he was ignorant of the law. Nor did Blagojevich seek to tell the jury that he knew the law but disagreed with it, a defense rejected in *Cheek v. United States*, 498 U.S. 192, 196 (1991). Rather, he sought to tell the jury that he knew and understood the law and honestly believed that his actions comported with its requirements.

The government argues that the "statutes involved here, as applied to Blagojevich's conduct are not complicated ...." Govt. Br., at 69. This is surely incorrect. Blagojevich's offer of proof, the correctness of which has not been challenged by the government, established that the type of deal Blagojevich attempted to make with Obama is common under our democratic system of government and has never before been prosecuted as a crime. Tr. 4153. Under these circumstances, it can hardly be said that Blagojevich's proposed political deal is clearly covered by the federal bribery and fraud statutes. Further, the laws relating to political fundraising are equally unclear and were described by the court in a recent case as "not a model of clarity" and a "murky field of federal law." *United States v. McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012).

**B.    The court's revised "good faith" instruction to the jury misstated the law and sealed Blagojevich's fate.**

The government erroneously asserts that Blagojevich challenges only the "fourth element" of the good faith instruction. Govt. Br., at 74. In his opening brief on page 63, Blagojevich also alleged that the non-pattern language telling the jury that, "[t]he government is not required to prove that the defendant knew his acts were unlawful" also "misstated the

law." Opening Brief at 64.

As for the fourth element of the instruction – that "in the context of this case, good faith means that the defendant acted without intending to exchange official actions for personal benefits" -- the government does not even argue that the instruction was a proper statement of the law; nor does it cite any case law authorizing such an instruction. Instead, the government argues that this language, drafted by the government's lawyers "was considerably more favorable to the defense" than an alternative instruction the lower court wanted to give. Govt. Br., at 75. Even if this were true, it would be irrelevant. But it is not true. This instruction told the jury that, in this case, "good faith" means Blagojevich did not attempt to trade the appointment of a Senator for any job. Because Blagojevich effectively conceded that he attempted to make this deal, this instruction doomed the defense.

## IV.  THE LOWER COURT ERRED IN EXCLUDING CROSS-EXAMINATION OF GOVERNMENT WITNESSES AS TO THEIR BIAS.

The government argues that the excluded cross-examination of Monk, which included the fact that his story about Blagojevich's intention to extort Johnston was first told after Monk learned of the government's desire to prosecute Blagojevich was "not probative of bias ...." Govt. Br., at 80. This argument ignores the reality of the federal system where cooperating witnesses earn leniency for their own transgressions by providing "substantial assistance" to the government in the "investigation or prosecution of another person" of greater interest to the government. See 18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1.

The government argues it was proper to exclude cross-examination of Wyma

regarding the criminal investigation of his lobbying work, which was dropped as soon as he agreed to cooperate with the government against Blagojevich, on grounds that "defense counsel's questions focused on the agent's intent and motives, rather than Wyma's." Govt. Br., at 82. This argument has no merit. Defense counsel's questions of Wyma went directly to bias. Counsel tried to ask Wyma whether the Provena grand jury investigation was unrelated to Blagojevich; and whether, after deciding to cooperate, Wyma "interviewed with the government eight separate times about Rod [Blagojevich] ... before you got to Provena." Tr. 2450. The court sustained objections to both of these questions declaring them "completely irrelevant." *Id*. Following a discussion at sidebar, the court prohibited any further questioning on the topic. Tr. 2460.

Defense counsel's questions were not irrelevant. The fact that Wyma was under criminal investigation for his lobbying work for Provena hospitals, agreed to cooperate and began talking about Blagojevich rather than Provena, and then the other investigation went away, was directly relevant to bias. The excluded questions would have shown Wyma's motive to fabricate information against Blagojevich in order to deflect attention from his own conduct.

The excluded impeachment of Monk and Wyma was standard impeachment permitted in every case where cooperating witnesses cooperate with the government against a bigger fish in hopes of leniency. Blagojevich was entitled to the same right to confront his accusers as every other defendant. The lower court's rulings were erroneous.

-16-

The government argues that the lower court properly excluded impeachment of Magoon and Johnston as to their extensive histories of political fundraising and lobbying because "defendant's proposed cross-examination would tend to improperly suggest (as defendant had argued elsewhere) that a history of making political contributions insulates the contributor from feeling pressure when he is later extorted." Govt. Br., at 84. This argument should be rejected. It was for the jury to decide whether Blagojevich's simple requests for donations rose to the level of extortion. The potential donors' extensive experience in politics would have directly refuted their claims that they felt undue pressure when Blagojevich asked them to raise funds for his campaign.

The government denies that the court applied any double standard, ignoring the fact that the lower court announced on the record that it "kept [the defense] on a shorter leash than ... the government ...." Tr. 3519. The government argues that its questioning of Congressman Lipinski about his support for the Blagojevich campaign in 2002 and his wife's appointment to a job on the Court of Claims "was an appropriate means of testing the witness's memory and potential bias." Govt. Br., at 85. The government cites no authority for its claim that a witness's political support for a defendant six years before trial is indicative of bias. Similarly, there was no relevance to evidence that Jackson Jr.'s wife did not receive an appointment from the Governor after her husband refused to support the campaign. The government's claim that Blagojevich opened the door to this irrelevant evidence (Govt. Br., at 86) is belied by the record. Tr. 3346-54.

-17-

Finally, the government argues that the lower court properly allowed the government to call Blagojevich a "convicted liar" both during cross-examination and closing argument. Tr. 4571, 5519. The government cites *United States v. Turner*, 651 F.3d 743, 751 (7th Cir. 2011), a case in which the prosecutor argued in closing that the defendant's testimony that he quit selling drugs prior to the charged conspiracy "doesn't make any sense." This Court in *Turner* did not approve calling the defendant a "convicted liar" based upon a non-final false statements conviction that is currently on appeal.

## V.    THE LOWER COURT'S ONE-SIDED AND ERRONEOUS EVIDENTIARY RULINGS PREJUDICED THE DEFENDANT.

### A.    The court erred in excluding nearly all of the tape recordings offered by the defense.

The government argues that the lower court properly excluded as hearsay nearly all of the tape recordings which would have corroborated the Governor's testimony, such as the dozens of calls showing Blagojevich trying to arrange a deal with Speaker Madigan to appoint the Speaker's daughter to the Senate in exchange for his cooperation in enacting certain of the Governor's legislative priorities. Govt. Br., at 91-93. The government argues that "[t]he district court reviewed transcript of the calls offered by defendant one by one and correctly determined that the calls did not evidence defendant's state of mind, at least without explanatory testimony." Govt. Br., at 93. But just because the court reviewed the transcripts does not mean it made the correct rulings. The excluded calls do evidence Blagojevich's state of mind during the critical time, November 2008, and they refute the government's

arguments to the jury that Blagojevich was lying about a Madigan deal.

The government argues that the exclusion of the December 6 call, in which Blagojevich and his brother agree that it should be made clear to Nayak that "[o]ne is not tied to the other" (Defense Tab 48), was proper because the call was "not was not probative of Blagojevich's state of mind at the only relevant time, the time of the offenses ...." Govt. Br., at 93. According to the government, the only relevant time was December 4, when Blagojevich told his brother to "talk to Raghu [Nayak]." Tr. 2135, 4538. December 6 is only two days later, and it was the day of the Indian Community fundraiser where the Blagojeviches would be seeing Nayak. There can be no better evidence of Blagojevich's state-of-mind than his private conversation, talking on his home phone, with his trusted brother and campaign-manager.

Out-of-court statements which show the defendant's state-of-mind are not hearsay because they are not admitted for their truth. See *United State v. Leonard-Allen*, 2013 WL 4573140, p.1 (7th Cir. 2013) (on denial of rehearing) (collecting cases). In *Leonard-Allen*, this Court found that reversal was required where the erroneously excluded evidence was "central to [defendant] Stern's defense ...." *Id.*, at p. 2. In the case at bar, the excluded tapes relating to the Madigan deal and to the alleged deal with Jesse Jackson Jr. were central to Blagojevich's defense. Exclusion of this evidence requires reversal.

-19-

**B.    Erroneous rulings relating to advice of counsel.**

As explained in Section III of this brief, Blagojevich had a right to mention conversations with his lawyers as part of his good faith defense.  The government has not cited any contrary authority.  Rather, the government argues that Blagojevich was not harmed by the court's restrictions because "there was not a single recording in which Blagojevich asked any of his advisors whether his purported plans were legally sound; what Blagojevich sought was tactical, not legal advice."  Govt. Br., at 94-95.  This is incorrect.  Blagojevich attempted to introduce numerous calls where he sought legal advice from his general counsel on the very issues central to this case, but these calls were all excluded on motion of the government.  See Tr. 3432, Defense Tab 3 (Blagojevich receiving advice from Quinlin about bargaining with Obama over Valerie Jarrett); Tr. 3454, Defense Tab 6 (same); Tr. 3464, Defense Tab 13 (Blagojevich receiving advice from Quinlin about his idea to try and use the Senate appointment to set up 501(c)(4) issue advocacy organization).

The government argues that there was "nothing inappropriate in pointing out to the jury" that Blagojevich had attorneys available for consultation.  Govt. Br., at 95.  But again, no legal authority is cited for why it was proper to tell the jury about Blagojevich's "personal attorney whose primary area of practice was criminal law" (Tr. 5258), or about his campaign's large legal bills (Tr. 2332).  Nor does the government cite any authority for its argument to the jury, allowed over defense objection, that "he's got four lawyers over there and they couldn't stop him from doing exactly what he wanted on that stand."  Tr. 5498.

Finally, the government argues that it did not commit misconduct during closing by asking the jury to consider Attorney Quinlin's out-of-court statement that Blagojevich's delay in signing the recapture bill "is what you think"; a statement which had been admitted "only for the purpose to explain [Harris's] state of mind or ... actions." Tr. 1585. In its brief, the government states:

> The government referred to Quinlan's comment for the exact purpose for which was introduced—to explain the chronology of events and why Harris stepped away from dealings on the racing bill. It was not offered, or used in argument as, an opinion regarding the legality of Blagojevich's conduct.

Govt. Br., at 95.

The record directly contradicts the government's claim that it only asked the jury to consider Quinlin's statement for the limited purpose on which it was admitted. The government told the jury:

> And so what John Harris says, "I bet he's holding this up for a campaign contribution." John Harris goes to Bill Quinlan, he tells him what his concern is, and he asks him to talk to the defendant and find out if that's what he's doing. And you got the call at Tab 56 where Bill Quinlan confirms that's exactly what the defendant is doing.

Tr. 5353.

The record could not be any more clear that when government counsel told the jury that "Bill Quinlan confirms that's exactly what the defendant is doing" he was asking the jury to consider Quinlin's statement for its truth, and it was committing the same misconduct which justified reversal of a conviction in *United States v. Richards,* 719 F.3d 746, 764-66 (7th Cir. 2013).

-21-

## VI.    BLAGOJEVICH'S FALSE STATEMENTS CONVICTION FROM HIS FIRST TRIAL MUST BE OVERTURNED.

### A.    Blagojevich's answer to the ambiguous question about whether he "tracked" campaign contributors was insufficient as a matter of law to support the conviction.

The government argues that there was no ambiguity in the question about whether Blagojevich "tracked" campaign contributors; nor in his answer that "he does not track" who contributes to him or how much they contribute.  Govt. Br., at 100.  The government cites *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989), as authority for why this Court should reject Blagojevich's "alternative interpretation after the fact."  Govt. Br., at 101.

In *Yasak*, the defendant was asked whether he ever took money to take care of peoples' parking tickets and he answered that he never received "benefits from any tickets that I would help people take care of."  *Yasak*, 884 F.2d at 998.  On appeal, he argued that his answer was "literally true" because he did not receive any benefits from "tickets" but only from people.  *Id*., at 1001.  This Court rejected the argument finding that both Yasak and the questioner understood the question to be about taking money from people to fix parking tickets.

Unlike the defendant in *Yasak*, Blagojevich does not seek to twist or contort the words used.  The word "track" in the context of his 2005 FBI interview had a different meaning to Blagojevich than to Agent Murphy.

**B.**     **The Court improperly excluded evidence to provide the jury with necessary context.**

The government argues that Blagojevich was permitted to introduce evidence of the context of his alleged false statement and that the disallowed questions on cross-examination were "irrelevant to the issue of materiality" and "properly excluded under applicable evidentiary rules ...." Govt. Br., at 105.    To the contrary, the government presented Blagojevich's comment about tracking campaign contributions in near-total isolation.  The alleged statement was introduced orally through Agent Murphy.  On cross-examination, the defense was not even permitted to point out that the statement was part of a "13-page" interview report, in which Blagojevich admitted his involvement in fundraising and directed Agent Murphy to the people who headed up fundraising for FOB.  Tr-I 3941; R. 572 and 573.  The defense was also prohibited from pointing out that Blagojevich was interviewed a second time in October 2006, yet the agents made no attempt to clarify any of his statements.  Nor was the defense permitted to point out that the main topic of the interview related to awarding state contracts, a fact which was critical to the issue of whether Blagojevich's statement about tracking was material.  Tr-I 3920-25.

Further, it was especially critical in the context of this case for the jury to understand the context of Blagojevich's 2005 statement to the FBI.  At trial, the jury heard extensive evidence, including dozens of tape recorded conversations, relating to Blagojevich's fundraising activities in the winter of 2008, three years after his interview with Agent Murphy.  The circumstances facing the Blagojevich campaign were much different in 2008

than at the time of the FBI interview.  In the winter of 2008, Blagojevich was a lame-duck, second-term Governor, his agenda was being blocked in the Illinois House by Speaker Madigan, his chief fundraiser was under indictment and his campaign was having a hard time raising funds.  Tr. 1290, 1376.  These circumstances forced Blagojevich to become more engaged in fundraising efforts than he had been in 2005.  Thus, all of the evidence heard by the trial jury clearly colored its interpretation of Blagojevich's isolated comment from a 2005 interview that he did not "track" contributions.  For all these reasons, the lower court should have allowed defense counsel to question Agent Murphy about the context of the remark.

## VII.   THE TRIAL COURT ERRED IN REFUSING TO STRIKE BIASED JUROR.

Juror 174 did not make unequivocal, affirmative assurances.  Govt. Br., 34-35. Rather, he provided "unsure" yes/no answers to questions that he "could," not even that he would.  Tr. 594 (defense counsel noted that juror was "unsure").  This fell short of the assurances required.  See *Thompson v. Altheimer & Gray*, 248 F.3d 621, 626 (7th Cir. 2001) (must unequivocally relinquish prior beliefs).

Error is heightened because the prior belief was not about a class of defendants, but rather, about the ultimate issue in this case - Blagojevich's guilt.  *Reynolds v. United States*, 98 U.S. 145, 155 (1878) (juror unfit where he "formed an opinion as to the issue to be tried"); Cf., *United States v. Allen*, 605 F.3d 461, 465 (7th Cir. 2010) (Juror acceptable where prior "belief has nothing to do with whether any particular defendant is guilty").

Moreover, there was no "special care" to select an unbiased jury.  The court left a pool

of jurors which included individuals who clearly should have been stricken for cause. E.g.,

Tr. 1018 (Juror 116: "He's guilty"; Juror 160: "he is guilty" and had downloaded wiretap as

phone ringtone); Tr. 526-27, 584 (Juror 170: required strong case by Blagojevich to prove

innocence). In contrast, the court summarily struck any juror who believed Blagojevich may

be innocent. E.g., Tr. 588, 991, 998.

Prejudice is evident. This structural error cannot be deemed harmless. *Gray v.*

*Mississippi*, 481 U.S. 648 (1987).

## VIII. THE DEFENDANT'S 168-MONTH SENTENCE MUST BE VACATED WHERE THE LOWER COURT ERRONEOUSLY APPLIED THE GUIDELINES.

The government argues that "there was no uncertainty about the dollar figure offered

for Jackson's appointment" because Blagojevich "admitted this amount on the witness

stand." Govt. Br., at 112. However, while it is true that an offer of $1.5 million in

"fundraising support" was communicated to Blagojevich, there was no acceptance of this

amount. To the extent that Blagojevich's instruction to his brother to tell Nayak that

Congressman Jackson is "very much real realistic" and "some of this stuff's got to start

happening now" can be deemed to be an acceptance of an illegal offer for fundraising, there

still was no acceptance of any actual amount of fundraising. Tr. 2135, 4538.

The government also argues that Blagojevich merited the four-level enhancement

because he "formulated most of the ideas" and "stood to benefit from the offenses." Govt.

Br., at 115. This is incorrect. At sentencing, the court was required to consider all of the

evidence, including the dozens of tapes offered by the defense but excluded at trial. These tapes show that all of Blagojevich's alleged crimes were the result of lengthy discussions with lawyers, advisors and consultants. Moreover, this excluded evidence shows that Blagojevich's attempts to make a deal involving the Senate seat and his efforts to raise campaign funds were not designed to benefit himself, but to advance issues that he cared about, such as health care, and to keep himself viable as a politician so that he could continue to be an effective advocate for his causes. Under the circumstances of this case, the enhancement was not justified.

## CONCLUSION

WHEREFORE, based on the foregoing, Rod Blagojevich moves this Honorable Court to reverse his conviction and sentence, remand for a new trial, or for a new sentencing hearing.

Respectfully submitted,
*/s/ Leonard Goodman*
Leonard C. Goodman

Leonard C. Goodman
Len Goodman Law Office LLC
53 W. Jackson, Suite 1650
Chicago, Illinois 60604
(312) 986-1984

Lauren Kaeseberg
158 W. Erie
Chicago, IL 60654
(773) 517-0622

*Counsel for Appellant Rod Blagojevich*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

The undersigned, counsel of record for Defendant-Appellant, Rod Blagojevich, hereby certifies that this brief complies with the type volume limitations of Fed. R. App.P. 32(a)(7), in that the brief contains 6,871 words.  Counsel used Word Perfect Version X6 to prepare the brief. The font style is Times New Roman and the size of the type is 13 point.

*/s/ Leonard Goodman*
LEONARD C. GOODMAN

Leonard C. Goodman
53 West Jackson Blvd.
Suite 1650
Chicago, IL 60604
(312) 986-1984

December 2, 2013

## <u>CERTIFICATE OF SERVICE</u>

   I, Leonard C. Goodman, hereby certify that on December 2, 2013, I caused two copies and a digital version of this reply brief to be served on the following by first-class postage prepaid mail:

Debra Bonamici
Assistant United States Attorney
219 S. Dearborn Street, 5th floor
Chicago, IL 60604

                                        Respectfully Submitted,

                                        */s/ Leonard Goodman*
                                        Leonard C. Goodman
                                        Counsel for Rod Blagojevich
                                        53 West Jackson Blvd., Suite 1650
                                        Chicago, IL 60604
                                        (312) 986-1984